Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN, MILLER**
**& SHAH, LLP**
11755 Wilshire Blvd.,15th Floor
Los Angeles, CA 90025
Phone: 323-510-4060
Fax: 866-300-7367
ktang@sfmslaw.com

*Counsel for Relator-Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MELINA EBU-ISAAC and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, the CITY OF CHICAGO and the DISTRICT OF COLUMBIA,<br><br>       Relator-Plaintiffs,<br><br>v.<br><br>INSYS THERAPEUTICS, INC. and LINDEN CARE LLC., LINDEN CARE, INC., LINDEN CARE HOLDINGS, INC., BELHEALTH INVESTMENT PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC, and BELHEALTH INVESTMENT FUND, LP,<br><br>       Defendants. | **CLASS ACTION**<br><br>CASE NO. 2:16-cv-07937-JLS-AJW<br>Hon. Josephine L. Staton<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

## FALSE CLAIMS ACT COMPLAINT

The facts alleged in this *qui tam* Complaint establish that INSYS Therapeutics, Inc., ("INSYS") committed a massive fraud at the expense of taxpayers and unwitting patients with promotion and sale of its patented sublingual fentanyl spray, SUBSYS. LINDEN CARE LLC, LINDEN CARE, INC., LINDEN CARE HOLDINGS, INC., (hereinafter collectively referred to as "LINDEN CARE"), under the management and direction of BELHEALTH INVESTMENT PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC, and BELHEALTH INVESTMENT FUND, LP, facilitated the fraudulent scheme by illegally distributing SUBSYS for uses that were not in compliance with established medical protocols, applicable legal requirements, or patient safety standards.

Through a widespread off-label marketing campaign, INSYS and LINDEN CARE took a dangerous opioid, approved only for breakthrough pain experienced by opioid-tolerant cancer patients, and pushed it to the pain management field as the ultimate remedy for uses that were neither approved nor safe.  During the times relevant to this Complaint, industry analysts estimated that more than 90% of SUBSYS was prescribed for off-label uses, such as non-cancer related pain.  This was no coincidence.

INSYS' management pressured its sales staff to use sex appeal, bribery, and blatant and aggressive off-label promotion to sell as much SUBSYS as possible, despite it being a dangerous controlled substance which has reportedly resulted in numerous

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

overdose-related deaths.   INSYS and LINDEN CARE worked hand-in-hand to implement a scheme that allowed them to reap substantial profits through blatant disregard of safety and legal requirements for prescribing and distributing dangerous opioids.

Relator-Plaintiff Melina Ebu-Isaac ("Relator" or "Relator-Plaintiff") (previously identified as "Jane Doe") experienced INSYS' unlawful misconduct first hand, as detailed herein.   She also experienced the anguish of a patient who overdosed on opioids and died while taking SUBSYS, which was provided by LINDEN CARE, for an off-label and unapproved use.

## I.   **INTRODUCTION**

1.   On behalf of the United States of America ("United States"), the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, (collectively, the "States"), the City of Chicago ("Chicago") and District of Columbia ("D.C."), and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 and the False Claims Acts of the States, Chicago and D.C., Relator files this *qui tam* Complaint against  INSYS, LINDEN CARE, BELHEALTH INVESTMENT PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC, and BELHEALTH INVESTMENT FUND, LP

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

(hereinafter referred to collectively as "Defendants").  Relator brings this action on behalf of the United States and the Plaintiff States, Chicago, and D.C. against Defendants for damages and civil penalties arising from violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and state-law counterparts in California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, and municipal-law counterparts in Chicago and D.C.  The States, Chicago, D.C. and the United States are hereafter collectively referred to as the "Government."

2.     The violations at issue arise out of requests for payment from Medicare, Medicaid, TRICARE, and possibly other federally-funded government health care programs (hereinafter collectively referred to as "Government Health Care Programs"). The state-law violations arise out of requests for payment under the Medicaid programs as well as any other payments made by health care programs administered by the States, Chicago, and D.C.

3.     This action concerns INSYS' illegal marketing of the patented fentanyl spray SUBSYS, from 2012, when the Food and Drug Administration ("FDA") first approved SUBSYS, to the present, as well as LINDEN CARE's unlawful distribution of the drug from 2012 until LINDEN CARE ceased business operations on July 26, 2017.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

4.     Through their intentional and reckless acts, which included false statements and claims for payment to the Government Health Care Programs, Defendants have put patients at risk and received millions of dollars in improper government payments.

5.      Relator worked as a sales representative for INSYS for approximately two years, after more than a decade of experience in the pharmaceutical industry.

6.     INSYS, a Delaware corporation, is a developer and marketer of pharmaceutical products in the United States and throughout the world.

7.     INSYS was founded in 1990 (as Oncomed, Inc.) and is headquartered in Phoenix, Arizona.   One of its primary business activities involves the company's manufacture and sale of SUBSYS, the patented fentanyl spray which is the subject of this action.

8.     As detailed herein, INSYS engaged in a variety of illegal marketing practices as part of this fraud, including, but not limited to:

    a.     Off-label marketing;

    b.     Misbranding;

    c.     Co-opting physicians by circumventing educational assessments required by TIRF REMS;

    d.     Paying kickbacks and other unlawful remuneration to physicians;

    e.     Focusing the majority of INSYS' sales force on promotion of SUBSYS for non-cancer uses, including contraindicated uses;

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

f.  Advising physicians to begin SUBSYS patients at dosages twice the FDA-approved entry dose;

g.  Advising patients to "titrate up," finding their optimal effective dose, without discussing dosage changes with their physicians;

h.  Training and supervising Relator and her sales colleagues in the use of illegal promotion and kickbacks before and during their promotion of SUBSYS; and

i.  Supervising fraudulent practices by the INSYS Reimbursement Center which, upon information and belief, encouraged INSYS' employees to lie to Medicare Part D insurers to assure prior authorization for SUBSYS prescriptions.

9.  These practices were widespread, egregious, and orchestrated from the highest levels of INSYS.

10.  LINDEN CARE LLC is a limited liability company registered in New York, with its principal place of business located at 130 Crossways Park Drive, Suite 101, Woodbury, New York.  It was founded in 2006 as a provider of specialty pharmacy

services to the pain management industry.  During all times relevant to this Complaint, LINDEN CARE LLC was licensed in all fifty U.S. states and the District of Columbia.[1]

11.    LINDEN CARE, INC. is a corporation formed under the laws of the State of Delaware on May 1, 2013, and was registered to conduct business in the State of New York under the fictional name Linden Care NY on May 13, 2013.  Its principal place of business is located at 126 East 56th Street, 10th Floor, New York, NY 10022.

12.    LINDEN CARE HOLDINGS, INC. is a corporation formed under the laws of the State of Delaware on June 13, 2013, and was registered to conduct business in the State of New York on July 1, 2013.  Its principal place of business is located at 126 East 56th Street, 10th Floor, New York, NY 10022.

13.    BELHEALTH INVESTMENT FUND, LP ("BELHEALTH FUND") is a private equity fund, owned by BELHEALTH INVESTMENT PARTNERS, LLC, operating as a limited partnership formed under the laws of the State of Delaware in 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050.  In July 2013, BELHEALTH FUND acquired LINDEN CARE LLC as a portfolio company of the fund.

14.    BELHEALTH INVESTMENT MANAGEMENT, LLC ("BELHEALTH MANAGEMENT") is a limited liability corporation formed under the laws of the State of

---

[1] For a certain period, LINDEN CARE LLC could only ship to thirty-two states, and could not ship to California until it acquired a company called Quick Care Pharmacy on June 23, 2014.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

Delaware on March 18, 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050.   BELHEALTH MANAGEMENT provided management, oversight and strategic guidance for the operations of LINDEN CARE, LLC.

15.   BELHEALTH INVESTMENT PARTNERS, LLC ("BELHEALTH PARTNERS") is a health care-focused private equity firm operating as a limited liability corporation formed under the laws of the State of Delaware on March 23, 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050. In July 2013, BELHEALTH PARTNERS acquired ownership of LINDEN CARE LLC through the BELHEALTH FUND, and subsequently formed LINDEN CARE, INC. and LINDEN CARE HOLDINGS, INC. in connection with the acquisition.  In its capacity as manager of BELHEALTH FUND, BELHEALTH PARTNERS controlled and directed the conduct of BELHEALTH MANAGEMENT on behalf of investors in the fund. BELHEALTH FUND, BELHEALTH MANAGEMENT, and BELHEALTH PARTNERS will hereinafter be collectively referred to as the "BELHEALTH ENTITIES."

16.   On December 18, 2012, BELHEALTH PARTNERS issued a press release announcing that the BELHEALTH FUND was closed to new investors after successfully raising $150 million in capital for investment in health care companies.  In that press release, Bert Brodsky, Managing Partner of BELHEALTH PARTNERS, said "[W]e look forward to continuing to deliver terrific returns to our investors through *our operational*

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

*hands-on approach*." (emphasis added)   In that same press release, Dennis Drislane, Chairman of BELHEALTH PARTNERS' Operating Committee, said "What differentiates BelHealth among other healthcare private equity firms is *its deep experience as healthcare operators* in the targeted sectors . . . ." (emphasis added).

17.   On July 2, 2013, BELHEALTH PARTNERS issued a press release announcing that it had completed its acquisition of LINDEN CARE LLC.  In that press release, Mark Bortnick, Founder and Chief Operating Officer of LINDEN CARE LLC said, "BelHealth is the perfect partner to accelerate Linden Care's growth from a regional company to a national platform. *BelHealth's significant experience as operators and investors, particularly in the pharmacy space*, make them the ideal equity partner for our Company."  (emphasis added)

18.   As detailed herein, LINDEN CARE engaged in a variety of illegal practices as part of this fraud, including, but not limited to:

a.   Dispensing prescriptions based on faxed prescriptions for Schedule II narcotics in violation of federal regulations;

b.   Mislabeling prescription medicines;

c.   Dispensing prescriptions in contravention of the terms of the TIRF REMS program; and

d.   Dispensing prescriptions in amounts, dosages, and for indications forbidden by law.

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

19.     Relator has complied with all procedural requirements of the laws under which this case is brought.

20.     Relator is reliably informed and, therefore, avers that INSYS' pervasive off-label marketing and kickback schemes, as described herein, began in 2012.

21.     Relator is reliably informed and, therefore, avers that LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, illegally dispensed and distributed SUBYS, as described herein, beginning in 2012 and continuing throughout the United States until LINDEN CARE ceased business operations on July 26, 2017.

## II.     JURISDICTION AND VENUE

22.     This Court has federal subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3742(a). This Court has supplemental jurisdiction over the counts relating to the state and municipal FCA-counterparts pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Defendant INSYS, Defendants LINDEN CARE and Defendants BELHEALTH ENTITIES because they can be found in, reside in, or transact business in this District.   Additionally, this Court has personal jurisdiction over both Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(d), because INSYS, LINDEN CARE, and the BELHEALTH ENTITIES transact business in this District.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

25.     Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

26.     Relator brings this action based on her direct knowledge and, where indicated, upon information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4)(A), and Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA and other laws at issue herein.

27.     At all times relevant hereto, INSYS, LINDEN CARE, and the BELHEALTH ENTITIES acted through their agents and employees, and the acts of their agents and employees were within the scope of their agency and employment.  The policies and practices alleged in this Complaint were, upon information and belief, established and/or ratified at the highest corporate levels of INSYS, LINDEN CARE, and the BELHEALTH ENTITIES.

## III.     THE REGULATORY ENVIRONMENT

### A.     FDCA and FDA Regulations

28.     The Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 321 *et seq.,* provides a regulatory regime for the approval of new drugs and new drug formulations intended to be marketed for use in interstate commerce.  Under the FDCA, a

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

new drug product cannot be marketed unless the FDA approves the product and determines that it is safe and effective for its intended use. *See* 21 U.S.C. § 355(a).

29.    When the FDA approves a drug, it approves the drug only for the particular use for which it was tested, *i.e.*, the intended use. 21 C.F.R. § 201.128. Once approved, an intended use is called an "indication."

30.    In approving uses for a drug, the FDA specifies particular dosages determined to be safe and effective for each indication. The determination of safe and effective dosages for each indication is based on the FDA's extensive review and analysis of data submitted by the drug manufacturer. The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also reviewed and approved by the FDA. 21 U.S.C. §§ 352, 355(d). "Labeling" includes more than just the drug's label; it also includes all "other written printed or graphic matter . . . accompanying the drug, including promotional material." 20 U.S.C. § 321(m). An example of the drug's labeling is the printed insert in the drug's packaging. The FDA will only approve a New Drug Application if the labeling conforms to the uses and dosages that the FDA has approved. 21 U.S.C. § 355(d).

31.    A drug manufacturer that wants to market or promote an approved drug for an alternative use, *i.e.*, a use not listed on the approved label, must submit a new application for evaluation and approval by the FDA. 21 C.F.R. §§ 314.3, 314.54. Until the FDA approves the new use, the unapproved use is considered to be "off label."

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

32.    The term "off label" refers to the use of an approved drug for any purpose, or in any manner, other than that described on the drug's label.  Off-label use includes treatment of a condition not indicated on the label; treatment of the indicated condition with a different dose or frequency than specified in the label; or treatment of a different patient population (*e.g.* treatment of a child when the drug is approved only for adult use).

33.    While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses.  21 U.S.C. § 331(d), 355(a).  It is, therefore, illegal for a drug manufacturer and/or its sales representatives to initiate discussions with medical professionals regarding any off-label use of the drug.

34.    The FDA also prohibits "misbranding," the labeling of a pharmaceutical without "adequate directions for use." 21 U.S.C. § 352(f). "Adequate directions" are those which will allow a lay patient to use the drug safely for its "intended use." 21 C.F.R. § 201.5. When a pharmaceutical manufacturer markets a drug, the improper actions of those who label and attempt to sell the drug for its intended use, can constitute misbranding even when the label is in accord with the indication approved by the FDA. 21 C.F.R. § 201.6.

35.    In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end.  The FDA

FIRST AMENDED COMPLAINT                                          2:16-cv-07937-JLS-AJW

regulates manufacturer support for Continuing Medical Education ("CME") programs and "speaker" programs that focus on off-label uses.

36.    With regard to manufacturer involvement in CME programs, the FDA published an Agency Enforcement Policy Guidance which states that CME programs must be truly independent of the drug companies and sets forth a number of factors that the FDA will consider in determining whether a program is "free from the supporting company's influence and bias."    62 Fed. Reg. 64074, 64093.    These factors include, among others, an examination of the relationship between the program provider and supporting company; the company's control of content and selection of presenters; whether there is a meaningful disclosure of the company's funding and its role in the program; whether multiple presentations of the same program are held; whether the audience is selected by the sales or marketing department of the company; and whether information about the supporting company's product is disseminated after the initial program other than in response to an unsolicited request.  The promotion of off-label drug uses at a CME program fails this test of "independence" and violates Congress' off-label marketing restrictions.

37.    Pursuant to the Anti-Kickback Act, 42 U.S.C. §§ 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

38.     The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

39.     Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of health care services in the United States.

40.     The Anti-Kickback Act prohibits suppliers such as pharmaceutical manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

41.     A violation of the Anti-Kickback Act is a violation of the False Claims Act.

**B.      The False Claims Act and The Medicare Fraud & Abuse/Anti-Kickback Statute**

42.     Congress adopted the FCA and amended it in 1986 to fight fraud in government payments.

43.     The United States Civil FCA provides, in pertinent part, that:

> (a)(1) … [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false records or statement material to a false or fraudulent claim;
> *    *    *    *
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000… plus 3 times

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

> the amount of damages which the Government sustains because
> of the act of that person.

*See* 31 U.S.C. § 3729.

44.     The FCA imposes liability on false claims and/or false statements material to a false or fraudulent claim.

45.     The submission of claims that are induced and written because of the off-label marketing of a pharmaceutical company is a violation of the FCA.

46.     The States, Chicago and D.C. have enacted false claims act statutes that apply to, *inter alia*, Medicare and Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds.

47.     The Medicare Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), which also applies to the state Medicaid programs and/or municipal programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.   The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

48.     The Medicare Anti-Kickback statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.   To protect the integrity of the federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

49.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a.

50.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated.  *See* 42 C.F.R. § 1001.952(f). Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to recommend drugs that may be paid for by a federal health care program.  The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company that has as one of its purposes inducement of a physician to write additional prescriptions for the company's pharmaceutical products.

51.     Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions.  Kickbacks increase Government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

reimbursements.  Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

52.     The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute.   See 42 U.S.C. § 1320a-7b(b)(3).   None of the statutory exceptions or regulatory safe harbors protects the conduct of INSYS, LINDEN CARE or the BELHEALTH ENTITIES in this case.

53.     The Patient Protection and Affordable Care Act ("ACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA   The ACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

54.     As detailed herein, INSYS devised a scheme whereby the company paid kickbacks to physician-speakers in the form of cash and cash-equivalents with the specific aim of artificially increasing the prescription and sale of SUBSYS for off-label uses.

55.     Knowingly paying kickbacks to physicians to induce them to prescribe a prescription drug on label or off label (or to influence physician prescriptions) for

FIRST AMENDED COMPLAINT                                2:16-cv-07937-JLS-AJW

individuals who seek reimbursement for the drug from a federal Government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates state and federal False Claims Acts.

## C.   Government Health Care Programs

56.   The United States government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Centers for Medicare and Medicaid Services ("CMS").   *See* 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. *See* 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan[.]" *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation ("FFP").

57.   Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries, and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e to 1395i-

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

58.     Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C §§ 1395j to 1395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. 42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.  These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. § 1395k(a); 42 U.S.C.  § 1395x(s)(2); 42 C.F.R. § 405.517i.

59.     Medicare Part D, administered by CMS, went into effect on January 1, 2006. For "dual eligibles," (individuals who received prescription drug coverage under Medicaid in addition to Medicare coverage for other health care in 2005) enrollment in Medicare Part D was compulsory.  These beneficiaries were automatically switched to Part D plans for 2006 and commenced receiving comprehensive prescription drug coverage under Medicare Part D.

60.     Coverage of prescription drugs under Medicare Part D is subject to the same regulations as coverage under the Medicaid Program described above.

FIRST AMENDED COMPLAINT                         2:16-cv-07937-JLS-AJW

61.     TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents. TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are government funds.

62.     The Railroad Retirement Medicare program is authorized by the Railroad Retirement Act of 1974, at U.S.C.A. §231 et seq.  It is administered through the United States Railroad Retirement Board ("RRB") and furnishes Medicare coverage to retired railroad employees.

63.     The Federal Employees Health Benefits Program ("FEHBP") is administered by the United States Office of Personnel Management ("OPM") pursuant to 5 U.S.C. § 8901 *et seq.* and provides health care coverage to federal employees, retirees and their dependents and survivors.

64.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") is a comprehensive health care program in which the Department of Veterans Affairs ("VA") shares the cost of covered health care services and supplies with eligible beneficiaries.  The program is administered by Health Administration Center from its offices located in Denver, Colorado.  In general, the CHAMPVA program covers most health care services and supplies that are medically and psychologically necessary.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

65.    Due to the similarity between CHAMPVA and the Department of Defense TRICARE program, the two are often mistaken for each other. CHAMPVA is a VA program whereas TRICARE is a regionally managed health care program for active duty and retired members of the uniformed services, their families and survivors.  In some cases, a veteran may appear to be eligible for both/either program on paper.  However, military retirees, or the spouse of a veteran who was killed in action, are and will always be TRICARE beneficiaries.

66.    Pursuant to 38 U.S.C. § 8126, and the regulations based thereon, and contracts the VA had with manufacturers, drugs furnished to the VA by drug manufacturers must be furnished at the best price.

67.    CHAMPVA and CHAMPUS/TRICARE operate in substantially similar ways to the Medicare and Medicaid programs, but primarily for the benefit of military veterans, their spouses (or widowed spouses) and other beneficiaries.

68.    The Indian Health Service is responsible for providing comprehensive health services to more than 1,400,000 Americans.  It is administered by HHS services pursuant to 42 U.S.C. § 2002 *et seq*. The statute authorizes the Secretary of HHS to enter into contracts with independent providers to furnish health services to Native Americans whenever the Secretary determines that independent providers can better meet the population's need.

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

69.    At all times material to this Complaint, off-label uses of SUBSYS promoted by INSYS were not eligible for reimbursement under the Government Health Care Programs because such off-label uses are neither listed in the labeling approved by the FDA nor, on information and belief, otherwise deemed safe and effective by any of the applicable drug compendia, as further described *infra*.

70.    As a direct result of INSYS' improper off-label and misleading marketing practices involving SUBSYS; payment of illegal kickbacks; and LINDEN CARE's improper labeling and illegal distribution of SUBSYS, under the management and direction of the BELHEALTH ENTITIES, the Government Health Care Programs paid false or fraudulent SUBSYS reimbursement claims for off-label, non-medically accepted indications.  The United States would not have paid such false claims but for the illegal and fraudulent conduct of INSYS, LINDEN CARE and the BELHEALTH ENTITIES.

71.    The fact that the Government Health Care Programs paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.  Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, as described more fully *infra*, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were not.  In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

### D.    The Food, Drug and Cosmetics Act and FDA Regulations

72.    The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. §§ 331(d), 355(a).

73.    The FDA reviews a pharmaceutical manufacturer's New Drug Application to determine whether the intended uses of the drug are safe and effective. *See* 21 U.S.C. § 355.  Once a drug is approved for a particular use, doctors can freely prescribe the drug for "non-indicated" or off-label purposes.  However, a Government Health Care Program will only allow reimbursement if the drug is prescribed for an indicated use or an off-label use listed in a statutorily-approved compendium.  While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.* "indications," not approved by the FDA.  As described herein, the term "off-label" refers to marketing an FDA-approved drug for a use that has not been reviewed and approved by the FDA, *i.e.*, a purpose not approved by the FDA.

74.    While purely scientific or educational programs are permissible, sales and marketing presentations, promotions or marketing to physicians for uses other than those approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDA.  *See* 21 U.S.C. §§ 331(a)-(b), 352(a), (f).  Additional proscribed marketing

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

24

activity includes any attempts by a pharmaceutical sales representative to solicit discussions with physicians concerning off-label use.

75.     Strong policy reasons exist for strict regulation of off-label marketing.  Off-label promotion bypasses the FDA's strict review and approval process, and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

76.     Pursuant to the FDCA, 21 U.S.C. § 301 *et seq.*, the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

77.     The FDA broadly interprets "labeling" in its regulations to include items that are "1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel."  21 C.F.R. § 202.1.  The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding."  21 U.S.C. § 321(n).  Labeling includes, among other things, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio-visual material.  21 C.F.R. § 202.1(1)(2).

78.     FDA regulations deem "advertising" to include advertisements in published journals, magazines, newspapers and other periodicals, and broadcast through media such as television, radio and telephone communications systems.  *See* 21 C.F.R. § 202.1(I)(1).  Courts have consistently held that oral statements made by a company's sales

representative relating to a pharmaceutical product constitute commercial advertising or promotion. *See, e.g.*, *Abbott Labs. v. Mead Johnson &Co.*, 971 F.2d 6, 7 (7th Cir. 1992) (interpreting Lanham Act).

79.   Pharmaceutical promotional and marketing materials, and presentations lacking in fair balance or that are otherwise false or misleading, "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. § 202.1(e)(6)-(7); 21 C.F.R. § 1.21.

80.   Such violations occur where promotional marketing materials and presentations, *i.e.*, advertisements for an FDA approved drug, among other things:

a.   Minimize, understate, or misrepresent the side effects, contraindications and/or effectiveness of the drug;

b.   Overstate or misrepresent the side effects, contraindications, and/or effectiveness of competing drugs;

c.   Expressly or implicitly promote uses, dosages or combination usage of the drug that are not contained in the FDA approved labeling (*i.e.*, off-label uses);

d.   Fail to reveal material facts with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

e.    Contain representations or suggestions, not approved or permitted in the labeling, that the drug is better, more effective, useful in a broader range of conditions or patients, safer, or has fewer, or less incidence of, or less serious side effects or contraindications than demonstrated by substantial evidence or substantial clinical experience; Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

f.    Use a quote or paraphrase out of context to convey a false or misleading idea; and/or

g.    Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1(e)(4)-(7).

81.    Oral statements and written materials presented at industry-supported activities, including lectures and teleconferences, provide evidence of a product's intended use.  If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, the drug is misbranded because the statements and materials fail to provide adequate directions for all intended uses.

82.    Whether the promotion of off-label uses occurs directly or indirectly, the facts related to the promotion may establish the existence of misbranding. "A drug is

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

misbranded if, *inter alia*, its labeling fails to contain 'adequate direction for use,' 21 U.S.C. §352(f), which FDA regulations define as 'directions under which the lay[person] can use a drug safely and for the purposes for which it is intended.'" *U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 615 (2d Cir. 2016) (citing 21 C.F.R. § 201.5). The "intended use" of a drug is determined by the expressions of those legally responsible for labeling them, as well as "the circumstances surrounding the distribution of the [drug]." *Id*. Where accumulated circumstances and impressions lead a factfinder to determine that a drug is intended for an off-label use, the drug is misbranded, and violators are subject to civil and criminal consequences outlined by 21 U.S.C. § 333.

83.    In sum, the FDA's regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body—the FDA.

## IV.    **THE DRUG**

84.    The FDA approved SUBSYS in January 2012. Since March 2012, INSYS has manufactured and marketed the drug throughout the United States.

85.    SUBSYS is a Schedule II opioid medication. The only FDA-approved indication for SUBSYS is the management of breakthrough cancer pain in opioid-tolerant adults. Breakthrough cancer pain is defined as the transient exacerbation of pain

that occurs in a patient with otherwise stable, persistent pain. Opioid tolerance[2] describes individuals who are less susceptible to the effects of opioids, both therapeutic and adverse, that may develop with long-term use of opioids.

86.    The ideal treatment for breakthrough cancer pain is a "strong, short-acting opioid medication that works quickly and lasts about as long as a breakthrough pain episode."[3]  Fentanyl is 50 to 100 times more potent than morphine, and such potency is necessary to treat breakthrough cancer pain.  SUBSYS' spray delivery system allows the drug to be absorbed into the body much more quickly than a pill or lozenge.

87.    SUBSYS, which contains fentanyl, has a high potential for abuse and addiction.  Its misuse can result in death from respiratory depression.

88.    Due to its status as a dangerous Transmucosal Immediate Release Fentanyl ("TIRF") drug, the FDA approved SUBSYS for a specific indication, as explained in its package labeling.  Any use of a TIRF drug requires that patients, prescribing physicians and distributing pharmacies comply with a Risk Evaluation and Mitigation Strategy ("REMS").

---

[2] The FDA defines opioid tolerance as "patients receiving, for one week or longer, at least 60 mg oral morphine/day, 25 mcg transdermal fentanyl/hour, 30 mg oral oxycodone/day, 8 mg oral hydromorphone/day, 25 mg oral oxymorphone/day, or an equianalgesic dose of another opioid."  FDA, *Highlights of Prescribing Information*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/202144s006lbl.pdf (last visited Aug. 7, 2018).

[3] Payne R *et al.* Long-Term Safety of Oral Transmucosal Fentanyl Citrate for Breakthrough Cancer Pain. 2001 J Pain Sym Mgmt, 22 (1): 575-83. Available at: https://www.jpsmjournal.com/article/S0885-3924(01)00306-2/fulltext (Last Visited: August 9, 2018).

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

89.    Despite this restricted indication, a market limited to patients with breakthrough cancer pain, and heightened public awareness of the opioid epidemic, SUBSYS was still the most prescribed TIRF product as of December 2017, with sales revenue of $139.25 million and a 29% market share.  For at least the first three years that SUBSYS was on the market, the majority of the prescriptions were, upon information and belief, written for off-label uses rather than the FDA-approved indication for breakthrough cancer pain.  These off-label uses included, but were not limited to, the use of SUBSYS for non-cancer chronic pain, post-operative pain and headaches.

## A.    FDA-Approved Indication

90.    The only FDA-approved indication for SUBSYS is "for management of breakthrough pain in cancer patients 18 years of age or older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[4]  *See* SUBSYS label below.

---

[4] SUBSYS label available at:
www.accessdata.fda.gov/drugsatfda_docs/label/2012/202788s000lbl.pdf

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use
SUBSYS safely and effectively. See full prescribing information for
SUBSYS.
SUBSYS™ (fentanyl sublingual spray), CII
Initial U.S. Approval: 1968

---

**WARNING: RISK OF RESPIRATORY DEPRESSION,
MEDICATION ERRORS, ABUSE POTENTIAL**
*See full prescribing information for complete boxed warning.*

- Due to the risk of fatal respiratory depression, SUBSYS is
  contraindicated in opioid non-tolerant patients (1) and in
  management of acute or postoperative pain, including
  headache/migraines. (4)
- Keep out of reach of children. (5.3)
- Use with CYP3A4 inhibitors may cause fatal respiratory depression.
  (7)
- When prescribing, do not convert patients on a mcg per mcg basis
  from any other oral transmucosal fentanyl product to SUBSYS. ( 5.1)
- When dispensing, do not substitute with any other fentanyl products.
  (5.1)
- Contains fentanyl, a Schedule II controlled substance with abuse
  liability similar to other opioid analgesics. (9.1)
- SUBSYS is available only through a restricted program called the
  TIRF REMS Access program. Outpatients, healthcare professionals
  who prescribe to outpatients, pharmacies, and distributors are
  required to enroll in the program. (5.10)

---

-------------------------INDICATIONS AND USAGE-------------------------
SUBSYS is an opioid agonist indicated for the management of breakthrough
pain in cancer patients 18 years of age and older who are already receiving
and who are tolerant to opioid therapy for their underlying persistent cancer
pain. Patients must remain on around-the-clock opioids when taking
SUBSYS. (1)
Limitations of Use:
SUBSYS may be dispensed only to patients enrolled in the TIRF REMS
ACCESS program.

91.     The FDA approved SUBSYS for a specific population of patients – adult

cancer sufferers who have become opioid-tolerant from managing persistent pain – and a

specific indication – breakthrough cancer pain.  Any other use of the drug, including use

in a different patient population or for a different indication, is not approved by the FDA.

92.     The FDA also determined that SUBSYS should only be prescribed by

"oncologists and pain specialists who are knowledgeable of and skilled in the use of

Schedule II opioids to treat cancer pain."  *See* SUBSYS label below.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

31

**1 INDICATIONS AND USAGE**

SUBSYS is indicated for the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Patients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 60 mg of oral morphine daily, at least 25 mcg of transdermal fentanyl/hour, at least 30 mg of oral oxycodone daily, at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid daily for a week or longer. Patients must remain on around-the-clock opioids when taking SUBSYS.

This product **must not** be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason, SUBSYS is contraindicated in the management of acute or postoperative pain.

SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

Limitations of Use:
As part of the Transmucosal Immediate-Release Fentanyl (TIRF) REMS ACCESS Program, SUBSYS may be dispensed only to outpatients enrolled in the program. [see *Warnings and Precautions* (5.10)]. For inpatient administration (e.g. hospitals, hospices, and long-term care facilities that prescribe for inpatient use) of SUBSYS, patient enrollment is not required.

93.     The FDA-approved label expressly provides that SUBSYS is contraindicated[5] in "opioid non-tolerant patients" and in "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." *See* SUBSYS label below.

---

[5] A contraindication is a symptom or circumstance that makes treatment with a drug unsafe or inappropriate. https://www.tabers.com/tabersonline/view/Tabers-Dictionary/754565 /all/contraindication (last visited August 9, 2018).

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

-------------------------CONTRAINDICATIONS-------------------------
• Opioid non-tolerant patients. (4)
• Management of acute or postoperative pain including headache/migraine and
  dental pain (4)
• Intolerance or hypersensitivity to fentanyl, SUBSYS, or its components. (4)
-------------------------WARNINGS AND PRECAUTIONS-------------------------
• Clinically significant respiratory and CNS depression can occur. Monitor
  patients accordingly. (5.1)
• Full and consumed SUBSYS units contain medicine that can be fatal to a
  child. Ensure proper storage and disposal. (5.3, 16.2)
• Use with other CNS depressants and moderate or strong CYP450 3A4
  inhibitors may increase depressant effects including respiratory depression,
  hypotension, and profound sedation. Consider dosage adjustments if
  warranted. (5.4)
• Titrate SUBSYS cautiously in patients with chronic obstructive pulmonary
  disease or preexisting medical conditions predisposing them to respiratory
  depression and in patients susceptible to intracranial effects of $CO_2$
  retention. (5.6, 5.7)

94.   In order to prevent potentially fatal side effects, and to reduce the risk of misuse and abuse, the FDA mandated that prescribers always limit patients to the lowest effective dose of the drug.  This was to be achieved through "titration," a process by which patients begin taking SUBSYS at 100 micrograms (mcg), and, if necessary, subsequently step up the dosage in one hundred mcg increments (up to a *maximum* of two doses in any four-hour period).

**B.   TIRF REMS Distribution Protocol**

95.   Due to the dangers associated with this class of drug, the FDA required that SUBSYS, and five other FDA-approved TIRF products, only be prescribed and dispensed through a REMS program.  The FDA refers to this protocol as TIRF REMS.

96.   TIRF REMS is intended to educate "prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose of TIRF medicines."

97.   In order to comply with TIRF REMS, prescribers and pharmacists must first enroll in the program.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

98.    The REMS program requires that prescribers and pharmacists review educational materials on a specific class of drugs and pass an online "Knowledge Assessment" exam.

99.    The prescriber and pharmacist must then read and sign a "Prescriber [or Pharmacist] Enrollment Form," which lists the risks associated with TIRF drugs and requires the parties to acknowledge their responsibilities associated with prescribing and dispensing such a drug.  The forms require the signing party to certify, in multiple ways, that they will comply with the labeling and TIRF REMS protocol in prescribing and dispensing SUBSYS or other TIRFs.  *See* acknowledgment and acceptance of TIRF REMS' responsibilities for prescribers and pharmacists below.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

The TIRF REMS Access Program: Prescriber Enrollment Form

**The Transmucosal Immediate Release Fentanyl (TIRF) REMS Access Program Prescriber Enrollment Form**

For real-time processing of enrollment, please go to www.TIRFREMSaccess.com.

To submit this form via fax, please complete all required fields below and fax pages 1, 2 and 3 to 1-866-822-1487.  Please note, you must review the TIRF REMS Access Education Program and successfully complete the Knowledge Assessment to complete enrollment.  If you have not completed the Knowledge Assessment online, please include it with this enrollment form. You will receive enrollment confirmation via email or fax.

I understand that TIRF medicines are only available through the TIRF REMS (Risk Evaluation and Mitigation Strategy) Access program and that I must comply with the program requirements. In addition, I acknowledge that:

1. I have reviewed the TIRF REMS Access Education Program, including the Full Prescribing Information for each TIRF medicine, and I have completed the Knowledge Assessment. I understand the responsible use conditions for TIRF medicines and the risks and benefits of chronic opioid therapy.
2. I understand that TIRF medicines can be abused and that this risk should be considered when prescribing or dispensing TIRF medicines in situations where I am concerned about an increased risk of misuse, abuse, or overdose, whether accidental or intentional.
3. I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain.
4. I understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients, and know that fatal overdose can occur at any dose.
5. I understand that TIRF medicines must not be used to treat any contraindicated conditions described in the full Prescribing Information, such as acute or postoperative pain, including headache/migraine.
6. I understand that converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis. I understand that TIRF medicines are not interchangeable with each other, regardless of route of administration, and that conversion may result in fatal overdose, unless conversion is done in accordance with labeled product-specific conversion recommendations (refer to the list of currently approved TIRF products located on the TIRF REMS Access website at www.TIRFREMSaccess.com/TirfUI/ProductList). Note, a branded TIRF medicine and its specific generic product(s) are interchangeable.
7. I understand that the initial starting dose for TIRF medicines for all patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations, and I understand that patients must be titrated individually.
8. I will provide a Medication Guide for the TIRF medicine I intend to prescribe to my patient or their caregiver and review it with them. If I convert my patient to a different TIRF medicine, the Medication Guide for the new TIRF medicine will be provided to, and reviewed with my patient or their caregiver.
9. I will complete and sign a TIRF REMS Access Patient-Prescriber Agreement (PPA) with each new patient, before writing the patient's first prescription for a TIRF medicine, and renew the agreement every two (2) years.
10. I will provide a completed, signed copy of the Patient-Prescriber Agreement (PPAF) to the patient and retain a copy for my records. I will also provide a completed, signed copy to the TIRF REMS Access program (through the TIRF REMS Access website or by fax) within ten (10) working days.
11. At all follow-up visits, I agree to assess the patient for appropriateness of the dose of the TIRF medicine, and for signs of misuse and abuse.

Prescriber Name* (please print): _____

FIRST AMENDED COMPLAINT                                                   2:16-cv-07937-JLS-AJW

The TIRF REMS Access Program: Independent Outpatient Pharmacy Enrollment Form

**The Transmucosal Immediate Release Fentanyl (TIRF) REMS Access Program
Independent Outpatient Pharmacy Enrollment Form**

**For real-time processing of enrollment, please go to www.TIRFREMSaccess.com.**

**To submit this form via fax, please complete all required fields below and fax pages 1, 2, 3 and 4 to 1-866-822-1487. Please note, you must review the TIRF REMS Access Education Program and successfully complete the Knowledge Assessment to complete enrollment.  If you have not completed the Knowledge Assessment online, please include it with this enrollment form. You will receive enrollment confirmation via email or fax.**

I understand that TIRF medicines are only available through the TIRF REMS (Risk Evaluation and Mitigation Strategy) Access program and that I must comply with the program requirements. In addition, as the designated authorized independent outpatient pharmacy representative, I acknowledge that:

1. I have reviewed the TIRF REMS Access Education Program, and I have completed the Knowledge Assessment. I understand the risks and benefits associated with TIRF medicines and the requirements of the TIRF REMS Access program for pharmacies.

2. I will ensure that all pharmacy staff who participate in dispensing TIRF medicines are educated on the risks associated with TIRF medicines and the requirements of the TIRF REMS Access program, as described in the TIRF REMS Access Education Program. This training should be documented and is subject to audit.

3. I understand that converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis. I understand that TIRF medicines are not interchangeable with each other, regardless of route of administration, and that conversion may result in fatal overdose, unless conversion is done in accordance with labeled product-specific conversion recommendations (refer to the list of currently approved TIRF products located on the TIRF REMS Access website at www.TIRFREMSaccess.com/TirfUI/ProductList).  Note, a branded TIRF medicine and its specific generic product(s) are interchangeable.

4. I understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients.

5. I understand that the initial starting dose for TIRF medicines for all patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations, and I understand that patients must be titrated individually.

6. I understand the importance of discussing the risks and benefits of TIRF medicines with patients and their caregivers, and in particular the importance of taking the drug as prescribed, not sharing with others, and proper disposal.

7. I understand that the product-specific Medication Guide must be given to the patient or their caregiver each time a TIRF medicine is dispensed.

8. I understand that a TIRF medicine will not be dispensed without verifying through our pharmacy management system that the prescriber and pharmacy are enrolled and active, and that the patient has not been inactivated in the program.

9. I understand that ALL TIRF medicine prescriptions, regardless of the method of payment, must be processed through our pharmacy management system.

10. I understand that all dispensing locations must be enrolled in the TIRF REMS Access program to dispense TIRF medicines.

11. I understand that TIRF medicines can only be obtained from wholesalers/distributors that are enrolled in the TIRF REMS Access program.

Pharmacist Name* (please print):_____

**FIRST AMENDED COMPLAINT**                                    2:16-cv-07937-JLS-AJW

100.   Prior to submitting a prescription for a TIRF drug to a pharmacy, a physician must discuss and have the patient sign a Patient-Prescriber Agreement Form, which lists the risks and responsibilities associated with the drug.

101.   TIRF prescribers must re-enroll every two years and can only have their TIRF prescriptions filled through pharmacies certified to do so.  Pharmacies are likewise required to re-enroll their "authorized pharmacist" in the TIRF REMS program every two years to maintain their certification.   The authorized pharmacist is responsible for ensuring enrollment and training of other pharmacy staff.

## V.   INSYS' OFF-LABEL MARKETING SCHEME

102.   INSYS waged a multi-pronged approach to build SUBSYS' market share, including direct and affirmative off-label promotion to potential prescribers.

103.   INSYS' campaign was successful.  SUBSYS gained close to a 50% market share among TIRF drugs only two years after its FDA approval.  During that period more than 80% of SUBSYS prescriptions were cited for off-label use.

104.   Although expressly contraindicated, INSYS promotes SUBSYS for post-surgical pain, resulting in off-label prescriptions. INSYS also promoted SUBSYS for musculoskeletal pain, fibromyalgia, neck pain and back pain, all of which were off label. SUBSYS has not been shown to be safe nor effective for these conditions.   In fact, opioids prescribed for back and neck pain can be harmful and ultimately lead to increased pain, dysfunction, and disability.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

105.   On several occasions, Relator expressed concerns to INSYS' sales managers regarding the number of prescriptions of SUBSYS written for non-cancer patients who would have been better served by a less dangerous and less addictive analgesic.  On one occasion, Relator told her Sales Manager, SM #1, that she wanted to increase her sales, but feared the consequences for patients whose opioid-tolerance and potential for addiction might increase unnecessarily.  SM #1 responded callously, stating: "They are already addicts."  Rather than respond in a serious manner, SM #1 dismissed Relator's concerns and advised her to use her sexuality toward pain-management physicians by stroking their hands while literally begging that they write prescriptions.  SM #1 advised Relator to ask physicians to prescribe SUBSYS as "a favor."  SM #1 told Relator that these patients would not be any worse as a consequence of unnecessarily taking SUBSYS because they were already addicts whose prospects were essentially rock-bottom.

106.   INSYS encouraged its sales staff, including Relator, to advise doctors to start patients on high doses of SUBSYS and push existing patients to "titrate up" to higher levels of medication usage and maintain their use round-the-clock, rather than use the drug appropriately as a response to breakthrough episodes of pain.

107.   In spite of the unnecessary dangers posed to non-cancer patients, INSYS instructed its sales staff to enroll new prescribers in the TIRF REMS program and lavish them with constant attention, free meals and other remuneration in order to increase SUBSYS prescriptions to patients.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

## A.    Promotion of SUBSYS for Off-Label Indications

108.   Beginning with the FDA's approval of SUBSYS in 2012, INSYS promoted the drug for off-label indications.  It targeted pain management specialists, internists and neurologists with the majority of its sales staff while reserving a smaller (now defunct) sales department for oncologists.

109.   When Relator began working for INSYS in 2014, she received marketing materials that only referenced cancer patients.  Nevertheless, she was advised during training that oncologists tend not to prescribe pain management drugs and, therefore, she should find a general practitioner who prescribed TIRFs and "live in their office" in order to educate an internist or pain-management physician about prescribing SUBSYS for an off-label use.

110.   Relator also received advice as to which medical practice specialties and personality types should be targeted. In addition to internists, INSYS sales trainers provided four targets: "(1) Physiatrists (PM&R (Pain Management and Rehabilitation)); (2) Anesthesiologists; (3) Neurologists (neuropathic pain/migraine); and (4) Psychiatrists."

111.   INSYS sales staff targeted prescribers of other TIRF drugs (including Cephalon's Actiq) for the sale of SUBSYS, even though sales representatives knew many of those physicians prescribed TIRF drugs for off-label uses.  By the end of 2014, approximately 80% of SUBSYS prescriptions were filled for off-label uses.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

112.   As an incentive to its sales force, INSYS offered rewards of between $500 and $800 for each instance that a sales representative successfully switched a patient switch from another TIRF drug to SUBSYS.  INSYS paid this reward irrespective of the type of use for which the drug was prescribed.

113.   During her time at INSYS, Relator found that oncologists began to show reluctance in prescribing SUBSYS for breakthrough cancer pain because the drug had developed a stigma.  Physicians started to associate SUBSYS with the unscrupulous sales practices used by INSYS and many considered its indication for cancer pain as a pretext for its actual intended use – off-label pain management for opioid addicts.

114.   Relator was advised to offer free SUBSYS to non-cancer patients when necessary to ensure coverage for the drug by payors, including Government Health Care Programs.  In doing so, INSYS informed Relator that (1) authorizations would be more likely be approved after three months to a year of use, and (2) patients would grow dependent on the medication during that time, ensuring a long prescribing relationship.

**B.   INSYS Advised Prescription of Off-Label Doses of SUBSYS**

115.   Led by management, INSYS sales staff consistently sought to increase revenue through promotion of (1) medically unnecessary high doses of SUBSYS, and (2) prescription of SUBSYS for continuous, rather than emergency, use.

116.   INSYS sales managers repeatedly lectured sales staff that the key to making more money was successfully encouraging physicians and patients to use higher doses of

FIRST AMENDED COMPLAINT                                          2:16-cv-07937-JLS-AJW

SUBSYS. Quite simply, the higher the dose, the more revenue generated by INSYS and, therefore, the greater the sales commissions to be earned by SUBSYS' sales representatives. Notably, the compensation structure for INSYS sales representatives was unique in that they earned relatively low salaries (usually $40,000 per year) while given the possibility to earn substantially more through incentive-laden commissions.

117. The FDA-approved labeling for SUBSYS states that new patients must *always* begin using the drug in 100 mcg increments. *See* SUBSYS label below (emphasis in original),

**2.1 Initial Dose**

Individually titrate SUBSYS to a dose that provides adequate analgesia and minimizes side effects. The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg. **. When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product *[see Warnings and Precautions (5.2) and Clinical Pharmacology (12.3)]*.

Prescribe an initial titration supply of 100 mcg SUBSYS units, which limits the number of units in the home during titration.

Avoid prescribing a higher dose until patients have used up all units to prevent confusion and possible overdose.

118. Despite this requirement, INSYS sales staff stressed to physicians that the 100 mcg dose was ineffective for all but 4% of patients. Sales staff were taught to disregard the fact that the entry titration dose is intended to be small, and therefore safe. Instead, they were instructed to convince physicians to double the entry dose, so that patients would immediately "feel the drug working." Sales managers complained that

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

41

the 100 mcg starting dose might cause patients to think the drug was ineffective. As such, the labeling instructions were disregarded and the off-label dose was promoted.



119.   In fact, INSYS sales representatives were instructed to recommend that new patients start with a 200 mcg dose. One sales manager advised Relator that some patients

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

begin with a 400 mcg dose. In line with INSYS policy, sales representatives, including Relator, advised prescribers to begin the initial dose at 200 mcg and expect to increase to a minimum of 400 mcg through titration during the first month of use. INSYS directed Relator and other sales representatives to recommend titration to an eventual dosage between 600 mcg and 1600 mcg.

120. Sales managers directed sales representatives, including Relator, to consult with directly with patients and advise that they begin at 200 mcg dose, wait 30 minutes, and repeat the same dose if still experiencing pain. Representatives were also told to advise patients that they should increase to their next dose (in 200 mcg increments) after four hours and repeat with an additional dose if symptoms remained. This instruction directly contradicts SUBSYS' label, which states "When you are first prescribed SUBSYS, your healthcare provider will start you with the lowest strength medicine, and change that dose until you and your healthcare provider find the right dose for you."

121. Further, INSYS sales staff advised both patients and physicians that patients should manage the titration without informing the treating physician of changes in dose during the titration process. This instruction also directly contradicts the SUBSYS' label.

122. Joe Rowan, INSYS' Director of Sales for the East Coast, advised sales representatives, including Relator, that patients should be pushed to a baseline dosage of 400-800 mcg, in the hope that continued use would increase the baseline toward 1600

FIRST AMENDED COMPLAINT                                       2:16-cv-07937-JLS-AJW

mcg.  During a sales meeting, Rowan told sales representatives they would attain their bonuses if the patient titrated closer to 1600 mcg.

123.   In meetings and on "ride-along" drives with other sales staff, Relator was encouraged to tell doctors and patients that an average effective dose was between 600 and 1600 mcg.  However, breakthrough pain is managed in approximately 25% of patients at 400 mcg or lower does according to studies included in the drug's FDA-approved label.

**C.    Use of IRC to Authorize Insurance Reimbursement for Off-Label Uses**

124.   In order to ensure authorization of payment for a SUBSYS prescription by an  insurer and the dispensing of the drug by a pharmacy, INSYS provided its sales staff with a multiple means to accomplish that objective: Patient Authorization & Referral ("Prior Authorization") form; the ability to provide as much as a year of free SUBSYS to establish a pattern of use; an INSYS Reimbursement Center ("IRC") to persuade insurers; and an appeal letter template for the physician to use in the event of denial. Each of these methods breached FDA regulations.

125.  INSYS employs a group known as the "INSYS Reimbursement Center," ("IRC") to communicate with pharmacies and insurers on behalf of the doctor and patient, to ensure authorization and dispensing of SUBSYS.   According to Relator, sales representatives knew that IRC staff would o do anything necessary, including lying, to ensure prior authorizations for SUBSYS prescriptions.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

126.   At the outset of a sales relationship, INSYS sales representatives attempted to enroll health care providers in the "INSYS Patient Services Center" by providing HIPAA waivers for likely SUBSYS patients. Once this has occurred, the sales representative supplied potential prescribers with INSYS Prior Authorization forms.  After the Prior Authorization forms were completed with doctor and patient specific information and signatures, the IRC attempted to gain prior authorization. Finally, the physician, like the pharmacy that eventually filled the prescription, was required to enroll in the TIRF REMS access program by taking an online exam and signing liability waivers.   These measures were intended to mitigate the risks associated with prescribing TIRF drugs like SUBSYS.

127.   Once a physician qualified to prescribe SUBSYS and write prescriptions to do so, the IRC's prior authorization mechanism unfolded in the following manner:

a.   INSYS' sales representative provided a partially pre-populated INSYS Prior Authorization form to the patient, and assisted in its completion.

b.   The prescribing physician completed the Prior Authorization form and returned it to an INSYS sales representative.

c.   INSYS sales representatives or the physicians' office staff faxed the form to IRC.

d.   IRC staff contacted the relevant Medicare Part D insurer (or other insurer) and pled INSYS' case for reimbursement of the cost of SUBSYS.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

e.  If the insurer agreed to reimburse, the drug was dispensed.

f.  If the insurer refused to reimburse, INSYS provided up to a year of free SUBSYS to the patient. After months of SUBSYS use by the patient, during which time the patient had likely become dependent on the drug, INSYS re-submitted the request for reimbursement based the three months of use by the patient. Relator reports that scheme regularly worked - INSYS won reimbursement by providing three months of free product and recouped its initial investment in the process.

128.  Upon information and belief, this process afforded INSYS a radically higher rate of insurer authorization than corresponding figures for any of the five other TIRF drugs now sold.

129.  During Relator's initial training, Relator's field sales trainer, Sales Representative #1 ("SR #1") showed Relator folders she had prepared for individual physicians, containing pre-populated Prior Authorization forms. Later, Sales Representative #2 (SR #2), another of Relator's local colleagues, showed Relator prepopulated forms up close. Relator and her colleagues pre-populated the certain lines of the form below (outlined in red): "Diagnosis: Other chronic pain," "Diagnosis: chronic pain syndrome," "Patient is Opioid Tolerant," and "Strength: 200 mcg." That is, INSYS sales staff pre-populated the form with off-label indications and an off-label initial dosage.

130.  On October 13, 2014, Relator-Plaintiff, feeling uncomfortable about the process, asked SR #1 if she was permitted to fill out the prior authorization form on behalf of the patient or physician, and received a text in return, stating, "No, but yes." Pursuant to this instruction by an INSYS representative, Relator met with patient and partially filled out the Prior Authorization form for the doctor.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

131. When the prior authorization process was not successful, INSYS instructed its sales staff to provide physicians with an appeal letter, which was to be completed and forwarded to IRC for submission to the insurer. This letter (below) does not mention cancer. Rather, it provides a general scheme by which anyone with any foreseeable off-label intended used might argue that they should have the drug authorized by their insurer.

> This letter of appeal is in response to the denial dated (xx/xx/xxxx) for patient (Full name). His patient contract with (Specific MCO) is:
>
> I have treated (Full name) in my clinic since (xx/xx/xxxx). (Mr. /Mrs.). Is a (age) year old (man/woman) with severe (Diagnosis). (He/She) has difficulty swallowing and digesting oral medications, and (he/she) is in almost constant severe pain. The pain gives Mr. /Mrs. (Name) a significantly limited quality of life. (He/She) is unable to sit, stand, walk or reach – which includes participating in family life and riding in automobiles – for more than 2 to 3 hours per day.
>
> In an effort to control his pain and improve his quality of life, (he/she) has been prescribed the following medications:
>
> A combination of (Drug names), at the highest dose available, tends to abate (Mr. /Mrs.) pain fairly well. However severe breakthrough pain continues to be a problem with a frequency that is debilitating to this unfortunate patient. (He/She) did seem to do well for a short time on (Drug name), but that medication too was denied coverage. Injectable pain relievers are not an option for this patient.
>
> Due to the severity of (Mr./Mrs.) illness and pain, and due to the limited number of medications available to him, I write this letter recommending that coverage be approved for (Drug name) as a medical necessity for offering this patient as much quality of life as possible.
>
> Sincerely,

132.   Where neither Prior Authorization nor appeal succeeded, INSYS instructed and permitted Relator to provide free SUBSYS to a patient for up to three months.

133.   INSYS sales mangers advised sales staff how to bargain with a physician who was leery of undergoing the prior authorization process. As Relator noted during her training, "Give us 1 wk – Doesn't get approved we will give pt free meds."

134.   Relator provided free medication to patients for up to a year. During that time, the IRC attempted Prior Authorization again to increase the likelihood that the prescription claims would be paid including by Government Health Care Programs.

**D.     Evasion of TIRF REMS**

135.   Fentanyl's deadly potency motivated the FDA to mandate that prescribers and pharmacists enroll in TIRF REMS prior to putting TIRF drugs in the hands of patients. TIRF REMS requires prescriber/pharmacist accreditation and forces prescribers and pharmacists to pass an exam and make a series of certifications in order to become accredited. INSYS' sales managers instructed sales staff to enroll physicians in TIRF REMS, a necessary predicate to prescribing SUBSYS. To assist in this effort, sales staff continually circulated "cheat sheets" that contained the answers to the TIRF REMS educational assessment.  These cheat sheets relieved potential prescribers of their duty to read the TIRF REMS website and ensured that the prescriber would be pass the assessment.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

136. INSYS assigned Relator a territory that contained only a few physicians qualified to write prescriptions for SUBSYS under the TIRF REMS program.

137. Given the requirement that prescribing physicians comply with TIRF REMS by enrolling in the program, taking the exam and signing the acknowledgment, INSYS management instructed sales staff to "do whatever it takes" to enroll potential prescribers in the program.

138. These efforts included supplying prescribers and their staff with cheat sheets. Relator learned of the cheat sheets from Sales Representative #3 ("SR #3"). Relator received the answers from a colleague on a sheet of notebook paper and gave that paper to office staff, considering it common practice. A copy of one such cheat sheet is illustrated below:



FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

139.   As a result of INSYS' distribution of the test answers, INSYS caused physicians to circumvent the educational requirement of the TIRF REMS program which was intended to ensure that prescribers understood the dangerous potential consequences associated with opioid prescriptions, particularly for unintended uses.

140.   The educational component of the TIRF REMS assessment was designed to ensure that physicians would write prescriptions for SUBSYS responsibly and protect patients against harm.

141.   If the United States had known that physicians were making false certifications to the TIRF REMS program, the Government Health Care Programs would not have paid for prescriptions written by them.

### E.   INSYS' Off-Label Promotion Amounted to Misbranding

142.   INSYS misbranded SUBSYS by advising doctors to prescribe high doses, to prescribe for off-label uses, and to prescribe to non-cancer patients. These actions manifested an "intended use" separate from that approved by the FDA, one which SUBSYS' label directions fail to render safe by a lay user.

143.   A drug is misbranded if its labeling fails to provide "adequate directions for use." 21 U.S.C. § 352(f).  Adequate directions are those which will allow a lay patient to safely use the drug for its "intended use." 21 C.F.R. § 201.5.

144.   A drug's "intended use" is that use manifested by those who label and distribute it. 21 C.F.R. § 201.6.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

145.   With respect to SUBSYS, INSYS sent its sales staff to "live" in the offices of internists, physiatrists who do not focus on cancer-pain treatment, neurologists and psychiatrists. Of the twenty sales representatives at Relator's initial training, only four were tasked with marketing SUBSYS (at that time INSYS' only approved drug) to oncologists. The remaining sales representatives were hired to the "Pain Management" wing of the sales staff. During the course of Relator's employ, INSYS combined the oncology and pain management wings into a single department.

146.   Unsurprisingly, the result was off-label prescriptions.  The off-label uses of SUBSYS amounted to approximately 80 to 90% of the drugs sold by INSYS.

147.   INSYS facilitated this off-label promotion by hiring additional sales staff to find new prescribers.  When Relator was hired, she received an "expansion territory." That is, other sales representatives in Relator's territory gave up work with two to four TIRF REMS qualified prescribers, and Relator began selling to those physicians. INSYS provided Relator a list of physicians in her area that included many internal medicine practitioners mislabeled as oncologists, and tasked Relator with selling to them as well. By handing out new territories to new sales reps without existing prescribers, INSYS encouraged them to promote the message which resulted in off-label prescriptions.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

148.   With most prescriptions not written for the FDA-approved indication for SUBSYS, INSYS expanded the list of intended uses for SUBSYS to include, among others, non-cancer pain and post-operative pain.

149.   Further, INSYS expanded the type of pain for which the drug was used, from breakthrough cancer pain, to breakthrough pain in non-cancer patients, to persistent pain. The expansion to persistent pain raised revenues dramatically, as it led to the use of SUBSYS every four hours, regardless of the level of pain experienced by the patient at any given time. Thus, SUBSYS, an analgesic 50 to 100 times as powerful as morphine, became a maintenance opioid, like OxyContin or Oxycodone.

150.   These actions amount to misbranding by INSYS because SUBSYS' FDA-approved label did not provide adequate directions for these uses. Neither the label nor any TIRF REMS documentation provide information that would allow a lay patient to safely use the drug for these purposes. In fact, the label clearly indicates that the drug is contraindicated for use of the drug for migraines, post-operative pain and dental pain. The label states, "If the patient experiences greater than four breakthrough pain episodes per day, the dose of the maintenance (around-the-clock) opioid used for persistent pain should be re-evaluated." INSYS' misbranding rendered this precaution meaningless, and serves as clear evidence of the substitution of a different, dangerous use for the original FDA-approved indication.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

151.  Relator was instructed to distribute materials concerning the use of SUBSYS to all patients regardless of indication.  For the majority of these patients, the marketing materials and label where inapplicable.   Patient #1, as discussed below in more detail, was the patient of a prescriber that Relator called upon. Patient #1 did not have cancer and received twice the FDA-approved starting dose of SUBSYS.

152.  INSYS misbranded SUBSYS by promoting it for off-label uses for which it would assuredly be used as a maintenance medication. SUBSYS' approval for breakthrough cancer pain, and INSYS' promotion of the drug for chronic, non-cancer pain, coupled with INSYS' assistance of physicians who prescribed the drug for continuous use, rather than "As Needed", created a situation in which the drug's labeling could not provide adequate instructions to ensure the safety of its intended uses.

**F.     Improper Payment by Government Health Care Programs**

153.  INSYS' off-label marketing efforts caused potentially hundreds of thousands of prescriptions to be improperly paid for by Government Health Care Programs.

154.  In the Medicaid Program, States will not receive FFP if a drug, as prescribed, is not for a medically acceptable use.  FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). States have, therefore, implemented their own laws and pharmacy regulations that require prescribed drugs be used for a medically-accepted use that comports with the definition of a "covered

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

outpatient drug."  "Covered outpatient drugs" do not include drugs that are used for a medical indication which is not a medically-accepted indication.  42 U.S.C. § 1396r-8(k)(3).

155.  A medically accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia.  42 U.S.C. § 1396r-8(k)(6).  The specified drug compendia approved for the Medicaid program are set forth in 42 U.S.C. § 1396r-8(g)(1)(B)(I):   American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information; the DRUGDEX Information System; and the peer-reviewed medical literature.

156.  Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e - 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting, and are "reasonable and necessary."

157.  Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary." 42 U.S.C. § 1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.  These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics, and drugs administered through durable

medical equipment such as a nebulizer.  42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

158.   The Medicare Part D drug benefit program covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. §1396r-8(k).

159.   The off-label uses of SUBSYS discussed herein are not supported by "clinical research that appear[ ] in peer-reviewed medical literature," and could not, under any circumstances, be considered "medically accepted as safe and effective" or "reasonable and necessary" for such uses.  Therefore, claims for reimbursement for SUBSYS prescribed for such off-label uses were not covered by Medicaid or Medicare.

160.  INSYS was aware that the natural and probable consequence of its promotion of off-label uses of SUBSYS was that health care providers would submit claims for payment to Government Health Care Programs for the off-label use.

161.   Notwithstanding this knowledge, INSYS illegally, vigorously, and without any thought to the possible negative health effects to which it subjected patients, promoted these off-label uses.  INSYS was aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label uses. INSYS was aware that its promotion activities were a substantial factor in producing the claims.

162.  When LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, and other pharmacies submitted claims based upon physicians' prescriptions for SUBSYS for off-label uses, they submitted false claims

because such off-label uses were not supported by: (1) citation to one of the drug compendia specified in 42 U.S.C. § 1396r-8(g)(1)(B)(I) (Medicaid); (2) "peer-reviewed medical literature;" (3) a determination that the drug was "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and (4) a coverage determination by other Government Health Care Programs, *see, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

163.   INSYS' off-label marketing directly and proximately caused the off-label prescribing for which these claims to government healthcare programs were filed. INSYS caused the submission of these claims, since healthcare providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Health Care Programs, and the states submitted Form CMS-64 to the Federal Government, all claiming reimbursement for SUBSYS for such off-label uses.

## VI.   **INSYS' KICKBACK SCHEME**

164.   From the moment SUBSYS entered the TIRF market, INSYS made clear to its sales staff that the drug would promoted for off-label prescriptions to physicians who were paid through sham "speaker" programs, in-kind donations and other forms of illegal kickbacks.

165.   At Relator's initial training, INSYS sales trainers educated her and her colleagues on how to identify potential prescribers as those to whom "money talks."

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

57

When questioned as to what this meant, trainers stated that the way to generate prescriptions was to sign up and pay speakers.

166.   In order to find these physicians, Relator was directed to search public disclosure data for those doctors who had accepted high speaking fees for presentations on behalf of fentanyl and other opioids.

167.   During training sessions, INSYS taught sales staff to classify physicians according to their perceived willingness to receive money for prescriptions.

168.   INSYS sales managers taught sales staff to color code doctors, "green" being the most likely to accept kickbacks, "yellow" less so, and "red" unlikely, on the basis of personality traits. During Relator's field training, she learned to associate the likelihood of physicians becoming prescription writers with the dollar amounts attributed to them on propublica.org.

169.   When sales districts failed to generate large numbers of new prescriptions, INSYS classified them as "low performing," and combined them with "high performing" districts. Sales managers from "high performing" districts instructed sales staff from "low performing" districts to buy prescriptions by arranging for individuals to act as paid speakers on behalf of SUBSYS.

170.   INSYS management participated in, encouraged, and authorized the unlawful payment of illegal kickbacks to physicians and pharmacists.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

171.   INSYS' kickback scheme had several components, including, but not limited to:

a.   Paying prescribing physicians sham "speaking" fees to reward prescribers of SUBSYS for off-label uses;

b.   Adding or removing presenters from speaking engagements based upon their propensity to prescribe SUBSYS;

c.   Performing unpaid office work in prescribing physicians' offices, for the purpose of inducing prescriptions for off-label uses; and

d.   Paying unauthorized speakers with restaurant and retail gift cards to reward SUBSYS prescriptions.

172.   At Relator's initial training, directed by Alec Burlakoff, INSYS' Director of Sales, trainers told trainee sales representatives to find three to five doctors for routine visits, as well as one doctor who "wants you around at all times."

173.   Burlakoff also lectured Relator and her colleagues to do whatever it took to be around the doctors, including providing office work at no cost. Relator and other sales representatives were trained to tell doctors to focus on identifying patients while ensuring the doctor that the sales representative will "run" the patient with the staff and pharmacy.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

174.   Alec Burlakoff, exhorted sales staff, including Relator, to do office work for potential prescribers including, for example, faxing documents related to prescription authorizations. .

175.   INSYS also promoted sham "speaker" programs to improperly pay doctors and pharmacists to convince other doctors and pharmacists to prescribe SUBSYS for off-label uses.

176.   Relator attended several "speaker" programs where no presentation was ever made, yet the "speaker" was paid by INSYS.

177.   For example, at 7:00 PM on October 2, 2014, Relator attended a speaker dinner at a popular steakhouse near her sales territory. Four sales representatives – Relator, SR #1, SR #2, and SR #3 - attended along with four physicians – Doctor #2, Doctor #3, and two physicians whose names are not known. Though Doctor #2 received payment from INSYS for providing a presentation, he did not provide one. Rather, the meeting, held in a noisy steakhouse, consisted of dinner table discussion between the physicians and sales representatives present. The event was a sham, an excuse to pay Doctor #2 a large speaking fee in remuneration for his prescriptions and to buy dinner for the others present.

178.   According to probublica.org, Doctor #2 accepted $46,482.00 in speaking fees, food and beverage, and travel and lodging on behalf of SUBSYS' promotion

FIRST AMENDED COMPLAINT                                      2:16-cv-07937-JLS-AJW

between August 2013 and the end of 2014. INSYS reported payments to Doctor #2 the surrounding the evening of the steakhouse dinner:

     a.  $127 in food and beverages on October 1, 2014;

     b.  $124 in food and beverage on October 2, 2014;

     c.  $203 in travel and lodging on October 2, 2014; and

     d.  $1900, $3200, and $3200 in Promotion Speaking/Other on October 6, 2014.

179.   According to propublica.org, Doctor #3 accepted $28,854.00 in speaking fees, food and beverage, and travel and lodging on behalf of SUBSYS' promotion between August 2013 and the end of 2014. INSYS reported a payment of $124 for food and beverage for Doctor #3 on October 2, 2014, the day of the steakhouse dinner. The following spreadsheets compare the events for which Doctor #2 (first picture) and Doctor #3 (second picture) received payment from INSYS during the months of September and October 2014.

FIRST AMENDED COMPLAINT          2:16-cv-07937-JLS-AJW

| Manufacturer | Date of Payment | Nature of Payment | Dollars Paid |
|---|---|---|---|
| INSYS Therapeutics Inc | 9/3/2014 | Food and Beverage | 72 |
| INSYS Therapeutics Inc | 9/4/2014 | Food and Beverage | 77.3 |
| INSYS Therapeutics Inc | 9/9/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 9/17/2014 | Food and Beverage | 90 |
| INSYS Therapeutics Inc | 9/18/2014 | Food and Beverage | 77.75 |
| INSYS Therapeutics Inc | 9/23/2014 | Food and Beverage | 99.6 |
| INSYS Therapeutics Inc | 9/23/2014 | Non-Consulting Speaking Fee | 3200 |
| INSYS Therapeutics Inc | 9/23/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 9/29/2014 | Food and Beverage | 85.47 |
| INSYS Therapeutics Inc | 9/30/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 10/1/2014 | Food and Beverage | 126.59 |
| INSYS Therapeutics Inc | 10/2/2014 | Food and Beverage | 124.25 |
| INSYS Therapeutics Inc | 10/2/2014 | Travel and Lodging | 203.15 |
| INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 3200 |
| INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 3200 |
| INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 10/13/2014 | Food and Beverage | 99.6 |
| INSYS Therapeutics Inc | 10/16/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 10/16/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 10/18/2014 | Travel and Lodging | 162.41 |
| INSYS Therapeutics Inc | 10/23/2014 | Food and Beverage | 24.8 |
| INSYS Therapeutics Inc | 10/23/2014 | Food and Beverage | 99.6 |
| INSYS Therapeutics Inc | 10/24/2014 | Travel and Lodging | 53.34 |
| INSYS Therapeutics Inc | 10/24/2014 | Travel and Lodging | 757.82 |
| INSYS Therapeutics Inc | 10/25/2014 | Food and Beverage | 423.09 |
| INSYS Therapeutics Inc | 10/25/2014 | Food and Beverage | 125.68 |
| INSYS Therapeutics Inc | 10/27/2014 | Non-Consulting Speaking Fee | 950 |
| INSYS Therapeutics Inc | 10/27/2014 | Non-Consulting Speaking Fee | 1900 |
| INSYS Therapeutics Inc | 10/28/2014 | Food and Beverage | 95.25 |
| INSYS Therapeutics Inc | 10/28/2014 | Food and Beverage | 9.39 |
| INSYS Therapeutics Inc | 10/30/2014 | Food and Beverage | 62.42 |
| INSYS Therapeutics Inc | 10/31/2014 | Non-Consulting Speaking Fee | 3750 |

| Manufactu | Date of Payment | Drug | Nature of Payment | Fee |
|---|---|---|---|---|
| INSYS Thera | 9/3/2014 | Subsys | Food and Beverage | 1.92 |
| INSYS Thera | 9/3/2014 | Subsys | Food and Beverage | 4.99 |
| INSYS Thera | 9/9/2014 | Subsys | Food and Beverage | 119.01 |
| INSYS Thera | 9/15/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| INSYS Thera | 9/15/2014 | Subsys | Food and Beverage | 13.31 |
| INSYS Thera | 9/22/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| INSYS Thera | 10/1/2014 | Subsys | Food and Beverage | 8.49 |
| INSYS Thera | 10/2/2014 | Subsys | Food and Beverage | 124.25 |
| INSYS Thera | 10/14/2014 | Subsys | Food and Beverage | 49.17 |
| INSYS Thera | 10/16/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| INSYS Thera | 10/20/2014 | Subsys | Food and Beverage | 17.5 |
| INSYS Thera | 10/27/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| INSYS Thera | 10/28/2014 | Subsys | Food and Beverage | 103.68 |
| INSYS Thera | 10/30/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |

180.   Relator observed that INSYS used its "speaker" programs as a conduit to pay doctors for prescribing SUBSYS, plain and simple. Relator witnessed sales staff and other INSYS personnel eliminate physicians from approved lists of paid speakers when they failed to prescribe sufficient amounts of SUBSYS. For example, SR #3 explained to Relator that he had previously arranged for Doctor #4 to receive payments to speak on

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

behalf of SUBSYS, beginning upon its FDA approval, but that Doctor #4 did not "play ball" by writing prescriptions for the drug. SR #3 handed off INSYS' relationship with Doctor #4 to Relator, given the lack of prescriptions. Doctor #4 told Relator that SR #3 informed him he had to write prescriptions for the drug, in return for the speaking fees INSYS had paid him.

181.   Another form of illegal kickbacks involved INSYS' use of gift cards. Relator was encouraged to give gift cards to prescribing physicians to encourage them to continue to prescribe SUBSYS.  Specifically, SM #1, who formerly worked as an INSYS sales representative, explained how she and other sales representatives were able to carry out this scheme. SM #1 told Relator how to purchase gift cards at local delicatessens whose owners she knew, and how to induce store owners to create fraudulent receipts for the value of the purchase price of the cards, which instead showed purchases of coffee and other sundries which might be permissibly dropped at physicians' offices.  SM #1 then submitted the fraudulent receipts for reimbursement by INSYS and used the cards to pay illegal and untraceable kickbacks to physicians prescribing SUBSYS. SM #1 informed Relator that she used her business relations manager, BRM #1, to physically transact kickbacks like these on many occasions. After several INSYS sales staff were arrested in early 2016, SM #1 asked an INSYS attorney, during a conference call regarding the arrests, "Are BRMs going to be protected, as well?"

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

182.   INSYS colleagues advised Relator, repeatedly, that these practices were encouraged by upper management and that INSYS sales managers had engaged in the same schemes before getting promoted.

183.   For example, SR #1, a sales representative who took Relator on some of her "ride along" sales calls at the beginning of her employ, advised Relator to search public disclosure data for physicians who received the largest amounts of money from drug manufacturers to speak on behalf of oxycodone, morphine, and fentanyl in her sales area. SR #1 advised that this was a good method of finding physicians interested in making extra money through INSYS' sham speaker programs. As she put it, this search would answer the questions, "Does money talk to them?" SR #1 and other sales staff repeatedly advised Relator that signing a physician on to receive payment for speaking engagements would lead to prescriptions by that physician.

184.   Similarly, during a sales meeting in Arizona, SM #2, an INSYS sales representative (later a sales manager) providing training at the event, advised sales representatives that speakers would write prescriptions in return for speaking fees. When asked for clarification on how the two were related, SM #2 said, slowing her speech for emphasis, "Just get speakers."

185.   On information and belief, Relator avers that the complained of illegal kickback schemes were national in scope.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

## A.    Pricing Violations

186.   Pharmaceutical manufacturers participating in Medicaid programs must rebate to the states a certain statutorily-prescribed portion of the price of drugs purchased by each Medicaid program in each state.  *See* 42 U.S.C. §1396r-8(a)(1). Manufacturers do this because the Medicaid statute, 42 U.S.C. §§1396a-u, permits the federal government to partially reimburse states only for drugs purchased from manufacturers who have agreed to pay statutorily specified rebates to those states. *See* 42 U.S.C. §1396r-8.  Thus, pharmaceutical manufacturers that want their drugs available to Medicaid beneficiaries under the Medicaid program enter into a Rebate Agreement with the Department of Health and Human Services ("HHS") Secretary to provide rebates.  *See* 42 U.S.C. §1396r-8(a)(1).

187.   The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form CMS-367).  The Quarterly Report includes information regarding each of the manufacturers' "Covered" Drugs, including such information as its "Average Manufacturer Price" ("AMP"), "Baseline AMP," and its "Best Price." Based upon this information, HHS, through its component agency, The Centers for Medicare & Medicaid Services ("CMS"), then tells the states how much rebate the state is entitled to collect with respect to each drug.

188.   INSYS entered into a Rebate Agreement with HHS.  In that Agreement, INSYS agreed to comply with 42 U.S.C. §1396r-8, and hence:

FIRST AMENDED COMPLAINT                           2:16-cv-07937-JLS-AJW

    a.  Agreed to report its Best Price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, etc.;

    b.  Agreed that it would determine its Best Price based upon its AMP, calculated as "net sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include that in the calculation, cash discounts and all other price reductions "which reduce the actual price paid"; and

    c.  Agreed that the Best Price would not take into account nominal prices, defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

189.  After execution of this Agreement, INSYS reported its AMP and/or Best Price in each quarter, to the Medicaid Program on an electronic form of Form CMS-367.

190.  In the instant case, Defendant failed to take into account the Kickbacks and free prescriptions it provided when reporting its Best Price.

191.  As a result, INSYS's Best Price, for quarterly reports submitted since 2012, were inflated, which reduced the percentage difference between AMP and Best Price, thereby reducing the rebate amount that Defendant ultimately paid to each state Medicaid program.  Defendant artificially inflated its Best Price, by calculating its

FIRST AMENDED COMPLAINT             2:16-cv-07937-JLS-AJW

Best Price without taking into account its inducement activities described in this Complaint, which reduced the true cost of its drugs.  Defendant knowingly set and reported its Best Price for these drugs at levels far higher than the actual Best Price, in Form CMS-367, submitted quarterly to CMS since 2012.  By doing so, Defendant has violated the Federal (and applicable state) False Claims Acts, by knowingly making, using, or causing to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money to federal and state governments.

192.   Under the Veterans Health Care Act of 1992 ("VHCA"), drug manufacturers are required to enter a pricing agreement with the Secretary of HHS for the section 340B Drug Pricing Program, and with the Department of Veterans Affairs (VA) and other Department of Defense programs.

193.   Once a labeler/manufacturer enters into such a pricing agreement, its drugs are listed on the Federal Supply Schedule ("FSS"), a price list containing over twenty-thousand pharmaceutical products.  The VA and other Government Programs depend on the FSS for most of its drug purchases, with the exception of several national contracts awarded for specific drugs considered to be therapeutically interchangeable.

194.   Under the VHCA, drug manufacturers must comply with 38 U.S.C. § 8126. Subsection (a)(2) requires that "the price charged during the one-year period beginning on the date on which the agreement takes effect may not exceed 76 percent

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

of the non-Federal average manufacturer price (less the amount of any additional discount required under subsection (c)) ...."

195.   In the instant case, INSYS failed to take into account its inducements when reporting the non-Federal average manufacturer price. INSYS therefore violated 38 U.S.C. §8126 causing damage to the VA program, and by not giving its best price as set forth in subsection (a)(2), INSYS became ineligible for Medicare and other federal program reimbursement.

## VII.   LINDEN CARE'S ILLEGAL DISTRIBUTION OF SUBSYS

### A.   Pharmacy Responsibilities under TIRF REMS

196.   A TIRF REMS-enrolled pharmacy is one that has "an authorized pharmacy representative that is responsible for ensuring enrollment and training of the pharmacy staff within an individual outpatient pharmacy."  Additionally, TIRF REMS requires that a "pharmacy must use a pharmacy management system to electronically transmit the required validation and claim information to the TIRF REMS Access program using established telecommunication standards."  TIRF REMS Access, An Overview for Independent Outpatient Pharmacies,

https://www.tirfremsaccess.com/TirfUI/rems/pdf/outpatient-pharmacy-overview.pdf

(last visited Aug. 7, 2018).

197.   Prior to dispensing SUBSYS and other TIRFs approved for cancer patients only, enrolled pharmacies must comply with terms of the TIRF REMS program.  The

FIRST AMENDED COMPLAINT                                2:16-cv-07937-JLS-AJW

FDCA provides the statutory justification for REMS programs at 21 U.S.C. § 355-1.  A REMS program is authorized for drugs that have a high likelihood of endangering the public health, but deliver a worthwhile benefit.  A pharmacy's failure to ensure compliance with TIRF REMS, if it leads to a product that cannot be used safely for its intended purpose, constitutes misbranding.  *See* 21 U.S.C. § 331 (explaining the prohibitions of the FDCA, including the prohibition against misbranding).  TIRF REMS imposes a duty on pharmacists to counsel patients and provides resources for that purpose. During enrollment in TIRF REMS Access, pharmacists agree to educate their staff and certify that they understand the terms of the program.

198.   The TIRF REMS Enrollment Form requires that pharmacists certify, among other things, that:

a.   They will ensure that their staff "are educated on the risks associated with TIRF medicines and the requirements of the TIRF REMS Access program;"

b.   They understand TIRF drugs to be "contraindicated for use in opioid non-tolerant patients;"

c.   They "understand that the initial starting dose for TIRF medicines for all patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations …;"

d.   They "understand that patients must be titrated individually.

    e.    They will discuss "the risks and benefits of TIRF medicines with patients and caregivers, and in particular the importance of taking the drug as prescribed, not sharing with others, and proper disposal."

TIRF REMS Access, Independent Outpatient Pharmacy Enrollment Form, https://www.tirfremsaccess.com/TirfUI/rems/pdf/outpatient-pharmacy-enrollment-form.pdf (last visited Aug. 7, 2018).

199.   The SUBSYS' label is in accord with the TIRF REMS requirements.  In the "Indications and Usage" section, it provides:

    a.    Patients must require and use around-the-clock opioids when taking SUBSYS;

    b.    Initial dose of SUBSYS: 100mcg;

    c.    Individuals titrate to a tolerable dose that provides adequate analgesia using a single SUBSYS dose per breakthrough cancer pain episode;

    d.    No more than two doses can be taken per breakthrough pain episode;

    e.    Wait at least 4 hours before treating another episode of breakthrough pain with SUBSYS;

    f.    Limit consumption to four or fewer doses per day once successful dose is found.

200.   The titration instruction above indicates that an increase to the next highest dosage is warranted if the patient is unsuccessful in managing breakthrough pain.  However, the *maximum allowable dosage* for SUBSYS limits consumption to four or fewer doses per day.  Even if patients may require more than four doses per day to treat

FIRST AMENDED COMPLAINT              2:16-cv-07937-JLS-AJW

breakthrough cancer pain, they are not to exceed the maximum allowable dosage for SUBSYS. Rather, those patients must consult with their doctor to increase their dosage of maintenance opioids. As the SUBSYS label states, "If the patient experiences greater than four breakthrough pain episodes per day, the dose of the maintenance (around-the-clock) opioid used for persistent pain should be reevaluated. In addition, if pain worsens, re-evaluate the patient for changes in the underlying condition."

### B.     LINDEN CARE's Misbranding by Breach of the TIRF REMS Protocol

201.   LINDEN CARE was a TIRF REMS enrolled pharmacy. A 2014 LINDEN CARE press release stated that "key to LINDEN CARE's success is the ability to provide solutions for today's complex pain therapies requiring Risk Evaluation and Mitigation Strategies (REMS) such as [TIRFs] and extended release opioids."

202.   It is believed and averred that, from 2012 until it ceased business operations on July 26, 2017, LINDEN CARE was one of, if not the largest dispensers of SUBSYS in the United States.

203.   LINDEN CARE described its business model on the now-defunct LINDEN CARE website: "Linden Care is a full-service pharmacy that can provide you with all the medications that your doctor prescribes. Many of our patients face chronic pain and need a dedicated pharmacy to help them to help relieve the pain . . . ." Further, "Linden Care understands that today's insurance plans are often confusing. Our patient care representatives work with your doctor and your insurance company to get you the

FIRST AMENDED COMPLAINT                                     2:16-cv-07937-JLS-AJW

71

medications you need.  We offer prior authorizations and work closely with your doctor to give you best in class pharmacy service"[6]

204.   The advent of SUBSYS allowed LINDEN CARE to fulfill its stated mission by dispensing SUBSYS for chronic pain patients and ensuring that its representatives obtained prior authorizations from insurers in order to receive government payment for off-label uses of SUBSYS.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, knowingly took advantage of the opioid epidemic, and endangered the lives of numerous patients, all for the sake of maximizing profits

205.   LINDEN CARE breached the TIRF REMS protocol with respect to SUBSYS by:

a.   Dispensing SUBSYS for contra-indicated and off-label uses, without discussing the drug or its safe usage with patients;

b.   Dispensing "initial starting doses" of 200 mcg, rather than the mandated initial maximum dosage of 100 mcg;

c.   Dispensing SUBSYS with directions to consume the drug six times daily, independent of pain.

---

[6] Linden Care no longer has a website accessible on the internet.  Various portions of Linden Care's now-defunct website can still be viewed via the Internet Archive located at archive.org.  The referenced portions of Linden Care's website are available at web.archive.org/web/20170602130713/http://lindencare.com/about/ (archived on June 2, 2017).

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

206.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, misbranded SUBSYS by: (1) distributing it for contraindicated and off-label uses; (2) labeling it for distribution at initial doses at least twice the FDA-approved limit; and (3) dispensing it for use six times daily *i.e.*, at 150% of the FDA-approved limit. LINDEN CARE's hardcopy labels, the stickers on the package of the pharmaceutical products it distributed, contained directions directly in contravention the product's FDA-approved label.   LINDEN CARE's blatant disregard of the FDA-approved label instructions, as well as the TIRF REMS protocol, rendered the product unsafe for use.

207. LIINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, misbranded SUBYS in violation of the TIRF REMS protocol of a pharmaceutical product, and the payment of that drug through a Government Health Care Program, is a violation of the False Claims Act.

## C.    LINDEN CARE's Repeated Breaches of the Controlled Substances Act

208.   The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, regulates the manufacture, importation, possession, use, and distribution of controlled substances. The CSA relies upon rules and definitions contained in the FDCA, 21 U.S.C. § 301 *et seq.*   Chapter II of Title 21 of the Code of Federal Regulations covers controlled substances regulation by the Drug Enforcement Administration and the Department of Justice and gives regulatory life to the CSA and FDCA with respect to controlled substances.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

73

209.   The CSA renders it unlawful for "a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, [to] be dispensed without the written prescription of a practitioner."  21 U.S.C. § 829(a).  This provision applies to Schedule II opioids, including SUBSYS, and also mandates that paper receipts be retained by the dispensing pharmacy.

210.   "A pharmacist may dispense directly a controlled substance listed in Schedule II that is a prescription drug . . . only pursuant to a written prescription signed by the practitioner, except as provided in paragraph (d) of this section.   A paper prescription for a Schedule II controlled substance may be transmitted by the practitioner or the practitioner's agent to a pharmacy via facsimile equipment, *provided that the original manually signed prescription is presented to a pharmacist for review prior to the actual dispensing of the controlled substance* . . . . " 21 C.F.R. § 1306.11(a) (emphasis added).

211.   Relator is informed and believes that, on at least six occasions, LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, dispensed SUBSYS on behalf of Patient #1, discussed below, on the basis of faxed prescriptions and without first receiving the paper prescription.

212.   Further, Relator is informed and believes that those prescriptions carried instructions for use which misbranded the medication and led to Patient #1's death.

FIRST AMENDED COMPLAINT                                              2:16-cv-07937-JLS-AJW

213.   Federal regulations make clear that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a).

214.   The federal regulations also outline the procedure a pharmacist must follow in filling a prescription for a Schedule II drug like SUBSYS:  "The pharmacist filling a written or emergency oral prescription for a controlled substance listed in Schedule II shall affix to the package a label showing date of filling, the pharmacy name and address, the serial number of the prescription, the name of the patient, the name of the prescribing practitioner, and directions for use and cautionary statements, if any, contained in such prescription or required by law."  21 C.F.R. §1306.14(a).

215.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, violated both the spirit and the letter of the CSA by enabling practitioners to order narcotics, and pharmacists to dispense these narcotics, without confirmation that the practitioner had exercised proper medical judgment as to whether these controlled substances were issued for a legitimate medical purpose and appropriate in form, strength and quantity for the patient.  This occurred every time LINDEN CARE received a faxed prescription for Patient #1's SUBSYS, and dispensed the drug without first receiving the original, signed prescription from her physician's office, as discussed further *infra*. 21 C.F.R. § 1304.04(f)(1)-(2); 21 C.F.R. § 1306.11(a).

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

216.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, routinely dispensed Schedule II drugs, including SUBSYS, without prescriptions that complied with the CSA, FDCA, and the regulations implementing those laws.   Accordingly, LINDEN CARE caused fraudulent and/ or false claims for these drugs to be submitted to the Medicare program.   LINDEN CARE did so notwithstanding that it knew or recklessly disregarded the fact that: (1) Schedule II controlled substances could not be legally dispensed without a valid prescription; (2) LINDEN CARE's pharmacists were dispensing Schedule II controlled substances without a valid prescription; and (3) drugs dispensed without a valid prescription are not payable under Medicare Part D.   As a direct, proximate and foreseeable result of LINDEN CARE's dispensing of Schedule II drugs without a valid prescription, LINDEN CARE knowingly caused false claims to be submitted to the Medicare program and made or caused to be made false statements that were material to such claims.

217.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, violated the CSA each time it dispensed or distributed a Schedule II controlled drug without a valid prescription as required under the statute and accompanying regulations.   Each instance was a violation of 21 U.S.C. § 842(a)(1).

**D.     LINDEN CARE's "Partnership" with INSYS**

218.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, did more than just fill prescriptions for SUBSYS.  LINDEN CARE was an integral part of the INSYS sales strategy to quickly and aggressively put SUBSYS in the hands of as many patients as possible, despite any delays necessitated by legal requirement or medical safeguards.

219.   In an October 2012 email to the SUBSYS sales team, Mike Gurry, Vice President of Managed Markets for INSYS ("Gurry") wrote:

> We have partnered with Linden Care, a Specialty Pharmacy based in Syosset, NY to Prescriptions written for SUBSYS by Physicians and assist in the Prior Authorization Process.   Linden Care can now receive prescriptions from your Physicians [sic] office, run the claim against commercial insurance, assist in the [Prior Authorization] process if required and when the Rx is filled ship it to the patient for delivery within 24 hours

220.   In that same October 2012 email, Gurry set out the steps that INSYS sales representatives were to follow:

> 1.     Present the Linden Care Specialty Pharmacy Option to your Physicians
>
> 2.     Get a commitment that they will use this program to alleviate any issues associated with the filling of SUBSYS prescriptions
>
> 3.     Leave an ample supply of Patient Information Sheets in the Physicians [sic] offices and instruct the staff on how its [sic] to be used . . .

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

4. Follow up immediately with the Physicians [sic] office if daily report lists Linden Care as the filling Pharmacy for a [sic] Rx in your territory.

221. INSYS' reliance on LINDEN CARE was largely based on "alleviat[ing] any issues associated with the filling of SUBSYS prescriptions." The only "issues" associated with filling prescriptions for SUBSYS were compliance with the TIRF REMS protocol and securing Prior Authorizations. Both "issues" were necessitated by the potential for misuse and abuse of SUBSYS and the requirement that the drug be prescribed for an indicated use or be exempted by an approved justification.

222. In a November 2012 email to the SUBSYS sales team, Gurry reiterated LINDEN CARE's role as an integral part of the SUBSYS sales strategy:

1. Where you have offices that struggle with Pharmacies to stock, assist with the [Prior Authorization] process and fill prescriptions for SUBSYS, Linden Care Specialty Pharmacy is an option . . . . This is because they will assist with all three of these main components.

2. Ask the [Prior Authorization] specialist and Physicians if they would be willing to send prescriptions for SUBSYS to Linden Care to be filled.

\*          \*          \*          \*

6. Linden will fill the first Rx with 30 free units and ship this to the patients [sic] address.

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

7.      Linden will then run another prescription against commercial insurance and populate the [Prior Authorization] form if a [Prior Authorization] is required and contact the physicians [sic] office to obtain the medical information and have the physician sign the [Prior Authorization] form for return to the Health Plan

8.      Linden will fil the Rx when the [Prior Authorization] is approved and ship to the patients [sic] address.

9.      Linden will process a Super Voucher if a PA has been denied and the patient is need of the product only if the office will appeal the denial and file a first appeal with the Health Plan.

10.      Linden will only process additional super vouchers for a particular patient if they are moving through the steps int he [sic] [Prior Authorization] appeal Process
- 1st appeal to Pharmacy Department after initial [Prior Authorization] is denied
- 2nd appeal to Pharmacy Department after 1st appeal is denied
- Final appeal to Independent Review Board

**Linden Care is a tool to assist in the filling and processing of prescriptions.** (emphasis in original)

223. Thus, LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, was a critical component in INSYS' strategy of ensuring that

FIRST AMENDED COMPLAINT                               2:16-cv-07937-JLS-AJW

patients received their first 30 units of the highly addictive narcotic for free, even before their prior authorization was submitted for approval.

224.   In that same November 2012 email, Gurry emphasized to INSYS sales representatives LINDEN CARE's important role in the distribution of SUBSYS.  Gurry provided INSYS sales representatives with talking points to use with physicians and their office staff "surrounding the Specialty Pharmacy Linden Care":

1.   "Doctor, if I had a program to make it easier for you, your staff and your patients to obtain SUBSYS would you be willing to give it a trial run?" . . . .

2.   "I Understand [sic] that the Doctor won't do [Prior Authorizations] for TIRF products.  What if I could provide administrative assistance to the office to greatly reduce the burden of the [Prior Authorization].  Is that something you would support and enlist the support of the Doctor?["] Upon getting a commitment from the [Prior Authorization] Specialist/Nurse/MA go through the Linden Care program step by step.  Ask for a commitment of 3 patients for a trial run, ensure you check back in daily to see if they started a patient.

3.   "Doctor, I understand you have experienced problems getting SUBSYS filled with pharmacies in your area.  INSYS has partnered with a specialty pharmacy to solve some of these issues for you. Can I take a few minutes to explain the program and how it would benefit you and your patients?"

FIRST AMENDED COMPLAINT                           2:16-cv-07937-JLS-AJW

225.   The LINDEN CARE-INSYS partnership was established to recruit patients and "solve the issues," *i.e.*, circumvent legal and medical safeguards specifically established to protect patients from the dangers of a highly addictive and dangerous narcotic.

226.   In order to facilitate the distribution of SUBSYS on such a massive scale, and garner millions of dollars in the process, LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, abdicated its legal and medical responsibilities to dispense SUBSYS for its only indicated use – breakthrough cancer pain for opioid-tolerant patients – and began encouraging physicians to prescribe SUBSYS for off-label uses.

**E.    Improper Payments by Government Health Care Programs**

227.   Under the management and direction of the BELHEALTH ENTITIES, LINDEN CARE's illegal distribution of SUBSYS ultimately caused hundreds of thousands of prescriptions to be improperly paid for by Government Health Care Programs.

228.   Under the Medicaid program, States will not receive FFP if a drug is not prescribed for a medically-acceptable use.  FFP is available to States only for "covered outpatient drugs."  42 U.S.C. § 1396b(i)(10).  States have, therefore, implemented their own laws and pharmacy regulations that require prescribed drugs be used for a medically-accepted use that comports with the definition of a "covered outpatient drug."

FIRST AMENDED COMPLAINT                               2:16-cv-07937-JLS-AJW

"Covered outpatient drugs" do not include drugs that are used for a medical indication which is not a medically-accepted indication.  42 U.S.C. § 1396r-8(k)(3).

229.   A medically accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia.  42 U.S.C. § 1396r-8(k)(6).  The specified drug compendia approved for the Medicaid program are set forth in 42 U.S.C. § 1396r-8(g)(1)(B)(I):   American Hospital Formulary Service Drug Information;  United States Pharmacopeia-Drug Information;  the DRUGDEX Information System; and the peer-reviewed medical literature.

230.   As described above, Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home health care services. 42 U.S.C. §§ 1395e to i-5.  Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting and when they are "reasonable and necessary."

231.   Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary," and typically include those administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics, and drugs administered through durable medical equipment, such as a nebulizer.  42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

232.   The Medicare Part D drug benefit program covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k).

233.   The off-label uses of SUBSYS discussed herein are not supported by "clinical research that appear[ ] in peer-reviewed medical literature," and could not, under any circumstances, be considered "medically accepted as safe and effective" or "reasonable and necessary" for such uses.   Therefore, claims for reimbursement for SUBSYS prescribed for such off-label uses were not covered by Medicaid or Medicare.

234.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, was aware that the natural and probable consequence of its illegal distribution of SUBSYS was that health care providers would submit claims for payment to Government Health Care Programs for said distribution.

235.   Notwithstanding this knowledge, LINDEN CARE illegally distributed SUBSYS without any thought to the potential harm to patients.

236.   When LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, submitted claims based upon physicians' prescriptions for SUBSYS for off-label uses, they submitted false claims because such off-label uses were not supported by: (1) citation to one of the drug compendia specified in 42 U.S.C. § 1396r-8(g)(1)(B)(I) (Medicaid); (2) "peer-reviewed medical literature;" (3) a determination that the drug was "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and (4) a coverage determination by other

Government Health Care Programs, *see, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

237.   LINDEN CARE, under the management and direction of the BELHEALTH ENTITIES, was aware that its illegal distribution did, in fact, result in false claims to Medicaid, Medicare and other government payers.

238.   Under the management and direction of the BELHEALTH ENTITIES, LINDEN CARE's illegal distribution of SUBSYS directly and proximately caused these claims to be submitted to Government Health Care programs. LINDEN CARE caused the submission of these claims, since health care providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Health Care Programs, and the States submitted Form CMS-64 to the Federal Government, all claiming reimbursement for SUBSYS based on off-label or unapproved uses.

239.   The fact that the Government Health Care Programs paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.  Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were

FIRST AMENDED COMPLAINT                                       2:16-cv-07937-JLS-AJW

not.  In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

## VIII.  <u>DEATH BY SUBSYS: OVERDOSE OF PATIENT #1</u>

240.  Through her work at INSYS, Relator interacted with the Patient and Physician described below, and learned the following facts, which exemplify INSYS' off-label promotion and misbranding of SUBSYS and its use of kickbacks to promote the drug, as well as LINDEN CARE's misbranding of the drug and repeated breach of the TIRF REMS protocol and the CSA.

241.  Patient #1 met Doctor #1 for an initial consultation on August 13, 2014, related to pain associated with degenerative disc disorder, kidney stones, migraines, fibromyalgia, and assorted other illnesses. Patient #1 bore injuries from two car accidents, and, as a consequence of chronic pain, grew dependent on the opioids she had taken for several years.

242.  Doctor #1 practices internal medicine, diabetic management, holistic medicine, and weight control. She does not advertise an expertise or accreditation in either oncology or pain management.

243.  INSYS trained and instructed Relator to use various techniques to promote SUBSYS to Doctor #1, including invitations to multiple speaker programs and dinners with Relator's regional sales manager.

FIRST AMENDED COMPLAINT                           2:16-cv-07937-JLS-AJW

244.   Further, in compliance with the training she received from INSYS, Relator made regular trips to Doctor #1's office, dropping off breakfast and lunch and boxes of coffee for the staff, and attempting to convince the Doctor #1 to prescribe SUBSYS to one of her patients. As Relator noted in a Business Plan she drafted for her sales manager, Doctor #1 was an "A" target, and Relator did the following: "weekly visits/staff and Dr. aware of benefits of SUBSYS and is looking for appropriate patient types…"

245.   In December, 2014, Doctor #1 found what she and INSYS considered to be an "appropriate patient type," a patient without cancer, who suffered from "chronic, intractable pain." Doctor #1 contacted Relator and scheduled a meeting with Patient #1.

**A.     INSYS' Complicity**

246.   INSYS, through Relator and its IRC, (1) advised Doctor #1 to prescribe SUBSYS at an improperly high introductory dosage and with improper instructions for use, (2) advised Patient #1 to change doses during titration without consulting her physician, and (3) pre-populated the prior authorization form with off-label indication and off-label dose.

247.   On January 5, 2015, Doctor #1 saw Patient #1 for medication monitoring, and noted in Patient #1's records the order of two prescriptions of SUBSYS 200 mcg, to be taken "every four hours for a script of 30 units, second script for 120 units[.]" Doctor #1 arranged for Patient #1 and her father to meet with Relator immediately after this

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

consultation, for instruction on the use of SUBSYS. At this time, Doctor #1 and Patient #1 executed a TIRF REMS Patient-Prescriber Agreement Form, a necessary predicate to the authorization and dispensation of the SUBSYS prescriptions.

248.   Relator met with Patient #1 and her father that same day. Doctor #1 did not join them. At the meeting, Relator provided a partially completed INSYS Reimbursement Center Patient Authorization & Referral Form ("Prior Authorization Form"), to which Patient #1's father added Patient #1's name, date of birth, gender, social security number, address, and phone number. Though Relator never filled this section out for a patient, she was advised by her sales manager at the time, SM #3, that other sales representatives did so, but that they made sure that the handwriting looked different to avoid detection by regulators.   Relator pre-populated the dosage line, checking the box for 200 mcg, and the indication section, checking boxes for "patient is opioid tolerant", "other chronic pain," and "chronic pain syndrome." (See form at ¶ 123).

249.   The standard INSYS prior authorization form lists both approved and off-label medical diagnoses among its rationales for prescribing SUBSYS.   One of the potential diagnosis is even contraindicated on the label. SUBSYS' FDA-approved label contraindicates "post-operative pain," yet INSYS' prior authorization form includes "Post-laminectomy syndrome," also known as Failed Back Syndrome (FBS). FBS is a catch-all diagnosis for patients whose pain persists after spinal surgery. When

FIRST AMENDED COMPLAINT                                      2:16-cv-07937-JLS-AJW

87

questioned regarding this, Relator was unaware that a contraindicated diagnosis appeared on the form, but explained that her training by INSYS was so focused on sales, rather than the consultative services emphasized by other pharmaceutical sales departments, that she and her colleagues received little to no explanation of the diagnoses for which the drug was contraindicated.

250.   Relator also instructed Patient #1 on the use of SUBSYS and INSYS' recommended method of titration for determining effective dosage. Relator handed marketing materials to Patient #1, including (1) a brochure titled "Are Your Patients Getting Relief From Their Breakthrough Cancer Pain?" (hereinafter the "Brochure") and (2) the Titration Process and Schedule booklet.

251.   In the course of educating Patient #1 on the use of SUBSYS, as directed by INSYS management, Relator advised Patient #1 and her father that neither the 100 mcg dose nor the 200 mcg dose would have the desired effect, that she would need to "titrate up" to her minimum effective dose. Ultimately, INSYS sales representatives were trained to make sure their prescriptions reached doses of 400 mcg or higher through titration, as INSYS circulated a daily report of prescriptions below 400 mcg, to serve as a list of doctors in need of "education" from sales representatives on proper dosing.

252.   The Brochure is targeted at prescribers. Relator received no direction from INSYS management on what to do with marketing materials during patient meetings, so she used them to educate the patients on the use of the drug. The Brochure provides

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

instructions on how to "titrate up" to an effective pain relief dosage. Relator used the Brochure, as well as the titration guide, along with notes she took during her week of training.  She showed Patient #1 a chart from the Brochure which states that a majority of patients achieve an effective dose of SUBSYS between 600 mcg and 1600 mcg, and advised the patient to begin use of SUBSYS by taking a 200 mcg dose upon having her first pain episode.  Relator advised Patient #1 that if pain remained after thirty minutes, she could take another 200 mcg dose.  Relator further advised, based on her limited training, that Patient #1 should double the dose, taking 400 mcg, after four hours elapsed.

253.   Relator's advice to Patient #1 regarding her initial dosage was undoubtedly off-label promotion. Relator, based on INSYS training, led Patient #1 to believe that a 100 mcg dose would have no effect on her pain, though the 100 mcg dose is the only FDA approved initial dosage. INSYS, in fact, instructed Relator and her colleagues that the FDA-approved 100 mcg dose was below the threshold of what any opioid-tolerant adult would benefit from, and that the patient population would cease using the drug if they were not able to feel its effects more dramatically, by beginning with the 200 mcg dose.

254.   Relator's advice to Patient #1 regarding the alteration of dosage during titration is further evidence of INSYS' systemic off label promotion of SUBSYS. At the direction of INSYS management, Relator advised Patient #1 to change her own dosage on

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

the basis of her relative pain levels during titration, without contacting her physician prior to or after the change. INSYS instructed Relator and her colleagues to do this during their initial training. In doing so, INSYS trained its employees to directly contradict SUBSYS' FDA-approved label, which tells patients to contact their prescribing physician before altering their dosage. The FDA-approved label advises patients to take this precaution because of the severity of the drug's side-effects, which include death.

255.   When Relator showed Patient #1 the Brochure containing a chart claiming that 3 out of 4 patients achieve an effective dose between 600 mcg and 1600 mcg, she was also following INSYS policy.  By providing this information to patients, INSYS prepared patients to be unsatisfied by the initial dose. This sales protocol approaches what micro-economists call "price framing." When sales people "price frame" they present higher than expected prices to a potential purchaser, in order to raise the purchaser's perception of what an acceptable price would be. When INSYS sales staff advised patients and physicians that the FDA-approved 100 mcg starting dose would be imperceptible, they pushed patients to consume higher and higher doses of a dangerous and addictive opioid.

256.   After Relator's meeting with Patient #1, Doctor #1's office staff faxed copies of the prescriptions to LINDEN CARE Pharmacy, and Relator submitted the parties' Patient-Prescriber Agreement Form and Prior Authorization Form to INSYS' Reimbursement Center ("IRC") representatives on proper dosing.

FIRST AMENDED COMPLAINT                                  2:16-cv-07937-JLS-AJW

257.   On January 8, 2015, Envision Pharmaceutical Services (now "EnvisionRx") authorized Medicare reimbursement for Prescription # 2080916-01N/D, one hundred and twenty units of SUBSYS 200 mcg spray, written on behalf of Patient #1 by Doctor #1. LINDEN CARE dispensed the prescription to Patient #1 that same day, without first receiving the original prescription from Doctor #1. LINDEN CARE priced the 20-day, 120 dose prescription of SUBSYS at approximately $6,667.60.   Patient #1 was responsible for $6.60 and EnvisionRx paid $5,509.52.

258.   EnvisionRx, the Medicare Part D insurer responsible for either authorizing or refusing reimbursement for Patient's SUBSYS, requires a journal article for off-label prescriptions. INSYS' Reimbursement Center handled all contract between INSYS staff and EnvisionRx, so Relator has no information on what was said or provided by INSYS to ensure reimbursement, however Relator does recall that sales staff agreed that certain members of the IRC staff had better results than others.

259.   Patient #1 received approval for an exception from Envision because of the prior authorization form. This is the only method for gaining approval where a patient seeks to use the drug for an off-label purpose.

260.   EnvisionRx's Medicare Part D Eldercare plan served as the Third Party Payor for the transaction.

261.   Between January 26, 2015 and March 21, 2016, Doctor #1 drafted, EnvisionRx authorized, and LINDEN CARE dispensed seventeen additional SUBSYS

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

prescriptions for Patient #1, each for 600 mcg spray, nine (9) of these for one hundred and twenty (120) doses and the remaining eight (8) prescriptions for one hundred and eighty (180) doses.

262.   Befitting her training by INSYS, Relator did not mention to Patient #1 the label's limitation to only patients with breakthrough cancer pain. Rather, she provided Patient #1 directions for using SUBSYS, and guided her to begin at the 200 mcg dose and begin titrating up without first consulting the prescribing physician, Doctor #1. In doing so, Relator behaved as trained and directed by INSYS management.

263.   Patient #1 continued to take a 600 mcg dose until her death.  The prescription was initially for a 20-day supply with a quantity of 120.  On August 25, 2015, and thereafter, the prescription was for a 30-day supply with a quantity of 180.

**B.     LINDEN CARE's Complicity**

264.   When LINDEN CARE received Patient #1's first prescription for SUBSYS, the dosage and wording should have immediately raised a red flag with pharmacists on duty. Patient's #1's physician (Doctor #1) prescribed the 200 mcg dosage, in direct contravention of the product's FDA approved label and the TIRF REMS guidelines, both of which mandate an initial 100 mcg dose in an effort to allow patients to titrate up to their optimal dosage safely. Despite certifying that it would start all patients at the lowest dose, LINDEN CARE dispensed Patient #1 her first prescription of SUBSYS at twice that dosage.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

265.  When LINDEN CARE received Patient #1's second prescription for SUBSYS, it again acceded to the written directions unlawfully and without question or complaint. LINDEN CARE dispensed 600 mcg SUBSYS spray to Patient #1, despite the fact that SUBSYS' label recommends a 400 mcg dose. Further, and even more troubling, LINDEN CARE distributed the drug for an off-label use – "Chronic Intractable Pain" – and without proper directions in the memo line of the prescription. The prescription's hardcopy label states, "Use 1 Spray Under Tongue Every Four Hours." It does not say "PRN," or "As Needed." Rather, the label instructed Patient #1 to use SUBSYS as a maintenance opioid. The directions on the hardcopy label came, verbatim, from the handwritten prescription Doctor #1's staff faxed to LINDEN CARE. Thus, the treating physician prescribed SUBSYS with patently improper and unsafe directions for use, INSYS' IRC forwarded said those directions to the pharmacy, and then LINDEN CARE dispensed the drugs to Patient #1 with no apparent scrutiny or oversight.

266.  No pharmacist should have dispensed the second prescription - and certainly no TIRF REMS certified pharmacist - because it was not prescribed as needed - a serious medication error. LINDEN CARE failed to satisfy its duty, under TIRF-REMS, the FDCA, and the CSA, to guard against prescription errors, especially with respect to drugs so dangerous as SUBSYS and other TIRFs.

267.  LINDEN CARE dispensed Patient #1's second prescription for SUBSYS on January 26, 2015, and two additional prescriptions, also for 600 mcg SUBSYS, on

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

February 27 and March 26, before adding the language "As Needed" to Patient's fifth prescription on April 17, 2015. A review of Doctor #1's prescription pad reveals what was apparent with the January 26, 2015 prescription, that LINDEN CARE employees merely transcribed whatever the physician wrote, independent of whether these directions were inherently dangerous and contrary to those approved by the FDA and taught by the TIRF REMS Access program.

268.   On May 28, 2015, LINDEN CARE again failed to include any "As Needed" language.

269.   Even when, on September 22, 2015, Doctor #1's prescription pad memo stated "PRN," LINDEN CARE's hardcopy label failed to include the "As Needed" language. To the contrary, the label stated, "Use 1 Spray Under Tongue Every 4 Hours."

270.   Incredibly, based on the prescription written by the Doctor #1 and filled by LINDEN CARE, Patient #1 could consume a 600 mcg dose of SUBSYS every four hours, every day, independent of what pain she felt or did not feel. Her physician and pharmacist, alike, advised her to do so. This is because, rather than raise the dosage of Patient's maintenance opioid, or change the maintenance opioid, the prescribing physician prescribed enough SUBSYS for Patient to consume it six times daily. Patient #1, an opioid addict suffering from severe, chronic pain, set an alarm clock each night, to make sure that she took the scheduled dose that fell in the middle of her sleep schedule.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

271.   TIRF-REMS, like SUBSYS' label, states that the drug should not be prescribed for more than four daily doses. SUBSYS is not a maintenance opioid. It is a powerful analgesic, one which can easily kill patients who abuse it.

272.   Patient #1's SUBSYS prescription, filled by LINDEN CARE, directed her to abuse the drug, which led to her death.

273.   On October 30, 2015, Virtua West Jersey Hospital ("Virtua Voorhees") admitted and discharged Patient #1 from its Emergency Department, where Patient #1 presented with chest pain. At the time of discharge, Patient #1's treating physician advised her to "wean her medications down."

274.   On January 17, 2016, Virtua Voorhees admitted and discharged Patient #1 from its Emergency Department, where Patient #1 presented with a wound on her left leg. On discharge, Patient #1's treating physician noted the following: "Pt somnolent but arousable on exam; pt took 600 mcg of fentanyl in the exam room; after arousing pt she requested something additional for pain; explained at this time given somnolence explained to pt that it was not appropriate at this time."

275.   Doctor #1 met with Patient #1 on January 18, 2016, the day following her final visit to Virtua Voorhees' Emergency Department. On that date, Doctor #1 prescribed additional medication, noting: "Med admin: SUBSYS 600 mcg q 4, #180 doses, OxyContin 10 mg q 12 #60, no evidence of substance abuse or aberrant behavior activities of daily living the patient can function with medications njrx cked and confirmed."

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

276.   On March 25, 2016, Patient #1's boyfriend woke to find her dead on the couple's bedroom floor. Subsequent toxicology reports caused her death to be ruled accidental, the result of adverse effects of drugs. Patient #1's blood contained high levels of fentanyl and norfentanyl (the prime fentanyl metabolite).

277.   LINDEN CARE abrogated its duty to ensure that no extra medication was dispensed to Patient #1. LINDEN CARE also failed to educate both patient and prescriber, as it certified would occur. These failures began with the first prescription LINDEN CARE filled for Patient #1, and continued until her death, eighteen prescriptions and $250,544.62 in Medicare copayments later.

278.   In sum, LINDEN CARE dispensed nine SUBSYS prescriptions to Patient #1 which failed to include any "As Needed" language. These labels directed the patient to use the drug every four hours, independent of pain.

279.   The preceding facts demonstrate that LINDEN CARE lacked a competent compliance program during the period of January 26, 2015 and March 21, 2016, the time between Patient's first prescription of SUBSYS and her death from its misuse.  It is believed and, therefore, averred that LINDEN CARE's failures as detailed herein were systemic in nature.

280.   By failing to comply with TIRF-REMS, and submitting its bills to government healthcare programs for repayment, LINDEN CARE committed eighteen FCA violations with respect to Patient #1, alone.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

281.   Relator believes and, therefore, avers that her experience with calling on Doctor #1 and the resulting prescriptions to Patient #1 were illustrative of Defendants INSYS' and LINDEN CARE's unlawful marketing, sale, and dispensing of SUBSYS on a nationwide basis.

## IX.   **CONCLUSION**

282.   INSYS willfully and intentionally promoted SUBSYS for off-label uses, and paid kickbacks to physicians in order to increase the revenues it received from Government Health Care Programs.   Under the management and direction of the BELHEALTH ENTITIES, LINDEN CARE, through its willful acts, in concert with INSYS, engaged in a systemic, fraudulent scheme that caused physicians to neglect the welfare of their patients and expand the use and abuse of a highly addictive and potent form of fentanyl. Upon information and belief, the illegal and unjust activities of INSYS continue unabated, and the illegal conduct of LINDEN CARE ended only after it ceased business operations on July 26, 2017.

### COUNT ONE
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

283.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein

284.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides, in relevant part, that any person who:

FIRST AMENDED COMPLAINT                                      2:16-cv-07937-JLS-AJW

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of the person.

285.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval of SUBSYS, or treatments involving SUBSYS, to officers, employees or agents of the United States Government.  Defendants knew that these claims for payment or approval were false or fraudulent, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

286.   The United States, unaware of Defendants' false or fraudulent representations, and the falsity or fraudulence of claims presented, or caused to be presented by Defendants, has paid the false claims submitted that would otherwise not have been allowed.

287.   The United States has made payments upon false and fraudulent claims presented, or caused to be presented, by Defendants and thereby has suffered damages. The United States is entitled to full recovery of the amounts paid, directly or indirectly, by the Government Health Care Programs pursuant to the submission of false claims, which Defendants presented, or caused to be presented.

FIRST AMENDED COMPLAINT                                     2:16-cv-07937-JLS-AJW

288.   The fact that the United States paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.  Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were not.  In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

289.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT TWO
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

290.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

291.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in, relevant part, that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . .

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

plus three times the amount of damages which the Government sustains because of the act of the person.

292.   By virtue of the acts described above, Defendants knowingly made and/or used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for payment or approval of SUBSYS, or treatments involving SUBSYS, to officers, employees or agents of the United States Government.

293.   The United States, unaware of the falsity of the records and/or statements made and use, or caused to be made and used, by Defendants, and in reliance on the accuracy thereof, have paid and approved claims that were ineligible for reimbursement and would not have been paid or approved if any part of the truth were known.

294.   The amounts of the false or fraudulent claims caused by Defendants to be submitted to the United States were material.

295.   As a direct and proximate consequence of Defendants' conspiratorial conduct, the United States has suffered significant, material financial damages in an amount to be proved at trial.

296.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

## COUNT THREE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

297.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

298.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of the person.

299.   By virtue of the acts described above, Defendants knowingly concealed and/or knowingly and improperly avoided an obligation to pay or transmit money to the Government for improper reimbursements that the Government provided, directly or indirectly, for the use of SUBSYS in violation of 31 U.S.C. § 3729(a)(1)(G).

300.   As a direct and proximate consequence of Defendants' conduct, the United States has suffered significant, material financial damages in an amount to be proved at trial.

301.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT FOUR
### Payment by Mistake
### (Restitution)

295.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

296.   This is a claim for the recovery of monies paid by the United States to Defendants, directly or indirectly, as a result of mistaken understandings of fact.

297.   The United States paid for claims for SUBSYS that were promoted for off-label uses and distributed by Defendants in violation of the FDA-approved label, the CSA, and the TIRF REMS protocol, without knowledge of material facts, and under the mistaken belief that Defendants were entitled to receive payment, directly or indirectly, for such claims when it was not.  The United States also paid Defendants, directly or indirectly, for Medicare and TRICARE claims that had been approved based on false factual representations regarding patients' medical conditions and histories.

298.   The United States' mistaken belief was material to its decision to pay Defendants, directly or indirectly, for such claims.

299.   Accordingly, Defendants are liable to make restitution to the United States of the amounts of the payments made, directly or indirectly, to it in error by the United States.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

300.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT FIVE
### Payment by Mistake
### (Unjust Enrichment)

301.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

302.   As a consequence of the acts set forth above, Defendants were unjustly enriched, directly or indirectly, at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

303.    The United States is entitled to recovery of all monies by which Defendants have been unjustly enriched.

304.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT SIX
### Violations of the California False Claims Act
### California Government Code § 12651 *et seq.*

305.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

306.   This is a claim for treble damages and penalties under the California False Claims Act.

307.   Cal. Gov't Code §12651(a) provides liability for the costs of a civil action, a civil penalty of up to $11,000 and treble damages for all damages sustained by the state for any person who

> (1)   Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.

> (2)   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

> (3)   Conspires to commit a violation of this subdivision.

*   *   *   *

> (8)   Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

308.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State Government of California for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

309.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of California; (2) made, used, or caused to be made or used, a false record or statement

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

material to a false or fraudulent claim; (3) conspired to commit violations of Cal. Gov't Code § 12651; and (4) failed to disclose a false claim to the State of California after discovering they were beneficiaries of an inadvertent submission of a false claim and subsequently learning of the falsity of that claim.

310.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

311.   Compliance with applicable Medicare, Medi-Cal, and various other Federal and State laws was a condition of payment of claims submitted to the California State Government.

312.   The California State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made, by Defendants, paid claims, directly or indirectly, that would not have been paid but for Defendants' false statements and representations concerning SUBSYS.

313.   By reason of Defendants' acts, the California State Government has been damaged in substantial amounts to be determined at trial.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

314.   The State of California is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

315.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

316.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of California in the operation of its Medi-Cal program.

## COUNT SEVEN
### Violations of the Colorado Medicaid False Claims Act
### C.R.S.A. § 25.5-4-304 *et seq*.

317.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

318.   This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

319.   Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-305(1), in relevant part, provides for liability for any person who

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

106

*   *   *   *

(f)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

(g)  Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

320.  By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

321.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Colorado; (2) made, used or caused to be made or used false records or statements to get false claims paid, directly or indirectly, by the State of Colorado; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Colorado in connection with the "Colorado Medical Assistance Act," and knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the State of Colorado in connection with the

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

107

"Colorado Medical Assistance Act;" and (4) conspired to commit a violation of and C.R.S.A. § 25.5-4-305(1).

322.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

323.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Colorado State Government.

324.   The Colorado State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not have been paid but for Defendants' false statements and representations concerning SUBSYS.

325.   By reason of Defendants' acts, the Colorado State Government has been damaged in substantial amounts to be determined at trial.

326.   The State of Colorado is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                           2:16-cv-07937-JLS-AJW

327.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

328.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

**COUNT EIGHT**
**Violations of the Connecticut False Claims Act**
**C.G.S.A. § 2-274 *et seq*.**

329.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

330.   This is a claim for treble damages and penalties under the Connecticut False Claims Act, CT Gen Stat § 4-274 *et seq*.

331.   CT Gen Stat § 4-275 of the Connecticut False Claims Act provides in relevant part:

> (a) No person shall:
>
> (1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;
>
> (2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;
>
> (3) Conspire to commit a violation of this section;

FIRST AMENDED COMPLAINT                                       2:16-cv-07937-JLS-AJW

\*   \*   \*   \*

(7) Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program; or

(8) Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program.

332.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

333.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, under a state-administered health or human services program (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim under a health or human services program administered by the State of Connecticut; (3) conspired to commit a violation of CT Gen Stat § 4-275; (4) made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, directly or indirectly, to the state under a health or human services program administered by the State of Connecticut and (5) concealed, or knowingly and improperly avoided or decreased an

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

obligation to pay or transmit money to the State of Connecticut under a health or human services program administered by the State of Connecticut.

334.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

335.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Connecticut State Government.

336.   The Connecticut State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

337.   By reason of Defendants' acts, the Connecticut State Government has been damaged in substantial amounts to be determined at trial.

338.   The State of Connecticut is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

FIRST AMENDED COMPLAINT                                     2:16-cv-07937-JLS-AJW

339. Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

340. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

## COUNT NINE
### Violations of the Delaware False Claims and Reporting Act
### 6 DEL. C. § 1201 *et seq*.

341. Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

342. This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

343. The Delaware False Claims and Reporting Act, 6 Del. Code Ann. § 1201 provides, in relevant part:

(a) Any person who:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of paragraph (a)(1), (2), (4), (5), (6) or (7) of this section;

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

\*   \*   \*   \*

> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

> shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of damages which the Government sustains because of the act of that person.

344.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

345.    Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Delaware; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of 6 Del. Code Ann. §1201(a); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Delaware, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Delaware.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

346.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

347.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the Delaware State Government.

348.   The Delaware State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

349.   By reason of Defendants' acts, the Delaware State Government has been damaged in substantial amounts to be determined at trial.

350.   The State of Delaware is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

351.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

352.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

## COUNT TEN
### Violations of the Florida False Claims Act
### FL. STAT. ANN. § 68.081 *et seq.*

353.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

354.   This is a claim for treble damages and penalties under the Florida False Claims Act.

355.   The Florida False Claims Act, Fla. Stat § 68.082 provides, in relevant part:

(2)   Any person who:

(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c)   Conspires to commit a violation of this subsection;

\*   \*   \*   \*

(g)   Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person.

356.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval, directly or indirectly, and have knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

357.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Florida; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Fla. Stat § 68.082(2); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Florida, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Florida.

358.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

FIRST AMENDED COMPLAINT                         2:16-cv-07937-JLS-AJW

359.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the Florida State Government.

360.   The Florida State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

361.   By reason of Defendants' acts, the Florida State Government has been damaged in substantial amounts to be determined at trial.

362.   The State of Florida is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

363.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

364.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

# COUNT ELEVEN
## Violations of the Georgia State False Medicaid Claims Act
## O.C.G.A. § 49-4-168 *et seq.*

365.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

366.   This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

367.   O.C.G.A. § 49-4-168 of the Georgia State False Medicaid Claims Act, provides, in relevant part:

(a) Any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

\*     \*     \*     \*

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia.

shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

368.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

369.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Georgia; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money to the State of Georgia.

370.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

371.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Georgia State Government.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

372.   The Georgia State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

373.   By reason of Defendants' acts, the Georgia State Government has been damaged in substantial amounts to be determined at trial.

374.   The State of Georgia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

375.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

376.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

## COUNT TWELVE
### Violations of the Hawaii False Claims Act
### HAW. REV. STAT. § 661-21 *et seq*.

377.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

378.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

379.    The Hawaii False Claims Act, Haw. Rev. Stat § 661-21 *et seq.*, provides, in relevant part:

(a) [A]ny person who:

(1)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

*    *    *    *

(6)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State;

(7)  Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim; or

(8)  Conspires to commit any of the conduct described in this subsection,

shall be liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages that the State sustains due to the act of that person.

380.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Hawaii State Government for

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

381.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Hawaii; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Hawaii, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Hawaii; (4) failed to disclose, within a reasonable time after discovery, a false claim to the State of Hawaii after discovering they were beneficiaries of an inadvertent submission of a false claim, and subsequently learning of the falsity of that claim; and (5) conspired to commit the conduct described in Haw. Rev. Stat § 661-21(a).

382.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

383.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Hawaii State Government.

384.   The Hawaii State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

385.   By reason of Defendants' acts, the Hawaii State Government has been damaged in substantial amounts to be determined at trial.

386.   The State of Hawaii is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

387.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

388.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                            2:16-cv-07937-JLS-AJW

## COUNT THIRTEEEN
### Violations of the Illinois False Claims Act
### 740 ILL. COMP. STAT. § 175/1 *et seq.*

389.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

390.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

391.   740 Ill. Comp. Stat. §175/3(a) of the Illinois False Claims Act provides in relevant part:

(1)   In general, any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

\*   \*   \*   \*

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State,

is liable to the State for a civil penalty of not less than the minimum amount and not more than the maximum amount allowed for a civil penalty for a violation of the federal False Claims Act (31 U.S.C. 3729 et seq.) as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461), plus 3 times the amount of damages

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

> which the State sustains because of the act of that person. Notwithstanding any other provision, a person is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person, when: (i) the civil action was brought by a private person pursuant to paragraph (1) of subsection (b) of Section 4; (ii) the State did not elect to intervene pursuant to paragraph (2) of subsection (b) of Section 4 . . . .

392.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

393.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Illinois; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of 740 Ill. Comp. Stat. §175/3(a)(1); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Illinois, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Illinois.

394.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

395.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Illinois State Government.

396.   The Illinois State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

397.   By reason of Defendants' acts, the Illinois State Government has been damaged in substantial amounts to be determined at trial.

398.   The State of Illinois is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

399.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

400.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

## COUNT FOURTEEN
### Violations of the Indiana False Claims and Whistleblower Protection Act
### IND. CODE ANN. § 5-11-5.5 *et seq.*

401.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

402.   This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

403.   The Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5 *et seq.*, provides in relevant part:

(b)  A person who knowingly or intentionally:

(1)  presents a false claim to the state for payment or approval;

(2)  makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

\*   \*   \*   \*

(6)  makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7)  conspires with another person to perform an act described in subdivisions (1) through (6); or

(8)  causes or induces another person to perform an act described in subdivisions (1) through (6);

is, except as provided in subsection (c), liable to the state for a civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state.  In addition, a person who violates this section is liable to the state for the costs of a civil action brought to recover a penalty or damages.

404.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Indiana State

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

127

Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

405.   Specifically, Defendants knowingly or intentionally: (1) presented a false claim for payment or approval, directly or indirectly, to the State of Indiana; (2) made or used a false record to obtain payment or approval of a false claim from the State of Indiana; (3) made or used a false record or statement to avoid an obligation to pay or transmit property to the State of Indiana; (4) conspired to perform an act described in IND. CODE ANN. § 5-11-5.5-2(b)(1)- (6); and (5) caused or induced another person to perform an act described in IND. CODE ANN. § 5-11-5.5-2(b)(1)-(6).

406.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

407.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Indiana State Government.

FIRST AMENDED COMPLAINT                                 2:16-cv-07937-JLS-AJW

408.   The Indiana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

409.   By reason of Defendant s' acts, the Indiana State Government has been damaged in substantial amounts to be determined at trial.

410.   The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

411.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

412.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

## COUNT FIFTEEN
### Violations of the Iowa False Claims Law
### I.C.A. § 685.1 *et seq.*

413.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

FIRST AMENDED COMPLAINT                            2:16-cv-07937-JLS-AJW

414.   This is a claim for treble damages and penalties under the Iowa False Claims Law.

415.   I.C.A. § 685.2 of the Iowa False Claims Law provides in relevant part:

> 1.  A person who commits any of the following acts is liable to the state for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act . . . plus three times the amount of damages which the state sustains:

> *a.* Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

> b. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> *c.* Conspires to commit a violation of paragraph "*a*", "*b*", "*d*", "*e*", "*f*", or "*g*".

> *         *         *         *

> *g.* Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

416.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

417.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false claim for payment or approval, directly or indirectly, to the State of Iowa; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim the State of Iowa; (3) conspired to commit a violation of I.C.A. § 685.2; and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Iowa, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Iowa.

418.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

419.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Iowa State Government.

420.   The Iowa State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

421.   By reason of Defendants' acts, the Iowa State Government has been damaged in substantial amounts to be determined at trial.

422.   The State of Iowa is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

423.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

424.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

## COUNT SIXTEEN
### Violations of the Louisiana Medical Assistance Programs Integrity Law
### LA. REV. STAT. § 46.437.1 *et seq.*

425.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

426.   This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

427.   The Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46-438.3 provides, in relevant part:

> A.   No person shall knowingly present or cause to be presented a false or fraudulent claim.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

B.     No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C.     No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D.     No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E.     (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

428.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

429.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim to the State of Louisiana; (2) engaged in misrepresentation or made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the State of Louisiana; (3) made, used, or caused to be made or used, a

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

false record or statement material to an obligation to pay or transmit money to the medical assistance programs of the State of Louisiana, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the medical assistance programs of the State of Louisiana; (4) conspired to defraud, or attempted to defraud, the medical assistance programs of the State of Louisiana through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim; and (5) submitted a claim for goods, services, or supplies which were medically unnecessary.

430.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

431.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Louisiana State Government.

432.   The Louisiana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

433.   By reason of Defendants' acts, the Louisiana State Government has been damaged in substantial amounts to be determined at trial.

434.   The State of Louisiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

435.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

436.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

## COUNT SEVENTEEN
### Violations of the Massachusetts False Claims Law
### MASS. GEN. LAWS CH. 12 § 5 *et seq*.

437.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

438.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

439.   The Massachusetts False Claims Law, Mass. Gen. Laws Ann. chap. 12, §5(B) provides in relevant part:

(a) Any person who:

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

135

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) conspires to commit a violation of this subsection;

(4) knowingly presents, or causes to be presented, a claim that includes items or services resulting from a violation of section 1128B of the Social Security Act, 42 U.S.C. 1320a-7b, or section 41 of chapter 118E;

\*   \*   \*   \*

 (9) knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof; or

(10) is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or (ii) the date any corresponding cost report is due, if applicable,

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation . . . plus 3 times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation.

440.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval, directly or indirectly, and have knowingly or

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

441. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false claim for payment or approval, directly or indirectly, to the Commonwealth of Massachusetts; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Mass. Gen. Laws Ann. chap. 12, §5(B); (4) presented, or caused to be presented, a claim that includes items or services resulting from a violation of section 1128B of the Social Security Act, 42 U.S.C. 1320a-7b, or section 41 of chapter 118E; (5) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or to transmit money to the Commonwealth of Massachusetts, or a political subdivision thereof, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Commonwealth of Massachusetts or a political subdivision thereof; and (6) failed to disclose, within the applicable time period, the receipt of overpayments from the Commonwealth of Massachusetts, or a political subdivision thereof, resulting from a false claim after discovering they were beneficiaries of an inadvertent submission of a false claim to the Commonwealth of Massachusetts or a political subdivision thereof, or were the beneficiaries of an overpayment from the Commonwealth of Massachusetts, or a political subdivision thereof.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

442.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

443.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Massachusetts State Government.

444.   The Massachusetts State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

445.   By reason of Defendants' acts, the Massachusetts State Government has been damaged in substantial amounts to be determined at trial.

446.   The Commonwealth of Massachusetts is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

447.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

448.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

## COUNT EIGHTEEN
### Violations of the Michigan Medicaid False Claims Act
### MICH. COMP. LAWS § 400.601 *et seq*.

449.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

450.   This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

451.   M.C.L.A. 400.603 provides in relevant part:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit.

(3) A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

M.C.L.A. 400.606 provides in relevant part:

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

(1) A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, . . . being sections 400.1 to 400.121 of the Michigan Compiled Laws.

M.C.L.A. 400.612 provides in relevant part:

(1) A person who receives a benefit that the person is not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact, or who engages in any conduct prohibited by this statute, shall forfeit and pay to the state the full amount received, and for each claim a civil penalty of not less than $5,000.00 or more than $10,000.00 plus triple the amount of damages suffered by the state as a result of the conduct by the person.

452.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

453.   Specifically, Defendants knowingly: (1) made, or caused to be made, a false statement or false representation of a material fact in an application for Medicaid benefits; (2) made, or caused to be made, a false statement or false representation of a material fact used in determining rights to a Medicaid benefit; (3) concealed or failed to disclose an event, of which they had knowledge, that affected the initial or continued right of another person to receive a benefit to which the person was not entitled, with intent to obtain that benefit; and (4) entered into an agreement, combination, or conspiracy to defraud the State of Michigan by obtaining or aiding another to obtain the payment or allowance of a false

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

claim under the social welfare act of sections 400.1 to 400.121 of the Michigan Compiled Laws.

454.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

455.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the Michigan State Government.

456.   The Michigan State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

457.   By reason of Defendants' acts, the Michigan State Government has been damaged in substantial amounts to be determined at trial.

458.   The State of Michigan is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

459.    Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

460.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

## COUNT NINETEEN
### Violations of the Minnesota False Claims Act
### M.S.A. § 15C.01 *et seq.*

461.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

462.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

463.    Section 15C.02 of the Minnesota False Claims Act provides in relevant part:

(a) A person who commits any act described in clauses (1) to (7) is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person . . .

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

FIRST AMENDED COMPLAINT                           2:16-cv-07937-JLS-AJW

\* \* \* \*

(7) knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

464.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

465.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim payment or approval to the State of Minnesota; (2) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Section 15C.02(a) of the Minnesota False Claims Act; and (4) made or used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, directly or indirectly, to the State of Minnesota or a political subdivision thereof, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money, directly or indirectly, to the State of Minnesota or a political subdivision thereof.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

466.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

467.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Minnesota State Government.

468.   The Minnesota State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

469.   By reason of Defendants' acts, the Minnesota State Government has been damaged in substantial amounts to be determined at trial.

470.   The State of Minnesota is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

471.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                         2:16-cv-07937-JLS-AJW

472.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

## COUNT TWENTY
### Violations of the Montana False Claims Act
### MONT. CODE ANN. § 17-8-401 *et seq*.

473.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

474.    This is a claim for treble damages and penalties under the Montana False Claims Act.

475.    Section 17-8-403 of the Montana False Claims Act provides in relevant part:

(1) Except as provided in subsection (2), a person is liable to a governmental entity for a civil penalty of not less than $5,500 and not more than $11,000 for each act specified in this section, plus three times the amount of damages that a governmental entity sustains, along with expenses, costs, and attorney fees, if the person:

(a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of this subsection (1);

\*    \*    \*    \*

(g) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit

FIRST AMENDED COMPLAINT                                     2:16-cv-07937-JLS-AJW

money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

476. By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

477. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval to the State of Montana; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Section 17-8-403(1) of the Montana False Claims Act; (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to a governmental entity of Montana or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to a governmental entity of Montana; and (5) failed to disclose a false or fraudulent claim to the State of Montana after discovering they were the

FIRST AMENDED COMPLAINT                                          2:16-cv-07937-JLS-AJW

146

beneficiaries of an inadvertent submission of a false claim and subsequently learning of the falsity of that claim.

478.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

479.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Montana State Government.

480.   The Montana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

481.   By reason of Defendants' acts, the Montana State Government has been damaged in substantial amounts to be determined at trial.

482.   The State of Montana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                                      2:16-cv-07937-JLS-AJW

483.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

484.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

**COUNT TWENTY-ONE**
**Violations of the Nevada False Claims Act**
**NEV. REV. STAT. ANN. § 357.010 *et seq*.**

485.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

486.   This is a claim for treble damages and penalties under the Nevada False Claims Act.

487.   N.R.S. § 357.040(1) provides in relevant part:

1.   [A] person who, with or without specific intent to defraud, does any of the following listed acts is liable to the State or a political subdivision, whichever is affected, for the amounts set forth in subsection 2:

(a)  Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)  Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

*   *   *   *

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

(f)  Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g)  Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h)  Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time.

(i)  Conspires to commit any of the acts set forth in this subsection,

488.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

489.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval to the State of Nevada; (2) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made or used, or caused to be made or used, a false record or statement that was material to an obligation to pay or transmit money to the State of Nevada or a political subdivision thereof; (4) concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Nevada or a

political subdivision thereof; (5) failed to disclose, within a reasonable time, the falsity of a claim submitted to the State of Nevada, or a political subdivision thereof, after discovering they the beneficiaries of an inadvertent submission of a false claim; and (6) conspired to commit one or more of the acts set forth in N.R.S. § 357.040(1).

490.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

491.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Nevada State Government.

492.   The Nevada State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

493.   By reason of Defendants' acts, the Nevada State Government has been damaged in substantial amounts to be determined at trial.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

494.   The State of Nevada is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

495.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

496.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

## COUNT TWENTY-TWO
### Violations of the New Jersey False Claims Act
### N.J. STAT. § 2A:32C-1 *et seq.*

497.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

498.   This is a claim for treble damages and penalties under the New Jersey False Claims Act.

499.   N.J. STAT. 2A § 32C-3 provides, in relevant part, liability for anyone who:

a.   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

c.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

\*   \*   \*   \*

g.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

500.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

501.   Specifically, Defendants knowingly: (1) presented, or caused to be presented to an employee, officer or agent of the State of New Jersey, or to any other recipient of State funds, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Jersey; (3) conspired to defraud the State of New Jersey by getting a false or fraudulent claim allowed or paid, directly or indirectly, by the State of New Jersey; and (4) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

502.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

503.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the New Jersey State Government.

504.   The New Jersey State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

505.   By reason of Defendants' acts, the New Jersey State Government has been damaged in substantial amounts to be determined at trial.

506.   The State of New Jersey is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

507.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

508.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

## COUNT TWENTY-THREE
### Violations of the New Mexico Medicaid False Claims Act
### N.M. STAT. ANN. § 27-14-1 *et seq.*

509.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

510.   This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

511.   N.M. Stat. Ann § 27-14-4 provides, in relevant part, liability for any person who:

A.     presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent;

B.     presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that the person receiving a medicaid benefit or payment is not authorized or is not eligible for a benefit under the medicaid program;

C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

D.     conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing that such claim is false or fraudulent;

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

E.   makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false;

F.   knowingly applies for and receives a benefit or payment on behalf of another person, except pursuant to a lawful assignment of benefits, under the medicaid program and converts that benefit or payment to his own personal use[.]

512.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

513.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to the State of New Mexico a claim for payment under the Medicaid program knowing that such claim was false or fraudulent; (2) presented, or caused to be presented, to the State of New Mexico a claim for payment under the Medicaid program knowing that the person receiving the Medicaid benefit or payment was not authorized or was not eligible for the benefit under the Medicaid program; (3) made, used or caused to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the State of New Mexico knowing such record or statement was false; (4) conspired to defraud the State of New Mexico by getting a claim allowed or paid

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

under the Medicaid program knowing that such claim was false or fraudulent; 5) made, used, or caused to be made or used, a record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the State of New Mexico, relative to the Medicaid program, knowing that such record or statement was false; and (6) applied for and received a benefit or payment on behalf of another person under the Medicaid program and converted that benefit or payment to their own personal use.

514.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

515.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the New Mexico State Government.

516.   The New Mexico State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

517.   By reason of Defendants' acts, the New Mexico State Government has been damaged in substantial amounts to be determined at trial.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

518.   The State of New Mexico is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

519.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

520.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

## COUNT TWENTY-FOUR
### Violations of the New York False Claims Act
### NY STATE FIN. § 187 *et seq*.

521.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

522.   This is a claim for treble damages and penalties under the New York False Claims Act.

523.   N.Y. State Finance Law § 189 (1) provides, in relevant part, liability for any person who:

(a)  knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

157

(c)  conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

*   *   *   *

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same;

shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

524.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

525.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim to the State of New York for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of N.Y. State Finance Law § 189 (1); (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of New York or a local government

FIRST AMENDED COMPLAINT                                           2:16-cv-07937-JLS-AJW

thereof; and (5) concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the State of New York or a local government thereof, or conspired to do the same.

526.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

527.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the New York State Government.

528.   The New York State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

529.   By reason of Defendants' acts, the New York State Government has been damaged in substantial amounts to be determined at trial.

530.   The State of New York is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

531.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

532.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

**COUNT TWENTY-FIVE**
**Violations of the North Carolina False Claims Act**
**N.C.G.S.A. § 1-605 *et seq*.**

533.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

534.   This is a claim for treble damages and penalties under the North Carolina False Claims Act.

535.   N.C.G.S.A. § 1-607 provides, in relevant part, for liability for any person who:

> (1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

> (2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> (3)   Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

*      *      *      *

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

(7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

536.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

537.   Specifically, Defendants knowingly: (1) presented, or caused to be presented a false or fraudulent claim to the State of North Carolina for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of N.C.G.S.A. § 1-607;  and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of North Carolina**,** or knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the State of North Carolina.

538.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

539. Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the North Carolina State Government.

540. The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

541. By reason of Defendants' acts, the North Carolina State Government has been damaged in substantial amounts to be determined at trial.

542. The State of North Carolina is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

543. Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

544. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

## COUNT TWENTY-SIX
### Violations of the Oklahoma Medicaid False Claims Act
### 63 Okla. Stat. § 5053 *et seq.*

545.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

546.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

547.   The Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 (B), provides, in relevant part, liability for any person who:

> 1. Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

> 3. Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

> \*     \*     \*     \*

> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state[.]

548.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

549.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Oklahoma; (3) conspired to defraud the State of Oklahoma by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma.

550.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

551.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Oklahoma State Government.

552.   The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

553.   By reason of Defendants' acts, the Oklahoma State Government has been damaged in substantial amounts to be determined at trial.

554.   The State of Oklahoma is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

555.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

556.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

### COUNT TWENTY-SEVEN
**Violations of the Rhode Island False Claims Act**
**R.I. Gen. Laws  § 9-1.1-1 *et seq.***

557.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

558.   This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

559.   The Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-3, provides in relevant part:

(a) Any person who:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);

\*   \*   \*   \*

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state;

is liable to the state for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), plus three (3) times the amount of damages which the state sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the state for the costs of a civil action brought to recover any such penalty or damages.

560.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

561.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval by the State of Rhode Island; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of R.I. Gen. Laws  § 9-1.1-3(a); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Rhode Island, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Rhode Island.

562.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

563.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Rhode Island State Government.

564.   The Rhode Island State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or

FIRST AMENDED COMPLAINT                                        2:16-cv-07937-JLS-AJW

indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

565.   By reason of Defendants' acts, the Rhode Island State Government has been damaged in substantial amounts to be determined at trial.

566.   The State of Rhode Island is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

567.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

568.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

## COUNT TWENTY-EIGHT
### Violations of the Tennessee False Claims Act and
### Tennessee Medicaid False Claims Act
### TENN. CODE. ANN. §§ 4-18-101 *et seq.* and 71-5-181 *et seq.*

569.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

570.   This is a claim for treble damages and penalties under the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

571.   Tenn. Code Ann. § 4-18-103 (a) in relevant part, provides liability for any person who:

> (1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
>
> (3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;
>
> *   *   *   *
>
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;
>
> (8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or
>
> (9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

572.   Tenn. Code Ann. § 71-5-182(a)(1) in relevant, part provides liability for any person who:

> (1) (A) Presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

(B) Makes, uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

(C) Conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing such claim is false or fraudulent; or

(D) Makes, uses, or causes to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing such record or statement is false;

Is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

573.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

574.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an officer or employee of the State of Tennessee, or of any political subdivision thereof, a false claim for payment or approval; (2) made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the State of Tennessee, or of any political subdivision thereof, knowing

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

such record or statement was false; (3) conspired to defraud the State of Tennessee, or any political subdivision thereof, by getting a false claim allowed or paid by the State of Tennessee, or by any political subdivision thereof; (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Tennessee, or any political subdivision thereof; (5) failed to disclose, within a reasonable time after discovery, a false claim to the State of Tennessee after discovering they were the beneficiaries of an inadvertent submission of a false claim after subsequently learning of the falsity of that claim; and (6) made, used, caused to be made or used, a false or fraudulent conduct, representation, or practice in order to procure anything of value, directly or indirectly, from the State of Tennessee or any political subdivision thereof.

575.   Defendants also: (1) presented, or caused to be presented, to the State of Tennessee, a claim for payment under the Medicaid program knowing such claim was false or fraudulent; (2) made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the State of Tennessee knowing such record or statement was false; (3) conspired to defraud the State of Tennessee by getting a claim allowed or paid under the Medicaid program knowing such claim was false or fraudulent; and (4) made, used, or caused to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

the State of Tennessee, relative to the Medicaid program, knowing such record or statement was false.

576.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

577.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Tennessee State Government.

578.   The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

579.   By reason of Defendants' acts, the Tennessee State Government has been damaged in substantial amounts to be determined at trial.

580.   The State of Tennessee is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

581.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

582.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

**COUNT TWENTY-NINE**
**Violations of the Texas Medicaid Fraud Prevention Law**
**TEX. HUM. RES. CODE § 36.001 *et seq.***

583.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

584.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

585.   Tex. Hum. Res. Code § 36.002 in relevant part, provides liability for any person who:

> (1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

\* \* \* \*

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

\* \* \* \*

(7) knowingly makes or causes to be made a claim under the Medicaid program for:

\* \* \* \*

(B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

(C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

\* \* \* \*

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(11) knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b).

586. By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

587.   Specifically, Defendants knowingly: (1) made, or caused to be made, a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that was not authorized, or that was greater than the benefit or payment that was authorized; (2) concealed or failed to disclose information that permitted a person to receive a benefit or payment under the Medicaid program that was not authorized, or that was greater than the benefit or payment that was authorized; (3) applied for and received a benefit or payment on behalf of another person under the Medicaid program and converted part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received; (4) made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program; (5) made, or caused to be made, a claim under the Medicaid program for a service or product that was substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; (6)  made, or caused to be made, a claim under the Medicaid program for a product that has been adulterated, debased, mislabeled, or that was otherwise inappropriate; (7) conspires to commit a violation of  Tex. Hum. Res. Code § 36.002; (8) made, used, or caused the making or use of, a false record or statement material to an obligation to pay or transmit money to the State of Texas under the Medicaid program, or knowingly concealed, or

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the State of Texas under the Medicaid program; and (9) engaged in conduct that constituted a violation under Tex. Hum. Res. Code § 32.039(b).

588.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

589.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Texas State Government.

590.   The Texas State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

591.   By reason of Defendants' acts, the Texas State Government has been damaged in substantial amounts to be determined at trial.

592.   The State of Texas is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

593.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

594.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

**COUNT THIRTY**
**Violations of the Vermont False Claims Act**
**32 V.S.A. § 630 *et seq*.**

595.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

596.   This is a claim for treble damages and penalties under the Vermont False Claims Act.

597.   32 V.S.A. § 631(a) in relevant part, provides that no person shall:

(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of . . . section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

*   *   *   *

(9) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

(10) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

(11) as a beneficiary of an inadvertent submission of a false claim to the State, or as a beneficiary of an overpayment from the State, and who subsequently discovers the falsity of the claim or the receipt of overpayment, fail to disclose the false claim or receipt of overpayment to the State by the later of:

(A) a date which is 120 days after the date on which the false claim or receipt of overpayment was identified; or

(B) the date any corresponding cost report is due, if applicable; or

(12) conspire to commit a violation of this subsection.

598. By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

599. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) presented, or caused to be presented, a claim that included items or services resulting from a violation of section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b; (4) made, used, or caused to be made or used, a false record or statement material to an obligation to

FIRST AMENDED COMPLAINT                                  2:16-cv-07937-JLS-AJW

pay or transmit money to the State of Vermont; (5) concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money the State of Vermont; (6) failed to disclose, within the time specified in 32 V.S.A. § 631(a)(11), a false claim to the State of Vermont, or receipt of overpayment by the State of Vermont, after discovering they were the beneficiaries of an inadvertent submission of a false claim to the State of Vermont**,** or as the beneficiaries of an overpayment from State of Vermont, and subsequently discovering the falsity of the claim or the receipt of overpayment; and (7) conspired to commit a violation of 32 V.S.A. § 631(a).

600.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

601.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Vermont State Government.

602.   The Vermont State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

603.   By reason of Defendants' acts, the Vermont State Government has been damaged in substantial amounts to be determined at trial.

604.   The State of Vermont is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

605.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

606.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

**COUNT THIRTY-ONE**
**Violations of the Virginia Fraud Against Taxpayers Act**
**VA CODE ANN. § 8.01-216.1 *et seq*.**

607.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

608.   This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

609.   VA Code Ann. § 8.01-216.3(A) in relevant part, provides liability for any person who:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

FIRST AMENDED COMPLAINT                               2:16-cv-07937-JLS-AJW

2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3. Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;

\*   \*   \*   \*

7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

shall be liable to the Commonwealth for a civil penalty of not less than $10,957 and not more than $21,916, except that these lower and upper limits on liability shall automatically be adjusted to equal the amounts allowed under the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended . . . plus three times the amount of damages sustained by the Commonwealth.

610.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

611.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of VA Code Ann. § 8.01-216.3(A); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Commonwealth of Virginia or knowingly concealed, or knowingly

FIRST AMENDED COMPLAINT                                   2:16-cv-07937-JLS-AJW

and improperly avoided or decreased an obligation to pay or transmit money the Commonwealth of Virginia.

612.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.   Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

613.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Virginia State Government.

614.   The Virginia State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

615.   By reason of Defendants' acts, the Virginia State Government has been damaged in substantial amounts to be determined at trial.

616.   The Commonwealth of Virginia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

617.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

618.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

## COUNT THIRTY-TWO
### Violations of the Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code § 74.66.005 *et seq.*

619.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

620.   This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et. seq*.

621.   The Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.020, provides, in relevant part, that any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c) Conspires to commit one or more of the violations in this subsection (1);
>
> \*   \*   \*   \*
>
> (g) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

622.    By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

623.    Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Wash. Rev. Code § 74.66.020; and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Washington, or a political subdivision thereof, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money the State of Washington or a political subdivision thereof.

624.    Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

625.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Washington State Government.

626.   The Washington State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

627.   By reason of Defendants' acts, the Washington State Government has been damaged in substantial amounts to be determined at trial.

628.   The State of Washington is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

629.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

630.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                                         2:16-cv-07937-JLS-AJW

## COUNT THIRTY-THREE
### Violations of the City of Chicago False Claims Act
### Chicago Municipal Code 1-22-010 *et seq.*

631.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

632.   This is a claim for treble damages and penalties under the Chicago False Claims Act.

633.   The Chicago False Claims Act, Chicago Municipal Code 1-22-020 provides, in relevant part, liability for any person who:

> 1. knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

> 2. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city;

> 3. conspires to defraud the city by getting a false or fraudulent claim allowed or paid;

> *    *    *    *

> 7. knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city[.]

634.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Government of the City of Chicago for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

635.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an official or employee of the City of Chicago, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City of Chicago; (3) conspired to defraud the City of Chicago by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the City of Chicago.

636.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the government-funded health insurance program represents a false or fraudulent claim for payment.

637.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Government of the City of Chicago.

638.   The Government of the City of Chicago, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims,

FIRST AMENDED COMPLAINT                          2:16-cv-07937-JLS-AJW

directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

639.   By reason of Defendants' acts, the Government of the City of Chicago has been damaged in substantial amounts to be determined at trial.

640.   The Government of the City of Chicago is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

641.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

642.   This Court is requested to accept supplemental jurisdiction of this related municipal claim pursuant to 28 U.S.C. § 1367(a), as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Government of the City of Chicago in the operation of its government health care programs.

## COUNT THIRTY-FOUR
### Violations of the District of Columbia Procurement Reform Amendment Act
### D.C. Code § 2-381-01 *et seq*.

643.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

644.   This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

645. The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-381.02, provides in relevant part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and shall be liable to the District for a civil penalty of not less than $5,500, and not more than $11,000, for each false or fraudulent claim for which the person:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

*   *   *   *

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(7) Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8) Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District; or

(9) Is the beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly fails to repay the inadvertent payment or overpayment to the District.

FIRST AMENDED COMPLAINT                              2:16-cv-07937-JLS-AJW

646.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Government of the District of Columbia for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

647.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the District of Columbia, or knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the District of Columbia; (4) conspired to commit a violation of D.C. Code § 2-381.02(a); (5) failed to disclose, after learning they were the beneficiaries of an inadvertent submission of a false or fraudulent claim, a false or fraudulent claim to the District of Columbia after subsequently discovering the falsity of the claim; and (6) failed to repay an inadvertent payment from District of Columbia, or overpayment to the District of Columbia, after learning they were the beneficiaries of the inadvertent payment or overpayment of monies not due.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

648.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the government-funded health insurance program represents a false or fraudulent claim for payment.

649.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Government of the District of Columbia.

650.   The Government of the District of Columbia, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

651.   By reason of Defendants' acts, the Government of the District of Columbia has been damaged in substantial amounts to be determined at trial.

652.   The Government of the District of Columbia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

653.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

654.   This Court is requested to accept supplemental jurisdiction of this related municipal claim pursuant to 28 U.S.C. § 1367(a), as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Government of the District of Columbia in the operation of its government health care programs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment against the Defendants as follows:

655.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of 31 U.S.C. § 3729 *et seq.*;

656.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the California False Claims Act, § 12650 *et seq.*;

657.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

658.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Connecticut False Claims Act, C.G.S.A. § 2-274 *et seq.*;

659.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*;

660.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Florida False Claims Act, Fl. Stat. Ann. § 68.081 *et seq.*;

661.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et. seq.*;

662.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained as a result of Defendants' actions plus a maximum civil penalty for each violation of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*;

FIRST AMENDED COMPLAINT                     2:16-cv-07937-JLS-AJW

663.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*;

664.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Indiana False Claims and Whistleblower Protection Act, Ind. Code. Ann. § 5-11-5.5 *et seq.*;

665.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Iowa False Claims Act, I.C.A. § 685.1 *et seq.*;

666.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*;

667.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Massachusetts False Claims Law, Mass. Gen. L. Ch. 12 § 5 *et seq.*;

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

668.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*, as amended 2008 PA 421;

669.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Minnesota False Claims Act, M.S.A. § 15C.01, *et seq.*;

670.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*;

671.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*;

672.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained as a result of

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

Defendants' actions, plus a maximum civil penalty for each violation of the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.;

673.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.;

674.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the New York False Claims Act, NY STATE FIN. § 187 *et seq*.;

675.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the North Carolina False Claims Act, N.C.G.S.A. § 1-605 *et seq*.;

676.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat.  § 5053 *et. seq.*;

677.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained as a result of

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

Defendants' actions, plus a maximum civil penalty for each violation of Rhode Island's State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et. seq.*;

678.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.*, and the Tennessee Medicaid False Claims Act, Tenn. Code Ann § 71-5-181 *et seq.*;

679.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*;

680.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Vermont False Claims Act, 32 V.S.A. § 630 *et seq.*;

681.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*;

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW

682.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*;

683.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the City of Chicago has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Chicago False Claims Act, Chicago Municipal Code 1-22-010 *et seq.*;

684.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the District of Columbia False Claims Act, D.C. Code Ann. § 2-381-01 *et seq.*;

685.   That the Plaintiffs be awarded the maximum amount allowable pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and the equivalent provisions of the State, City and District statutes and/or codes set forth above;

686.   That the Plaintiffs be awarded all costs of this action, including reasonable attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d) and the equivalent State, City and District statutes and/or codes set forth above; and

687.   That the United States, the States, Chicago, D.C. and the Plaintiffs be granted such other and further relief as this Court deems just and proper.

FIRST AMENDED COMPLAINT                                    2:16-cv-07937-JLS-AJW

# JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial.

Respectfully submitted,

**SHEPHERD FINKELMAN MILLER & SHAH, LLP**

/s/ *Kolin C. Tang*
KOLIN C. TANG (SBN 279834)
ktang@sfmslaw.com
11755 Wilshire Blvd., 15th Floor
Los Angeles, CA 90025
Telephone: 323-510-4060
Facsimile: 866-300-7367

**McELDREW YOUNG, Attorneys-at-Law**

ERIC L. YOUNG, Esquire
eyoung@mceldrewyoung.com
BRANDON J. LAURIA, Esquire
blauria@mceldrewyoung.com
PAUL V. SHEHADI, Esquire
paul@mceldrewyoung.com
123 S. Broad Street, Suite 2250
Philadelphia, PA 19109
Telephone: 215-367-5151
Facsimile: 215-367-5143

**CONSOLE & HOLLAWELL P.C.**

RICHARD J. HOLLAWELL, Esquire
rhollawell@consoleandhollawell.com
121 Saratoga Lane
Woolwich Twp., NJ 08085
Telephone: 215-498-8609
Facsimile: 856-467-5101
*Attorneys for Relator-Plaintiff Melina Ebu-Isaac*

FIRST AMENDED COMPLAINT                    2:16-cv-07937-JLS-AJW