UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

|  Melissa Kunig  |        N/A       |
| :---: | :---: |
| Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFF:   ATTORNEYS PRESENT FOR DEFENDANTS:

Not Present                              Not Present

**PROCEEDINGS:   (IN CHAMBERS)  ORDER DENYING BELHEALTH'S MOTION TO DISMISS (DOC. 142) AND GRANTING IN PART AND DENYING IN PART LINDEN CARE'S MOTION TO DISMISS (DOC. 143)**

In this *qui tam* action, Relator Melina Ebu-Isaac ("Relator") asserts claims under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), as well as state- and local-law analogs of the FCA.[1]  Relator also asserts two claims, the fourth and fifth causes of action, that are captioned as claims for "Payment by Mistake," and seek return of monies paid based on restitution or unjust enrichment.

Presently before the Court are two Motions to Dismiss the Second Amended Complaint ("SAC") in its entirety.[2]  The Relator filed two Opposition briefs (Docs. 164-65); and the moving Defendants filed Reply briefs. (Docs. 166-67)  These Motions to

---

[1] There are other Plaintiffs as well.  In addition to the Relator, Plaintiffs include the United States, which intervened pursuant to the False Claims Act (*see* Doc. 30, Intervenor Complaint), a number of States, the City of Chicago, and the District of Columbia.

[2] The first Motion to Dismiss was filed by BelHealth Investment Partners, LLC, BelHealth Investment Management, LLC, and BelHealth Investment Fund, LP (collectively, "BelHealth").  (Doc. 142.)  The second was filed by Linden Care LLC, Linden Care, Inc., and Linden Care Holdings, Inc. (collectively "Linden Care").  (Doc. 143.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                     Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

Dismiss were heard on March 12, 2021, at which time the Court took the matter under submission.

As set forth herein, the Court DENIES BelHealth's Motion to Dismiss.  The Court GRANTS IN PART and DENIES IN PART Linden Care's Motion to Dismiss, and dismisses without prejudice two state-law claims asserted as the fourth and fifth causes of action.

I. **BACKGROUND AS ALLEGED IN THE SAC**

The Second Amended Complaint ("SAC") sets forth the following allegations. The Relator alleges a fraudulent scheme whereby INSYS Therapeutics, Inc. ("INSYS"), BelHealth, and Linden Care promoted and facilitated the widespread off-label use of a prescription opioid pain reliever approved by the United States Food and Drug Administration ("FDA") for a very limited purpose.  (*See* SAC at 2-3.)  As described more specifically below, in carrying out the scheme, Defendants are alleged to have put patients at risk, to have made false statements in claims for payments from Government Health Care Programs,[3] and to have received millions of dollars of payments from the government.  (¶ 4.)[4]

A. **Defendants**

During all times relevant, former Defendant INSYS,[5] developed, marketed, and distributed pharmaceutical products throughout the United States and world.  (¶¶ 6-7.) Relevant here is its development of an opioid pain reliever, brand-named SUBSYS, a patented fentanyl spray.  (¶ 3.)

The BelHealth Defendants and the Linden Care Defendants are related entities. BelHealth Investment Partners, LLC owns BelHealth Investment Fund, LP, which  is a health care-focused private equity firm that in July 2013 acquired Linden Care, LLC; BelHealth Investment Partners thereafter formed Linden Care, Inc. and Linden Care

---

[3] The SAC defines "Government Health Care Programs" as including Medicaid and Medicare and other federal government health programs.  (¶ 2.)
[4] Throughout, citations to paragraph numbers are to the SAC.
[5] INSYS settled the claims against it and is no longer party to this action.  (*See* Doc. 84, Order Dismissing Claims Against INSYS.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

Holdings, Inc.  (¶¶ 13, 15; *see id.* ¶ 23 (alleging that "LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEATH, illegally dispensed and distributed SUBYS [*sic*]"), ¶¶ 231-37 (alleging interaction among BelHealth Defendants, Linden Care Defendants, and INSYS in developing business practices underlying the present claims).)  BelHealth's control over Linden Care continued through July 2017, when it transferred Linden Care's assets and business to another BelHealth-owned company, Quick Care Pharmacy, Inc. ("Quick Care").  (¶¶ 3-7, 247-57.)  In this manner, BelHealth, Linden Care, and Quick Care were all allegedly involved in the distribution of SUBSYS produced by INSYS.  (¶¶ 18, 253-57.)  Quick Care is not a defendant in this action.

B.      **Allegations Related to SUBSYS**

The SAC alleges that SUBSYS was approved by the FDA in January 2012 solely for the management of "breakthrough" cancer pain in opioid-tolerant adults.  (¶¶ 86-87 & n.3 (setting forth the FDA's definition of "opioid tolerance"); *id.* ¶¶ 92-96.)  SUBSYS is an oral spray form of fentanyl, described by the FDA as a "Transmucosal Immediate Release Fentanyl" drug, or "TIRF."  (¶ 90.)  Patients, physicians, and pharmacists who use, prescribe, or dispense a TIRF drug must comply with the FDA's Risk Evaluation and Mitigation Strategy, or "REMS," before doing so.  (¶ 90; *see id.* ¶¶ 97-103 (describing in detail the "TIRF REMS").)  The SAC alleges that fentanyl is 50 to 100 times more potent than morphine and that, as a result, SUBSYS has a high potential for abuse and addiction. (¶¶ 88-89.)  For the same reason, SUBSYS is also alleged to be a dangerous drug; "misuse [of SUBSYS] can result in death from respiratory depression."  (¶¶ 89-90.)

C.      **Defendants' Alleged Promotion of Off-Label Use of SUBSYS**

The SAC alleges extensive marketing for off-label use of SUBSYS by INSYS.[6]  Specifically, it alleges that INSYS engaged in a number of successful strategies

---

[6] Prescribers may lawfully prescribe off-label use of prescription drugs, but the promotion of such off-label use by drug companies is prohibited.  The prohibition is well-known to those in the industry, but it is not easily discerned from statutory and regulatory law.  *See* Coleen Klasmeier & Martin H. Redish, *Off-Label Prescription Advertising, the FDA and the First Amendment: A Study in the Values of Commercial Speech Protection*, 37 Am.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

to promote the off-label use of SUBSYS such that, within two years of its FDA approval for breakthrough pain in opioid-tolerant cancer patients, SUBSYS accounted for nearly 50% of the market share for TIRF drugs, and over 80% of prescriptions for SUBSYS were for off-label use.  (¶¶ 104-05.)  Of that market share, by April 2014, Linden Care dispensed more than 40% of the SUBSYS produced by INSYS.  (¶ 246.)

Specifically, as part of promoting off-label use over FDA-approved use, INSYS allegedly assigned to the majority of its staff the task of "target[ing] pain management specialists, internists and neurologists," while devoting fewer staff to the task of marketing to oncologists.  (¶ 110.)  INSYS also trained its sales staff to employ various methods of promoting off-label uses over FDA-approved uses.  (*See* SAC ¶¶ 111-13.)  For instance, INSYS gave its sales staff financial rewards of $500 to $800 for each patient who was switched from another TIRF drug to SUBSYS by a prescriber.[7]  (¶ 114.)  According to Relator, INSYS directed her to provide free samples of SUBSYS to patients in order to encourage their insurers and the Government to pay for SUBSYS prescriptions after the drug companies stopped providing SUBSYS without charge; this practice of providing three months' to a year's worth of SUBSYS could also allegedly cause "patients [to] grow dependent on the medication during that time, ensuring a long prescribing relationship."  (¶ 116.)

Sales staff were allegedly directed to encourage physicians and patients to use higher doses of SUBSYS than medically indicated and to prescribe more SUBSYS by prescribing it for continuous use, rather than just emergency use.  (¶¶ 117-18.)  Sales staff were encouraged to inform physicians that they should disregard the prescribing

---

J.L. & Med. 315, 319-23 (2011) (explaining the source of three theories of how such promotion or advertising violates the FDCA).  Relator relies upon the "misbranding" theory.  (*See* ¶¶ 144-154.)

[7] INSYS sales representatives are alleged to have had a low-base-salary plus sales commission compensation structure; therefore, they had strong financial incentives to accomplish the objectives defined by their employer to earn greater commissions.  (¶ 118.)  Higher doses of SUBSYS also resulted in higher commissions to sales representatives.  (*See* ¶ 124 ("During a sales meeting, [INSYS] told sales representatives they would attain their bonuses if the patient titrated closer to 1600 mcg.").)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                         Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

information that required the first dose for all patients to "**always**"[8] be the lowest dose, 100 micrograms,[9] and to instead inform physicians to "double the entry dose," expect to increase the dosage significantly within a month, and to expect to titrate upward to dosages between 600 and 1000 micrograms.[10]  (¶¶ 120-21.)  Sales representative communicated directly with patients and advised them, contrary to labeling information, to start with a 200-microgram dose (rather than the recommended 100-microgram first dose) and to repeat the 200-microgram dose if still in pain without first communicating with their physicians (as advised by SUBSYS's label).  (¶¶ 121-23.)

INSYS facilitated reimbursement by insurers for off-label use through a related entity, the INSYS Reimbursement Center ("the Center"); the purpose of the Center was to persuade insurers to pay for SUBSYS prescriptions.  (¶¶ 126-27.)  INSYS also provided prior authorization forms to its sales representatives, an appeal letter template for use by physicians, and free samples during an initial period of use by the patient. (¶ 126.)  Specifically, prior authorization forms were sometimes pre-populated with diagnoses likely to receive off-label authorization and an off-label initial dosage. (¶¶ 131-32.)  The appeal letter was geared toward obtaining approval for off-label use. (¶ 133.)  Where an insurer refused to authorize off-label use of SUBSYS notwithstanding the efforts of the Center, INSYS provided the patient with a supply of SUBSYS.  (¶¶ 129, 134-36.)  After the patient had taken SUBSYS for three months to a year, insurers were allegedly more willing to approve its future use.  (¶ 129.)

INSYS also provided prescribers and pharmacists with "cheat sheets" to enable them to easily pass the FDA online assessment required by the TIRF REMS. (¶¶ 137-143.)  These "cheat sheets" were not summaries or other study materials; instead, they were the "A-D" answers to eleven multiple-choice questions.  (¶ 140.)

---

[8] The SUBSYS label states:  "The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg."  (¶ 119 (emphasis in the original).)

[9] Because fentanyl is an extremely potent drug, dosages are measured in micrograms ("mcg") rather than the more common measure of milligrams.  One milligram is 1,000 micrograms.

[10] The Relator alleges that breakthrough pain is managed in approximately 25% of patients at a dosage of 400 micrograms or lower.  (¶ 125.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

In addition to promoting the off-label use described above, INSYS also allegedly engaged in a kickback scheme whereby it would reward physicians who routinely prescribed off-label use of SUBSYS.  (¶¶ 166-187.)  The kickbacks were disguised as "speaker fees," free labor to perform office work in physicians' offices, and restaurant- and retail-gift cards.[11]  (¶ 173; *cf.* Doc. 30, United States Intervenor Complaint, ¶¶ 43-139 (detailing "speaker fees" paid to seventeen prescribers).)  Relator alleges she was trained to identify physicians for whom "money talk[ed]," that is, to identify which physicians seemed willing to write prescriptions in exchange for kickbacks.  (¶ 167.)  She was also trained to rate physicians on a green-yellow-red scale, where a green rating meant the physician was most likely to accept kickbacks in exchange for writing prescriptions, a red rating meant the physician was unlikely to accept kickbacks, and a yellow rating was somewhere in the middle.  (¶ 170.)

Linden Care, as directed by BelHealth, submitted claims to Government Health Care Programs based on physician's prescriptions for off-label use.  (¶ 164.)  It did so by filing claim forms (or by causing others to file such claim forms) to seek payment from Government Health Care Programs.  (*See* ¶¶ 165, 269 (referring to the filing of specific claim forms).)  Specifically, the Relator alleges that these constitute actionable false claims because Medicare and Medicaid payments for off-label use of a drug must be supported by the following:  (1) citation to one of the drug compendia specified in 42 U.S.C. § 1396r-8(g)(1)(B)([i]) (Medicaid); (2) "peer-reviewed medical literature;" (3) a determination that the drug was "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and (4) a coverage determination by other Government Health Care Programs.  (¶ 165.)  The Relator alleges that SUBSYS did not meet these requirements.  (¶¶ 155-65.)

Moreover, the Relator alleges that Linden Care, under the direction of BelHealth, breached TIRF REMS protocols in a number of ways.  (¶ 203-09.)  These include

---

[11] The pricing structure of SUBSYS was lucrative.  For instance, the Relator alleges that a 20-day, 120-dose, 200 mcg supply of SUBSYS—the next-to-lowest-dosage available—was "priced . . . at approximately $6,667." (¶ 288.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

"[d]ispensing SUBSYS for contra-indicated and off-label uses, . . . [d]ispensing 'initial starting doses' of 200 mcg, rather than the mandated initial maximum dosage of 100 mcg[,] and [d]ispensing SUBSYS with directions to consume the drug six times daily, independent of pain."  (¶ 207 (paragraph structure altered).)  The Relator also alleges Linden Care dispensed SUBSYS without following a legal requirement that SUBSYS, as a controlled substance, be dispensed only upon presentation of a written prescription.  (¶ 210-19.)

Linden Care's role, and later Quick Care's role, under the direction of BelHealth, was to, *inter alia*, dispense SUBSYS and to help facilitate resolution of any issues associated with the filling of SUBSYS prescriptions.  (¶ 223; *see* ¶¶ 220-57.)  Essentially, Linden Care facilitated the dispensing of and payment for SUBSYS pursuant to prescriptions written by physicians who had been encouraged by INSYS to write as many such prescriptions for as many patients as they possibly could.  (*See id.*)

The SAC alleges that INSYS sales representatives were trained to encourage physicians to use Linden Care to fill prescriptions for SUBSYS, to use the Center to resolve any issues with filling those prescriptions, to leave forms to assist office staff to do so, and to follow up with physicians who chose to use Linden Care to fill prescriptions for SUBSYS.  (¶ 222.)  Sales representatives were also provided with a script for "selling" physicians on the use of Linden Care to resolve any issues in filling prescriptions, which included asking the physician for a three-patient commitment to start the process.  (¶ 226.)  Linden Care also facilitated the shipping of a free first thirty-unit supply if prior authorization was refused.  (¶ 225.)

The SAC alleges that at least one patient died as a result of overdosing on SUBSYS dispensed by Linden Care.  (¶¶ 271-312.)  After using SUBSYS in a manner advocated by INSYS (and facilitated by Linden Care), Patient #1 died as a result of the drug's improper use.  (¶ 312; *see generally* ¶¶ 271-312.)

**D.    Claims Asserted**

Against this background, the SAC asserts claims for three separate violations of the False Claims Act.  Specifically, the three False Claims Act claims are brought

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                          Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

pursuant to subsections (a)(1)(A), (a)(1)(B) and (a)(1)(G), of 31 U.S.C. § 3729, which in general impose liability for presenting false or fraudulent claims, using a false record or statement that is material to a false or fraudulent claim, and engaging in the knowing use of a false, material record or statement to avoid or decrease an obligation to the United States.  *See* 31 U.S.C. § 3729(a)(1)(A)-(B), (G).  Additionally, the Relator brings twenty-nine claims under state- and local-law analogs of the FCA.  She also asserts claims for "payment by mistake," seeking restitution and claiming unjust enrichment.

## II.    LEGAL STANDARD

### A.    Standard for Dismissal Pursuant to Rule 12(b)(6)

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party.  *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).  Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

### B.    Pleading Fraudulent Conduct with Particularity Under Rule 9(b)

Claims that sound in fraud, including FCA claims, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b), which requires that allegations of fraud be made "with particularity."  *See* Fed. R. Civ. P. 9(b).  To satisfy this standard, plaintiffs must allege "the who, what, when, where, and how of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                          Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

2003) (internal quotation marks omitted).  However, "[w]hile the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally."  *Odom v. Microsoft Corp*., 486 F.3d 541, 554 (9th Cir. 2007) (citing *In re GlenFed, Inc. Sec. Litig*., 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc)).

   C.     **Liability Under the False Claims Act**

   The False Claims Act makes liable any "person"[12] who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  A similar provision prohibits the use of material records or statements (or concealment thereof) that "avoids or decreases an obligation to pay or transmit money . . . to the Government."  31 U.S.C. § 3729(a)(1)(G).  "In an archetypal *qui tam* False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent."  *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1172-73 (9th Cir. 2016) (internal quotation marks omitted).  "As [is also] relevant here, . . . a claim under the False Claims Act can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment."  *Id*. at 1173 (internal quotation marks omitted).  "Under a false certification theory, it is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."  *Id*. (internal quotation marks omitted) (emphasis in the original).  As discussed below, this false certification can be either express or implied, depending on a defendant's alleged conduct.  *See United States ex rel. Rose v. Stephens Inst.,* 909 F.3d 1012, 1017 (9th Cir. 2018).

   Generally, to state a claim under the FCA, a relator must allege facts sufficient to satisfy four elements:  "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or

---

[12] The FCA's use of "person" includes corporations and other business entities.  *See Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 125 (2003).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                              Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

forfeit moneys due." *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890,
902 (9th Cir. 2017).

### III.    COLLECTIVE ALLEGATIONS

More than once, the SAC refers to all Defendants collectively.  (*See, e.g.*, ¶ 4
("Through their intentional and reckless acts, which included false statements and claims
for payment to the Government Health Care Programs, Defendants have put patients at
risk and received millions of dollars in improper government payments."); ¶¶ 1, 73, 270.)
The SAC also refers to three BelHealth entities collectively and three Linden Care
entities collectively.  (*See supra* note 2.)  BelHealth correctly argues that because these
Defendants are all in fact separate entities, liability under the FCA cannot be premised
merely upon their relatedness.  However, where an entity uses its ability to control or
influence another to submit false claims, that entity is not shielded from liability based on
its mere status as a separate entity.

Overall, the SAC alleges cooperation among the Defendant entities—all of
them—to carry out a joint business venture related to the distribution of SUBSYS.  This
business venture was allegedly devised by individuals at the highest level of these
entities, whereby the separate business entities were managed and used to varying
degrees to carry out a common goal.  Relator alleges that "BelHealth" was key to the
large-scale operation to profit from dispensing SUBSYS to populations of patients for
whom SUBSYS was not intended, and to dispense SUBSYS at dosages keyed to profit
rather than to compliance with applicable laws and with patient health and well-being.
This alleged large-scale operation involved BelHealth's use of several separate business
entities, including three "Linden Care" entities and one "Quick Care" entity.

From these allegations, two specific issues arise as to the remaining Defendants:
First, whether BelHealth may be found liable under the FCA even though it was Linden
Care (and later Quick Care) that actually dispensed SUBSYS and that actually submitted
the claims for reimbursement to the Government; and second, whether the FCA claims
are sufficiently alleged against all BelHealth Defendants and all Linden Care Defendants.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                           Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

As to the first issue, all three subsections of the FCA relied upon by the Relator impose liability where one person or entity commits a violation through its control of the actions of another person or entity.  For instance, subsection (a)(1)(A) of § 3729 imposes liability on "any person who . . . knowingly presents, *or causes to* be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A) (emphasis added).  Subsections (a)(1)(B) and (a)(1)(G) repeat the emphasized language.  31 U.S.C. § 3729(a)(1)(B), (G); *see also United States v. Mackby*, 261 F.3d 821, 827-28 (9th Cir. 2001) ("[A] person need not be the one who actually submitted the claim forms in order to be liable."); *see also* 31 U.S.C. § 3729(b)(2)(A) (broadly defining "claim" as including "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that . . . is presented to an officer, employee, or agent of the United States").

As summarized above, the SAC alleges that BelHealth caused false claims to be submitted for reimbursement from Government Health Care Programs.  For instance, the SAC alleges that BelHealth acquired one Linden Care entity (and then formed two more such entities), acquired Quick Care, and transferred Linden Care's assets to Quick Care.  It alleges that BelHealth promoted the use of Linden Care to INSYS to facilitate the large scale distribution SUBSYS, directed Linden Care to dispense SUBSYS for contraindicated use and off-label use, directed Linden Care to dispense the incorrect initial dosages and to dispense with the instructions that instructed six-time per day use of SUBSYS rather than "as needed" use, and directed Linden Care to submit claims based on the widespread off-label use of SUBSYS.  And as discussed below, BelHealth negotiated with INSYS on behalf of Linden Care.  Thus, the SAC sufficiently alleges that the BelHealth Defendants worked with or through other entities and thereby caused false claims to be presented for payment.

As to the second issue, BelHealth's argument that the SAC's allegations are lacking sufficient specificity as to each BelHealth entity is also unavailing.  The SAC does not rely on the mere fact that the three BelHealth entities are related.  Instead, as

_____

**CIVIL MINUTES – GENERAL**
11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                          Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

noted above (*see supra* note 2), the SAC first identifies the three BelHealth entities:
BelHealth Investment Partners, LLC ("Investment Partners"); BelHealth Investment
Management, LLC ("Investment Management"); and BelHealth Investment Fund, LP
("Investment Fund").  (¶ 1.)  At relevant times, Investment Partners was a limited
partnership that owned Investment Fund.  (¶ 13.)  Investment Fund acquired Linden Care,
LLC.  (¶ 13.)  Investment Management "provided management, oversight, and strategic
guidance for the operations of" Linden Care, LLC.  (¶ 14.)  Similarly, the SAC alleges
that Investment Partners, through Investment Fund, acquired Linden Care, LLC "as a
portfolio company," and thereafter formed Linden Care, Inc., and Linden Care Holdings,
Inc.  (¶¶ 13, 15.)

　　　Given the scope of the scheme and the manner in which it was alleged to have
been carried out, the SAC plausibly alleges involvement by all the entities in presenting
false claims or causing such claims to be presented.  Communications from the top
officials of BelHealth do not distinguish among the various entities and suggest
cooperation by all the entities in the common endeavor of expanding the market for
SUBSYS far beyond that approved by the FDA.

　　　For instance, the SAC sets forth verbatim a June 19, 2014 email from Harold Blue,
Founder and Managing Partner of Investment Fund and Managing Partner of Investment
Partners.  (¶¶ 230, 234.)  There, Blue fails to distinguish among the BelHealth entities,
and he appears to speak on behalf of them all.  (*See* ¶ 230.)  Therein, in proposing
additional business with INSYS, through Linden Care, he touts a new facility, new
technology, new robot and phone systems, and "basically everything new."  (¶ 230.)
Significantly, that email shows that Blue was attempting to negotiate a better commission
for SUBSYS dispensed by Linden Care; in doing so, he uses the collective pronoun "we"
to discuss volumes of drugs to be acquired and rebates to be paid.  (¶ 230.)  In context,
this email is one voice speaking collectively for BelHealth and Linden Care about key
points of the ongoing business venture between them and INSYS involving distribution
of SUBSYS.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                     Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

And even before that, in July 2013, Investment Partners issued a press release announcing the acquisition of Linden Care, LLC by Investment Partners, again not distinguishing among the BelHealth entities, and quoting Linden Care's Chief Operating Officer: "BelHealth is the perfect partner to accelerate Linden Care's growth from a regional company to a national platform.  BelHealth's significant experience as operators and investors, particularly in the pharmacy space, make them the ideal equity partner for our Company."  (¶ 17 (emphasis omitted).)

The allegations that all these entities worked together to facilitate the filing of false claims is made all the more plausible by the overlap of officers and board members for the various entities.  (*See* ¶ 234.)

At the pleadings stage, the allegations are sufficient as to each BelHealth and each Linden Care entity.

## IV.    FALSE CLAIMS ACT CLAIMS

BelHealth and Linden Care move to dismiss the FCA claims.  Because, as discussed above, BelHealth is alleged to have caused false claims to be presented through its control of Linden Care, the Court considers their motions together.

Defendants argue that all four elements of the FCA claims are insufficiently pleaded and that once those are dismissed, the Court should dismiss the related state-law claims rather than exercise supplemental jurisdiction over those claims in the absence of any federal claim.  *See* 28 U.S.C. § 1367(c)(3).  As set forth below, the Court finds all the elements of the FCA have been sufficiently pleaded.  The Court therefore DENIES both Motions to Dismiss as to the FCA claims.

### A.    FCA Element One: Falsity

Defendants contend Relator has not sufficiently alleged the element of falsity. (BelHealth Mot. at 10-15; Linden Care Mot. at 9-10.)  In stating an FCA claim, the element of falsity can be satisfied by either of two ways:  (1) express false certification, which "means that the entity seeking payment falsely certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                          Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

submitted," and (2) "implied false certification, which occurs when an entity has *previously* undertaken to expressly comply with a law, rule, or regulation but does not, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim."  *Rose*, 909 F.3d at 1017 (internal alteration marks and quotation marks omitted) (emphasis in the original).  The latter is at issue here.

An implied false certification claim is sufficiently supported by allegations showing two conditions:  "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016); *see also Rose*, 909 F3d at 1018 (clarifying that the *Escobar* test, rather than a three-factor test previously employed by the Ninth Circuit, applied to implied certification claims).

To illustrate, in *Escobar*, a patient was treated in a mental health care facility by providers who were not licensed in the manner required by Medicaid regulations.  *Id.* at 1997-98.  In asserting an FCA claim against the provider, relators alleged that the provider submitted claims for services provided by purportedly qualified professionals, when in fact the professionals lacked the required qualifications.  *Id.*  "[B]y submitting claims for payment using payment codes that corresponded to specific counseling services, [the provider] represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment."  *Id.* at 2000.  The provider also "made further representations in submitting Medicaid reimbursement claims by using [codes to identify] specific job titles," which falsely implied that the services were provided by staff with particular licenses.  *Id.*  These allegations were sufficient to state a claim because there were "specific representations about the . . . services provided" by the use of the billing codes, but those "representations [were]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

misleading half-truths" based on the provider's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements."  *Id.* at 2001.

In *Campie*, the Ninth Circuit applied *Escobar*.  There, a pharmaceutical company sold to the federal government certain prescription drugs that used ingredients from facilities not approved by the FDA.  *Campie*, 862 F.3d at 895-96.  By doing so, the company "established policies and practices [that] violate[d] the FDA's regulatory requirements . . . [but still] submitt[ed] claims for 'FDA approved' drugs."  *Id.* at 904.  The Ninth Circuit found this to be an example of the misleading "half-truths" that satisfy the FCA's falsity element.  *Id.* at 904 (finding that the claims at issue "'fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information'") (quoting *Escobar*, 136 S.Ct. at 2000).

In that regard, this case is like *Campie*.  Here, the SAC alleges that Linden Care (as directed by BelHealth) engaged in a course of fraudulent conduct by repeatedly submitting claims for payment without disclosing non-compliance with the FDA, the Medicaid Act, and the Controlled Substances Act ("CSA").  And because the claims at issue here seek reimbursement for a specific drug, those claims, like the ones at issue in *Campie*, "necessarily refer[red] to specific drugs under the FDA's regulatory regime," which by itself makes certain representations about those drugs.  *See Campie*, 862 F.3d at 902-03.

For instance, the SAC alleges that Linden Care dispensed SUBSYS "without 'adequate directions for use'" in violation of 21 U.S.C. § 352(f), described as "misbranding."  (¶ 36.)  The SAC also alleges that Linden Care engaged in misbranding through its non-compliance with the TIRF REMS protocol in three ways.  (*See* ¶¶ 203-209.)  Specifically, Linden Care allegedly breached that protocol by dispensing SUBSYS for contra-indicated and off-label uses, without discussing the drug or its safe usage with patients, by dispensing SUBSYS at "initial starting doses" of 200 micrograms rather than the mandated initial maximum dosage of 100 micrograms, and by dispensing SUBSYS with directions to consume the drug six times daily, independent of pain.  (¶ 207.)

**CIVIL MINUTES – GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                          Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

The SAC also alleges non-compliance with the CSA, 21 U.S.C. § 842(a)(1).
(¶¶ 210-19.)  Specifically, the CSA makes it unlawful to dispense a controlled substance
without a written prescription.  21 U.S.C. § 829(a); (*see* ¶¶ 211-213).  The SAC alleges
six instances in which the CSA was violated in this manner.  (¶ 213.)

The SAC also alleges Linden Care's failure to comply with the Medicaid Act.
(¶ 267; *see* ¶¶ 58, 157, 164.)  Specifically, it alleges that Linden Care submitted claims
for off-label uses of SUBSYS that were not supported by "medically accepted
indication[s]" as defined by the Medicaid Act.  *See* 42 U.S.C. § 1396r-8(k)(6)
(incorporating subsection (g)(1)(B)(i)).

These failures to disclose its non-compliance with the FDA, the Medicaid Act, and
the CSA are sufficient to meet the standard for implied certification, meeting the falsity
element of an FCA claim.  That is, by "mak[ing] specific representations about the goods
. . . provided" by reference to the brand name of an FDA-approved drug, coupled with the
"failure to disclose noncompliance with material statutory . . . requirements," Linden
Care made "representations [that were] misleading half-truths."  *Escobar*, 136 S. Ct. at
2001.

The Rule 9(b) pleading-with-particularity requirement has likewise been fulfilled.
The SAC alleges "the who, what, when, where, and how of the misconduct
charged."  *Vess*, 317 F.3d at 1106 (internal quotation marks omitted).  The SAC alleges
that Linden Care (the "who") made implied certifications regarding the dispensing of
SUBSYS (the "what") during the time period of July 2013 through June 2014 (the
"when") by submitting claims seeking payment from the United States by the filing of
specific claim forms designed to seek such payment (the "where" and "how").

**B.      FCA Element Two:  Scienter**

BelHealth and Linden Care also contend scienter is insufficiently alleged.
(BelHealth Mot. at 16-17; Linden Care Mot. at 10-12.)  Due to its nature, scienter is not
subject to the heightened Rule 9(b) pleading-with-particularity requirement.  *Odom*, 486
F.3d at 554.  Instead, it must be pleaded in accordance with the more general pleading

_____
**CIVIL MINUTES – GENERAL**
16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

standard set forth in Federal Rule of Civil Procedure 8(a).  *See United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).

The FCA sets forth a statutory definition of scienter by defining "knowing" and "knowingly" as "(A) mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A).  Beyond this, the FCA "require[s] no proof of specific intent to defraud."  31 U.S.C. §§ 3729(b)(1)(B).

For instance, in *Corinthian Colleges*, the court considered an express certification by a college that it was in compliance with certain requirements restricting the payment of bonuses (referred to as an "incentive ban") to admissions recruiters.  655 F.3d at 990-91.  Applying the lower Rule 8(a) standard, the court held that merely reciting that the college either "knowingly" made a false certification (or acted "in deliberate or reckless disregard" as to the falsity of its certification) was insufficient to plead the scienter element.  *Id.* at 996-97.  Instead, the court required the relator to plead facts sufficient "to support an inference or to render plausible that [a defendant] acted while knowing" its certification of compliance with the incentive ban was untrue.  *Id.* at 997.

Here, the SAC alleges Linden Care impliedly certified its compliance with the FDA, the Medicaid Act, and the CSA in dispensing SUBSYS, all while being controlled by the same entities that were advocating for and facilitating the large-scale marketing and distribution of SUBSYS in a manner that violated these laws.  The scope of the distribution proposed by BelHealth supports an inference that BelHealth intended that SUBSYS be widely distributed to a patient population that far outstripped the limited market of opioid-tolerant cancer patients experiencing breakthrough pain.  (*See, e.g.,* SAC ¶ 230 (Blue's email to INSYS's CEO stating "[w]e will likely distribute $120 Million of Subsys in 2014"); ¶ 240 (internal INSYS email estimating Linden Care's SUBSYS sales in 2015 as $2.85 million per week); ¶ 105 (alleging that during the relevant period, more than 80% of prescriptions for SUBSYS were for off-label use).)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

The SAC alleges such wide distribution actually occurred, and that SUBSYS was dispensed to patients for whom it was contraindicated, for off-label purposes, with improper instructions, at incorrect dosages.

This case is like *Winter*.  There, the court noted that "[b]ecause medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary."  *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020), *cert. denied sub nom. RollinsNelson LTC Corp. v. United States ex rel. Winters*, 141 S. Ct. 1380 (2021).  Therefore, where a relator alleged facts that plausibly supported an inference that providers were knowingly admitting patients to a hospital where it was not medically indicated to do so, she pleaded facts sufficient to support an inference of scienter.  *Id.* at 1120-21; *id.* at 1114 ("Claims for unnecessary treatment are false claims.").

In the same manner here, by alleging the dispensing of SUBSYS on a broad scale for off-label purposes, at improper dosages, with improper instructions, and to patients for whom it was contraindicated, the SAC alleges facts that plausibly support the inference that BelHealth and Linden Care acted with the requisite scienter.

**C.      FCA Element Three: Materiality**

BelHealth and Linden Care argue the element of materiality is lacking. (BelHealth Mot. at 17-18; Linden Care Mot. at 13-15.)  "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 136 S. Ct. at 2002.  Statutorily defined, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

In explaining that "[t]he materiality standard is demanding," the Court in *Escobar* elaborated:

The False Claims Act is not "an all-purpose antifraud statute," . . . or a vehicle for punishing garden-variety breaches of contract or regulatory

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

> violations.  A misrepresentation cannot be deemed material merely because
> the Government designates compliance with a particular statutory,
> regulatory, or contractual requirement as a condition of payment.  Nor is it
> sufficient for a finding of materiality that the Government would have the
> option to decline to pay if it knew of the defendant's noncompliance.
> Materiality, in addition, cannot be found where noncompliance is minor or
> insubstantial.

*Id.* at 2003 (citation omitted).

As to materiality, the SAC alleges that had the Government known of Defendants'
noncompliance with a number of federal laws and regulations, it would not have paid the
claims.  (*See* ¶¶ 72, 207-09, 213.)  Specifically, as discussed below, the SAC alleges
materiality in at least three ways.

First, it alleges that Defendants' actions caused the payment of false or fraudulent
SUBSYS reimbursement claims.  (¶ 72.)  Specifically, the SAC alleges multiple ways in
which the Defendants worked to promote and facilitate the widespread, off-label and
medically non-indicated uses of SUBSYS (including by Linden Care's dispensing of
SUBSYS in the manner described in the SAC), resulting in the payment of claims by the
Government for SUBSYS reimbursement despite Defendants' and/or claimants'
noncompliance with federal laws.  (¶ 72.)  Because drug companies are prohibited from
marketing or otherwise promoting off-label prescription drug use (*see supra* note 6), and
given the breadth of the marketing and promotion of off-label use of alleged in the SAC,
Relator has sufficiently alleged materiality.  This conclusion is reinforced by the
allegations that Linden Care's dispensing of SUBSYS for off-label use compromised the
safety of the patients who used it, as described in the next paragraph.

Second, the SAC alleges the Government would not have paid the claims had it
known of the multiple ways in which Linden Care failed to comply with the TIRF REMS
program.  (¶¶ 207-09.)  The SAC alleges that by failing to comply with TIRF REMS,
Linden Care "misbranded" SUBSYS in that the labels on SUBSYS dispensed by Linden

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                      Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

Care contradicted the FDA-approved label in ways related to the TIRF REMS protocol.
(¶¶ 207-08.)  Thereafter, Linden Care sought payment for SUBSYS with the implied
certification described above, including that Linden Care dispensed in compliance with
TIRF REMS protocol. Relator therefore plausibly alleges materiality on this basis.

Finally, the SAC alleges that the requirement that SUBSYS be dispensed only
with a written prescription was material, and the Government would not have paid claims
under Medicare Part D had it known of Linden Care's failure to dispense only upon
written prescription.  (¶¶ 213-18.)  The Ninth Circuit found this kind of failure to be
material in *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1205 (9th Cir. 2017).
There, the Ninth Circuit reversed the district court's dismissal of an FCA claim, holding
that by alleging delivery of a medical device and supplies without first receiving the
written order to do so, in violation of the CSA, the relator sufficiently alleged the
materiality element.  *Id.* at 1213.  Here, the SAC alleges that Linden Care dispensed
SUBSYS without first receiving the paper prescriptions required by applicable law on at
least six occasions. (¶¶ 210-13.)  This also sufficiently alleges materiality.

**D.    FCA Element Four: Disbursement or Loss**

Finally, Defendants challenge the fourth element of an FCA claim.  (BelHealth
Mot. at 18-19; Linden Care Mot. at 15-16.)  The fourth element is disbursement by the
Government or loss to the Government by the forfeiture of moneys due to it.  *Campie*,
862 F.3d at 902.  Here, Relator alleges that by 2015, Linden Care dispensed between
two- and three-million dollars' worth of SUBSYS each day.  (*See* ¶ 240 (an estimated
$2.85 million each week).)  Most of these prescriptions—80%—were for off-label use.
(¶ 105.)  Given these allegations, and given the allegations regarding the Government
Health Care Programs (¶¶ 58-73), Relator plausibly alleges disbursement by the
Government.

And most directly, Relator expressly alleges Government payment of "hundreds of
thousands of prescriptions" billed by Linden Care.  (¶ 258.)  These prescriptions were
billed and paid notwithstanding the fact that, when prescribed in the manner alleged in

**CIVIL MINUTES – GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                     Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

the SAC, SUBSYS failed to fit within the definition of a "covered outpatient drug" under
Medicaid and Medicare Part D and its use was not "reasonable and necessary" under
Medicare Part B.  (¶¶ 156-61, 164, 259-69.)  These allegations sufficiently allege
disbursement by the Government.

Therefore, as discussed herein, the Court concludes that the SAC alleges facts
sufficient to support all four elements of the FCA claims.

## V.      FCA SERVICE AND FILING REQUIREMENTS

BelHealth argues that the SAC should be dismissed because Relator has failed to
follow the FCA's mandatory service and filing procedures.  (*See* BelHealth's Mot. at 19-
22); 31 U.S.C. § 3730(b)(2).  The Court considered (and rejected) this argument when it
granted leave to Relator to file her Second Amended Complaint.  (*See* Doc. 128, Order
Granting Relator's Motion for Leave to Amend the Complaint at 4-5.)  The Court
declines to revisit this issue now.

## VI.     CLAIMS FOR RESTITUTION AND UNJUST ENRICHMENT

Linden Care moves to dismiss the fourth and fifth causes of action, both captioned
as claims for "payment by mistake."  (Linden Care Mot. at 23-24.) These claims are
described as claims for "restitution" and "unjust enrichment," respectively.  (¶¶ 333-42.)
The legal basis for these claims is unclear.  Although the factual allegations underlying
the claims asserted in the SAC are clearly nationwide in scope, Relator fails to describe
the source of law upon which she relies, whether it is federal or any particular state law.
(*Id.*)  In the Opposition, Relator refers to "a claim for mistake under federal common
law," but she also attempts to distinguish California case law cited by Linden Care
without disavowing any reliance on California law.  (Opp. to Linden Care Mot. at 23-24.)
Thus, the Court is left with the impression that these claims are based on "federal
common law" and perhaps California state law.

As to the former, Relator does not cite any source or authority of such "federal
common law."  These claims are clearly based upon the same conduct as the FCA claims,
and they appear to be alternative claims to recover on an equitable basis if the FCA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

claims fail on the element(s) of falsity, scienter, and/or materiality and facts bear out that
claims were instead paid out based on a "mistake."  (*See* ¶¶ 333-42.)

Relator cites no authority suggesting that she may assert such a back up claim in a
*qui tam* action.  Essentially, Relator brings this action to vindicate an alleged fraud on the
United States.  Although she is empowered to do so under the FCA as a matter of
statutory law, her right to do so is circumscribed by the FCA as well.  *See* 31 U.S.C.
§ 3730(b)(1) (authorizing a person to sue "in the name of the Government" pursuant to
"section 3729 for the person and for the United States Government"); *Stoner v. Santa
Clara Cty. Off. of Educ.*, 502 F.3d 1116, 1125-27 (9th Cir. 2007) ("The FCA makes clear
that notwithstanding the relator's statutory right to the government's share of the
recovery, the underlying claim of fraud always belongs to the government.").  Here,
Relator attempts to extend that right beyond that authorized by the FCA, to assert two
equitable claims on behalf of the Government that she contends are authorized by
"federal common law."  She cites no authority that empowers her to do so, and the Court
has found none.  *Cf. id.* at 1126-27 (holding that because the FCA did not authorize the
relator to proceed pro se on behalf of the Government, in order to avoid dismissal, the
relator would be required to either identify an alternate source granting him that right or
secure counsel to pursue the FCA claims).  Therefore, the Court DISMISSES the fourth
and fifth causes of action.

**VII.   CONCLUSION**

As set forth herein, the Court DENIES BelHealth's Motion to Dismiss in its
entirety.  The Court GRANTS IN PART Linden Care's Motion to Dismiss and dismisses
without prejudice the fourth and fifth causes of action.[13]  In all other respects, Linden
Care's Motion is DENIED.

---

[13] Because the rationale for dismissing the fourth and fifth causes of action is equally applicable to all
Defendants, these claims are dismissed without prejudice as to all Defendants.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:16-CV-07937-JLS-AJW                    Date:  June 9, 2021
Title:  United States ex rel. Ebu-Isaac, et al. v. INSYS Therapeutics, Inc., et al.

**IT IS SO ORDERED.**

Initials of Deputy Clerk: mku