**MILLER SHAH LLP**
Kolin C. Tang (SBN 279834)
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Phone: 323-510-4060
Fax: 866-300-7367
kctang@millershah.com

*Counsel for Relator-Plaintiff*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MELINA EBU-ISAAC and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, the CITY OF CHICAGO and the DISTRICT OF COLUMBIA, <br><br> Relator-Plaintiffs, <br><br> v. <br><br> INSYS THERAPEUTICS, INC. and LINDEN CARE LLC., LINDEN CARE, INC., LINDEN CARE HOLDINGS, INC., BELHEALTH INVESTMENT PARTNERS, LLC, BEHEALTH INVESTMENT MANAGEMENT, LLC, and BELHEALTH INVESTMENT FUND, LP, <br><br> Defendants, | CASE NO. 2:16-cv-07937-JLS-ASx <br> Hon. Josephine L. Staton <br><br> **THIRD AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

QUICK CARE PHARMACY, INC.
217 Woodbury Road, Unit 747
Woodbury, New York 11797

HAROLD BLUE
1425 Brickell Avenue
Apt. 63F
Miami, Florida 33131

DENNIS DRISLANE
30 Surfspray Blf
Newport Coast, California 92657

INDER TALLUR
330 Main Street S
Bridgewater, CT 06752

Additional Defendants.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

1

### FALSE CLAIMS ACT COMPLAINT[1]

2   The facts alleged in this *qui tam* Complaint establish that INSYS Therapeutics, Inc.,

3   ("INSYS") committed a massive fraud at the expense of taxpayers and unwitting patients

4   with the promotion and sale of its patented sublingual fentanyl spray, SUBSYS.  LINDEN

5   CARE LLC, LINDEN CARE, INC., LINDEN CARE HOLDINGS, INC., (hereinafter

6   collectively referred to as "LINDEN CARE"), BELHEALTH INVESTMENT

7   PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC, and

8   BELHEALTH INVESTMENT FUND, LP, (hereinafter collectively referred to as

9   "BELHEALTH"), QUICK CARE PHARMACY, INC. ("QUICK CARE"), HAROLD

10  BLUE ("BLUE"), DENNIS DRISLANE ("DRISLANE"), and INDER TALLUR

11  ("TALLUR") facilitated the fraudulent scheme by illegally distributing SUBSYS for uses

12  that were not in compliance with established medical protocols, applicable legal

13  requirements, or patient safety standards.

14  Through a widespread off-label marketing campaign, INSYS, LINDEN CARE,

15  QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR took a dangerous

16  opioid, approved only for breakthrough pain experienced by opioid-tolerant cancer

17  patients, and pushed it to the pain management field as the ultimate remedy for uses that

18  were neither approved nor safe.  During the times relevant to this Third Amended

19  Complaint, industry analysts estimated that more than 90% of SUBSYS was prescribed for

20  off-label uses, such as non-cancer related pain.  This was no coincidence.

21

22  ――――――――――

[1] The lawsuit against INSYS THERAPEUTICS, INC. has been settled as of June 5, 2019
23  and therefore this third amended complaint is filed against LINDEN CARE LLC, LINDEN
    CARE, INC., LINDEN CARE HOLDINGS, INC., BELHEALTH INVESTMENT
24  PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC,
    BELHEALTH INVESTMENT FUND, LP; QUICK CARE PHARMACY, INC; HAROLD
25  BLUE; DENNIS DRISLANE; AND INDER TALLUR.

26

27  ――――――――――――――――――――――――――――――――――――――――――――
    THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx
28                                  3

INSYS' management pressured its sales staff to use sex appeal, bribery, and blatant and aggressive off-label promotion to sell as much SUBSYS as possible, despite it being a dangerous controlled substance that has reportedly resulted in numerous overdose-related deaths.  INSYS, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR worked hand-in-hand, along with non-party Rochester Drug Cooperative ("RDC"), to implement a scheme that allowed them to reap substantial profits through blatant disregard of safety and legal requirements for prescribing and distributing dangerous opioids.

Relator-Plaintiff Melina Ebu-Isaac ("Relator" or "Relator-Plaintiff") (previously identified as "Jane Doe") experienced INSYS' unlawful misconduct first-hand, as detailed herein.  She also experienced the anguish of a patient who overdosed on SUBSYS and died while taking SUBSYS, which was filled, dispensed, and shipped by LINDEN CARE, for an off-label and unapproved use.

I. **INTRODUCTION**

1.    On behalf of the United States of America ("United States"), the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, (collectively, the "States"), the City of Chicago ("Chicago") and District of Columbia ("D.C."), and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 and the False Claims Acts of the States, Chicago, and D.C., Relator files this *qui tam* Complaint against  INSYS, LINDEN CARE, BELHEALTH INVESTMENT PARTNERS, LLC, BELHEALTH INVESTMENT MANAGEMENT, LLC, BELHEALTH INVESTMENT FUND, LP, QUICK CARE PHARMACY, INC, HAROLD BLUE, DENNIS DRISLANE, and INDER TALLUR (hereinafter referred to collectively as "Defendants").  Relator brings this action

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

4

on behalf of the United States and the Plaintiff States, Chicago, and D.C. against Defendants for damages and civil penalties arising from violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and state-law counterparts in California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, and municipal-law counterparts in Chicago and D.C. The States, Chicago, D.C., and the United States are hereafter collectively referred to as the "Government."

2. The violations at issue arise out of requests for payment from Medicare, Medicaid, TRICARE, and possibly other federally-funded government health care programs (hereinafter collectively referred to as "Government Health Care Programs"). The state-law violations arise out of requests for payment under the Medicaid programs as well as any other payments made by health care programs administered by the States, Chicago, and D.C.

3. This action concerns INSYS' illegal marketing of the patented fentanyl spray SUBSYS, from 2012, when the Food and Drug Administration ("FDA") first approved SUBSYS, to the present, LINDEN CARE's unlawful distribution of the drug from 2012 until LINDEN CARE ceased business operations on July 26, 2017, QUICK CARE's unlawful distribution of the drug from 2013 until it ceased business operations, and BELHEALTH's, BLUE's, DRISLANE's, and TALLUR's direct instruction, funding, strategic planning, and control of LINDEN CARE's and QUICK CARE's unlawful distribution of the drug via LINDEN CARE LLC and QUICK CARE from July 2013 until, amid government scrutiny, BELHEALTH transferred the assets and business of LINDEN CARE LLC to QUICK CARE, another company that BELHEALTH owned and controlled, and LINDEN CARE LLC ceased business operations on July 26, 2017.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

4.      Through their intentional and reckless acts, which included false statements and claims for payment to the Government Health Care Programs, Defendants put patients at risk and received hundreds of millions of dollars in improper government payments.

5.      Relator worked as a sales representative for INSYS for approximately two years, after more than a decade of experience in the pharmaceutical industry.

6.      INSYS, a Delaware corporation, was a developer and marketer of pharmaceutical products in the United States and throughout the world.

7.      INSYS was founded in 1990 (as Oncomed, Inc.) and was headquartered in Phoenix, Arizona.   One of its primary business activities involved the company's manufacture and sale of SUBSYS, the patented fentanyl spray which is the subject of this action.

8.      As detailed herein, INSYS engaged in a variety of illegal marketing practices as part of this fraud, including, but not limited to:

     a.      Off-label marketing;

     b.      Misbranding;

     c.      Co-opting physicians by circumventing educational assessments required by Transmucosal Immediate Release Fentanyl Risk Evaluation Mitigation Strategy (TIRF REMS);

     d.      Paying kickbacks, bribes, and other unlawful remuneration to physicians;

     e.      Focusing the majority of INSYS' sales force on the promotion of SUBSYS for non-cancer uses, including contraindicated uses;

     f.      Advising physicians to begin SUBSYS patients at dosages twice the FDA-approved entry dose;

     g.      Advising patients to "titrate up," finding their optimal effective dose, without discussing dosage changes with their physicians;

THIRD AMENDED COMPLAINT                                 2:16-cv-07937-JLS-ASx

6

h.    Training and supervising Relator and her sales colleagues in the use of illegal promotion and kickbacks before and during their promotion of SUBSYS; and

i.    Supervising fraudulent practices by the INSYS Reimbursement Center which, upon information and belief, encouraged INSYS' employees to lie to Medicare Part D insurers to assure prior authorization for SUBSYS prescriptions.

9.    These practices were widespread, egregious, and orchestrated from the highest levels of INSYS.

10.    LINDEN CARE LLC is a limited liability company registered in New York, with its principal place of business located at 130 Crossways Park Drive, Suite 101, Woodbury, New York.  It was founded in 2006 as a provider of specialty pharmacy services to the pain management industry.  During all times relevant to this Complaint, LINDEN CARE LLC was licensed in all fifty U.S. states and the District of Columbia.[2]

11.    LINDEN CARE, INC. is a corporation formed under the laws of the State of Delaware on May 1, 2013, and was registered to conduct business in the State of New York under the fictional name Linden Care NY on May 13, 2013.  Its principal place of business is located at 126 East 56th Street, 10th Floor, New York, NY 10022.

12.    LINDEN CARE HOLDINGS, INC. ("LINDEN CARE HOLDINGS") is a corporation formed under the laws of the State of Delaware on June 13, 2013, and was registered to conduct business in the State of New York on July 1, 2013.  Its principal place of business is located at 126 East 56th Street, 10th Floor, New York, NY 10022. LINDEN CARE, INC. and LINDEN CARE HOLDINGS, INC. were the two members of LINDEN CARE, LLC.

---

[2] For a certain period, LINDEN CARE LLC could only ship to thirty-two states, and could not ship to California until it acquired QUICK CARE on June 23, 2014.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

13.     QUICK CARE PHARMACY, INC. is a corporation formed under the laws of the State of California on June 10, 2008 by Rohit Sheta and was registered to conduct business in the State of California on August 7, 2009. QUICK CARE's principal place of business is located at 217 Woodbury Road, Unit 747, Woodbury, New York 11797. Like LINDEN CARE, QUICK CARE is a pain-focused specialty pharmacy. On July 25, 2013, BELHEALTH FUND acquired QUICK CARE. QUICK CARE then began operating as a "Linden Care Company." On June 23, 2014, LINDEN CARE LLC, while under BELHEALTH FUND's ownership and control, acquired QUICK CARE from BELHEALTH FUND. LINDEN CARE LLC's acquisition of QUICK CARE enabled it to distribute SUBSYS to California, which it previously could not do. When LINDEN CARE ceased operating in June 2017, BELHEALTH rolled LINDEN CARE, including its assets, into QUICK CARE. As of August 2020, QUICK CARE remains a viable entity. The officers and directors of QUICK CARE include Rohit Sheta, a former Senior VP of LINDEN CARE and CEO of LINDEN CARE HOLDINGS, INDER TALLUR, a managing partner and director of BELHEALTH FUND and former director of LINDEN CARE, and Vera Abramova, LINDEN CARE's former corporate controller.

14.     BELHEALTH INVESTMENT FUND, LP ("BELHEALTH FUND") is a private equity fund, owned by BELHEALTH INVESTMENT PARTNERS, LLC, operating as a limited partnership, formed under the laws of the State of Delaware in 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050. In July 2013, BELHEALTH FUND acquired LINDEN CARE LLC as a portfolio company of the fund. BELHEALTH FUND obtained 74% ownership of preferred stock of LINDEN CARE HOLDINGS, INC. which constituted 42%, the majority, of its partners' capital. LINDEN CARE HOLDINGS, INC. paid $9 million that it received from BELHEALTH to LINDEN CARE, LLC. in exchange for its membership. In July 2013, BELHEALTH FUND also acquired QUICK CARE as a portfolio company. BELHEALTH FUND acquired

QUICK CARE because LINDEN CARE was not licensed to dispense narcotics in California. In June 2014, BELHEALTH facilitated LINDEN CARE LLC's acquisition of QUICK CARE, at which time QUICK CARE became a wholly owned subsidiary of LINDEN CARE LLC. Once QUICK CARE became a subsidiary of LINDEN CARE, LINDEN CARE could dispense narcotics to patients living in California.

15. BELHEALTH INVESTMENT MANAGEMENT, LLC ("BELHEALTH MANAGEMENT") is a limited liability corporation formed under the laws of the State of Delaware on March 18, 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050. BELHEALTH MANAGEMENT provided management, oversight and strategic guidance for the operations of LINDEN CARE, LLC.

16. BELHEALTH INVESTMENT PARTNERS, LLC ("BELHEALTH PARTNERS") is a health care-focused private equity firm operating as a limited liability corporation formed under the laws of the State of Delaware on March 23, 2011, with its principal place of business located at 26 Harbor Park Drive, Port Washington, NY 11050. In July 2013, BELHEALTH PARTNERS acquired ownership of LINDEN CARE LLC through the BELHEALTH FUND, and subsequently formed LINDEN CARE, INC. and LINDEN CARE HOLDINGS, INC. in connection with the acquisition. In its capacity as manager of BELHEALTH FUND, BELHEALTH PARTNERS controlled and directed the conduct of BELHEALTH MANAGEMENT on behalf of investors in the fund.

17. HAROLD BLUE is an adult individual residing at 1425 Bricell Avenue, Apt. 63F, Miami, Florida 33131. BLUE is a founder and managing partner of BELHEALTH FUND. BLUE is also the former Board Chairman of LINDEN CARE, a former member of LINDEN CARE's Compliance Committee, and a director of QUICK CARE. At all relevant times, BLUE controlled and directed the conduct of BELHEALTH, QUICK CARE, and LINDEN CARE, and directly participated with INSYS, RDC, LINDEN CARE, QUICK

CARE, BELHEALTH, DRISLANE, and TALLUR in causing false claims for SUBSYS to be submitted to the Government.

18.     DENNIS DRISLANE is an adult individual residing at 30 Surfpsray Blf, Newport Coast, California 92657. DRISLANE is a managing partner of BELHEALTH FUND. DRISLANE is also a former director of LINDEN CARE, a former member of LINDEN CARE's Compliance Committee, and a director of QUICK CARE. At all relevant times, DRISLANE controlled and directed the conduct of BELHEALTH, QUICK CARE, and LINDEN CARE, and directly participated with INSYS, RDC, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, and TALLUR in causing false claims for SUBSYS to be submitted to the Government.

19.     INDER TALLUR is an adult individual residing at 330 Main Street S, Bridgewater, Connecticut 06752. TALLUR is a managing partner of BELHEALTH FUND. TALLUR is also a former director of LINDEN CARE, a former member of LINDEN CARE's Compliance Committee, a former member of LINDEN CARE's Quality Management Committee, and a current director and officer of QUICK CARE. At all relevant times, TALLUR controlled and directed the conduct of BELHEALTH, QUICK CARE, and LINDEN CARE, and directly participated with INSYS, RDC, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, and DRISLANE in causing false claims for SUBSYS to be submitted to the Government.

20.     On December 18, 2012, BELHEALTH PARTNERS issued a press release announcing that the BELHEALTH FUND was closed to new investors after successfully raising $150 million in capital for investment in health care companies.  In that press release, Bert Brodsky, Managing Partner of BELHEALTH PARTNERS, said "[W]e look forward to continuing to deliver terrific returns to our investors through *our operational hands-on approach*" (emphasis added). In that same press release DRISLANE, then Chairman of BELHEALTH PARTNERS' Operating Committee, said "What differentiates BelHealth

THIRD AMENDED COMPLAINT

2:16-cv-07937-JLS-ASx

among other healthcare private equity firms is *its deep experience as healthcare operators* in the targeted sectors . . . ." (emphasis added).

21.     On July 2, 2013, BELHEALTH PARTNERS issued a press release announcing that it had completed its acquisition of LINDEN CARE LLC.  In that press release, Mark Bortnick, Founder and Chief Operating Officer of LINDEN CARE LLC said, "BelHealth is the perfect partner to accelerate Linden Care's growth from a regional company to a national platform. *BelHealth's significant experience as operators and investors, particularly in the pharmacy space*, make them the ideal equity partner for our Company" (emphasis added).

22.     On December 10, 2014, six months after LINDEN CARE acquired QUICK CARE as its subsidiary from BELHEALTH, LINDEN CARE released a press release announcing its expansion into the West Coast with the opening of a larger QUICK CARE facility. That press release stated that "[t]he new facility provides Linden Care with the necessary capacity to continue its *rapid West Coast growth*. With physical locations on both coasts, Linden Care is poised to maintain its position as the leading pain-focused specialty pharmacy in the country. (emphasis added). Rohit Sheta stated, "The new facility provides Linden Care with technology and distribution capabilities unparalleled in the industry and will support our continued growth." Marc Weiner, Founder and CEO of LINDEN CARE, stated, "The opening of our new facility demonstrates Linden Care's commitment to providing best-in-class service to patients, physicians and pharmaceutical manufacturer clients. The pain management industry continues to grow and increase in complexity, and with the opening of a state-of-the-art facility, we ensure Linden Care will stay at the forefront of the marketplace."

23.     As detailed herein, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR knowingly engaged in, participated in, and authorized a variety of illegal practices as part of their fraud relating to SUBSYS, including, but not limited to:

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

a.  Dispensing prescriptions based on faxed prescriptions for Schedule II narcotics in violation of federal regulations;

b.  Mislabeling and misbranding prescription medicines;

c.  Dispensing prescriptions in contravention of the terms of the TIRF REMS program; and

d.  Dispensing prescriptions in amounts, dosages, and for indications forbidden by law.

24.  BLUE, DRISLANE, and TALLUR actively and directly participated in the strategic planning of these illegal practices, negotiating directly with INSYS to obtain SUBSYS at a more favorable rate, bypassing the drug wholesalers, and instructing LINDEN CARE and QUICK CARE how to proceed in each of these types of transactions, as well as in all critical transactions relating to SUBSYS. BLUE, DRISLANE, and TALLUR spearheaded LINDEN CARE's Compliance Committee, which should have ensured that LINDEN CARE was compliant with all regulations pertaining to the pharmacy's dispensing of opioids, particularly the TIRF REMS program, but instead, directed, endorsed, and approved LINDEN CARE's and QUICK CARE's dispensing of opioids in violation of numerous regulations. BLUE, DRISLANE, and TALLUR negotiated directly with RDC, the main wholesale distributor of SUBSYS to LINDEN CARE and QUICK CARE, to, among others, ensure that LINDEN CARE and QUICK CARE's orders of controlled substances would not be reported as suspicious to the Drug Enforcement Administration ("DEA"), particularly since no other wholesaler would accept LINDEN CARE or QUICK CARE's orders for Schedule II controlled substances, knowing that they were suspicious.

25.  BELHEALTH, BLUE, DRISLANE, and TALLUR utilized the existing relationship between LINDEN CARE, LLC and INSYS and defrauded the United States in the sale and distribution of SUBSYS. BELHEALTH, BLUE, DRISLANE, and TALLUR directly dealt with INSYS and RDC to distribute SUBSYS, and LINDEN CARE and

THIRD AMENDED COMPLAINT                                          2:16-cv-07937-JLS-ASx

QUICK CARE operated under the direct instruction and control of BELHEALTH, BLUE, DRISLANE, and TALLUR. BELHEALTH, BLUE, DRISLANE, and TALLUR had knowledge of their own precise role in the conduct of LINDEN CARE and QUICK CARE through BELHEALTH's strategy of expanding LINDEN CARE's and QUICK CARE's facilities and extending the number of States in which LINDEN CARE could distribute SUBSYS – ultimately all 50 states after its acquisition of QUICK CARE, among other pharmacies, including those in Florida, Arizona, Nevada, and Washington.

26.    Relator has complied with all procedural requirements of the laws under which this case is brought.

27.    Relator is reliably informed and, therefore, avers that INSYS' pervasive off-label marketing and kickback schemes, as described herein, began in 2012.

28.    Relator is reliably informed and, therefore, avers that LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR illegally dispensed and distributed SUBYS, as described herein, beginning in 2012 and continuing throughout the United States until BELHEALTH transferred the assets and business of LINDEN CARE LLC to QUICK CARE and LINDEN CARE LLC, among government scrutiny, ceased business operations on July 26, 2017.

## II.    **JURISDICTION AND VENUE**

29.    This Court has federal subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3742(a). This Court has supplemental jurisdiction over the counts relating to the state and municipal FCA counterparts pursuant to 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants INSYS, LINDEN CARE BELHEALTH, QUICK CARE, BLUE, DRISLANE, and TALLUR because they can be found in, reside in, or transact business in this District.  Additionally, this Court has personal

jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(d), because INSYS, LINDEN CARE, BELHEALTH, QUICK CARE, BLUE, DRISLANE, and TALLUR transact business in this District.

32.     Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

33.     Relator brings this action based on her direct knowledge and, where indicated, upon information and belief.  None of the actionable allegations set forth in this third Amended Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4)(A), and Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA and other laws at issue herein.

34.     At all times relevant hereto, INSYS, LINDEN CARE, QUICK CARE, and BELHEALTH acted through their agents and employees, including BLUE, DRISLANE, and TALLUR, and the acts of their agents and employees were within the scope of their agency and employment.  The policies and practices alleged in this Third Amended Complaint Complaint were established and/or ratified at the highest corporate levels of INSYS, LINDEN CARE, QUICK CARE, and BELHEALTH.

## III.   THE REGULATORY ENVIRONMENT

### A.    FDCA and FDA Regulations

35.     The Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 321 *et seq.,* provides a regulatory regime for the approval of new drugs and new drug formulations intended to be marketed for use in interstate commerce.  Under the FDCA, a new drug product cannot be marketed unless the FDA approves the product and determines that it is safe and effective for its intended use.  *See* 21 U.S.C. § 355(a).

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

36.     When the FDA approves a drug, it approves the drug only for the particular use for which it was tested, *i.e.*, the intended use.  21 C.F.R. § 201.128.  Once approved, an intended use is called an "indication."

37.     In approving uses for a drug, the FDA specifies particular dosages determined to be safe and effective for each indication.  The determination of safe and effective dosages for each indication is based on the FDA's extensive review and analysis of data submitted by the drug manufacturer.  The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also reviewed and approved by the FDA.  21 U.S.C. §§ 352, 355(d).  "Labeling" includes more than just the drug's label; it also includes all "other written printed or graphic matter . . . accompanying the drug, including promotional material."  20 U.S.C. § 321(m).  An example of the drug's labeling is the printed insert in the drug's packaging.  The FDA will only approve a New Drug Application if the labeling conforms to the uses and dosages that the FDA has approved.  21 U.S.C. § 355(d).

38.     A drug manufacturer that wants to market or promote an approved drug for an alternative use, *i.e.*, a use not listed on the approved label, must submit a new application for evaluation and approval by the FDA.  21 C.F.R. §§ 314.3, 314.54.  Until the FDA approves the new use, the unapproved use is considered to be "off label."

39.     The term "off label" refers to the use of an approved drug for any purpose, or in any manner, other than that described on the drug's label.  Off-label use includes treatment of a condition not indicated on the label; treatment of the indicated condition with a different dose or frequency than specified in the label; or treatment of a different patient population (*e.g.* treatment of a child when the drug is approved only for adult use).

40.     While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses.  21 U.S.C. § 331(d), 355(a).  It is, therefore, illegal for a drug

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

manufacturer and/or its sales representatives to initiate discussions with medical professionals regarding any off-label use of the drug.

41. The FDA also prohibits "misbranding," the labeling of a pharmaceutical without "adequate directions for use." 21 U.S.C. § 352(f). "Adequate directions" are those which will allow a lay patient to use the drug safely for its "intended use." 21 C.F.R. § 201.5. When a pharmaceutical manufacturer markets a drug, the improper actions of those who label and attempt to sell the drug for its intended use, can constitute misbranding even when the label is in accord with the indication approved by the FDA. 21 C.F.R. § 201.6.

42. In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end. The FDA regulates manufacturer support for Continuing Medical Education ("CME") programs and "speaker" programs that focus on off-label uses.

43. With regard to manufacturer involvement in CME programs, the FDA published an Agency Enforcement Policy Guidance which states that CME programs must be truly independent of the drug companies and sets forth a number of factors that the FDA will consider in determining whether a program is "free from the supporting company's influence and bias."  62 Fed. Reg. 64074, 64093.  These factors include, among others, an examination of the relationship between the program provider and supporting company; the company's control of content and selection of presenters; whether there is a meaningful disclosure of the company's funding and its role in the program; whether multiple presentations of the same program are held; whether the audience is selected by the sales or marketing department of the company; and whether information about the supporting company's product is disseminated after the initial program other than in response to an unsolicited request.  The promotion of off-label drug uses at a CME program fails this test of "independence" and violates Congress' off-label marketing restrictions.

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

44.     Pursuant to the Anti-Kickback Act, 42 U.S.C. §§ 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally funded health care program, including Medicare, Medicaid, and TRICARE.

45.     The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

46.     Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of health care services in the United States.

47.     The Anti-Kickback Act prohibits suppliers such as pharmaceutical manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

48.     A violation of the Anti-Kickback Act is a violation of the False Claims Act.

**B.     The False Claims Act and The Medicare Fraud & Abuse/Anti-Kickback Statute**

49.     Congress adopted the FCA and amended it in 1986 to fight fraud in government payments.

50.     The United States Civil FCA provides, in pertinent part, that:

> (a)(1) … [A]ny person who (A) knowingly presents, or causes to
> be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false
> records or statement material to a false or fraudulent claim;

*     *     *     *

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000… plus 3 times the amount of damages which the Government sustains because of the act of that person.

*See* 31 U.S.C. § 3729.

51.     The FCA imposes liability on false claims and/or false statements material to a false or fraudulent claim.

52.     The submission of claims that are induced and written because of the off-label marketing of a pharmaceutical company is a violation of the FCA.

53.     The States, Chicago and D.C. have enacted false claims act statutes that apply to, *inter alia*, Medicare and Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds.

54.     The Medicare Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), which also applies to the state Medicaid programs and/or municipal programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.  The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

55.     The Medicare Anti-Kickback statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

56.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a.

57.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f).  Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to recommend drugs that may be paid for by a federal health care program.  The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company that has as one of its purposes, inducement of a physician to write additional prescriptions for the company's pharmaceutical products.

58.     Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions.  Kickbacks increase Government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements.  Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

59.     The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3).  None of the statutory exceptions or regulatory safe harbors protects the conduct of INSYS, LINDEN CARE, QUICK CARE or BELHEALTH in this case.

THIRD AMENDED COMPLAINT                                   2:16-cv-07937-JLS-ASx

60.    The Patient Protection and Affordable Care Act ("ACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA.  The ACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

61.    As detailed herein, INSYS devised a scheme whereby the company paid kickbacks to physician-speakers in the form of cash and cash equivalents with the specific aim of artificially increasing the prescription and sale of SUBSYS for off-label uses.

62.    Knowingly paying kickbacks to physicians to induce them to prescribe a prescription drug on label or off label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal Government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates state and federal False Claims Acts.

## C.    Government Health Care Programs

63.    The United States government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Centers for Medicare and Medicaid Services ("CMS").  *See* 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. *See* 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical

THIRD AMENDED COMPLAINT                                      2:16-cv-07937-JLS-ASx

1   assistance under the State plan[.]" *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state

2   payment is known as Federal Financial Participation ("FFP").

3       64.     Medicare Part A is funded primarily by a federal payroll tax, premiums paid

4   by Medicare beneficiaries, and appropriations from Congress. Medicare Part A generally

5   pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing

6   facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e to 1395i-5.

7   Prescription drugs are covered under Medicare Part A only if they are administered on an

8   inpatient basis in a hospital or similar setting.

9       65.     Medicare Part B is optional to beneficiaries and covers some healthcare

10  benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from

11  Congress and premiums paid by Medicare beneficiaries who choose to participate in the

12  program. 42 U.S.C §§ 1395j to 1395w-4. Medicare Part B pays for some types of

13  prescription drugs that are not administered in a hospital setting. 42 U.S.C. § 1395k(a); 42

14  U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.  These typically include drugs administered by

15  a physician or other provider in an outpatient setting, some orally administered anti-cancer

16  drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and

17  drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §

18  1395k(a); 42 U.S.C.  § 1395x(s)(2); 42 C.F.R. § 405.517i.

19      66.     Medicare Part D, administered by CMS, went into effect on January 1, 2006.

20  For "dual eligibles," (individuals who received prescription drug coverage under Medicaid

21  in addition to Medicare coverage for other health care in 2005) enrollment in Medicare Part

22  D was compulsory.  These beneficiaries were automatically switched to Part D plans for

23  2006 and commenced receiving comprehensive prescription drug coverage under Medicare

24  Part D.

25      67.     Coverage of prescription drugs under Medicare Part D is subject to the same

26  regulations as coverage under the Medicaid Program described above.

27

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

28

68.    TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents. TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are government funds.

69.    The Railroad Retirement Medicare program is authorized by the Railroad Retirement Act of 1974, at U.S.C.A. §231 *et seq.*  It is administered through the United States Railroad Retirement Board ("RRB") and furnishes Medicare coverage to retired railroad employees.

70.    The Federal Employees Health Benefits Program ("FEHBP") is administered by the United States Office of Personnel Management ("OPM") pursuant to 5 U.S.C. § 8901 *et seq.* and provides health care coverage to federal employees, retirees and their dependents and survivors.

71.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") is a comprehensive health care program in which the Department of Veterans Affairs ("VA") shares the cost of covered health care services and supplies with eligible beneficiaries.  The program is administered by the Health Administration Center from its offices located in Denver, Colorado.  In general, the CHAMPVA program covers most health care services and supplies that are medically and psychologically necessary.

72.    Due to the similarity between CHAMPVA and the Department of Defense TRICARE program, the two are often mistaken for each other. CHAMPVA is a VA program whereas TRICARE is a regionally managed health care program for active duty and retired members of the uniformed services, their families and survivors.  In some cases, a veteran may appear to be eligible for both/program on paper.  However, military retirees, or the spouse of a veteran who was killed in action, are and will always be TRICARE beneficiaries.

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

73.     Pursuant to 38 U.S.C. § 8126, the regulations based thereon, and contracts the VA had with manufacturers, drugs furnished to the VA by drug manufacturers must be furnished at the best price.

74.     CHAMPVA, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), and TRICARE operate in substantially similar ways to the Medicare and Medicaid programs, but primarily for the benefit of military veterans, their spouses (or widowed spouses) and other beneficiaries.

75.     The Indian Health Service is responsible for providing comprehensive health services to more than 1,400,000 Americans.  It is administered by HHS services pursuant to 42 U.S.C. § 2002 *et seq*.  The statute authorizes the Secretary of HHS to enter into contracts with independent providers to furnish health services to Native Americans whenever the Secretary determines that independent providers can better meet the population's needs.

76.     At all times material to this Third Amended Complaint, off-label uses of SUBSYS promoted by INSYS were not eligible for reimbursement under the Government Health Care Programs because such off-label uses are neither listed in the labeling approved by the FDA nor, on information and belief, otherwise deemed safe and effective by any of the applicable drug compendia, as further described *infra*.

77.     As a direct result of INSYS' improper off-label and misleading marketing practices involving SUBSYS; payment of illegal kickbacks; LINDEN CARE's and QUICK CARE's improper labeling and illegal distribution of SUBSYS; and BELHEALTH's, BLUE's, DRISLANE's, and TALLUR's instructions, strategic planning, funding, and control of LINDEN CARE's  and QUICK CARE's conduct and LINDEN CARE's dealings with INSYS to procure and distribute a larger amount of SUBSYS, the Government Health Care Programs paid false or fraudulent SUBSYS reimbursement claims for off-label, non-medically accepted indications.  The United States would not have paid such false claims

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

but for the illegal and fraudulent conduct of INSYS, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR.

78.     The fact that the Government Health Care Programs paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.  Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, as described more fully *infra*, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were not, particularly since there is no ICD-10 diagnostic code for breakthrough cancer pain.  In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

**D.     The Food, Drug and Cosmetics Act and FDA Regulations**

79.     The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. §§ 331(d), 355(a).

80.     The FDA reviews a pharmaceutical manufacturer's New Drug Application to determine whether the intended uses of the drug are safe and effective. *See* 21 U.S.C. § 355. Once a drug is approved for a particular use, doctors can freely prescribe the drug for "non-indicated" or off-label purposes.  However, a Government Health Care Program will only allow reimbursement if the drug is prescribed for an indicated use or an off-label use listed in a statutorily-approved compendium.   While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.* "indications," not approved by the FDA.  As described herein, the term "off-label" refers to

marketing an FDA-approved drug for a use that has not been reviewed and approved by the FDA, *i.e.*, a purpose not approved by the FDA.

81.     While purely scientific or educational programs are permissible, sales and marketing presentations, promotions or marketing to physicians for uses other than those approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDA. *See* 21 U.S.C. §§ 331(a)-(b), 352(a), (f).  Additional proscribed marketing activity includes any attempts by a pharmaceutical sales representative to solicit discussions with physicians concerning off-label use.

82.     Strong policy reasons exist for strict regulation of off-label marketing.  Off-label promotion bypasses the FDA's strict review and approval process, and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

83.     Pursuant to the FDCA, 21 U.S.C. § 301 *et seq.*, the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

84.     The FDA broadly interprets "labeling" in its regulations to include items that are "1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel."  21 C.F.R. § 202.1.  The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding."  21 U.S.C. § 321(n).  Labeling includes, among other things, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio-visual material.  21 C.F.R. § 202.1(1)(2).

85.     FDA regulations deem "advertising" to include advertisements in published journals, magazines, newspapers and other periodicals, and broadcast through media such as television, radio and telephone communications systems.  *See* 21 C.F.R. § 202.1(I)(1). Courts have consistently held that oral statements made by a company's sales representative

relating to a pharmaceutical product constitute commercial advertising or promotion. *See, e.g.*, *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 7 (7th Cir. 1992) (interpreting the Lanham Act).

86.     Pharmaceutical promotional and marketing materials, and presentations lacking in fair balance or that are otherwise false or misleading, "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. § 202.1(e)(6)-(7); 21 C.F.R. § 1.21.

87.     Such violations occur where promotional marketing materials and presentations, *i.e.*, advertisements for an FDA approved drug, among other things:

      a.     Minimize, understate, or misrepresent the side effects, contraindications and/or effectiveness of the drug;

      b.     Overstate or misrepresent the side effects, contraindications, and/or effectiveness of competing drugs;

      c.     Expressly or implicitly promote uses, dosages or combination usage of the drug that are not contained in the FDA approved labeling (*i.e.*, off-label uses);

      d.     Fail to reveal material facts with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

      e.     Contain representations or suggestions, not approved or permitted in the labeling, that the drug is better, more effective, useful in a broader range of conditions or patients, safer, or has fewer, or less incidence of, or less serious side effects or contraindications than demonstrated by substantial evidence or substantial clinical experience;

      f.     Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

g.     Use a quote or paraphrase out of context to convey a false or misleading idea; and/or

h.     Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1(e)(4)-(7).

88.    Oral statements and written materials presented at industry-supported activities, including lectures and teleconferences, provide evidence of a product's intended use.  If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, the drug is misbranded because the statements and materials fail to provide adequate directions for all intended uses.

89.    Whether the promotion of off-label uses occurs directly or indirectly, the facts related to the promotion may establish the existence of misbranding. "A drug is misbranded if, *inter alia*, its labeling fails to contain 'adequate direction for use,' 21 U.S.C. §352(f), which FDA regulations define as 'directions under which the lay[person] can use a drug safely and for the purposes for which it is intended.'" *U.S. ex rel. Polansky v. Pfizer, Inc.,* 822 F.3d 613, 615 (2d Cir. 2016) (citing 21 C.F.R. § 201.5).  The "intended use" of a drug is determined by the expressions of those legally responsible for labeling them, as well as "the circumstances surrounding the distribution of the [drug]." *Id*.  Where accumulated circumstances and impressions lead a factfinder to determine that a drug is intended for an off-label use, the drug is misbranded, and violators are subject to civil and criminal consequences outlined by 21 U.S.C. § 333.

90.    In sum, the FDA's regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body—the FDA.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

## IV.    **THE DRUG**

91.    The FDA approved SUBSYS in January 2012.  Since March 2012, INSYS has manufactured and marketed the drug throughout the United States. In late 2019, INSYS, who filed for bankruptcy in 2019, sold SUBSYS to BTcP Pharma LLC.

92.    SUBSYS is a Schedule II opioid medication.    The only FDA-approved indication for SUBSYS is the management of breakthrough cancer pain in opioid-tolerant adults.  Breakthrough cancer pain is defined as the transient exacerbation of pain that occurs in a patient with otherwise stable, persistent pain. Opioid tolerance[3] describes individuals who are less susceptible to the effects of opioids, both therapeutic and adverse, that may develop with long-term use of opioids.

93.    The ideal treatment for breakthrough cancer pain is a "strong, short-acting opioid medication that works quickly and lasts about as long as a breakthrough pain episode."[4]  Fentanyl is 50 to 100 times more potent than morphine, and such potency is necessary to treat breakthrough cancer pain.  SUBSYS' spray delivery system allows the drug to be absorbed into the body much more quickly than a pill or lozenge.

94.    SUBSYS, which contains fentanyl, has a high potential for abuse and addiction.  Its misuse can result in death from respiratory depression.

---

[3] The FDA defines opioid tolerance as "patients receiving, for one week or longer, at least 60 mg oral morphine/day, 25 mcg transdermal fentanyl/hour, 30 mg oral *oxycodone*/day, 8 mg oral hydromorphone/day, 25 mg oral oxymorphone/day, or an equianalgesic dose of another opioid." FDA, *Highlights of Prescribing Information*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/202144s006lbl.pdf (last visited Aug. 7, 2018).

[4] Payne R *et al.* Long-Term Safety of Oral Transmucosal Fentanyl Citrate for Breakthrough Cancer Pain. 2001 J Pain Sym Mgmt, 22 (1): 575-83. Available at: https://www.jpsmjournal.com/article/S0885-3924(01)00306-2/fulltext (Last Visited: August 9, 2018).

95.     Due to its status as a dangerous Transmucosal Immediate Release Fentanyl ("TIRF") drug, the FDA approved SUBSYS for a specific indication, as explained in its package labeling.  Any use of a TIRF drug requires that patients, prescribing physicians, and distributing pharmacies comply with a Risk Evaluation and Mitigation Strategy ("REMS"). As a Schedule II drug subject to TIRF REMS, SUBSYS is one of the most regulated (and dangerous) legal prescription drugs.

96.     Despite this restricted indication, a market limited to patients with breakthrough cancer pain, and heightened public awareness of the opioid epidemic, SUBSYS was still the most prescribed TIRF product as of December 2017, with sales revenue of $139.25 million and a 29% market share.  For at least the period of late-2012 through 2016, the large majority of the prescriptions of SUBSYS were, upon information and belief, written for off-label uses rather than the FDA-approved indication for breakthrough cancer pain.  These off-label uses included, but were not limited to, the use of SUBSYS for non-cancer-related chronic pain, post-operative pain (a contraindicated use), and headaches (a contraindicated use).

A.     FDA-Approved Indication

97.     The only FDA-approved indication for SUBSYS is "for management of breakthrough pain in cancer patients 18 years of age or older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[5]     *See* SUBSYS label below.

---

[5]     SUBSYS     label     available     at: www.accessdata.fda.gov/drugsatfda_docs/label/2012/202788s000lbl.pdf

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use
SUBSYS safely and effectively. See full prescribing information for
SUBSYS.
SUBSYS™ (fentanyl sublingual spray), CII
Initial U.S. Approval: 1968

| WARNING: RISK OF RESPIRATORY DEPRESSION, MEDICATION ERRORS, ABUSE POTENTIAL |
|---|
| *See full prescribing information for complete boxed warning.* |

- Due to the risk of fatal respiratory depression, SUBSYS is contraindicated in opioid non-tolerant patients (1) and in management of acute or postoperative pain, including headache/migraines. (4)
- Keep out of reach of children. (5.3)
- Use with CYP3A4 inhibitors may cause fatal respiratory depression. (7)
- When prescribing, do not convert patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS. (5.1)
- When dispensing, do not substitute with any other fentanyl products. (5.1)
- Contains fentanyl, a Schedule II controlled substance with abuse liability similar to other opioid analgesics. (9.1)
- SUBSYS is available only through a restricted program called the TIRF REMS Access program. Outpatients, healthcare professionals who prescribe to outpatients, pharmacies, and distributors are required to enroll in the program. (5.10)

------------------------------INDICATIONS AND USAGE------------------------------
SUBSYS is an opioid agonist indicated for the management of breakthrough
pain in cancer patients 18 years of age and older who are already receiving
and who are tolerant to opioid therapy for their underlying persistent cancer
pain. Patients must remain on around-the-clock opioids when taking
SUBSYS. (1)
Limitations of Use:
SUBSYS may be dispensed only to patients enrolled in the TIRF REMS
ACCESS program.

98.    The FDA approved SUBSYS for a specific population of patients – adult cancer sufferers who have become opioid-tolerant from managing persistent pain – and a specific indication – breakthrough cancer pain.  Any other use of the drug, including use in a different patient population or for a different indication, is not approved by the FDA.

99.    The FDA also determined that SUBSYS should only be prescribed by "oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."  *See* SUBSYS label below.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

**1 INDICATIONS AND USAGE**

SUBSYS is indicated for the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Patients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 60 mg of oral morphine daily, at least 25 mcg of transdermal fentanyl/hour, at least 30 mg of oral oxycodone daily, at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid daily for a week or longer. Patients must remain on around-the-clock opioids when taking SUBSYS.

This product **must not** be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason, SUBSYS is contraindicated in the management of acute or postoperative pain.

SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

Limitations of Use:

As part of the Transmucosal Immediate-Release Fentanyl (TIRF) REMS ACCESS Program, SUBSYS may be dispensed only to outpatients enrolled in the program. [see *Warnings and Precautions* (5.10)]. For inpatient administration (e.g. hospitals, hospices, and long-term care facilities that prescribe for inpatient use) of SUBSYS, patient enrollment is not required.

100.   The FDA-approved label expressly provides that SUBSYS is contraindicated[6] in "opioid non-tolerant patients" and in "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." *See* SUBSYS label below. The drug is contraindicated for these purposes because the risk of respiratory depression and death in opioid naïve patients is significant.

---

[6] A contraindication is a symptom or a circumstance that makes treatment with a drug unsafe or inappropriate.   https://www.tabers.com/tabersonline/view/Tabers-Dictionary/754565 (last visited August 9, 2018).

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

-----------------CONTRAINDICATIONS-----------------
• Opioid non-tolerant patients. (4)
• Management of acute or postoperative pain including headache/migraine and dental pain (4)
• Intolerance or hypersensitivity to fentanyl, SUBSYS, or its components. (4)
-----------------WARNINGS AND PRECAUTIONS-----------------
• Clinically significant respiratory and CNS depression can occur. Monitor patients accordingly. (5.1)
• Full and consumed SUBSYS units contain medicine that can be fatal to a child. Ensure proper storage and disposal. (5.3, 16.2)
• Use with other CNS depressants and moderate or strong CYP450 3A4 inhibitors may increase depressant effects including respiratory depression, hypotension, and profound sedation. Consider dosage adjustments if warranted. (5.4)
• Titrate SUBSYS cautiously in patients with chronic obstructive pulmonary disease or preexisting medical conditions predisposing them to respiratory depression and in patients susceptible to intracranial effects of $CO_2$ retention. (5.6, 5.7)

101.   In order to prevent potentially fatal side effects, and to reduce the risk of misuse and abuse, the FDA mandated that prescribers always limit patients to the lowest effective dose of the drug.  This was to be achieved through "titration," a process by which patients begin taking SUBSYS at 100 micrograms (mcg), and, if necessary, subsequently step up the dosage in one hundred mcg increments (up to a *maximum* of two doses in any four-hour period).

102.   The "black box warning"[7] in the FDA-approved label for SUBSYS includes, among others, a list of its contraindications.

**B.     TIRF REMS Distribution Protocol**

103.   Due to the dangers associated with this class of drug, the FDA required that SUBSYS, and five other FDA-approved TIRF products, only be prescribed and dispensed through a REMS program.  The FDA refers to this protocol as TIRF REMS.

104.   TIRF REMS is intended to educate "prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose of TIRF medicines."

105.   In order to comply with TIRF REMS, prescribers and pharmacists must first enroll in the program.

---

[7] A "black box warning" is the FDA's most stringent warning for prescription drugs. It alerts the public and health care providers to a serious side effects, such as injury or death.

106.   The REMS program requires that prescribers and pharmacists review educational materials on a specific class of drugs and pass an online "Knowledge Assessment" exam.

107.   The prescriber and pharmacist must then read and sign a "Prescriber [or Pharmacist] Enrollment Form," which lists the risks associated with TIRF drugs and requires the parties to acknowledge their responsibilities associated with prescribing and dispensing such a drug.  The forms require the signing party to certify, in multiple ways, that they will comply with the labeling and TIRF REMS protocol in prescribing and dispensing SUBSYS or other TIRFs.  *See* acknowledgment and acceptance of TIRF REMS responsibilities for prescribers and pharmacists below.

The TIRF REMS Access Program: Prescriber Enrollment Form

**The Transmucosal Immediate Release Fentanyl (TIRF) REMS Access Program Prescriber Enrollment Form**

**For real-time processing of enrollment, please go to www.TIRFREMSaccess.com.**

**To submit this form via fax, please complete all required fields below and fax pages 1, 2 and 3 to 1-866-822-1487. Please note, you must review the TIRF REMS Access Education Program and successfully complete the Knowledge Assessment to complete enrollment. If you have not completed the Knowledge Assessment online, please include it with this enrollment form. You will receive enrollment confirmation via email or fax.**

I understand that TIRF medicines are only available through the TIRF REMS (Risk Evaluation and Mitigation Strategy) Access program and that I must comply with the program requirements. In addition, I acknowledge that:

1. I have reviewed the TIRF REMS Access Education Program, including the Full Prescribing Information for each TIRF medicine, and I have completed the Knowledge Assessment. I understand the responsible use conditions for TIRF medicines and the risks and benefits of chronic opioid therapy.

2. I understand that TIRF medicines can be abused and that this risk should be considered when prescribing or dispensing TIRF medicines in situations where I am concerned about an increased risk of misuse, abuse, or overdose, whether accidental or intentional.

3. I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain.

4. I understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients, and know that fatal overdose can occur at any dose.

5. I understand that TIRF medicines must not be used to treat any contraindicated conditions described in the full Prescribing Information, such as acute or postoperative pain, including headache/migraine.

6. I understand that converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis. I understand that TIRF medicines are not interchangeable with each other, regardless of route of administration, and that conversion may result in fatal overdose, unless conversion is done in accordance with labeled product-specific conversion recommendations (refer to the list of currently approved TIRF products located on the TIRF REMS Access website at www.TIRFREMSaccess.com/TirfUI/ProductList). Note, a branded TIRF medicine and its specific generic product(s) are interchangeable.

7. I understand that the initial starting dose for TIRF medicines for <u>all</u> patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations, and I understand that patients must be titrated individually.

8. I will provide a Medication Guide for the TIRF medicine I intend to prescribe to my patient or their caregiver and review it with them. If I convert my patient to a different TIRF medicine, the Medication Guide for the new TIRF medicine will be provided to, and reviewed with my patient or their caregiver.

9. I will complete and sign a TIRF REMS Access Patient-Prescriber Agreement (PPAF) with <u>each</u> new patient, before writing the patient's first prescription for a TIRF medicine, and renew the agreement every two (2) years.

10. I will provide a completed, signed copy of the Patient-Prescriber Agreement (PPAF) to the patient and retain a copy for my records. I will also provide a completed, signed copy to the TIRF REMS Access program (through the TIRF REMS Access website or by fax) within ten (10) working days.

11. At all follow-up visits, I agree to assess the patient for appropriateness of the dose of the TIRF medicine, and for signs of misuse and abuse.

Prescriber Name* (please print): _____

THIRD AMENDED COMPLAINT                                         2:16-cv-07937-JLS-ASx

The TIRF REMS Access Program: Independent Outpatient Pharmacy Enrollment Form

**The Transmucosal Immediate Release Fentanyl (TIRF) REMS Access Program Independent Outpatient Pharmacy Enrollment Form**

For real-time processing of enrollment, please go to www.TIRFREMSaccess.com.

To submit this form via fax, please complete all required fields below and fax pages 1, 2, 3 and 4 to 1-866-822-1487. Please note, you must review the TIRF REMS Access Education Program and successfully complete the Knowledge Assessment to complete enrollment. If you have not completed the Knowledge Assessment online, please include it with this enrollment form. You will receive enrollment confirmation via email or fax.

I understand that TIRF medicines are only available through the TIRF REMS (Risk Evaluation and Mitigation Strategy) Access program and that I must comply with the program requirements. In addition, as the designated authorized independent outpatient pharmacy representative, I acknowledge that:

1. I have reviewed the TIRF REMS Access Education Program, and I have completed the Knowledge Assessment. I understand the risks and benefits associated with TIRF medicines and the requirements of the TIRF REMS Access program for pharmacies.
2. I will ensure that all pharmacy staff who participate in dispensing TIRF medicines are educated on the risks associated with TIRF medicines and the requirements of the TIRF REMS Access program, as described in the TIRF REMS Access Education Program. This training should be documented and is subject to audit.
3. I understand that converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis. I understand that TIRF medicines are not interchangeable with each other, regardless of route of administration, and that conversion may result in fatal overdose, unless conversion is done in accordance with labeled product-specific conversion recommendations (refer to the list of currently approved TIRF products located on the TIRF REMS Access website at www.TIRFREMSaccess.com/TirfUI/ProductList). Note, a branded TIRF medicine and its specific generic product(s) are interchangeable.
4. I understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients.
5. I understand that the initial starting dose for TIRF medicines for <u>all</u> patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations, and I understand that patients must be titrated individually.
6. I understand the importance of discussing the risks and benefits of TIRF medicines with patients and their caregivers, and in particular the importance of taking the drug as prescribed, not sharing with others, and proper disposal.
7. I understand that the product-specific Medication Guide must be given to the patient or their caregiver each time a TIRF medicine is dispensed.
8. I understand that a TIRF medicine will not be dispensed without verifying through our pharmacy management system that the prescriber and pharmacy are enrolled and active, and that the patient has not been inactivated in the program.
9. I understand that ALL TIRF medicine prescriptions, regardless of the method of payment, must be processed through our pharmacy management system.
10. I understand that all dispensing locations must be enrolled in the TIRF REMS Access program to dispense TIRF medicines.
11. I understand that TIRF medicines can only be obtained from wholesalers/distributors that are enrolled in the TIRF REMS Access program.

Pharmacist Name* (please print):_____

THIRD AMENDED COMPLAINT                                        2:16-cv-07937-JLS-ASx

35

108.   Prior to submitting a prescription for a TIRF drug to a pharmacy, a physician must discuss and have the patient sign a Patient-Prescriber Agreement Form, which lists the risks and responsibilities associated with the drug.

109.   TIRF prescribers must re-enroll every two years and can only have their TIRF prescriptions filled through pharmacies certified to do so.  Pharmacies are likewise required to re-enroll their "authorized pharmacist" in the TIRF REMS program every two years to maintain their certification.   The authorized pharmacist is responsible for ensuring enrollment and training of other pharmacy staff.

## V.   INSYS' OFF-LABEL MARKETING SCHEME

110.   INSYS waged a multi-pronged approach to build SUBSYS' market share, including direct and affirmative off-label promotion to potential prescribers.

111.   INSYS' campaign was successful.  SUBSYS gained close to a 50% market share among TIRF drugs only two years after its FDA approval.  During that period more than 90% of SUBSYS prescriptions were cited for off-label use.

112.   Although expressly contraindicated, INSYS promoted SUBSYS for post-surgical pain, resulting in off-label prescriptions. INSYS also promoted SUBSYS for musculoskeletal pain, fibromyalgia, neck pain and back pain, all of which were off label. SUBSYS has not been shown to be safe nor effective for these conditions.  In fact, opioids prescribed for back and neck pain can be harmful and ultimately lead to increased pain, dysfunction, and disability.

113.   On several occasions, Relator expressed concerns to INSYS' sales managers regarding the number of prescriptions of SUBSYS written for non-cancer patients who would have been better served by a less dangerous and less addictive analgesic.  On one occasion, Relator told her Sales Manager, SM #1, that she wanted to increase her sales, but feared the consequences for patients whose opioid tolerance and potential for addiction might increase unnecessarily.   SM #1 responded callously, stating: "They are already

THIRD AMENDED COMPLAINT

2:16-cv-07937-JLS-ASx

36

addicts."  Rather than respond in a serious manner, SM #1 dismissed Relator's concerns and advised her to use her sexuality toward pain-management physicians by stroking their hands while literally begging that they write prescriptions.  SM #1 advised Relator to ask physicians to prescribe SUBSYS as "a favor."  SM #1 told Relator that these patients would not be any worse as a consequence of unnecessarily taking SUBSYS because they were already addicts whose prospects were essentially rock-bottom.

114.   INSYS encouraged its sales staff, including Relator, to advise doctors to start patients on high doses of SUBSYS and push existing patients to "titrate up" to higher levels of medication usage and maintain their use round-the-clock, rather than use the drug appropriately as a response to breakthrough episodes of pain.

115.   In spite of the unnecessary dangers posed to non-cancer patients, INSYS instructed its sales staff to enroll new prescribers in the TIRF REMS program and lavish them with constant attention, free meals and other remuneration in order to increase SUBSYS prescriptions to patients.

A.     **Promotion of SUBSYS for Off-Label Indications**

116.   Beginning with the FDA's approval of SUBSYS in 2012, INSYS promoted the drug for off-label indications.  It targeted pain management specialists, internists and neurologists with the majority of its sales staff while reserving a smaller (now defunct) sales department for oncologists.

117.   When Relator began working for INSYS in 2014, she received marketing materials that only referenced cancer patients.  Nevertheless, she was advised during training that oncologists tend not to prescribe pain management drugs and, therefore, she should find a general practitioner who prescribed TIRFs and "live in their office" in order to educate an internist or pain-management physician about prescribing SUBSYS for an off-label use.

118.   Relator also received advice as to which medical practice specialties and personality types should be targeted. In addition to internists, INSYS sales trainers provided four targets: "(1) Physiatrists (PM&R (Pain Management and Rehabilitation)); (2) Anesthesiologists; (3) Neurologists (neuropathic pain/migraine); and (4) Psychiatrists."

119.   INSYS sales staff targeted prescribers of other TIRF drugs (including Cephalon's Actiq) for the sale of SUBSYS, even though sales representatives knew many of those physicians prescribed TIRF drugs for off-label uses.  By the end of 2014, approximately 90% of SUBSYS prescriptions were filled for off-label uses.

120.   As an incentive to its sales force, INSYS offered rewards of between $500 and $800 for each instance that a sales representative successfully switched a patient from another TIRF drug to SUBSYS.  INSYS paid this reward irrespective of the type of use for which the drug was prescribed.

121.   During her time at INSYS, Relator found that oncologists began to show reluctance in prescribing SUBSYS for breakthrough cancer pain because the drug had developed a stigma.  Physicians started to associate SUBSYS with the unscrupulous sales practices used by INSYS and many considered its indication for cancer pain as a pretext for its actual intended use – off-label pain management for opioid addicts.

122.   Relator was advised to offer free SUBSYS to non-cancer patients when necessary to ensure coverage for the drug by payors, including Government Health Care Programs.  In doing so, INSYS informed Relator that (1) authorizations would be more likely to be approved after three months to a year of use, and (2) patients would grow dependent on the medication during that time, ensuring a long prescribing relationship.

**B.    INSYS Advised Prescription of Off-Label Doses of SUBSYS**

123.   Led by management, INSYS sales staff consistently sought to increase revenue through promotion of (1) medically unnecessary high doses of SUBSYS, and (2) prescription of SUBSYS for continuous, rather than emergency, use.

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

124.   INSYS sales managers repeatedly lectured sales staff that the key to making more money was successfully encouraging physicians and patients to use higher doses of SUBSYS.  Quite simply, the higher the dose, the more revenue generated by INSYS and, therefore, the greater the sales commissions to be earned by SUBSYS' sales representatives. Notably, the compensation structure for INSYS sales representatives was unique in that they earned relatively low salaries (usually $40,000 per year) while given the possibility to earn substantially more through incentive-laden commissions.

125.   The FDA-approved labeling for SUBSYS states that new patients must *always* begin using the drug in 100 mcg increments.  *See* SUBSYS label below (emphasis in original),

**2.1 Initial Dose**
Individually titrate SUBSYS to a dose that provides adequate analgesia and minimizes side effects. The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg. **. When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product *[see Warnings and Precautions (5.2) and Clinical Pharmacology (12.3)]*.

Prescribe an initial titration supply of 100 mcg SUBSYS units, which limits the number of units in the home during titration.

Avoid prescribing a higher dose until patients have used up all units to prevent confusion and possible overdose.

126.   Despite this requirement, INSYS sales staff stressed to physicians that the 100 mcg dose was ineffective for all but 4% of patients.  Sales staff were taught to disregard the fact that the entry titration dose is intended to be small, and therefore safe.  Instead, they were instructed to convince physicians to double the entry dose, so that patients would immediately "feel the drug working."  Sales managers complained that the 100 mcg starting dose might cause patients to think the drug was ineffective.  As such, the labeling instructions were disregarded and the off-label dose was promoted.

127.   In fact, INSYS sales representatives were instructed to recommend that new patients start with a 200 mcg dose. One sales manager advised Relator that some patients begin with a 400 mcg dose. In line with INSYS policy, sales representatives, including Relator, advised prescribers to begin the initial dose at 200 mcg and expect to increase to a minimum of 400 mcg through titration during the first month of use.  INSYS directed Relator and other sales representatives to recommend titration to an eventual dosage between 600 mcg and 1600 mcg.

128.   Sales managers directed sales representatives, including Relator, to consult directly with patients and advise that they begin at 200 mcg dose, wait 30 minutes, and repeat the same dose if still experiencing pain. Representatives were also told to advise patients that they should increase to their next dose (in 200 mcg increments) after four hours and repeat with an additional dose if symptoms remained.  This instruction directly contradicts SUBSYS' label, which states "When you are first prescribed SUBSYS, your healthcare provider will start you with the lowest strength medicine, and change that dose until you and your healthcare provider find the right dose for you."

129.   Further, INSYS sales staff advised both patients and physicians that patients should manage the titration without informing the treating physician of changes in dose during the titration process. This instruction also directly contradicts the SUBSYS' label.

130.   Joe Rowan, INSYS' Director of Sales for the East Coast, advised sales representatives, including Relator, that patients should be pushed to a baseline dosage of 400-800 mcg, in the hope that continued use would increase the baseline toward 1600 mcg.  During a sales meeting, Rowan told sales representatives they would attain their bonuses if the patient titrated closer to 1600 mcg.

131.   In meetings and on "ride-along" drives with other sales staff, Relator was encouraged to tell doctors and patients that an average effective dose was between 600

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

and 1600 mcg.  However, breakthrough pain is managed in approximately 25% of patients at 400 mcg or lower doses according to studies included in the drug's FDA-approved label.

### C.  Use of IRC to Authorize Insurance Reimbursement for Off-Label Uses

132.  In order to ensure authorization of payment for a SUBSYS prescription by an  insurer and the dispensing of the drug by a pharmacy, INSYS provided its sales staff with multiple means to accomplish that objective: Patient Authorization & Referral ("Prior Authorization") forms; the ability to provide as much as a year of free SUBSYS to establish a pattern of use; an INSYS Reimbursement Center to persuade insurers; and an appeal letter template for the physician to use in the event of a denial. Each of these methods breached FDA regulations.

133.  INSYS employs a group known as the "INSYS Reimbursement Center," ("IRC") to communicate with pharmacies and insurers on behalf of the doctor and patient, to ensure authorization and dispensing of SUBSYS.   According to Relator, sales representatives knew that IRC staff would do anything necessary, including lying, to ensure prior authorizations for SUBSYS prescriptions.

134.  At the outset of a sales relationship, INSYS sales representatives attempted to enroll health care providers in the "INSYS Patient Services Center" by providing HIPAA waivers for likely SUBSYS patients. Once this occurred, the sales representative supplied potential prescribers with INSYS Prior Authorization forms. After the Prior Authorization forms were completed with doctor and patient-specific information and signatures, the IRC attempted to gain prior authorization.  Finally, the physician, like the pharmacy that eventually filled the prescription, was required to enroll in the TIRF REMS access program by taking an online exam and signing liability waivers.  These measures were intended to mitigate the risks associated with prescribing TIRF drugs like SUBSYS.

135.   Once a physician qualified to prescribe SUBSYS and write prescriptions to do so, the IRC's prior authorization mechanism unfolded in the following manner:

    a.   INSYS' sales representative provided a partially pre-populated INSYS Prior Authorization form to the patient and assisted in its completion.

    b.   The prescribing physician completed the Prior Authorization form and returned it to an INSYS sales representative.

    c.   INSYS sales representatives or the physicians' office staff faxed the form to the IRC.

    d.   IRC staff contacted the relevant Medicare Part D insurer (or other insurer) and pled INSYS' case for reimbursement of the cost of SUBSYS.

    e.   If the insurer agreed to reimburse, the drug was dispensed.

    f.   If the insurer refused to reimburse, INSYS provided up to a year of free SUBSYS to the patient. After months of SUBSYS use by the patient, during which time the patient had likely become dependent on the drug, INSYS re-submitted the request for reimbursement based on the three months of use by the patient. Relator reports that the scheme regularly worked—INSYS won reimbursement by providing three months of free product and recouped its initial investment in the process.

136.   Upon information and belief, this process afforded INSYS a radically higher rate of insurer authorization than corresponding figures for any of the five other TIRF drugs then sold.

137.   During Relator's initial training, Relator's field sales trainer, Sales Representative #1 ("SR #1") showed Relator folders she had prepared for individual physicians, containing pre-populated Prior Authorization forms. Later, Sales Representative #2 (SR #2), another of Relator's local colleagues, showed Relator

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

prepopulated forms up close. Relator and her colleagues pre-populated the certain lines of the form below (outlined in red): "Diagnosis: Other chronic pain," "Diagnosis: chronic pain syndrome," "Patient is Opioid Tolerant," and "Strength: 200 mcg." That is, INSYS sales staff pre-populated the form with off-label indications and an off-label initial dosage.

138.   On October 13, 2014, Relator-Plaintiff, feeling uncomfortable about the process, asked SR #1 if she was permitted to fill out the prior authorization form on behalf of the patient or physician, and received a text in return, stating, "No, but yes." Pursuant to this instruction by an INSYS representative, Relator met with patient and partially filled out the Prior Authorization form for the doctor.

139.   When the prior authorization process was not successful, INSYS instructed its sales staff to provide physicians with an appeal letter, which was to be completed and forwarded to IRC for submission to the insurer. This letter (below) does not mention cancer. Rather, it provides a general scheme by which anyone with any foreseeable off-label intended use might argue that they should have the drug authorized by their insurer.

This letter of appeal is in response to the denial dated (xx/xx/xxxx) for patient (Full name). His patient contract with (Specific MCO) is:

I have treated (Full name) in my clinic since (xx/xx/xxxx). (Mr. /Mrs.). Is a (age) year old (man/woman) with severe (Diagnosis). (He/She) has difficulty swallowing and digesting oral medications, and (he/she) is in almost constant severe pain. The pain gives Mr. /Mrs. (Name) a significantly limited quality of life. (He/She) is unable to sit, stand, walk or reach – which includes participating in family life and riding in automobiles – for more than 2 to 3 hours per day.

In an effort to control his pain and improve his quality of life, (he/she) has been prescribed the following medications:

A combination of (Drug names), at the highest dose available, tends to abate (Mr. /Mrs.) pain fairly well. However severe breakthrough pain continues to be a problem with a frequency that is debilitating to this unfortunate patient. (He/She) did seem to do well for a short time on (Drug name), but that medication too was denied coverage. Injectable pain relievers are not an option for this patient.

Due to the severity of (Mr./Mrs.) illness and pain, and due to the limited number of medications available to him, I write this letter recommending that coverage be approved for (Drug name) as a medical necessity for offering this patient as much quality of life as possible.

Sincerely,

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

44

140.   Where neither Prior Authorization nor appeal succeeded, INSYS instructed and permitted Relator to provide free SUBSYS to a patient for up to three months.

141.   INSYS sales managers advised sales staff how to bargain with a physician who was leery of undergoing the prior authorization process. As Relator noted during her training, "Give us 1 wk – Doesn't get approved we will give pt free meds."

142.   Relator provided free medication to patients for up to a year. During that time, the IRC attempted Prior Authorization again to increase the likelihood that the prescription claims would be paid including by Government Health Care Programs.

**D.     Evasion of TIRF REMS**

143.   Fentanyl's deadly potency motivated the FDA to mandate that prescribers and pharmacists enroll in TIRF REMS prior to putting TIRF drugs in the hands of patients. TIRF REMS requires prescriber/pharmacist accreditation and forces prescribers and pharmacists to pass an exam and make a series of certifications in order to become accredited. INSYS' sales managers instructed sales staff to enroll physicians in TIRF REMS, a necessary predicate to prescribing SUBSYS. To assist in this effort, sales staff continually circulated "cheat sheets" that contained the answers to the TIRF REMS educational assessment.  These cheat sheets relieved potential prescribers of their duty to read the TIRF REMS website and ensured that the prescriber would pass the assessment.

144.   INSYS assigned Relator a territory that contained only a few physicians qualified to write prescriptions for SUBSYS under the TIRF REMS program.

145.   Given the requirement that prescribing physicians comply with TIRF REMS by enrolling in the program, taking the exam, and signing the acknowledgment, INSYS management instructed sales staff to "do whatever it takes" to enroll potential prescribers in the program.

146.   These efforts included supplying prescribers and their staff with cheat sheets. Relator learned of the cheat sheets from Sales Representative #3 ("SR #3"). Relator

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

received the answers from a colleague on a sheet of notebook paper and gave that paper to office staff, considering it common practice. A copy of one such cheat sheet is illustrated below:



147.   As a result of INSYS' distribution of the test answers, INSYS caused physicians to circumvent the educational requirement of the TIRF REMS program which was intended to ensure that prescribers understood the dangerous potential consequences associated with opioid prescriptions, particularly for unintended uses.

148.   The educational component of the TIRF REMS assessment was designed to ensure that physicians would write prescriptions for SUBSYS responsibly and protect patients against harm.

149.   If the United States had known that physicians were making false certifications to the TIRF REMS program, the Government Health Care Programs would not have paid for prescriptions written by them.

**E.     INSYS' Off-Label Promotion Amounted to Misbranding**

150.   INSYS misbranded SUBSYS by advising doctors to prescribe high doses, to prescribe for off-label uses, and to prescribe to non-cancer patients. These actions manifested an "intended use" separate from that approved by the FDA, one which SUBSYS' label directions fail to render safe by a lay user.

151.   A drug is misbranded if its labeling fails to provide "adequate directions for use." 21 U.S.C. § 352(f).  Adequate directions are those which will allow a lay patient to safely use the drug for its "intended use." 21 C.F.R. § 201.5.

152.   A drug's "intended use" is that use manifested by those who label and distribute it. 21 C.F.R. § 201.6.

153.   With respect to SUBSYS, INSYS sent its sales staff to "live" in the offices of internists, physiatrists who do not focus on cancer-pain treatment, neurologists, and psychiatrists. Of the twenty sales representatives at Relator's initial training, only four were tasked with marketing SUBSYS (at that time INSYS' only approved drug) to oncologists. The remaining sales representatives were hired to the "Pain Management" wing of the sales staff. During the course of Relator's employment, INSYS combined the oncology and pain management wings into a single department.

154.   Unsurprisingly, the result was off-label prescriptions.  The off-label uses of SUBSYS amounted to approximately 90% of the drugs sold by INSYS.

155.   INSYS facilitated this off-label promotion by hiring additional sales staff to find new prescribers.  When Relator was hired, she received an "expansion territory." That is, other sales representatives in Relator's territory gave up work with two to four TIRF REMS qualified prescribers, and Relator began selling to those physicians.  INSYS provided Relator a list of physicians in her area that included many internal medicine practitioners, mislabeled as oncologists, and tasked Relator with selling to them as well.

By handing out new territories to new sales reps without existing prescribers, INSYS encouraged them to promote the message which resulted in off-label prescriptions.

156.   With most prescriptions not written for the FDA-approved indication for SUBSYS, INSYS expanded the list of intended uses for SUBSYS to include, among others, non-cancer pain and post-operative pain.

157.   Further, INSYS expanded the type of pain for which the drug was used, from breakthrough cancer pain, to breakthrough pain in non-cancer patients, to persistent pain. The expansion to persistent pain raised revenues dramatically, as it led to the use of SUBSYS every four hours, regardless of the level of pain experienced by the patient at any given time. Thus, SUBSYS, an analgesic 50 to 100 times as powerful as morphine, became a maintenance opioid, like OxyContin or Oxycodone.

158.   These actions amount to misbranding by INSYS because SUBSYS' FDA-approved label did not provide adequate directions for these uses. Neither the label nor any TIRF REMS documentation provide information that would allow a lay patient to safely use the drug for these purposes. In fact, the label clearly indicates that the drug is contraindicated for use of the drug for migraines, post-operative pain, and dental pain. The label states, "If the patient experiences greater than four breakthrough pain episodes per day, the dose of the maintenance (around-the-clock) opioid used for persistent pain should be re-evaluated." INSYS' misbranding rendered this precaution meaningless and serves as clear evidence of the substitution of a different, dangerous use for the original FDA-approved indication.

159.   Relator was instructed to distribute materials concerning the use of SUBSYS to all patients regardless of indication.  For the majority of these patients, the marketing materials and labels were inapplicable.  Patient #1, as discussed below in more detail, was the patient of a prescriber that Relator called upon. Patient #1 did not have cancer and received twice the FDA-approved starting dose of SUBSYS.

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

160.   INSYS misbranded SUBSYS by promoting it for off-label uses for which it would assuredly be used as a maintenance medication. SUBSYS' approval for breakthrough cancer pain, and INSYS' promotion of the drug for chronic, non-cancer pain, coupled with INSYS' assistance of physicians who prescribed the drug for continuous use, rather than "As Needed", created a situation in which the drug's labeling could not provide adequate instructions to ensure the safety of its intended uses.

**F.      Improper Payment by Government Health Care Programs**

161.   INSYS' off-label marketing efforts caused potentially hundreds of thousands of prescriptions to be improperly paid for by Government Health Care Programs.

162.   Medicaid provides coverage for prescription drugs only when used for medically accepted indications. In the Medicaid Program, States will not receive FFP if a drug, as prescribed, is not for a medically acceptable use.  FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). States have, therefore, implemented their own laws and pharmacy regulations that require prescribed drugs be used for a medically accepted use that comports with the definition of a "covered outpatient drug."  "Covered outpatient drugs" do not include drugs that are used for a medical indication which is not a medically accepted indication.  42 U.S.C. § 1396r-8(k)(3).

163.   A "medically accepted indication" is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia.  42 U.S.C. § 1396r-8(k)(6).  The specified drug compendia approved for the Medicaid program are set forth in 42 U.S.C. § 1396r-8(g)(1)(B)(I):  American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information; the DRUGDEX Information System; and the peer-reviewed medical literature.

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

164.   Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e - 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting and are "reasonable and necessary."

165.   Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary." 42 U.S.C. § 1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.  These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics, and drugs administered through durable medical equipment such as a nebulizer.  42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

166.   The Medicare Part D drug benefit program covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. §1396r-8(k).

167.   "Covered outpatient drugs" exclude a drug used for a medical indication that is not a medically accepted indication.

168.   CMS has adopted a regulation that interprets the Medicare statute to exclude from Part D's coverage all indications that are not "medically accepted." 42 C.F.R. § 423.100.

169.   This restriction in the Medicare Part D Program is an essential feature of the program—a coverage limitation that is central to the balance Congress struck between expanding prescription drug coverage and containing costs.

170.   The off-label uses of SUBSYS discussed herein are not supported by "clinical research that appear[ ] in peer-reviewed medical literature," and could not, under any circumstances, be considered "medically accepted as safe and effective" or

"reasonable and necessary" for such uses.   Therefore, claims for reimbursement for SUBSYS prescribed for such off-label uses were not covered by Medicaid or Medicare.

171.   INSYS was aware that the natural and probable consequence of its promotion of off-label uses of SUBSYS was that health care providers would submit claims for payment to Government Health Care Programs for the off-label use.

172.   Notwithstanding this knowledge, INSYS illegally, vigorously, and without any thought to the possible negative health effects to which it subjected patients, promoted these off-label uses.  INSYS was aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label uses. INSYS was aware that its promotion activities were a substantial factor in producing the claims.

173.   When LINDEN CARE and QUICK CARE under direct instructions of BELHEALTH, BLUE, DRISLANE, and TALLUR, and other pharmacies submitted claims based upon physicians' prescriptions for SUBSYS for off-label uses, they submitted false claims because such off-label uses were not supported by: (1) citation to one of the drug compendia specified in 42 U.S.C. § 1396r-8(g)(1)(B)(I) (Medicaid); (2) "peer-reviewed medical literature;" (3) a determination that the drug was  "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and (4) a coverage determination by other Government Health Care Programs, *see, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

174.   INSYS' off-label marketing directly and proximately caused the off-label prescribing for which these claims to government healthcare programs were filed. INSYS caused the submission of these claims, since healthcare providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Health Care Programs, and the states submitted Form CMS-64 to the Federal Government, all claiming reimbursement for SUBSYS for such off-label uses.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

175.   The government would not have paid Defendants' false claims for SUBSYS if it knew that the prescriptions were for off-label, non-medically necessary uses.

## VI.   **INSYS' KICKBACK SCHEME**

176.   From the moment SUBSYS entered the TIRF market, INSYS made clear to its sales staff that the drug would be promoted for off-label prescriptions to physicians who were paid through sham "speaker" programs, in-kind donations and other forms of illegal kickbacks.

177.   At Relator's initial training, INSYS sales trainers educated her and her colleagues on how to identify potential prescribers as those to whom "money talks." When questioned as to what this meant, trainers stated that the way to generate prescriptions was to sign up and pay speakers.

178.   In order to find these physicians, Relator was directed to search public disclosure data for those doctors who had accepted high speaking fees for presentations on behalf of fentanyl and other opioids.

179.   During training sessions, INSYS taught sales staff to classify physicians according to their perceived willingness to receive money for prescriptions.

180.   INSYS sales managers taught sales staff to color-code doctors, "green" being the most likely to accept kickbacks, "yellow" less so, and "red" unlikely, on the basis of personality traits. During Relator's field training, she learned to associate the likelihood of physicians becoming prescription writers with the dollar amounts attributed to them on propublica.org.

181.   When sales districts failed to generate large numbers of new prescriptions, INSYS classified them as "low performing," and combined them with "high performing" districts. Sales managers from "high performing" districts instructed sales staff from "low performing" districts to buy prescriptions by arranging for individuals to act as paid speakers on behalf of SUBSYS.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

182.   INSYS management participated in, encouraged, and authorized the unlawful payment of illegal kickbacks to physicians and pharmacists.

183.   INSYS' kickback scheme had several components, including, but not limited to:

a.   Paying prescribing physicians sham "speaking" fees to reward prescribers of SUBSYS for off-label uses;

b.   Adding or removing presenters from speaking engagements based upon their propensity to prescribe SUBSYS;

c.   Performing unpaid office work in prescribing physicians' offices, for the purpose of inducing prescriptions for off-label uses; and

d.   Paying unauthorized speakers with restaurant and retail gift cards to reward SUBSYS prescriptions.

184.   At Relator's initial training, directed by Alec Burlakoff, INSYS' Director of Sales, trainers told trainee sales representatives to find three to five doctors for routine visits, as well as one doctor who "wants you around at all times."

185.   Burlakoff also lectured Relator and her colleagues to do whatever it took to be around the doctors, including providing office work at no cost.  Relator and other sales representatives were trained to tell doctors to focus on identifying patients while ensuring the doctor that the sales representative will "run" the patient with the staff and pharmacy.

186.   Burlakoff exhorted sales staff, including Relator, to do office work for potential prescribers including, for example, faxing documents related to prescription authorizations.

187.   INSYS also promoted sham "speaker" programs to improperly pay doctors and pharmacists to convince other doctors and pharmacists to prescribe SUBSYS for off-label uses.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

188.   Relator attended several "speaker" programs where no presentation was ever made, yet the "speaker" was paid by INSYS.

189.   For example, at 7:00 PM on October 2, 2014, Relator attended a speaker dinner at a popular steakhouse near her sales territory. Four sales representatives – Relator, SR #1, SR #2, and SR #3 - attended along with four physicians – Doctor #2, Doctor #3, and two physicians whose names are not known. Though Doctor #2 received payment from INSYS for providing a presentation, he did not provide one. Rather, the meeting, held in a noisy steakhouse, consisted of dinner table discussions between the physicians and sales representatives present. The event was a sham, an excuse to pay Doctor #2 a large speaking fee in remuneration for his prescriptions and to buy dinner for the others present.

190.   According to probublica.org, Doctor #2 accepted $46,482.00 in speaking fees, food and beverage, and travel and lodging on behalf of SUBSYS' promotion between August 2013 and the end of 2014. INSYS reported payments to Doctor #2 surrounding the evening of the steakhouse dinner:

         a.  $127 in food and beverages on October 1, 2014;

         b.  $124 in food and beverage on October 2, 2014;

         c.  $203 in travel and lodging on October 2, 2014; and

         d.  $1900, $3200, and $3200 in Promotion Speaking/Other on October 6, 2014.

191.   According to propublica.org, Doctor #3 accepted $28,854.00 in speaking fees, food and beverage, and travel and lodging on behalf of SUBSYS' promotion between August 2013 and the end of 2014. INSYS reported a payment of $124 for food and beverage for Doctor #3 on October 2, 2014, the day of the steakhouse dinner. The following spreadsheets compare the events for which Doctor #2 (first picture) and Doctor

THIRD AMENDED COMPLAINT                                   2:16-cv-07937-JLS-ASx

#3 (second picture) received payment from INSYS during the months of September and October 2014.

| | Manufacturer | Date of Payment | Nature of Payment | Dollars Paid | |
|---|---|---|---|---|---|
| 2 | INSYS Therapeutics Inc | 9/3/2014 | Food and Beverage | 72 | |
| 3 | INSYS Therapeutics Inc | 9/4/2014 | Food and Beverage | 77.3 | |
| 4 | INSYS Therapeutics Inc | 9/9/2014 | Non-Consulting Speaking Fee | 1900 | |
| 5 | INSYS Therapeutics Inc | 9/17/2014 | Food and Beverage | 90 | |
| 6 | INSYS Therapeutics Inc | 9/18/2014 | Food and Beverage | 77.75 | |
| 7 | INSYS Therapeutics Inc | 9/23/2014 | Food and Beverage | 99.6 | |
| 8 | INSYS Therapeutics Inc | 9/23/2014 | Non-Consulting Speaking Fee | 3200 | |
| 9 | INSYS Therapeutics Inc | 9/23/2014 | Non-Consulting Speaking Fee | 1900 | |
| 10 | INSYS Therapeutics Inc | 9/29/2014 | Food and Beverage | 85.47 | |
| 11 | INSYS Therapeutics Inc | 9/30/2014 | Non-Consulting Speaking Fee | 1900 | |
| 12 | INSYS Therapeutics Inc | 10/1/2014 | Food and Beverage | 126.59 | |
| 13 | INSYS Therapeutics Inc | 10/2/2014 | Food and Beverage | 124.25 | |
| 14 | INSYS Therapeutics Inc | 10/2/2014 | Travel and Lodging | 203.15 | |
| 15 | INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 3200 | |
| 16 | INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 3200 | |
| 17 | INSYS Therapeutics Inc | 10/6/2014 | Non-Consulting Speaking Fee | 1900 | |
| 18 | INSYS Therapeutics Inc | 10/13/2014 | Food and Beverage | 99.6 | |
| 19 | INSYS Therapeutics Inc | 10/16/2014 | Non-Consulting Speaking Fee | 1900 | |
| 20 | INSYS Therapeutics Inc | 10/16/2014 | Non-Consulting Speaking Fee | 1900 | |
| 21 | INSYS Therapeutics Inc | 10/18/2014 | Travel and Lodging | 162.41 | |
| 22 | INSYS Therapeutics Inc | 10/23/2014 | Food and Beverage | 24.8 | |
| 23 | INSYS Therapeutics Inc | 10/23/2014 | Food and Beverage | 99.6 | |
| 24 | INSYS Therapeutics Inc | 10/24/2014 | Travel and Lodging | 53.34 | |
| 25 | INSYS Therapeutics Inc | 10/24/2014 | Travel and Lodging | 757.82 | |
| 26 | INSYS Therapeutics Inc | 10/25/2014 | Food and Beverage | 423.09 | |
| 27 | INSYS Therapeutics Inc | 10/25/2014 | Food and Beverage | 125.68 | |
| 28 | INSYS Therapeutics Inc | 10/27/2014 | Non-Consulting Speaking Fee | 950 | |
| 29 | INSYS Therapeutics Inc | 10/27/2014 | Non-Consulting Speaking Fee | 1900 | |
| 30 | INSYS Therapeutics Inc | 10/28/2014 | Food and Beverage | 95.25 | |
| 31 | INSYS Therapeutics Inc | 10/28/2014 | Food and Beverage | 9.39 | |
| 32 | INSYS Therapeutics Inc | 10/30/2014 | Food and Beverage | 62.42 | |
| 33 | INSYS Therapeutics Inc | 10/31/2014 | Non-Consulting Speaking Fee | 3750 | |

| | Manufactur | Date of Payment | Drug | Nature of Payment | Fee |
|---|---|---|---|---|---|
| 2 | INSYS Thera | 9/3/2014 | Subsys | Food and Beverage | 1.92 |
| 3 | INSYS Thera | 9/3/2014 | Subsys | Food and Beverage | 4.99 |
| 4 | INSYS Thera | 9/9/2014 | Subsys | Food and Beverage | 119.01 |
| 5 | INSYS Thera | 9/15/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| 6 | INSYS Thera | 9/15/2014 | Subsys | Food and Beverage | 13.31 |
| 7 | INSYS Thera | 9/22/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| 8 | INSYS Thera | 10/1/2014 | Subsys | Food and Beverage | 8.49 |
| 9 | INSYS Thera | 10/2/2014 | Subsys | Food and Beverage | 124.25 |
| 10 | INSYS Thera | 10/14/2014 | Subsys | Food and Beverage | 49.17 |
| 11 | INSYS Thera | 10/16/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| 12 | INSYS Thera | 10/20/2014 | Subsys | Food and Beverage | 17.5 |
| 13 | INSYS Thera | 10/27/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |
| 14 | INSYS Thera | 10/28/2014 | Subsys | Food and Beverage | 103.68 |
| 15 | INSYS Thera | 10/30/2014 | Subsys | Non-Consulting Speaking Fee | 1900 |

192.   Relator observed that INSYS used its "speaker" programs as a conduit to pay doctors for prescribing SUBSYS, plain and simple. Relator witnessed sales staff and other INSYS personnel eliminate physicians from approved lists of paid speakers when they

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

failed to prescribe sufficient amounts of SUBSYS. For example, SR #3 explained to Relator that he had previously arranged for Doctor #4 to receive payments to speak on behalf of SUBSYS, beginning upon its FDA approval, but that Doctor #4 did not "play ball" by writing prescriptions for the drug. SR #3 handed off INSYS' relationship with Doctor #4 to Relator, given the lack of prescriptions. Doctor #4 told Relator that SR #3 informed him he had to write prescriptions for the drug, in return for the speaking fees INSYS had paid him.

193.    Another form of illegal kickbacks involved INSYS' use of gift cards. Relator was encouraged to give gift cards to prescribing physicians to encourage them to continue to prescribe SUBSYS.  Specifically, SM #1, who formerly worked as an INSYS sales representative, explained how she and other sales representatives were able to carry out this scheme. SM #1 told Relator how to purchase gift cards at local delicatessens whose owners she knew, and how to induce store owners to create fraudulent receipts for the value of the purchase price of the cards, which instead showed purchases of coffee and other sundries which might be permissibly dropped at physicians' offices.  SM #1 then submitted the fraudulent receipts for reimbursement by INSYS and used the cards to pay illegal and untraceable kickbacks to physicians prescribing SUBSYS. SM #1 informed Relator that she used her business relations manager, BRM #1, to physically transact kickbacks like these on many occasions. After several INSYS sales staff were arrested in early 2016, SM #1 asked an INSYS attorney, during a conference call regarding the arrests, "Are BRMs going to be protected, as well?"

194.    INSYS colleagues advised Relator, repeatedly, that these practices were encouraged by upper management and that INSYS sales managers had engaged in the same schemes before getting promoted.

195.    For example, SR #1, a sales representative who took Relator on some of her "ride along" sales calls at the beginning of her employ, advised Relator to search public

disclosure data for physicians who received the largest amounts of money from drug manufacturers to speak on behalf of oxycodone, morphine, and fentanyl in her sales area. SR #1 advised that this was a good method of finding physicians interested in making extra money through INSYS' sham speaker programs. As she put it, this search would answer the question, "Does money talk to them?" SR #1 and other sales staff repeatedly advised Relator that signing a physician on to receive payment for speaking engagements would lead to prescriptions by that physician.

196.  Similarly, during a sales meeting in Arizona, SM #2, an INSYS sales representative (later a sales manager) providing training at the event, advised sales representatives that speakers would write prescriptions in return for speaking fees. When asked for clarification on how the two were related, SM #2 said, slowing her speech for emphasis, "Just get speakers."

197.  On information and belief, Relator avers that the illegal kickback schemes complained of were national in scope.

A.    **Pricing Violations**

198.  Pharmaceutical manufacturers participating in Medicaid programs must rebate to the states a certain statutorily prescribed portion of the price of drugs purchased by each Medicaid program in each state.  *See* 42 U.S.C. §1396r-8(a)(1). Manufacturers do this because the Medicaid statute, 42 U.S.C. §§1396a-u, permits the federal government to partially reimburse states only for drugs purchased from manufacturers who have agreed to pay statutorily specified rebates to those states.  *See* 42 U.S.C. §1396r-8.   Thus, pharmaceutical manufacturers that want their drugs available to Medicaid beneficiaries under the Medicaid program enter into a Rebate Agreement with the Department of Health and Human Services ("HHS") Secretary to provide rebates.  *See* 42 U.S.C. §1396r-8(a)(1).

199.    The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form CMS-367).  The Quarterly Report includes information regarding each of the manufacturers' "Covered" Drugs, including such information as to their "Average Manufacturer Price" ("AMP"), "Baseline AMP," and "Best Price." Based upon this information, HHS, through its component agency, CMS, then tells the states how much rebate the state is entitled to collect with respect to each drug.

200.    INSYS entered into a Rebate Agreement with HHS.  In that Agreement, INSYS agreed to comply with 42 U.S.C. §1396r-8, and hence:

    a.  Agreed to report its Best Price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, etc.;

    b.  Agreed that it would determine its Best Price based upon its AMP, calculated as "net sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include that in the calculation, cash discounts and all other price reductions "which reduce the actual price paid"; and

    c.  Agreed that the Best Price would not take into account nominal prices, defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of the product at a nominal price was not contingent on any other sale.

201.    After execution of this Agreement, INSYS reported its AMP and/or Best Price in each quarter to the Medicaid Program on an electronic form of Form CMS-367.

202.    In the instant case, Defendant failed to take into account the Kickbacks and free prescriptions it provided when reporting its Best Price.

THIRD AMENDED COMPLAINT                            2:16-cv-07937-JLS-ASx

58

203.   As a result, INSYS's Best Price, for quarterly reports submitted since 2012, were inflated, which reduced the percentage difference between AMP and Best Price, thereby reducing the rebate amount that Defendant ultimately paid to each state Medicaid program.  Defendant artificially inflated its Best Price, by calculating its Best Price without taking into account its inducement activities described in this Complaint, which reduced the true cost of its drugs.  Defendant knowingly set and reported its Best Price for these drugs at levels far higher than the actual Best Price, in Form CMS-367, submitted quarterly to CMS since 2012.  By doing so, Defendant has violated the Federal (and applicable state) False Claims Acts, by knowingly making, using, or causing to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money to federal and state governments.

204.  Under the Veterans Health Care Act of 1992 ("VHCA"), drug manufacturers are required to enter a pricing agreement with the Secretary of HHS for the section 340B Drug Pricing Program, and with the Department of Veterans Affairs (VA) and other Department of Defense programs.

205.   Once a labeler/manufacturer enters into such a pricing agreement, its drugs are listed on the Federal Supply Schedule ("FSS"), a price list containing over twenty-thousand pharmaceutical products.  The VA and other Government Programs depend on the FSS for most of its drug purchases, with the exception of several national contracts awarded for specific drugs considered to be therapeutically interchangeable.

206.   Under the VHCA, drug manufacturers must comply with 38 U.S.C. § 8126. Subsection (a)(2) requires that "the price charged during the one-year period beginning on the date on which the agreement takes effect may not exceed 76 percent of the non-Federal average manufacturer price (less the amount of any additional discount required under subsection (c)) ...."

THIRD AMENDED COMPLAINT                                      2:16-cv-07937-JLS-ASx

207.   In the instant case, INSYS failed to take into account its inducements when reporting the non-Federal average manufacturer price. INSYS, therefore, violated 38 U.S.C. §8126 causing damage to the VA program, and by not giving its best price as set forth in subsection (a)(2), INSYS became ineligible for Medicare and other federal reimbursement programs.

## VII.   LINDEN CARE'S AND QUICK CARE'S ILLEGAL DISTRIBUTION OF SUBSYS

### A.   Pharmacy Responsibilities under TIRF REMS

208.   A TIRF REMS-enrolled pharmacy is one that has "an authorized pharmacy representative that is responsible for ensuring enrollment and training of the pharmacy staff within an individual outpatient pharmacy."  Additionally, TIRF REMS requires that a "pharmacy must use a pharmacy management system to electronically transmit the required validation and claim information to the TIRF REMS Access program using established telecommunication standards."  TIRF REMS Access, An Overview for Independent                    Outpatient                    Pharmacies, https://www.tirfremsaccess.com/TirfUI/rems/pdf/outpatient-pharmacy-overview.pdf (last visited Aug. 7, 2018).

209.   Prior to dispensing SUBSYS and other TIRF products approved for cancer patients only, enrolled pharmacies must comply with the terms of the TIRF REMS program.  The FDCA provides the statutory justification for REMS programs at 21 U.S.C. § 355-1.  A REMS program is authorized for drugs that have a high likelihood of endangering the public health, but deliver a worthwhile benefit.  A pharmacy's failure to ensure compliance with TIRF REMS, if it leads to a product that cannot be used safely for its intended purpose, constitutes misbranding.  *See* 21 U.S.C. § 331 (explaining the prohibitions of the FDCA, including the prohibition against misbranding).  TIRF REMS imposes a duty on pharmacists to counsel patients and provides resources for that purpose.

During enrollment in TIRF REMS Access, pharmacists agree to educate their staff and certify that they understand the terms of the program.

210.   The TIRF REMS Enrollment Form requires that pharmacists certify, among other things, that:

    a.   They will ensure that their staff "are educated on the risks associated with TIRF medicines and the requirements of the TIRF REMS Access program;"

    b.   They understand TIRF drugs to be "contraindicated for use in opioid non-tolerant patients;"

    c.   They "understand that the initial starting dose for TIRF medicines for all patients is the lowest dose, unless individual product labels provide product-specific conversion recommendations …;"

    d.   They "understand that patients must be titrated individually.

    e.   They will discuss "the risks and benefits of TIRF medicines with patients and caregivers, and in particular the importance of taking the drug as prescribed, not sharing with others, and proper disposal."

TIRF REMS Access, Independent Outpatient Pharmacy Enrollment Form, https://www.tirfremsaccess.com/TirfUI/rems/pdf/outpatient-pharmacy-enrollment-form.pdf (last visited Aug. 7, 2018).

211.   The SUBSYS' label is in accord with the TIRF REMS requirements.  In the "Indications and Usage" section, it provides:

    a.   Patients must require and use around-the-clock opioids when taking SUBSYS;

    b.   Initial dose of SUBSYS: 100 mcg;

    c.   Individuals titrate to a tolerable dose that provides adequate analgesia using a single SUBSYS dose per breakthrough cancer pain episode;

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

d.   No more than two doses can be taken per breakthrough pain episode;

e.   Wait at least 4 hours before treating another episode of breakthrough pain with SUBSYS;

f.   Limit consumption to four or fewer doses per day once a successful dose is found.

212.   The titration instruction above indicates that an increase to the next highest dosage is warranted if the patient is unsuccessful in managing breakthrough pain. However, the *maximum allowable dosage* for SUBSYS limits consumption to four or fewer doses per day.  Even if patients may require more than four doses per day to treat breakthrough cancer pain, they are not to exceed the maximum allowable dosage for SUBSYS.  Rather, those patients must consult with their doctor to increase their dosage of maintenance opioids.  As the SUBSYS label states, "If the patient experiences greater than four breakthrough pain episodes per day, the dose of the maintenance (around-the-clock) opioid used for persistent pain should be reevaluated.  In addition, if pain worsens, re-evaluate the patient for changes in the underlying condition."

**B.   LINDEN CARE's and QUICK CARE's Misbranding by Breach of the TIRF REMS Protocol**

213.   LINDEN CARE and QUICK CARE were TIRF REMS enrolled pharmacies.

214.   From July 2013 through June 2014, QUICK CARE operated as a "Linden Care Pharmacy," as evidenced by QUICK CARE's employees' email signatures, while under BELHEALTH's direction and control.

215.   As of June 2014, QUICK CARE became a wholly owned subsidiary of LINDEN CARE.

216.   LINDEN CARE's acquisition of QUICK CARE allowed it to dispense SUBSYS to patients in California. California, as a state, had the second highest number of SUBSYS prescriptions, behind only Florida.

THIRD AMENDED COMPLAINT                                   2:16-cv-07937-JLS-ASx

217.   BELHEALTH and LINDEN CARE publicly touted LINDEN CARE's acquisition of QUICK CARE as allowing LINDEN CARE to "continue its rapid West Coast growth."

218.   A 2014 LINDEN CARE press release stated that the "key to LINDEN CARE's success is the ability to provide solutions for today's complex pain therapies requiring Risk Evaluation and Mitigation Strategies (REMS) such as [TIRFs] and extended release opioids."

219.   As of 2014, after LINDEN CARE acquired QUICK CARE, among other pharmacies throughout the United States, including pharmacies in Florida, Arizona, San Diego, Last Vegas, and Washington, it became the largest pain management focused specialty pharmacy in the United States.

220.   BELHEALTH, BLUE, DRISLANE, and TALLUR orchestrated LINDEN CARE's acquisition of QUICK CARE and other pharmacies, in a direct effort to rapidly expand LINDEN CARE's ability to widely dispense and distribute controlled substances, including SUBSYS, throughout the United States.

221.   LINDEN CARE, with the acquisition of QUICK CARE, captured more than 15% of the entire United States fentanyl market.

222.   In 2015, the year after LINDEN CARE acquired QUICK CARE, 18.3% of LINDEN CARE's revenue was derived from prescriptions dispensed in California, the highest percentage of revenue for any state, followed by Florida, which represented 9.8% of LINDEN CARE's revenue.

223.   It is believed and averred that, from 2012 until it ceased business operations on July 26, 2017, LINDEN CARE was one of, if not the largest dispensers of SUBSYS in the United States.

224.   As of 2014, LINDEN CARE was dispensing as much as 65% of the SUBSYS manufactured by INSYS.

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

225.   LINDEN CARE's annual revenue from SUBSYS prescriptions was approximately $180 million. As the majority owner of LINDEN CARE, BELHEALTH recognized large annual returns from SUBSYS sales.

226.   INSYS received significant *net* revenue from its sales of SUBSYS, a large portion of which was directly from LINDEN CARE's and QUICK CARE's willingness to routinely dispense SUBSYS off-label to non-cancer patients, no questions asked. In 2013, INSYS received $95.7 million in net revenue from sales of SUBSYS. In 2014, that number grew to $216.5 million. In 2015, the number grew again to $329 million. In 2016, once the criminal investigations into INSYS began, the number decreased to $242.3 million. In 2017, after criminal indictments were filed against multiple INSYS executives and employees, INSYS received $139.3 million in net revenue from sales of SUBSYS.

227.   While the demand for SUBSYS grew exponentially from 2012 to 2016, the demand for other TIRF products, such as Actiq, Duragesic, Fentora, and Lazanda was stagnant.

228.   LINDEN CARE described its business model on the now-defunct LINDEN CARE website: "Linden Care is a full-service pharmacy that can provide you with all the medications that your doctor prescribes.  Many of our patients face chronic pain and need a dedicated pharmacy to help them to help relieve the pain . . . ."  Further, "Linden Care understands that today's insurance plans are often confusing.   Our patient care representatives work with your doctor and your insurance company to get you the medications you need.  We offer prior authorizations and work closely with your doctor to give you best in class pharmacy service"[8]

---

[8] Linden Care no longer has a website accessible on the internet.  Various portions of Linden Care's now-defunct website can still be viewed via the Internet Archive located at archive.org.   The referenced portions of Linden Care's website are available at web.archive.org/web/20170602130713/http://lindencare.com/about/ (archived on June 2, 2017).

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

229.   The advent of SUBSYS allowed LINDEN CARE and QUICK CARE to fulfill LINDEN CARE's stated mission by dispensing SUBSYS for chronic pain patients and ensuring that its representatives obtained prior authorizations from insurers in order to receive government payment for off-label uses of SUBSYS.  LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, knowingly took advantage of the opioid epidemic and endangered the lives of numerous patients, all for the sake of maximizing profits.

230.  LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control of BELHEALTH, BLUE, DRISLANE, and TALLUR breached the TIRF REMS protocol with respect to SUBSYS by:

       a. Dispensing SUBSYS for contra-indicated and off-label uses, without discussing the drug or its safe usage with patients, and while ignoring "red flags" or "alert flags" of improper use and diversion;

       b. Dispensing SUBSYS for non-opioid tolerant patients (a contraindication), either knowingly or without investigating whether the patients were opioid-tolerant;

       c. Dispensing SUBSYS in "initial starting doses" of 200 mcg, rather than the mandated initial maximum dosage of 100 mcg;

       d. Dispensing SUBSYS with directions to consume the drug six times daily, independent of pain.

231.  LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, knowingly and intentionally misbranded SUBSYS by: (1) distributing it for contraindicated and off-label uses; (2) dispensing SUBSYS for non-opioid tolerant patients (a contraindication); (3) labeling it for distribution at initial doses at least twice

the FDA-approved limit; and (4) dispensing it for use six times daily *i.e.*, at 150% of the FDA-approved limit.   LINDEN CARE's and QUICK CARE's hardcopy labels, the stickers on the package of the pharmaceutical products it distributed, contained directions directly in contravention of the product's FDA-approved label.   LINDEN CARE's and QUICK CARE's blatant disregard of the FDA-approved label instructions, as well as the TIRF REMS protocol, rendered the product unsafe for use.

232.   LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, misbranded SUBSYS in violation of the TIRF REMS protocol of a pharmaceutical product, and the payment of that drug through a Government Health Care Program is a violation of the False Claims Act.

**C.     LINDEN CARE's and QUICK CARE's Repeated Breaches of the Controlled Substances Act**

233.   The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, regulates the manufacture, importation, possession, use, and distribution of controlled substances. The CSA relies upon rules and definitions contained in the FDCA, 21 U.S.C. § 301 *et seq*. Chapter II of Title 21 of the Code of Federal Regulations covers controlled substances regulation by the Drug Enforcement Administration and the Department of Justice and gives regulatory life to the CSA and FDCA with respect to controlled substances.

234.   The CSA renders it unlawful for "a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, [to] be dispensed without the written prescription of a practitioner."   21 U.S.C. § 829(a).   This provision applies to Schedule II opioids, including SUBSYS, and also mandates that paper receipts be retained by the dispensing pharmacy.

235.   "A pharmacist may dispense directly a controlled substance listed in Schedule II that is a prescription drug . . . only pursuant to a written prescription signed

by the practitioner, except as provided in paragraph (d) of this section. A paper prescription for a Schedule II controlled substance may be transmitted by the practitioner or the practitioner's agent to a pharmacy via facsimile equipment, *provided that the original manually signed prescription is presented to a pharmacist for review prior to the actual dispensing of the controlled substance . . . .* " 21 C.F.R. § 1306.11(a) (emphasis added).

236.   Relator is informed and believes that, on at least six occasions, LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR dispensed SUBSYS on behalf of Patient #1, discussed below, on the basis of faxed prescriptions and without first receiving the paper prescription.

237.   Further, Relator is informed and believes that those prescriptions carried instructions for use which misbranded the medication and led to Patient #1's death.

238.   Federal regulations make clear that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a).

239.   A prescription is legally valid under the CSA only if issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

240.   "An order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent" of 21 U.S.C. § 829. 21 C.F.R. § 1306.04.

241.   Pharmacies and pharmacists ignore their "corresponding responsibility" by filling prescriptions in circumstances where although the prescriber has acknowledged

ordering the controlled substance, a closer review reveals a question as to whether the patient's need is legitimate.

242.   The CFR also states, "the person knowingly filling such a purported prescription, as well as the person issuing it [is] subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04(a).

243.   A pharmacist should not fill prescriptions for controlled substances "when he either knows of or has reason to know that the prescription was not written for a legitimate purpose." 75 Fed. Reg. at 66163.

244.   When prescriptions are not issued for a legitimate medical need, a pharmacist may not intentionally close his eyes and avoid knowledge of the real purpose of the prescription. A pharmacist has an unequivocal federal statutory duty to be vigilant in filling prescriptions so as to avoid filling any that are issued for nonmedical purposes.

245.   The DEA Pharmacist Manual further provides, "A pharmacist needs to know there is a corresponding responsibility for the pharmacist who fills the prescription …. A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed."

246.   Some of the "red flags" (*i.e.* indicia that the prescriptions were not issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice) for illegitimate prescriptions include:

> a.   Refilling prescriptions of patients or doctors great distances from the pharmacy, and at times even located hundreds of miles away from the pharmacy;
>
> b.   An overwhelming and unusually high proportion of prescriptions filled by the pharmacy are controlled substances prescriptions;

c.     A disproportionate percentage of the pharmacy's controlled substance purchases were for highly-abused drugs, such as oxycodone 30-milligram tablets or fentanyl patches or spray (like SUBSYS);

d.     The pharmacist did not reach out to or otherwise contact other area pharmacists to determine why they were not filling a particular doctor's prescriptions; and

e.     The pharmacy frequently filled prescriptions for quantities or dosages of controlled substances that were higher than accepted medical standards;

f.     Filling abnormally large volumes of prescriptions for a drug whose only FDA-approved use was for the narrow case of breakthrough cancer pain in opioid-tolerant adults.

247.   "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy …." 21 C.F.R. § 1306.06.

248.   The federal regulations also outline the procedure a pharmacist must follow in filling a prescription for a Schedule II drug like SUBSYS: "The pharmacist filling a written or emergency oral prescription for a controlled substance listed in Schedule II shall affix to the package a label showing date of filling, the pharmacy name and address, the serial number of the prescription, the name of the patient, the name of the prescribing practitioner, and directions for use and cautionary statements, if any, contained in such prescription or required by law." 21 C.F.R. §1306.14(a).

249.   LINDEN CARE and QUICK CARE routinely and regularly, at the instruction of BELHEALTH, BLUE, DRISLANE, and TALLUR, intentionally ignored obvious warning signs and red flags with regard to prescriptions for SUBSYS and Schedule II narcotics, in violation of, among others, the CSA.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

250.   BELHEALTH, BLUE, DRISLANE, TALLUR, LINDEN CARE, and QUICK CARE knew that 90% to 99% of the prescriptions for SUBSYS filled by LINDEN CARE and QUICK CARE were for off-label use, the vast majority of which was for patients who did not have cancer.

251.   BELHEALTH, BLUE, DRISLANE, TALLUR, LINDEN CARE, and QUICK CARE knew about the speaker program at INSYS, and that many of the prescribers who wrote prescriptions for SUBSYS to be filled at LINDEN CARE and QUICK CARE were enrolled in INSYS' speaker program.

252.   These prescribers, who wrote scripts for SUBSYS that were filled at LINDEN CARE and QUICK CARE, include, among others, Gavin Awerbuch, Gordon Freedman, Christopher Clough, Paul Madison, Thomas Whitten, Jeffrey Kesten, Edward Lubin, Alexander Weingarten, Parveen Khanna, Mahmood Ahmad, Gregory Gerber, Rodney Rothstein, many of whom have been criminally prosecuted in connection with the bribes and kickbacks they received from INSYS in exchange for prescribing SUBSYS off-label for medically unnecessary purposes.

253.   At the criminal trial of John Kapoor, INSYS' founder and former Chairman and CEO, the court found that the United States proved damages suffered by Medicare in the amount of $30.2 million relating to prescriptions for SUBSYS written by just thirteen providers who accepted bribes and kickbacks from INSYS.

254.   LINDEN CARE and QUICK CARE, under the direction of BELHEALTH, BLUE, DRISLANE, and TALLUR, shipped 95% of their prescriptions, many of which were controlled substances, with many of these prescriptions being shipped to patients hundreds of miles away.

255.   After LINDEN CARE acquired QUICK CARE, despite only maintaining two physical storefront locations (one in New York and one in California), LINDEN CARE shipped SUBSYS and other Schedule II narcotics to all fifty states.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

256.   The majority of the prescriptions filled by LINDEN CARE and QUICK CARE comprised of Schedule II controlled substances. In the case of LINDEN CARE, 78% of the total prescriptions it filled were for controlled substances, including SUBSYS.

257.   LINDEN CARE and QUICK CARE, under the direction and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, filled prescriptions for SUBSYS and other controlled substances in quantities and dosages that were higher than accepted medical standards.

258.   In the case of SUBSYS, LINDEN CARE and QUICK CARE, under the direction and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, filled prescriptions where the initial starting dose exceeded 100 mcg.

259.   LINDEN CARE and QUICK CARE routinely filled prescriptions for SUBSYS that were for the strongest formulation (1600 mcg), a red flag that both LINDEN CARE and QUICK CARE, under the direction and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, willfully ignored.

260.   LINDEN CARE and QUICK CARE, under the direction and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, routinely dispensed prescriptions for SUBSYS received by fax without receiving the original written prescriptions, in violation of the CSA.

261.   LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, violated both the spirit and the letter of the CSA by enabling practitioners to order narcotics, and pharmacists to dispense these narcotics, without exercising reasonably sound professional judgment to investigate whether the practitioner had exercised proper medical judgment as to whether these controlled substances were issued for a legitimate medical purpose and appropriate in form, strength and quantity for the patient, including, for example, investigating whether the patient was opioid tolerant.  For example, this

THIRD AMENDED COMPLAINT                                      2:16-cv-07937-JLS-ASx

71

infraction occurred every time LINDEN CARE received a faxed prescription for Patient #1's SUBSYS, and dispensed the drug without first receiving the original, signed prescription from her physician's office, as discussed further *infra*. 21 C.F.R. § 1304.04(f)(1)-(2); 21 C.F.R. § 1306.11(a).

262.  LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, routinely dispensed Schedule II drugs, including SUBSYS, without prescriptions that complied with the CSA, FDCA, and the regulations implementing those laws. Accordingly, LINDEN CARE and QUICK CARE caused fraudulent and/ or false claims for these drugs to be submitted to the Medicare program.  LINDEN CARE and QUICK CARE did so notwithstanding that they knew or recklessly disregarded the fact that: (1) Schedule II controlled substances could not be legally dispensed without a valid prescription; (2) LINDEN CARE's and QUICK CARE's pharmacists were dispensing Schedule II controlled substances without a valid prescription; and (3) drugs dispensed without a valid prescription are not payable under Medicare Part D.  As a direct, proximate and foreseeable result of LINDEN CARE's and QUICK CARE's dispensing of Schedule II drugs without a valid prescription, LINDEN CARE and QUICK CARE knowingly caused false claims to be submitted to the Medicare program and made or caused to be made false statements that were material to such claims.

263.  LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, violated the CSA each time they dispensed or distributed a Schedule II controlled drug without a valid prescription as required under the statute and accompanying regulations. Each instance was a violation of 21 U.S.C. § 842(a)(1).

264.  LINDEN CARE and QUICK CARE, under direct, instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR,

violated the CSA by acting in a manner inconsistent with the usual course of professional pharmacy practice, and specifically by failing to exercise sound judgment before dispensing SUBSYS for illegitimate use.

265. A pharmacist exercising his or her "corresponding responsibility" would not have filled many of the prescriptions for SUBSYS and other Schedule II opioids that LINDEN CARE and QUICK CARE filled. LINDEN CARE and QUICK CARE, however, at the instruction, direction, and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, implemented a business plan pursuant to which their pharmacists were directed to ignore their "corresponding responsibility" when dispensing SUBSYS and other Schedule II opioids.

266. The dispensing of a controlled substance in the face of the warning signals described above, without first ensuring the prescription as issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the CSA. When LINDEN CARE and QUICK CARE, under the direction, instruction, and control of BELHEALTH, BLUE, DRISLANE, and TALLUR, filled prescriptions of SUBSYS in the face of one or more red flags without taking sufficient steps to resolve the red flags, LINDEN CARE and QUICK CARE exceeded their authorization to dispense controlled substances under the CSA.

267. LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, violated the CSA by allowing unlicensed pharmacists, including Marc Weiner, LINDEN CARE's former Chief Executive Officer, to dispense SUBSYS, and perform the final verification process prior to dispensing SUBSYS.

268. LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, violated the CSA by allowing non-pharmacists with little-to-no pharmacy experience to perform the final

THIRD AMENDED COMPLAINT

2:16-cv-07937-JLS-ASx

verification process for prescriptions for SUBSYS, the process during which a pharmacist is supposed to check the proper dosage, drug interactions, contraindications, and patient allergies.

269.   Given that BELHEALTH, including BLUE, DRISLANE, and TALLUR, spearheaded LINDEN CARE's Compliance Committee, BELHEALTH, BLUE, DRISLANE, and TALLUR knew or should have known that unlicensed pharmacists, including Marc Weiner, who BELHEALTH, BLUE, DRISLANE, and TALLUR regularly interacted with, were dispensing SUBSYS, in violation of the CSA.

270. LINDEN CARE, under the direction and control of BELHEALTH, repeatedly and regularly violated the CSA by dispensing SUBSYS without receiving the original written prescription. To that end, LINDEN CARE and INSYS entered into a Service Agreement pursuant to which LINDEN CARE agreed to have prescriptions for SUBSYS faxed to it.

271.   Not only did LINDEN CARE routinely accept faxed prescriptions for SUBSYS, without receiving the original written prescription, on at least one occasion, LINDEN CARE filled multiple prescriptions for SUBSYS for the same faxed prescription (same serial number).

272.   LINDEN CARE also dispensed SUBSYS with the wrong name of the patient on the label.

273.   Submitting or causing the submission of claims to the Medicaid and/or Medicare federal healthcare programs for medications (whether scheduled controlled substances or not) in the face of the red flags described above, without first ensuring the prescriptions are valid and medically necessary, violates the FCA. LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR knew that the prescriptions LINDEN CARE and QUICK CARE filled for SUBSYS were invalid and not used for a medically accepted indication, but nonetheless, LINDEN CARE, QUICK

CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR submitted or caused to be submitted claims for their reimbursement to the Medicaid and Medicare federal healthcare programs, along with other government healthcare programs. If the government had known that these prescriptions for SUBSYS were invalid, they would not have paid for them.

274.   LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, did more than just fill prescriptions for SUBSYS.  LINDEN CARE and QUICK CARE were an integral part of the INSYS sales strategy to quickly and aggressively put SUBSYS in the hands of as many patients as possible, despite any delays necessitated by legal requirements or medical safeguards.

275.   In an October 2012 email to the SUBSYS sales team, Mike Gurry, Vice President of Managed Markets for INSYS ("Gurry") wrote:

> We have partnered with Linden Care, a Specialty Pharmacy based in Syosset, NY to Prescriptions written for SUBSYS by Physicians and assist in the Prior Authorization Process.  Linden Care can now receive prescriptions from your Physicians [sic] office, run the claim against commercial insurance, assist in the [Prior Authorization] process if required and when the Rx is filled ship it to the patient for delivery within 24 hours

276.   In that same October 2012 email, Gurry set out the steps that INSYS sales representatives were to follow:

> 1.   Present the Linden Care Specialty Pharmacy Option to your Physicians
> 2.   Get a commitment that they will use this program to alleviate any issues associated with the filling of SUBSYS prescriptions
> 3.   Leave an ample supply of Patient Information Sheets in the Physicians [sic] offices and instruct the staff on how its [sic] to be used . . .

> 4.      Follow up immediately with the Physicians [*sic*] office if daily report lists Linden Care as the filling Pharmacy for a [*sic*] Rx in your territory.

277.   INSYS' reliance on LINDEN CARE was largely based on "alleviat[ing] any issues associated with the filling of SUBSYS prescriptions." The only "issues" associated with filling prescriptions for SUBSYS were compliance with the TIRF REMS protocol and securing Prior Authorizations. Both "issues" were necessitated by the potential for misuse and abuse of SUBSYS and the requirement that the drug is prescribed for an indicated use or be exempted by an approved justification.

278.   In a November 2012 email to the SUBSYS sales team, Gurry reiterated LINDEN CARE's role as an integral part of the SUBSYS sales strategy:

> 1.      Where you have offices that struggle with Pharmacies to stock, assist with the [Prior Authorization] process and fill prescriptions for SUBSYS, Linden Care Specialty Pharmacy is an option . . . . This is because they will assist with all three of these main components.

> 2.      Ask the [Prior Authorization] specialist and Physicians if they would be willing to send prescriptions for SUBSYS to Linden Care to be filled.

> *       *       *       *

> 6.      Linden will fill the first Rx with 30 free units and ship this to the patients [*sic*] address.

> 7.      Linden will then run another prescription against commercial insurance and populate the [Prior Authorization] form if a [Prior Authorization] is required and contact the physicians [sic] office to obtain the medical information and have the physician sign the [Prior Authorization] form for return to the Health Plan

> 8.      Linden will fil the Rx when the [Prior Authorization] is approved and ship to the patients [*sic*] address.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

9.    Linden will process a Super Voucher if a PA has been denied and the patient is need of the product only if the office will appeal the denial and file a first appeal with the Health Plan.

10.    Linden will only process additional super vouchers for a particular patient if they are moving through the steps int he [*sic*] [Prior Authorization] appeal Process

- 1st appeal to Pharmacy Department after initial [Prior Authorization] is denied
- 2nd appeal to Pharmacy Department after 1st appeal is denied
- Final appeal to Independent Review Board

**Linden Care is a tool to assist in the filling and processing of prescriptions.** (emphasis in original)

279.    Michael Babich, INSYS' former CEO, confirmed that LINDEN CARE assisted INSYS with the prior authorization process.

280.    Thus, LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, was a critical component in INSYS' strategy of ensuring that patients received their first 30 units of the highly addictive narcotic for free, even before their prior authorization was submitted for approval.

281.    In that same November 2012 email, Gurry emphasized to INSYS sales representatives LINDEN CARE's important role in the distribution of SUBSYS.  Gurry provided INSYS sales representatives with talking points to use with physicians and their office staff "surrounding the Specialty Pharmacy Linden Care":

1.    "Doctor, if I had a program to make it easier for you, your staff and your patients to obtain SUBSYS would you be willing to give it a trial run?"

. . . .

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

2.      "I Understand [*sic*] that the Doctor won't do [Prior Authorizations] for TIRF products.  What if I could provide administrative assistance to the office to greatly reduce the burden of the [Prior Authorization].  Is that something you would support and enlist the support of the Doctor?["] Upon getting a commitment from the [Prior Authorization] Specialist/Nurse/MA go through the Linden Care program step by step.  Ask for a commitment of 3 patients for a trial run, ensure you check back in daily to see if they started a patient.

3.      "Doctor, I understand you have experienced problems getting SUBSYS filled with pharmacies in your area.  INSYS has partnered with a specialty pharmacy to solve some of these issues for you. Can I take a few minutes to explain the program and how it would benefit you and your patients?"

282.   The LINDEN CARE-INSYS partnership was established to recruit patients and "solve the issues," *i.e.*, circumvent legal and medical safeguards specifically established to protect patients from the dangers of a highly addictive and dangerous narcotic.

283.   In order to facilitate the distribution of SUBSYS on such a massive scale, and garner millions of dollars in the process, LINDEN CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, abdicated its legal and medical responsibilities to dispense SUBSYS for its only indicated use – breakthrough cancer pain for opioid-tolerant patients – and began encouraging physicians to prescribe SUBSYS for off-label uses.

284.   On July 24, 2014, after LINDEN CARE acquired QUICK CARE, Gurry, now a convicted felon for his role in INSYS' scheme, sent INSYS sales staff in multiple Western sales districts an email entitled "Linden Care Acquisition of Quick Care." In the

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

78

email, Gurry said that LINDEN CARE was INSYS' "valued partner in the success of SUBSYS distribution," and detailed the process for routing SUBSYS prescriptions through LINDEN CARE, which now owned QUICK CARE.

285.   In June 2014, at the time LINDEN CARE acquired QUICK CARE, under BELHEALTH's direction, LINDEN CARE's revenues had grown eight-fold, reaching $250 million. LINDEN CARE's success under BELHEALTH's direction was due primarily to LINDEN CARE's dispensing of opioids, particularly, SUBSYS.

286.   Once BELHEALTH acquired LINDEN CARE, LINDEN CARE arranged for meetings between BELHEALTH's and INSYS's board members and officers in New York and Arizona. BLUE, Founder and Managing Partner, and TALLUR, Managing Director (currently Senior Managing Director) of BELHEALTH were introduced to INSYS.

287.   BELHEALTH, BLUE, DRISLANE, and TALLUR directly dealt with INSYS on business strategies to increase SUBSYS sales, including the targeting of physicians who were high prescribers of opioids. To that end, TALLUR sent the following email to Matthew Napoletano, INSYS' former head of marketing and Mike Gurry:

> From: Inder Tallur [mailto:itallur@belhealth.com]
>
> Sent: Friday, September 20, 2013 7:47 AM
>
> To: Matthew Napoletano; Mike Gurry
>
> Cc: Harold Blue; mwiener@lindencare.com; archieg@qforma.com
>
> Subject: Linden Care follow up
>
> Matthew and Michael,
>
> It was nice meeting both of you this week and learning more about Insys. Congratulations again on the tremendous launch and performance over the past year. We are looking forward to continuing the strong relationship with Linden Care.
>
> As discussed, during lunch, we think our portfolio company, Qforma, could be very interesting for you. There are a range of Qforma solutions that can help Insys accelerate sales through

advanced analytics and physician targeting. Qforma solutions incorporate cutting edge technology utilizing medical claims, pharmacy claims, social media/public domain to identify high value physician targets and their networks. Qforma solutions have been used as early as 18 months prelaunch and as late as end of life cycle, by orphan drugs and blockbuster primary care compounds. Qforma has the ability to customize solutions and these in over 60 disease states/conditions, including the pain market.

I have copied Al Reicheg, who leads strategic partnerships at Qforma and would like to set up conference call to introduce you both to Al and see if there is a possibility of working together. Do you have time early next week? Monday?

Best,

Inder

288. BELHEALTH, BLUE, DRISLANE, and TALLUR directly dealt with INSYS to obtain and distribute SUBSYS. A June 19, 2014 correspondence from Harold Blue, BELHEALTH's Founder and Managing Partner, with Michael Babich, INSYS's CEO, reveals the direct involvement of BELHEALTH in the INYS-LINDEN CARE scheme. *See* the full text of this email exchange below:

From: Harold Blue [hblue@belhealth.com]

Sent: Thursday, June 19, 2014 10:00 PM

To: Michael Babich

CC: Inder Tallur

Subject: Agreement

Michael,

I hope you are well. I have watched us/you continue to distribute your product very well. With our recent move to a new facility 4 x the old size, new RX technology, new robot and new phone systems and basically everything new as we transition Linden from an entrepreneurial company to a more professionally operated one, it comes with growing pains. At BelHealth we are used to

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

this and do very well. I would like to revisit an agreement we discussed while together in Arizona with you alone, so we can move it along if you so desire.

I know we have allowed Marc at LindenCare to acquire some short dated Subsys because we move it so quickly and we received a healthy discount, thanks. We can do MUCH more. We will likely distribute about $120 Million of Subsys in 2014 which based on your analysts numbers might be more than 50% of your annual volume so we are both important to each other, WIN/WIN. Our YTD@ 4/30/14 is $44 M in Subsys revenue so the $120 MM is probably low. Your gross margin is 87% and ours is 6/7 %.

Below are some topics to ponder before we speak as I would like to hear what's important for you and how can we continue to be good partners. Flexibility is my middle name so name it, as long as we both win.

Ideas\Asks

1.      We can acquire more short dated in Q2 2014 if we can get an additional 8% on this order, up from 12%. And we can even go another 1-2 months shorter dated.

2.      Every quarter or/and year end, we can buy larger volume of short or regular dated product at the end of a quarter, discount.

3.      We would like to ask for an overall rebate of 2.5% paid quarterly on all purchases.

4.      When you have your price increase, 1-2 times a year we would like to be able to acquire a decent amount in front of that date.

In# 1,2 or 4, if we really acquire allot (up to you) we might need 30 days of additional dating from RDC [Rochester Drug Co-Operative, the wholesaler that procured SUBSYS from INSYS for LINDEN CARE], sometimes.

I hope you find this email in the spirit of our partnership and we haven't asked or bothered you since the press came out. We knew you would come out on top but didn't want to distract you during the crisis. By the way, today, we acquired a mini California based Pain RX pharmacy so now we are all set for the California market, company was called Quick Care and operated by

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

1     Rohit Sheta who is now our SVP of West Coast operations. QC does a decent amount of Subsys

2     monthly, about 10% of LC volume.

3     Please let me know if we can speak soon.

4     Harold S. Blue

5     BelHealth Investment Partners, LLC

6     126 E. 56th street, 10th Floor

7     New York, NY 10022

8     347 308 7012direct

9     917 755 1187 cell

10     Hblue@Belhealth.com

11     289.  This email demonstrates that BELHEALTH, BLUE, and TALLUR,

12 sophisticated players in the healthcare field, ignored that the demand for SUBSYS would

13 necessarily be limited by the number of people with breakthrough cancer pain, and instead,

14 focused purely on the volume that could be "moved," thus expanding the distribution of

15 SUBSYS in the market.

16     290.  This email also demonstrates that BLUE, who uses the collective pronoun

17 "we," does not distinguish between BELHEALTH and LINDEN CARE, and that he had

18 the authority to act on behalf of LINDEN CARE vis-à-vis INSYS and relating to SUBSYS.

19     291.  BELHEALTH directly negotiated with INSYS to procure SUBSYS.

20 BELHEALTH negotiated a wholesale agreement with INSYS for the distribution of

21 SUBSYS in 2015. INSYS required credit insurance, and as part of it required BELHEALTH

22 and LINDEN CARE to submit their financial statements for 2013 and 2014. The purpose

23 of this negotiation was to omit Rochester Drug Co-Operative as the wholesaler that procured

24 SUBSYS for Linden Care. In or around March and April 2015, TALLUR, Managing

25 Director of BELHEALTH, and Darryl Baker, CFO of INSYS, negotiated the deal.

26 TALLUR instructed Scott Kantor, the CFO of LINDEN CARE, LLC, how to proceed

27

THIRD AMENDED COMPLAINT             2:16-cv-07937-JLS-ASx

28

throughout the process. INSYS was interested in pursuing a direct transaction with LINDEN CARE to reduce the fees that it paid to Rochester Drug Co-Operative. In or around August of 2016, INSYS started directly selling SUBSYS to LINDEN CARE, bypassing Rochester Drug Co-Operative.

292.  TALLUR was directly involved in LINDEN CARE's marketing of SUBSYS and their outreach to physicians to prescribe SUBSYS.

293.  TALLUR attended meetings between LINDEN CARE and INSYS.

294.  BELHEALTH appointed its Founder and Managing Partner, BLUE, and its Operating Partners, Richard Friedman and Richard Wolpow, to the Board of Directors of LINDEN CARE.  It also later hired Scott Kantor as the Chief Financial Officer of LINDEN CARE, LLC. Scott Kantor is now working in the same position at Gemini Bio, another company owned by BELHEALTH. BELHEALTH also appointed its Chief Financial and Administrative Officer, Joseph Wynne, as the CEO of LINDEN CARE HOLDINGS, INC. Further, BELHEALTH appointed Rohit Sheta, the Founder and President of QUICK CARE, one of BELHEALTH's portfolio companies, to the positions of Senior VP of LINDEN CARE LLC and CEO of LINDEN CARE HOLDINGS, INC. See the table below for the overlaps of officers and directors of BELHEALTH and other companies it owns with those of LINDEN CARE and QUICK CARE.

| Name | Belhealth Role | Linden Care Role | Quick Care Role | Belhealth Portfolio Cos. |
|---|---|---|---|---|
| Harold Blue | Founder and Managing Partner | Chairman, Board of Directors Member, Compliance Committee | Member, Board of Directors | Member, Board of Directors, Aureus |
| Dennis Drislane | Managing Partner | Member, Board of Directors Member, Compliance Committee | Member, Board of Directors | |
| Inder Tallur | Managing Partner | Member, Board of Directors Member, Compliance Committee Member, Quality Management Committee | Member, Board of Directors Secretary | |
| Thomas Ridge | Member, Advisory Board | Member, Board of Directors | | |
| Bert Brodsky | Managing Partner | Co-Chairman, Board of Directors | Member, Board of Directors | Member, Board of Directors, Aureus |
| Richard Friedman | Operating Partner | Member, Board of Directors | Member, Board of Directors | |
| Robert Stutman | Member, Board of Directors | Member, Board of Directors Member, Compliance Committee | | |
| Burt Zweigenhaft | Member, Advisory Board | Member, Quality Management Committee Member, Governing Body | | |
| Richard Wolpow | Operating Partner | Member, Board of Directors Member, Governing Body | Member, Board of Directors | |
| Rohit Sheta | | Chief Executive Officer (Linden Care Holdings) Senior Vice President (Linden Care LLC) | Founder and Chief Executive Officer Member, Board of Directors | |
| Joseph Wynne | Chief Financial Officer and Chief Administrative Officer | Chief Executive Officer (Linden Care Holdings) Member, Quality Management Committee Member, Governing Body | | Member, Board of Directors, Precision Diagnostics |
| Michael Nameth | | Member, Board of Directors | | Chief Executive Officer, Aureus |

295.   After BELHEALTH acquired LINDEN CARE, BELHEALTH's executives occupied four of the six seats on LINDEN CARE's Board of Directors.

THIRD AMENDED COMPLAINT

2:16-cv-07937-JLS-ASx

296.   Over time, twelve different executives or directors from BELHEALTH, or one of its portfolio companies, occupied seats on LINDEN CARE's Board of Directors. These include BLUE, DRISLANE, TALLUR, Bert Brodsky, Richard Friedman, Richard Wolpow, Thomas Ridge, Robert Stutman, Joseph Wynne, Burt Zweigenhaft, Rohit Sheta, and Michael Nameth.

297.   BLUE served as Chairman on LINDEN CARE's Board of Directors. Bert Brodsky was Co-Chairman.

298.   BELHEALTH's officers and directors were also installed on LINDEN CARE's Compliance Committee, Quality Management Committee, and Governing Body.

299.   LINDEN CARE's Compliance Committee, which oversaw LINDEN CARE's compliance with TIRF REMS, CSA, and all other federal and state government laws and regulations, was spearheaded by BLUE, DRISLANE, and TALLUR and included other BELHEALTH directors and executives, such as Robert Stutman.

300.   LINDEN CARE's Compliance Committee reported directly to the Chairman of LINDEN CARE's Board of Directors—BLUE.

301.   After BELHEALTH acquired QUICK CARE, it similarly installed its directors and executives on QUICK CARE's Board of Directors, including BLUE, DRISLANE, and TALLUR, along with Bert Brodsky, Richard Friedman, and Richard Wolpow.

302.   While BLUE, DRISLANE, and TALLUR were spearheading LINDEN CARE's Compliance Committee, on July 28, 2015, Arthur Kersey, LINDEN CARE's Chief Compliance Officer emailed BLUE as follows:

From: Arthur Kersey [mailto:AKersey@lindencare.com]

Sent: Tuesday, July 28, 2015 9:32 AM

To: Harold Blue

Subject: RE: Information for Linden Care Compliance Committee Meeting Tuesday July 28th

Harold,

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

I am not certain that replacing Michael with Al would be prudent. It is not that Al is competent; he is and would do a good job. In the present environment and with the present management team (March W and Mark B) no matter who is the PIC is going to be undercut, ignored, pushed aside and run roughshod over. Michael knows exactly what needs to be done to have this pharmacy run in compliance with not only best business practices but the law.

Mark B and Marc W want to talk about having a Compliance program but they do not really want to have it. They want to continue to do exactly what they have been doing all along; disregard the pharmacy law, disregard best business practices, maximize profit at the expense of prudent and sound practice, cut corners, and run this place like a Mom and Pop candy store; the only problem is we are selling the most dangerous legal medication in the country and this could all come crashing down around us because of their arrogance, hubris, lack of foresight and failure to heed the warning signs. All it will take is one instance like the Dunn Meadow Subsys prescription for TIRF REMS to ask some questions that we cannot answer and they will shut us down, perhaps for good.

There is no leadership evidenced from either one of them; neither one of them has the faintest idea of leadership and how to deal with and treat subordinates fairly or reasonably. They run this place using screaming, bullying and threats; everyone knows you cannot tell them what they don't want to hear even if it is the truth. All I have done from day one is try to find the most palatable way of telling them what they NEED to hear despite the fact that they don't want to hear it. All they have done is lie to me about following procedures and policies that they agreed to; example, they agreed that we would hold every fax for a TIRF-REMS product from outside NY at least one day; this serves the dual purpose of giving us time for the hard copy to arrive so we can actually be compliant with the law when we fill it and gives us a degree of plausible deniability if we ever get questioned on how we possibly could have filled a fax written in Texas on the same day it was written.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

The two of them run into the Subsys department 20 times a day and grab faxes dated the same day if they think things are "slow" in the pharmacy, despite the fact that I have told them repeatedly that all they do is put the company in an indefensible position every single time they do it. Mark B told me to my face several months ago that we would hold every TIRF REMS product fax at least one day; apparently the caveat to that is that this "policy" applies only if he has something to do; if he is not kept busy enough he runs in and grabs faxes and starts having them pushed through.

Michael is not the problem. Changing him for Al (who would be qualified) will only put another individual who has been browbeaten down by the two Marks in an untenable and impossible position. It is not a matter of Michael not stepping up; it is a matter of them going behind his back and doing things which place this company in jeopardy every single day because they have gotten away with it for so long; they have been lucky; the problem is luck eventually runs out.

Forgive me if I have given you too much of an answer but all these things need to be said to frame a complete answer.

Art

303.   In response to this email, BLUE wrote to Kersey, "Thank you so much for this email and brutal honesty [.] As you know this has been a difficult mgt. situation from day one."

304.   At the same time, BLUE also forwarded Kersey's email to DRISLANE and wrote: "Weird."

305.   DRISLANE then forwarded the chain to TALLUR and wrote: "FYI. Don't share with anyone, but you need to know. Dennis"

306.   Kersey's email confirms that LINDEN CARE was violating TIRF REMS and the CSA when dispensing SUBSYS in 2015.

307.   Kersey's email also shows that BELHEALTH, BLUE, DRISLANE, and TALLUR knew about LINDEN CARE's violations of TIRF REMS and the CSA and chose to do nothing.

308.   Instead, at the direction of BELHEALTH, BLUE, DRISLANE, and TALLUR, LINDEN CARE continued to dispense SUBSYS, committing the same infractions Kersey complains of, for two more years, favoring profits over the law.

309.   BELHEALTH increased the earning capacity of Linden Care Pharmacy considerably. By the end of 2014, LINDEN CARE's revenue was $208,873,768, three times its revenue of $78,249,775 in 2013.

310.   BELHEALTH also increased LINDEN CARE's capacity to distribute SUBSYS. For example, in May of 2014, LINDEN CARE took $3.5 million worth of SUBSYS, which was all the stock of its wholesale supplier, Rochester Drug Co-Operative, in a single order.

311.   BELHEALTH funded the expansion of the facilities used by LINDEN CARE and leased another new facility for LINDEN CARE to store and dispense SUBSYS in October 2013.

312.   Similarly, BELHEALTH funded the expansion of the facilities used by QUICK CARE and leased a 9,000 square foot facility for QUICK CARE to store and dispense SUBSYS and other narcotics.

313.   After LINDEN CARE acquired QUICK CARE, QUICK CARE's new facility became LINDEN CARE's facility.

314.   BELHEALTH allowed LINDEN CARE and QUICK CARE to knowingly participate in INSYS's "Super-Voucher" program, which was one of INSYS's sales tools that offered free units of SUBSYS to certain patients.

315.   INSYS utilized two marketing tools that offered free drugs to patients: the Effective Dose Savings Program and the "Super-Voucher" program. The Effective Dose

Savings Program offered 30 free units of any strength of SUBSYS to new patients.  The "Super-Voucher" program was used for patients who had initiated therapy on SUBSYS and had utilized the 30 units free program during the time they were waiting for prior authorization, which is the approval of their prescriptions by their health insurance company, or for patients who switched from another drug to SUBSYS.

316.   In 2015, the sale of SUBSYS by BELHEALTH via LINDEN CARE was on average valued at $2.85 million per week. *See* below data from INSYS in an email dated July 6, 2015 from Jim Doroz, Senior Manager, Financial Planning and Analysis of INSYS, to John Kapoor, CEO of INSYS:

> Linden Care has maintained a predictable amount of inventory for the duration of the quarter as well Levels of Subsys at Linden Care ranged from $2.0 MM to $3.5 MM for most of the quarter ending at about $2.9 MM which is approximately equivalent to one week's worth of their Subsys sales ($2.85 MM). This is a reasonable level to maintain considering that their replenishment from RDC [Rochester Drug Co-Operative] arrives on a weekly basis.

317.   LINDEN CARE, LLC was a member of Rochester Drug Co-Operative, a pharmaceutical wholesaler, and received dividends based on its share of the sale of drugs it obtained from Rochester Drug Co-Operative. In 2014, LINDEN CARE, LLC received $2 million in dividends from Rochester Drug Co-Operative.

318.   BELHEALTH increased the number of States in which LINDEN CARE was able to distribute SUBSYS, including by acquiring QUICK CARE to obtain access to the market in California.

319.   In or about May 2014, LINDEN CARE was informed of some cases of fraud by physicians who prescribed SUBSYS and whose prescriptions were filled by LINDEN CARE. LINDEN CARE did not reduce its order of SUBSYS nor change its policies, stating

"that it will not affected [*sic*] their ordering, nothing has changed, we certainly not filling for that doctor, but we added more pain doctors."

320.   LINDEN CARE was selling SUBSYS at such a high rate that it was known to "burn through the product …at a quick rate."

321.   As early as October of 2013, LINDEN CARE was the largest distributor of SUBSYS sold to Rochester Drug Co-Operative, and BELHEALTH, BLUE, DRISLANE, and TALLUR were known to make decisions for LINDEN CARE. An email dated October 30, 2013 from Dion Reimer to Jim Doroz and Darryl Baker of INSYS regarding Rochester Drug Co-Operative and LINDEN CARE, states that "[Rochester Drug Co-Operative] is also concerned about the potential of [LINDEN CARE] new owners to switching to new wholesale customer and their exposure of several dollars of inventory that would be difficult to move."

322.   In or about April 2014, LINDEN CARE sold more than 40% of the SUBSYS that INSYS produced. During this period, "Linden care [*sic*] sends out 180 cartons of SUBSYS on daily average."

323.   At other points, LINDEN CARE sold as much as 65% of the SUBSYS manufactured by INSYS.

324.   Once criminal investigations into INSYS, its board members, and its officers were made public, BELHEALTH transferred the assets and the business of LINDEN CARE to another Company it owned, QUICK CARE, to avoid liability.

325.   In or around June 2014, BELHEALTH acquired QUICK CARE, which is based in California, through LINDEN CARE, LLC.

326.   Originally, QUICK CARE provided BELHEALTH access to market in California because LINDEN CARE LLC was not licensed in California.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

327.   BLUE, Founder and Managing Partner of BELHEALTH, shared the news of the acquisition of QUICK CARE through LINDEN CARE with Michael Babich, INSYS' CEO, prior to announcing it.

328.   John Kapoor, CEO of INSYS, met with BLUE, Marc Weiner, CEO of Linden Care, and Rohit Sheta, VP of QUICK CARE, shortly after the acquisition of QUICK CARE.

329.   In August 2014, BELHEALTH and LINDEN CARE requested INSYS to add QUICK CARE to the agreement between INSYS and LINDEN CARE.

330.   In or around June 2017, a letter was sent to all patients of LINDEN CARE advising that Linden Care Pharmacy would close in July 2017 and that all original prescription records would be transferred to QUICK CARE. *See* the screenshot of the letter dated June 28, 2017, below:



June 28, 2017

Dear Patient:

This letter serves to inform you that effective July 26, 2017, ("Effective Date") **Linden Care Pharmacy**, located at 130 Crossways Park Drive, Woodbury, New York, 11797, will be closed. As of this date, your original prescription records will be transferred to **Quick Care Pharmacy** (a duly licensed pharmacy)* located at 9397 Haven Avenue, Rancho Cucamonga, California 91730. All valid prescription orders and refills will thereinafter be dispensed by Quick Care. Please note that only prescriptions for non-controlled and non-narcotic medication can be accepted for filling at **Quick Care Pharmacy**. Patients who have controlled and narcotic medication should arrange through their prescriber to have their prescriptions sent to another pharmacy.

Please note that you continue to have the right to transfer your prescription to a pharmacy of your choosing at any time, and should you wish to transfer your prescription records or have any questions regarding the same, please contact **Linden Care Pharmacy** at (516) 221-7600 prior to the effective date, or **Quick Care Pharmacy** at (866) 393-8116 at any time hereafter. Thank you.

Very truly yours,

Rebecca Cho
Supervising Pharmacist
Linden Care Pharmacy

* Quick Care is licensed in the following states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming and the District of Columbia.

130 Crossways Park Drive, Suite 101, Woodbury, New York 11797

331.   BELHEALTH's webpage listed LINDEN CARE as one of the companies in its "Current Portfolio" until at least July 2017. A screenshot of the same page in August 2018 shows that BELHEALTH removed LINDEN CARE and replaced it with QUICK CARE, which utilizes the same logo as LINDEN CARE. *See* below the logo that LINDEN CARE formerly used, which QUICK CARE currently uses.





See below the screenshots of BELHEALTH's webpage on July 7, 2017 and August 21, 2018 showing that LINDEN CARE was substituted by QUICK CARE.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



PORTFOLIO

REALIZED PORTFOLIO













Copyright © 2017 BelHealth Investment Partners, LLC. All Rights Reserved.

Powered by OGK Creative.

web.archive.org/web/20170707195657/http://belhealth.com/portfolio-companies/          1/2

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

3/20/2020                                    Portfolio Companies - BeiHealth

http://beihealth.com/portfolio-companies/          Go     JUL  AUG  SEP
35 captures                                              ◄  21  ►
11 May 2015 - 21 Aug 2018                               2017  2018  2019

PORTFOLIO

REALIZED PORTFOLIO

web.archive.org/web/20180821061355/http://beihealth.com/portfolio-companies/                              1/2

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

332.   BELHEALTH still lists QUICK CARE as one of its portfolio companies on its business webpage. In fact, BELHEALTH lists "July 2013," which is the date it acquired LINDEN CARE LLC, as the date it acquired QUICK CARE, as opposed to June 2014, which was the actual date of its acquisition of QUICK CARE through LINDEN CARE LLC. *See* below the screenshot of BELHEALTH's webpage listing QUICK CARE as acquired in July of 2013.



333.   BELHEALTH used the corporate structure of QUICK CARE to replace LINDEN CARE LLC.

334.   BELHEALTH also removed any reference to LINDEN CARE in its business website to hide its direct involvement with LINDEN CARE.

335.   BELHEALTH used LINDEN CARE and QUICK CARE as instruments to defraud the United States.

336.   On August 27, 2020, QUICK CARE filed a Statement of Information with the California Secretary of State, which indicates that TALLUR is QUICK CARE's secretary, and a director of QUICK CARE, and that Vera Abramova, LINDEN CARE's former corporate controller, is QUICK CARE's CFO. TALLUR signed the Statement of Information on behalf of QUICK CARE.

**E.     The "Partnership" Between RDC and LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR**

337.   At all relevant times, RDC was one of the country's top ten distributors of pharmaceutical products with over 1,300 pharmacy customers and over $1 billion in revenue per year.

338.   RDC was a stock cooperative with approximately 310 shareholders, many of which were RDC's largest pharmacy customers, including LINDEN CARE.

339.   RDC was the primary wholesale distributor for SUBSYS.

340.   Michael Babich, INSYS' former CEO, and now a convicted felon for his role in INSYS' scheme, described the relationship between RDC and Linden Care as "peanut butter and jelly" and that "you needed one to have the other."

341.   Prior to BELHEALTH's negotiations with INSYS to purchase SUBSYS directly from INSYS, LINDEN CARE was RDC's largest SUBSYS purchaser, as LINDEN CARE dispensed as much as 65% of the SUBSYS manufactured by INSYS and purchased at least 90% of its supply of SUBSYS from RDC.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

342.   LINDEN CARE and QUICK CARE, under the control of, and at the direction of, BELHEALTH, BLUE, DRISLANE, and TALLUR, purchased large volumes of SUBSYS and other controlled substances from RDC.

343.   LINDEN CARE, under the control of, and at the direction of BELHEALTH, BLUE, DRISLANE, and TALLUR, purchased $11 million worth of controlled substances from RDC per week.

344.   None of the big three wholesale distributors, McKesson, Amerisource Bergen Corporation, and Cardinal Health, would allow LINDEN CARE or QUICK CARE to purchase the volume of SUBSYS they needed to satisfy the demand for the drug, which was driven by illegitimate prescriptions written by prescribers being paid kickbacks and bribes by INSYS.

345.   BLUE, DRISLANE, TALLUR, and Rohit Sheta of QUICK CARE, along with Marc Weiner and Mark Bortnick of LINDEN CARE, regularly interacted directly with RDC, including playing golf with RDC's executives and lawyers. In these interactions, BLUE, DRISLANE, and TALLUR negotiated agreements with RDC on behalf of LINDEN CARE and QUICK CARE.

346.   RDC's compliance department flagged LINDEN CARE's ordering of controlled substances as "suspicious" on multiple occasions but did not report these orders to the DEA.

347.   LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR knew that RDC was not reporting LINDEN CARE's and QUICK CARE's orders for SUBSYS and other controlled substances as "suspicious," as it was required to do.

348.   LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR worked together with RDC, primarily through RDC's CEO Laurence Doud III, to structure LINDEN CARE's and QUICK CARE's orders for controlled substances so that they would not trigger RDC's mandatory obligation to report the orders as suspicious.

349.   At the end of 2013, an RDC executive told Doud that he was "very concerned with the growth of Subsys at Linden Care" and that his "gut feeling is the risk to [*sic*] great versus the reward" and "that Linden Care could potentially become a real problem for RDC."

350.   Notwithstanding these grave concerns, RDC continued to supply LINDEN CARE with fentanyl and oxycodone until June 2017.

351.   From 2012 through 2016, RDC made annual distributions called "patronage dividends" to its shareholder pharmacy customers, like LINDEN CARE, which were calculated based on the amount of drugs and other products that the pharmacy purchased from RDC during a year. The pharmacies that purchased the most from RDC received the largest dividend payments each year.

352.   In just four years, RDC paid LINDEN CARE patronage dividends of nearly $32 million as follows:

   a.   2014 - $2,954,819;

   b.   2015 - $10,567,921;

   c.   2016 - $12,721,060; and

   d.   2017 - $5,582,601.

353.   Given that BELHEALTH owned more than 75% of LINDEN CARE, BELHEALTH reaped enormous profits from RDC's patronage dividends to LINDEN CARE.

354.   Like with INSYS, the criminal case against RDC is well-established. In 2019, RDC was criminally charged in the Southern District of New York for violations of narcotics laws and conspiring to defraud the DEA.

355.   The Government alleged that RDC's "chief executive officer [Larry Doud] and other members of senior management directed [RDC] to supply pharmacies they knew were

dispensing controlled substances in contravention of the Controlled Substances Act … in order to maximize [RDC]'s revenues and the compensation of [Doud]."

356.   The Government further alleged that "RDC … violated the CSA and its own written policies in an effort to conceal [its] illicit distribution of controlled substances from the Drug Enforcement Administration ("DEA") and other law enforcement authorities. Among other things, [RDC] made the deliberate decision not to investigate, monitor, or report the DEA pharmacy customers that they knew were diverting controlled substances for illegitimate use. Because Doud knew that reporting these pharmacies would likely result in the DEA investigating and shutting down its customers, Doud directed the company's compliance department not to report them, and instead to continue supplying those customers with dangerous controlled substances that the company knew were being dispensed and used for illicit purposes."

357.   RDC settled the criminal case against it for $20 million. At the time of settlement, the DOJ released a statement, indicating that "[f]or at least half a decade, RDC distributed dangerous, highly addictive opioids to pharmacy customers that its senior management, including Laurence F. Doud III … knew were being sold and used illicitly. Among other things, and at the direction of Doud, RDC supplied tens of millions of oxycodone, fentanyl, and other dangerous opioids to pharmacy customers that its own compliance personnel determined, and reported to Doud, were dispensing those drugs to individuals who had no legitimate medical need for them."

358.   William Pietruszewski, RDC's Operations & DEA Compliance Manager, was also criminally charged for conspiracy to defraud the United States by failing to file suspicious order reports. Pietruszewski pled guilty.

359.   Doud was criminally charged with a conspiracy to distribute controlled substances, which carries a mandatory minimum sentence of 10 years and a maximum

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

1   sentence of life in prison, as well as conspiracy to defraud the United States. Doud's

2   criminal case remains active.

3       360.   LINDEN CARE was an unindicted co-conspirator in the criminal case against

4   RDC (*e.g.*, referred through the criminal information as "Pharmacy-1").

5       361.   As part of its settlement of the criminal case against it, RDC entered into a

6   detailed Statement of Facts, in which it admitted, among others, that it deliberately failed to

7   implement an adequate system to detect, investigate, and report suspicious orders of

8   controlled substances to the DEA. RDC further acknowledged that, despite receiving and

9   fulfilling over 1.5 million orders for controlled substances from its pharmacy customers,

10  including hundreds of thousands of orders for highly-abused drugs, such as oxycodone,

11  fentanyl, and hydrocodone, RDC reported only a total of 4 suspicious orders to the DEA,

12  notwithstanding senior management's awareness of the company's reporting obligations

13  under the CSA.  RDC further admitted that it failed to report to the DEA at least two

14  thousand orders of controlled substances made by its pharmacy customers that should have

15  been reported as suspicious pursuant to the criteria set forth in 21 C.F.R. § 1301.74(b) and

16  the guidance contained in the DEA Letters.

17      362.   In the Statement of Facts, RDC further admitted that several of its largest

18  pharmacy customers exhibited ordering patterns that should have resulted in further

19  investigations to determine whether the pharmacies, and/or certain physicians who

20  prescribed drugs dispensed by the pharmacies, were engaging in opioid diversion; that

21  several physicians who wrote a large number of prescriptions filled by RDC customers were

22  subsequently arrested and prosecuted for diversion; and that RDC failed to maintain

23  effective controls to prevent such diversion and failed to report frequent, unexplained sharp

24  spikes in opioid orders.

25      363.   With respect to LINDEN CARE, in the Statement of Facts, RDC admitted as

26  follows: "RDC's top customer during the Covered Period was a specialty pharmacy located

27

28

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

in Woodbury, New York. This pharmacy was one of the largest providers of Subsys, a highly-addictive fentanyl spray that is approved by the FDA only for use by cancer patients with breakthrough pain. This pharmacy was also a large provider of oxycodone; between October 2012 and October 2013, the pharmacy went from purchasing approximately 70,000 units of oxycodone per month to purchasing over 200,000 units per month. This pharmacy filled a high volume of prescriptions written by prescribers included on RDC's Suspicious Prescriber List, including numerous physicians who were subsequently arrested for diversion."

364.   LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR were aware of and benefitted from this unlawful conduct by RDC. In fact, one of the reasons RDC's Board of Directors eventually terminated Doud's employment as CEO was that Doud had entered into a side financial deal to support BELHEALTH.

365.   Specifically, in RDC's notice of termination to Doud, RDC's Board of Directors stated "Your misconduct in the performance of your duties, including but not limited to receipt of financial benefit through RDC's relationship with BelHealth at the expense of RDC's other members…" as a reason for Doud's termination.

**F.    LINDEN CARE and QUICK CARE are the Alter Egos of BELHEALTH and the Corporate Veils of LINDEN CARE and QUICK CARE Should Be Pierced**

366.   LINDEN CARE and QUICK CARE were both owned, controlled, operated, managed, and dominated by BELHEALTH and are the alter egos of BELHEALTH.

367.   BELHEALTH owned 75% of LINDEN CARE.

368.   BELHEALTH owned all of QUICK CARE before it caused LINDEN CARE, its alter ego, to acquire QUICK CARE, another of BELHEALTH's alter egos.

369.   BELHEALTH maintained control and domination over LINDEN CARE's and QUICK CARE's assets, day-to-day fiscal policies, management, operations, and compliance.

370.   BELHEALTH directed the minute details of LINDEN CARE and QUICK CARE, including LINDEN CARE's and QUICK CARE's illegal distribution of SUBSYS through the overlapping directors, and executives between BELHEALTH, LINDEN CARE, and QUICK CARE, including but not limited to, BLUE, DRISLANE, TALLUR, Bert Brodsky, Richard Friedman, Richard Wolpow, Thomas Ridge, Robert Stutman, Rohi Sheta, Joseph Wynne, Vera Abramova, Burt Zweignehaft, and Michael Nameth, as described above.

371.   As described above, BELHEALTH routinely directly negotiated and dealt with INSYS and RDC, both of which were criminal entities, on behalf of LINDEN CARE and QUICK CARE.

372.   BLUE, BELHEALTH's top-ranking executive, saw no distinction between BELHEALTH and LINDEN CARE (or QUICK CARE), describing BELHEALTH and LINDEN CARE as "we" in an email to INSYS relating to SUBSYS.

373.   BELHEALTH, LINDEN CARE, and QUICK CARE had a unity of interest in committing a fraud against the Government in the form of distribution of large quantities of SUBSYS for off-label uses, in exchange for enormous profits worth hundreds of millions of dollars.

374.   All meaningful assets of LINDEN CARE and QUICK CARE ended in the possession of BELHEALTH, not LINDEN CARE or QUICK CARE.

375.   Justice requires recognizing the substance of the relationship between BELHEALTH and LINDEN CARE and BELHEALTH and QUICK CARE over the form because BELHEALTH used the corporate fiction distinguishing between LINDEN CARE, QUICK CARE, and BELHEALTH to perpetrate a fraud on the United States.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

376.   As alleged, BELHEALTH has transferred assets from LINDEN CARE to QUICK CARE, which remains an operating entity today, without reasonably equivalent value for the purpose of delaying or hindering creditors of LINDEN CARE, including Relator-Plaintiff, and BELHEALTH, LINDEN CARE, and QUICK CARE were closely intertwined, with BELHEALTH and QUICK CARE remaining closely intertwined today.

377.   An equitable result is achieved by disregarding the corporate form and holding BELHEALTH liable for LINDEN CARE's and QUICK CARE's violations of the FCA as pharmacies as LINDEN CARE is defunct and has been drained of assets and QUICK CARE, upon information and belief, has insufficient assets to satisfy Defendants' liability in this action. Without piercing the corporate veil, Relator-Plaintiff, on behalf of the United States Government, the States, the City of Chicago and the District of Columbia, will be unable to recoup damages and monies owed for Defendants' violations of the FCA.

## G.   Improper Payments by Government Health Care Programs

378.   Under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, LINDEN CARE's illegal distribution of SUBSYS ultimately caused hundreds of thousands of prescriptions to be improperly paid for by Government Health Care Programs.

379.   LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR relied on Medicare and Medicaid reimbursements for SUBSYS and other controlled substances for a significant portion of LINDEN CARE's and QUICK CARE's revenue.

380.   BELHEALTH, LINDEN CARE, QUICK CARE, BLUE, DRISLANE, and TALLUR knew that many of the prescriptions for SUBSYS being filled by LINDEN CARE and QUICK CARE, including those for off-label use, would be submitted to Medicare and Medicaid.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

381. For example, BELHEALTH, BLUE, DRISLANE, and TALLUR spearheaded LINDEN CARE's response to an audit conducted by Humana at the request of CMS for prescriptions of SUBSYS that were filled by LINDEN CARE. As a result, Humana clawed back payment from LINDEN CARE in the amount of $4.2 million.

382. On January 15, 2016, LINDEN CARE received a letter from Humana regarding the audit stating as follows:

> The Centers for Medicare & Medicaid Services (CMS) and Humana have conducted a review related to pharmacy claims submitted by your pharmacy indicated in the enclosed list. The review has determined that the list of Transmucosal Immediate Release Fentanyl (TIRF) medications were dispensed for Humana members who did not have an appropriate diagnosis of cancer to support use of the product(s) and coverage of the product(s) under Medicare Part D.
>
> At CMS's direction, Humana has initiated a deletion of the Prescription Drug Events (PDEs) which will result in reversal and recovery of the identified claims previously paid to your pharmacy. These claims are considered coverage errors because these drugs cannot be covered under Medicare Part D because the drugs have not been used for a US Food and Drug Administration (FDA) approved indication(s).
>
> Additionally, Humana believes that the failure of your pharmacy to identify the inappropriate use of these medications is a serious situation. Pursuant to US Drug Enforcement Administration (DEA) regulations (21 C.F.R. § 1306.04), pharmacists have a corresponding responsibility (with prescribers) to ensure that controlled substances are used for a legitimate medical purpose. Use of TIRF medications for indications other than FDA approved indications is counter to FDA approved

labeling and prescribing information, as well as the TIRF REMS ACCESS Education Program and Knowledge Assessment provided to and completed by all pharmacies who dispense TIRF products, and represents a serious safety concern for Humana's members.

383. Even after receiving the above-referenced letter from Humana, BELHEALTH, BLUE, DRISLANE, TALLUR, and LINDEN CARE only discontinued off-label prescriptions of SUBSYS for Humana insureds, despite being on direct notice that CMS rejected all of LINDEN CARE's SUBSYS prescriptions for a three-year period.

384. Humana additionally tagged QUICK CARE in the same audit.

385. DRISLANE spearheaded LINDEN CARE's Compliance Committee's handling of the Humana audit in 2016.

386. Ultimately, Humana issued a chargeback for $4.2 million for off-label prescriptions of SUBSYS that were filled by LINDEN CARE and submitted to and paid by CMS/Medicare. All of these claims were false.

387. BLUE responded to the Humana audit by exclaiming that "all the doctors are allowed to prescribe off label so we need to determine what our liability is here?"

388. In other words, BLUE, despite being a member of LINDEN CARE's Compliance Committee, and despite LINDEN CARE's Compliance Committee reporting to BLUE as the Chairman of LINDEN CARE's Board of Directors, directly disregarded LINDEN CARE's corresponding responsibility.

389. Under the Medicaid program, States will not receive FFP if a drug is not prescribed for a medically-acceptable use. FFP is available to States only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). States have, therefore, implemented their own laws and pharmacy regulations that require prescribed drugs be used for a medically accepted use that comports with the definition of a "covered outpatient drug." "Covered

outpatient drugs" do not include drugs that are used for a medical indication which is not a medically accepted indication. 42 U.S.C. § 1396r-8(k)(3).

390.   A medically accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia.  42 U.S.C. § 1396r-8(k)(6).  The specified drug compendia approved for the Medicaid program are set forth in 42 U.S.C. § 1396r-8(g)(1)(B)(I):   American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information; the DRUGDEX Information System; and the peer-reviewed medical literature.

391.   As described above, Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home health care services. 42 U.S.C. §§ 1395e to i-5.  Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting and when they are "reasonable and necessary."

392.   Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary," and typically include those administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics, and drugs administered through durable medical equipment, such as a nebulizer.   42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

393.   The Medicare Part D drug benefit program covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k).

394.   The off-label uses of SUBSYS discussed herein are not supported by "clinical research that appear[ ] in peer-reviewed medical literature," and could not, under any circumstances, be considered "medically accepted as safe and effective" or

"reasonable and necessary" for such uses. Therefore, claims for reimbursement for SUBSYS prescribed for such off-label uses were not covered by Medicaid or Medicare.

395. LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, were aware that the natural and probable consequence of their illegal distribution of SUBSYS was that health care providers would submit claims for payment to Government Health Care Programs for said distribution.

396. Notwithstanding this knowledge, LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, illegally distributed SUBSYS without any thought to the potential harm to patients.

397. When LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, submitted claims based upon physicians' prescriptions for SUBSYS for off-label uses, they submitted false claims because such off-label uses were not supported by: (1) citation to one of the drug compendia specified in 42 U.S.C. § 1396r-8(g)(1)(B)(I) (Medicaid); (2) "peer-reviewed medical literature;" (3) a determination that the drug was "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare); and (4) a coverage determination by other Government Health Care Programs, *see, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

398. LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, did not disclose to the government that the claims for SUBSYS were predicated on noncompliance with material statutory and regulatory requirements.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

399.   LINDEN CARE and QUICK CARE, under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, were aware that their illegal distribution did, in fact, result in false claims to be submitted to Medicaid, Medicare and other government payers.

400.   LINDEN CARE had a department dedicated to obtaining prior authorizations for SUBSYS. This department worked hand-in-hand with INSYS' IRC to obtain prior authorizations for off-label prescriptions of SUBSYS that were filled by LINDEN CARE and QUICK CARE.

401.   Under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, LINDEN CARE's and QUICK CARE's illegal distribution of SUBSYS directly and proximately caused these claims to be submitted to Government Health Care programs. LINDEN CARE and QUICK CARE caused the submission of these claims, since health care providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Health Care Programs, and the States submitted Form CMS-64 to the Federal Government, all claiming reimbursement for SUBSYS based on off-label or unapproved uses.

402.   The fact that the Government Health Care Programs paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.  Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were not because, among others, there is no ICD for breakthrough cancer pain.  In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

403.   In 2012, the Government paid $932,555 for 305 claims of SUBSYS under Medicare Part D.

404.   In 2013, the Government paid $29,918,916 for 5,072 claims for SUBSYS under Medicare Part D.

405.    In 2014, the Government paid $97,225,743 for 12,1801 claims for SUBSYS under Medicare Part D.

406.   In 2015, the Government paid $162,941,182 for 15,704 claims for SUBSYS under Medicare Part D.

407.   In 2016, the Government paid $125,789,788 for 9,212 claims for SUBSYS under Medicare Part D.

408.   From January 1, 2017 through July 31, 2017, the Government paid approximately $46,482,842 for 2,774 claims for SUBSYS under Medicare Part D.

409.   From 2012 through July 31, 2017, under Medicare Part D and Medicaid, the Government paid $522,936,144 for 50,961 claims of SUBSYS.

410.   In 2019, after the scheme between INSYS, RDC, LINDEN CARE, QUICK CARE, BELHEALTH, BLUE, DRISLANE, and TALLUR had been halted, the Government paid just $21,959,380 for 1,058 claims for SUBSYS—figures that are in stark contrast to those from 2014-2017.

411.   In 2012, the Government paid $132,060.44 for 50 claims for SUBSYS under Medicaid.

412.   In 2013, the Government paid $1,676,344.24 for 353 claims for SUBSYS under Medicaid.

413.   In 2014, the Government paid $5,282,495.40 for 783 claims for SUBSYS under Medicaid.

414.   In 2015, the Government paid $18,205,536.15 for 1,951 claims for SUBSYS under Medicaid.

THIRD AMENDED COMPLAINT

2:16-cv-07937-JLS-ASx

415.   In 2016, the Government paid $23,593,890.12 for 1,827 claims for SUBSYS under Medicaid.

416.   From January 1, 2017 through July 31, 2017, the Government paid $10,754,792.73 for 750 claims for SUBSYS under Medicaid.

417.   In comparison, the Government spent far less during this same time period on SUBSYS' main competitors, such as Actiq, Abstral, Fentora, and Lazanda.

418.   Under Medicare Part D, the Government spent far less on all claims across these four drugs (Actiq, Abstral, Fentora, and Lazanda) than on claims for SUBSYS.

419.   From 2012 through July 31, 2017, under Medicare Part D, the Government paid $24,761,922.26 for 2,113 claims for Actiq; $14,979,768.02 for 2,049 claims for Abstral; $138,697,016.81 for 17,229 claims for Fentora; and $22,949,915.56 for 1,864 claims for Lazanda.

## VIII.  **DEATH BY SUBSYS: OVERDOSE OF PATIENT #1**

420.   Through her work at INSYS, Relator interacted with the Patient and Physician described below, and learned the following facts, which exemplify INSYS' off-label promotion and misbranding of SUBSYS and its use of kickbacks to promote the drug, as well as LINDEN CARE's misbranding of the drug and repeated breach of the TIRF REMS protocol and the CSA.

421.   Patient #1 met Doctor #1 for an initial consultation on August 13, 2014, related to pain associated with degenerative disc disorder, kidney stones, migraines, fibromyalgia, and assorted other illnesses. Patient #1 bore injuries from two car accidents, and, as a consequence of chronic pain, grew dependent on the opioids she had taken for several years.

422.   Doctor #1 practices internal medicine, diabetic management, holistic medicine, and weight control. She does not advertise expertise or accreditation in either oncology or pain management.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

423.   INSYS trained and instructed Relator to use various techniques to promote SUBSYS to Doctor #1, including invitations to multiple speaker programs and dinners with Relator's regional sales manager.

424.   Further, in compliance with the training she received from INSYS, Relator made regular trips to Doctor #1's office, dropping off breakfast and lunch and boxes of coffee for the staff, and attempting to convince Doctor #1 to prescribe SUBSYS to one of her patients. As Relator noted in a Business Plan she drafted for her sales manager, Doctor #1 was an "A" target, and Relator did the following: "weekly visits/staff and Dr. aware of benefits of SUBSYS and is looking for appropriate patient types…"

425.   In December 2014, Doctor #1 found what she and INSYS considered to be an "appropriate patient type," a patient without cancer, who suffered from "chronic, intractable pain." Doctor #1 contacted Relator and scheduled a meeting with Patient #1.

A.     INSYS' Complicity

426.   INSYS, through Relator and its IRC, (1) advised Doctor #1 to prescribe SUBSYS at an improperly high introductory dosage and with improper instructions for use, (2) advised Patient #1 to change doses during titration without consulting her physician, and (3) pre-populated the prior authorization form with off-label indication and off-label dose.

427.   On January 5, 2015, Doctor #1 saw Patient #1 for medication monitoring, and noted in Patient #1's records the order of two prescriptions of SUBSYS 200 mcg, to be taken "every four hours for a script of 30 units, second script for 120 units[.]" Doctor #1 arranged for Patient #1 and her father to meet with Relator immediately after this consultation, for instruction on the use of SUBSYS. At this time, Doctor #1 and Patient #1 executed a TIRF REMS Patient-Prescriber Agreement Form, a necessary predicate to the authorization and dispensation of the SUBSYS prescriptions.

428.   Relator met with Patient #1 and her father that same day. Doctor #1 did not join them. At the meeting, Relator provided a partially completed INSYS Reimbursement Center Patient Authorization & Referral Form ("Prior Authorization Form"), to which Patient #1's father added Patient #1's name, date of birth, gender, social security number, address, and phone number. Though Relator never filled this section out for a patient, she was advised by her sales manager at the time, SM #3, that other sales representatives did so, but that they made sure that the handwriting looked different to avoid detection by regulators.  Relator pre-populated the dosage line, checking the box for 200 mcg, and the indication section, checking boxes for "patient is opioid tolerant", "other chronic pain," and "chronic pain syndrome." (See form at ¶ 131).

429.   The standard INSYS prior authorization form lists both approved and off-label medical diagnoses among its rationales for prescribing SUBSYS.  One of the potential diagnosis is even contraindicated on the label. SUBSYS' FDA-approved label contraindicates "post-operative pain," yet INSYS' prior authorization form includes "Post-laminectomy syndrome," also known as Failed Back Syndrome (FBS). FBS is a catch-all diagnosis for patients whose pain persists after spinal surgery. When questioned regarding this, Relator was unaware that a contraindicated diagnosis appeared on the form, but explained that her training by INSYS was so focused on sales, rather than the consultative services emphasized by other pharmaceutical sales departments, that she and her colleagues received little to no explanation of the diagnoses for which the drug was contraindicated.

430.   Relator also instructed Patient #1 on the use of SUBSYS and INSYS' recommended method of titration for determining effective dosage. Relator handed marketing materials to Patient #1, including (1) a brochure titled "Are Your Patients Getting Relief From Their Breakthrough Cancer Pain?" (hereinafter the "Brochure") and (2) the Titration Process and Schedule booklet.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

431.   In the course of educating Patient #1 on the use of SUBSYS, as directed by INSYS management, Relator advised Patient #1 and her father that neither the 100 mcg dose nor the 200 mcg dose would have the desired effect, that she would need to "titrate up" to her minimum effective dose. Ultimately, INSYS sales representatives were trained to make sure their prescriptions reached doses of 400 mcg or higher through titration, as INSYS circulated a daily report of prescriptions below 400 mcg, to serve as a list of doctors in need of "education" from sales representatives on proper dosing.

432.   The Brochure is targeted at prescribers. Relator received no direction from INSYS management on what to do with marketing materials during patient meetings, so she used them to educate the patients on the use of the drug. The Brochure provides instructions on how to "titrate up" to an effective pain relief dosage. Relator used the Brochure, as well as the titration guide, along with notes she took during her week of training.  She showed Patient #1 a chart from the Brochure which states that a majority of patients achieve an effective dose of SUBSYS between 600 mcg and 1600 mcg, and advised the patient to begin use of SUBSYS by taking a 200 mcg dose upon having her first pain episode.  Relator advised Patient #1 that if pain remained after thirty minutes, she could take another 200 mcg dose.  Relator further advised, based on her limited training, that Patient #1 should double the dose, taking 400 mcg, after four hours elapsed.

433.   Relator's advice to Patient #1 regarding her initial dosage was undoubtedly off-label promotion. Relator, based on INSYS training, led Patient #1 to believe that a 100 mcg dose would have no effect on her pain, though the 100 mcg dose is the only FDA-approved initial dosage. INSYS, in fact, instructed Relator and her colleagues that the FDA-approved 100 mcg dose was below the threshold of what any opioid-tolerant adult would benefit from, and that the patient population would cease using the drug if they were not able to feel its effects more dramatically, by beginning with the 200 mcg dose.

THIRD AMENDED COMPLAINT                                              2:16-cv-07937-JLS-ASx

434.   Relator's advice to Patient #1 regarding the alteration of dosage during titration is further evidence of INSYS' systemic off-label promotion of SUBSYS. At the direction of INSYS management, Relator advised Patient #1 to change her own dosage on the basis of her relative pain levels during titration, without contacting her physician prior to or after the change. INSYS instructed Relator and her colleagues to do this during their initial training. In doing so, INSYS trained its employees to directly contradict SUBSYS' FDA-approved label, which tells patients to contact their prescribing physician before altering their dosage. The FDA-approved label advises patients to take this precaution because of the severity of the drug's side effects, which include death.

435.   When Relator showed Patient #1 the Brochure containing a chart claiming that 3 out of 4 patients achieve an effective dose between 600 mcg and 1600 mcg, she was also following INSYS policy.  By providing this information to patients, INSYS prepared patients to be unsatisfied by the initial dose. This sales protocol approaches what micro-economists call "price framing." When salespeople "price frame" they present higher than expected prices to a potential purchaser, in order to raise the purchaser's perception of what an acceptable price would be. When INSYS sales staff advised patients and physicians that the FDA-approved 100 mcg starting dose would be imperceptible, they pushed patients to consume higher and higher doses of a dangerous and addictive opioid.

436.   After Relator's meeting with Patient #1, Doctor #1's office staff faxed copies of the prescriptions to LINDEN CARE Pharmacy, and Relator submitted the parties' Patient-Prescriber Agreement Form and Prior Authorization Form to INSYS' Reimbursement Center ("IRC") representatives on proper dosing.

437.   On January 8, 2015, Envision Pharmaceutical Services (now "EnvisionRx") authorized Medicare reimbursement for Prescription # 2080916-01N/D, one hundred and twenty units of SUBSYS 200 mcg spray, written on behalf of Patient #1 by Doctor #1. LINDEN CARE dispensed the prescription to Patient #1 that same day, without first

receiving the original prescription from Doctor #1. LINDEN CARE priced the 20-day, 120 dose prescription of SUBSYS at approximately $6,667.60.  Patient #1 was responsible for $6.60 and EnvisionRx paid $5,509.52.

438.   EnvisionRx, the Medicare Part D insurer responsible for either authorizing or refusing reimbursement for Patient's SUBSYS, requires a journal article for off-label prescriptions. INSYS' Reimbursement Center handled all contact between INSYS staff and EnvisionRx, so Relator has no information on what was said or provided by INSYS to ensure reimbursement; however, Relator does recall that sales staff agreed that certain members of the IRC staff had better results than others.

439.   Patient #1 received approval for an exception from Envision because of the prior authorization form. This is the only method for gaining approval where a patient seeks to use the drug for an off-label purpose.

440.   EnvisionRx's Medicare Part D Eldercare plan served as the Third Party Payor for the transaction.

441.   Between January 26, 2015 and March 21, 2016, Doctor #1 drafted, EnvisionRx authorized, and LINDEN CARE dispensed seventeen additional SUBSYS prescriptions for Patient #1, each for 600 mcg spray, nine (9) of these for one hundred and twenty (120) doses and the remaining eight (8) prescriptions for one hundred and eighty (180) doses.

442.   Befitting her training by INSYS, Relator did not mention to Patient #1 the label's limitation to only patients with breakthrough cancer pain. Rather, she provided Patient #1 directions for using SUBSYS, and guided her to begin at the 200 mcg dose and begin titrating up without first consulting the prescribing physician, Doctor #1. In doing so, Relator behaved as trained and directed by INSYS management.

443.   Patient #1 continued to take a 600 mcg dose until her death.  The prescription was initially for a 20-day supply with a quantity of 120.  On August 25, 2015, and thereafter, the prescription was for a 30-day supply with a quantity of 180.

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

**B.     LINDEN CARE's Complicity**

444.   When LINDEN CARE received Patient #1's first prescription for SUBSYS, the dosage and wording should have immediately raised a red flag with pharmacists on duty. Patient's #1's physician (Doctor #1) prescribed the 200 mcg dosage, in direct contravention of the product's FDA approved label and the TIRF REMS guidelines, both of which mandate an initial 100 mcg dose in an effort to allow patients to titrate up to their optimal dosage safely. Despite certifying that it would start all patients at the lowest dose, LINDEN CARE dispensed Patient #1 her first prescription of SUBSYS at twice that dosage.

445.   When LINDEN CARE received Patient #1's second prescription for SUBSYS, it again acceded to the written directions unlawfully and without question or complaint. LINDEN CARE dispensed 600 mcg SUBSYS spray to Patient #1, despite the fact that SUBSYS' label recommends a 400 mcg dose. Further, and even more troubling, LINDEN CARE distributed the drug for an off-label use – "Chronic Intractable Pain" – and without proper directions in the memo line of the prescription. The prescription's hardcopy label states, "Use 1 Spray Under Tongue Every Four Hours." It does not say "PRN," or "As Needed." Rather, the label instructed Patient #1 to use SUBSYS as a maintenance opioid. The directions on the hardcopy label came, verbatim, from the handwritten prescription Doctor #1's staff faxed to LINDEN CARE. Thus, the treating physician prescribed SUBSYS with patently improper and unsafe directions for use, INSYS' IRC forwarded said those directions to the pharmacy, and then LINDEN CARE dispensed the drugs to Patient #1 with no apparent scrutiny or oversight.

446.   No pharmacist should have dispensed the second prescription—and certainly, no TIRF REMS certified pharmacist—because it was not prescribed as needed, a serious medication error. LINDEN CARE failed to satisfy its duty, under TIRF-REMS, the FDCA, and the CSA, to guard against prescription errors, especially with respect to drugs so dangerous as SUBSYS and other TIRFs.

447.   LINDEN CARE dispensed Patient #1's second prescription for SUBSYS on January 26, 2015, and two additional prescriptions, also for 600 mcg SUBSYS, on February 27 and March 26, before adding the language "As Needed" to Patient's fifth prescription on April 17, 2015. A review of Doctor #1's prescription pad reveals what was apparent with the January 26, 2015 prescription, that LINDEN CARE employees merely transcribed whatever the physician wrote, independent of whether these directions were inherently dangerous and contrary to those approved by the FDA and taught by the TIRF REMS Access program.

448.   On May 28, 2015, LINDEN CARE again failed to include any "As Needed" language.

449.   Even when, on September 22, 2015, Doctor #1's prescription pad memo stated: "PRN," LINDEN CARE's hardcopy label failed to include the "As Needed" language. To the contrary, the label stated, "Use 1 Spray Under Tongue Every 4 Hours."

450.   Incredibly, based on the prescription written by the Doctor #1 and filled by LINDEN CARE, Patient #1 could consume a 600 mcg dose of SUBSYS every four hours, every day, independent of what pain she felt or did not feel. Her physician and pharmacist, alike, advised her to do so. This is because rather than raise the dosage of Patient's maintenance opioid, or change the maintenance opioid, the prescribing physician prescribed enough SUBSYS for Patient to consume it six times daily. Patient #1, an opioid addict suffering from severe, chronic pain, set an alarm clock each night, to make sure that she took the scheduled dose that fell in the middle of her sleep schedule.

451.   TIRF-REMS, like SUBSYS' label, states that the drug should not be prescribed for more than four daily doses. SUBSYS is not a maintenance opioid. It is a powerful analgesic, one which can easily kill patients who abuse it.

452.   Patient #1's SUBSYS prescription, filled by LINDEN CARE, directed her to abuse the drug, which led to her death.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

453.   On October 30, 2015, Virtua West Jersey Hospital ("Virtua Voorhees") admitted and discharged Patient #1 from its Emergency Department, where Patient #1 presented with chest pain. At the time of discharge, Patient #1's treating physician advised her to "wean her medications down."

454.   On January 17, 2016, Virtua Voorhees admitted and discharged Patient #1 from its Emergency Department, where Patient #1 presented with a wound on her left leg. On discharge, Patient #1's treating physician noted the following: "Pt somnolent but arousable on exam; pt took 600 mcg of fentanyl in the exam room; after arousing pt she requested something additional for pain; explained at this time given somnolence explained to pt that it was not appropriate at this time."

455.   Doctor #1 met with Patient #1 on January 18, 2016, the day following her final visit to Virtua Voorhees' Emergency Department. On that date, Doctor #1 prescribed additional medication, noting: "Med admin: SUBSYS 600 mcg q 4, #180 doses, OxyContin 10 mg q 12 #60, no evidence of substance abuse or aberrant behavior activities of daily living the patient can function with medications njrx cked and confirmed."

456.   On March 25, 2016, Patient #1's boyfriend woke to find her dead on the couple's bedroom floor. Subsequent toxicology reports caused her death to be ruled accidental, the result of adverse effects of drugs. Patient #1's blood contained high levels of fentanyl and norfentanyl (the prime fentanyl metabolite).

457.   LINDEN CARE abrogated its duty to ensure that no extra medication was dispensed to Patient #1. LINDEN CARE also failed to educate both patient and prescriber, as it certified would occur. These failures began with the first prescription LINDEN CARE filled for Patient #1, and continued until her death, eighteen prescriptions and $250,544.62 in Medicare copayments later.

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

458.   In sum, LINDEN CARE dispensed nine SUBSYS prescriptions to Patient #1 which failed to include any "As Needed" language. These labels directed the patient to use the drug every four hours, independent of pain.

459.   The preceding facts demonstrate that LINDEN CARE lacked a competent compliance program during the period of January 26, 2015 and March 21, 2016, the time between Patient's first prescription of SUBSYS and her death from its misuse.  It is believed and, therefore, averred that LINDEN CARE's failures as detailed herein were inherently systemic.

460.   By failing to comply with TIRF-REMS, and submitting its bills to government healthcare programs for repayment, LINDEN CARE committed eighteen FCA violations with respect to Patient #1, alone.

461.   Relator believes and, therefore, avers that her experience with calling on Doctor #1 and the resulting prescriptions to Patient #1 were illustrative of Defendants INSYS' and LINDEN CARE's unlawful marketing, sale, and dispensing of SUBSYS on a nationwide basis.

## IX.   CONCLUSION

462.   INSYS willfully and intentionally promoted SUBSYS for off-label uses, and paid kickbacks to physicians in order to increase the revenues it received from Government Health Care Programs.  Under direct instruction, strategic planning, funding, and control by BELHEALTH, BLUE, DRISLANE, and TALLUR, LINDEN CARE and QUICK CARE, through their willful acts, in concert with INSYS, engaged in a systemic, fraudulent scheme that caused physicians to neglect the welfare of their patients and expand the use and abuse of a highly addictive and potent form of fentanyl. Upon information and belief, the illegal and unjust activities of INSYS continue unabated, and the illegal conduct of LINDEN CARE ended only after it ceased business operations on July 26, 2017.

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

## COUNT ONE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

463.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

464.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

465.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides, in relevant part, that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of the person.

466.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval of SUBSYS, or treatments involving SUBSYS, to officers, employees or agents of the United States Government.  Defendants knew that these claims for payment or approval were false or fraudulent, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

467.   The United States, unaware of Defendants' false or fraudulent representations, and the falsity or fraudulence of claims presented, or caused to be presented by Defendants, has paid the false claims submitted that would otherwise not have been allowed.

468.   The United States has made payments upon false and fraudulent claims presented, or caused to be presented, by Defendants and thereby has suffered damages. The United States is entitled to full recovery of the amounts paid, directly or indirectly, by the Government Health Care Programs pursuant to the submission of false claims, which Defendants presented, or caused to be presented.

469.   The fact that the United States paid for false and fraudulent claims subsequent to the filing of this action does not negate the materiality of the Defendants' conduct and noncompliance.   Even though many, if not most, SUBSYS prescriptions are procured through improper financial incentives or off-label marketing, some prescriptions were legitimate, and the Government has no practical means of discerning, on a prepayment basis, which prescriptions were appropriate and which were not.   In addition, certain patients need a drug like SUBYS, and a blanket suspension of payments for SUBSYS would cause them substantial harm.

470.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT TWO
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

471.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

472.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

473.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in, relevant part, that any person who:

> knowingly makes, uses, or causes to be made or used, a false record
> or statement material to a false or fraudulent claim . . . is liable to the

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

> United States Government for a civil penalty of not less than $5,000
> and not more than $10,000, as adjusted by the Federal Civil Penalties
> Inflation Adjustment Act of 1990 . . .
>
> plus three times the amount of damages which the Government
> sustains because of the act of the person.

474.   By virtue of the acts described above, Defendants knowingly made and/or used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for payment or approval of SUBSYS, or treatments involving SUBSYS, to officers, employees or agents of the United States Government.

475.   The United States, unaware of the falsity of the records and/or statements made and used, or caused to be made and used, by Defendants, and in reliance on the accuracy thereof, have paid and approved claims that were ineligible for reimbursement and would not have been paid or approved if any part of the truth were known.

476.   The amounts of the false or fraudulent claims caused by Defendants to be submitted to the United States were material.

477.   As a direct and proximate consequence of Defendants' conspiratorial conduct, the United States has suffered significant, material financial damages in an amount to be proved at trial.

478.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

### COUNT THREE
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

479.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

480.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

481.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of the person.

482.   By virtue of the acts described above, Defendants knowingly concealed and/or knowingly and improperly avoided an obligation to pay or transmit money to the Government for improper reimbursements that the Government provided, directly or indirectly, for the use of SUBSYS in violation of 31 U.S.C. § 3729(a)(1)(G).

483.   As a direct and proximate consequence of Defendants' conduct, the United States has suffered significant, material financial damages in an amount to be proved at trial.

484.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT FOUR
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(C).

485.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

486.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

487.   By virtue of the conduct described above, Defendants conspired with each other to commit a violation of § 3729(a)(1)(A) and/or § 3729(a)(1)(B) of the False Claims Act.

488.   More specifically, Defendants conspired to knowingly present or cause to be presented false or fraudulent claims for payment or approval by government programs, including Medicare and Medicaid. In furtherance of accomplishing this unlawful objective, Defendants took multiple overt actions, as set forth above.

489.   Additionally, Defendants conspired to knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims submitted by Defendants for payment to government programs, including Medicare and Medicaid. In furtherance of accomplishing this unlawful objective, Defendants took multiple overt actions which are detailed above.

490.   The United States, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants paid for claims for SUBSYS prescriptions that otherwise would not have been allowed or paid.

491.   Payment of the false and fraudulent claims was a reasonably foreseeable consequence of the conspiracy by, among, and between Defendants.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

492.   By reason of the foregoing, the United States has been damaged in an amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

493.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

## COUNT FIVE
### Violations of the California False Claims Act
### California Government Code § 12651 *et seq.*

343.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

344.   This is a claim for treble damages and penalties under the California False Claims Act.

345.   Cal. Gov't Code §12651(a) provides liability for the costs of a civil action, a civil penalty of up to $11,000 and treble damages for all damages sustained by the state for any person who

> (1)   Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.

> (2)   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

> (3)   Conspires to commit a violation of this subdivision.

> \*   \*   \*   \*

> (8)   Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

346.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State Government of California for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

347.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of California; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit violations of Cal. Gov't Code § 12651; and (4) failed to disclose a false claim to the State of California after discovering they were beneficiaries of an inadvertent submission of a false claim and subsequently learning of the falsity of that claim.

348.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

349.   Compliance with applicable Medicare, Medi-Cal, and various other Federal and State laws was a condition of payment of claims submitted to the California State Government.

350.   The California State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made, by Defendants, paid claims, directly or indirectly, that would not have been paid but for Defendants' false statements and representations concerning SUBSYS.

351.   By reason of Defendants' acts, the California State Government has been damaged in substantial amounts to be determined at trial.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

352.   The State of California is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

353.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

354.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of California in the operation of its Medi-Cal program.

## COUNT SIX
### Violations of the Colorado Medicaid False Claims Act
### C.R.S.A. § 25.5-4-304 *et seq.*

355.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

356.   This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

357.   Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-305(1), in relevant part, provides for liability for any person who

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> \*   \*   \*   \*
>
> (f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and

THIRD AMENDED COMPLAINT                                        2:16-cv-07937-JLS-ASx

improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

358. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

359. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Colorado; (2) made, used or caused to be made or used false records or statements to get false claims paid, directly or indirectly, by the State of Colorado; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Colorado in connection with the "Colorado Medical Assistance Act," and knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the State of Colorado in connection with the "Colorado Medical Assistance Act;" and (4) conspired to commit a violation of C.R.S.A. § 25.5-4-305(1).

360. Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement. Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

361.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Colorado State Government.

362.   The Colorado State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not have been paid but for Defendants' false statements and representations concerning SUBSYS.

363.   By reason of Defendants' acts, the Colorado State Government has been damaged in substantial amounts to be determined at trial.

364.   The State of Colorado is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

365.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

366.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

**COUNT SEVEN**
**Violations of the Connecticut False Claims Act**
**C.G.S.A. § 2-274 *et seq.***

367.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

368.   This is a claim for treble damages and penalties under the Connecticut False Claims Act, CT Gen Stat § 4-274 *et seq.*

369.   CT Gen Stat § 4-275 of the Connecticut False Claims Act provides in relevant part:

THIRD AMENDED COMPLAINT                            2:16-cv-07937-JLS-ASx

(a) No person shall:

(1) Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(2) Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(3) Conspire to commit a violation of this section;

\*   \*   \*   \*

(7) Knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program; or

(8) Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program.

370.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

371.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, under a state-administered health or human services program (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim under a health or

human services program administered by the State of Connecticut; (3) conspired to commit a violation of CT Gen Stat § 4-275; (4) made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, directly or indirectly, to the state under a health or human services program administered by the State of Connecticut and (5) concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Connecticut under a health or human services program administered by the State of Connecticut.

372.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

373.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Connecticut State Government.

374.   The Connecticut State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

375.   By reason of Defendants' acts, the Connecticut State Government has been damaged in substantial amounts to be determined at trial.

376.   The State of Connecticut is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

377.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

378.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

## COUNT EIGHT
### Violations of the Delaware False Claims and Reporting Act
### 6 DEL. C. § 1201 *et seq.*

379.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

380.   This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

381.   The Delaware False Claims and Reporting Act, 6 Del. Code Ann. § 1201 provides, in relevant part:

(a)  Any person who:

(1)  Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2)  Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)  Conspires to commit a violation of paragraph (a)(1), (2), (4), (5), (6) or (7) of this section;

*   *   *   *

(7)  Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

> shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of damages which the Government sustains because of the act of that person.

382.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

383.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Delaware; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of 6 Del. Code Ann. §1201(a); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Delaware, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Delaware.

384.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

385.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the Delaware State Government.

386.   The Delaware State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

387.   By reason of Defendants' acts, the Delaware State Government has been damaged in substantial amounts to be determined at trial.

388.   The State of Delaware is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

389.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

390.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

## COUNT NINE
### Violations of the Florida False Claims Act
### FL. STAT. ANN. § 68.081 *et seq.*

391.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

392.   This is a claim for treble damages and penalties under the Florida False Claims Act.

393.   The Florida False Claims Act, Fla. Stat § 68.082 provides, in relevant part:

(2)   Any person who:

(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

      (b)   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

      (c)   Conspires to commit a violation of this subsection;

\*    \*    \*    \*

      (g)   Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state

is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person.

394.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval, directly or indirectly, and have knowingly made, used or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

395.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Florida; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Fla. Stat § 68.082(2); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Florida, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Florida.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

396.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

397.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Florida State Government.

398.   The Florida State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

399.   By reason of Defendants' acts, the Florida State Government has been damaged in substantial amounts to be determined at trial.

400.   The State of Florida is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

401.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

402.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                        2:16-cv-07937-JLS-ASx

## COUNT TEN
### Violations of the Georgia State False Medicaid Claims Act
### O.C.G.A. § 49-4-168 *et seq.*

403.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

404.   This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

405.   O.C.G.A. § 49-4-168 of the Georgia State False Medicaid Claims Act, provides, in relevant part:

(a) Any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

\*      \*      \*      \*

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia.

shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

406.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

407.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Georgia; (2) made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money to the State of Georgia.

408.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

409.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Georgia State Government.

410.   The Georgia State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

411.   By reason of Defendants' acts, the Georgia State Government has been damaged in substantial amounts to be determined at trial.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

412.    The State of Georgia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

413.    Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

414.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

## COUNT ELEVEN
### Violations of the Hawaii False Claims Act
### HAW. REV. STAT. § 661-21 *et seq.*

415.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

416.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

417.    The Hawaii False Claims Act, Haw. Rev. Stat § 661-21 *et seq.*, provides, in relevant part:

(a) [A]ny person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

*    *    *    *

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

improperly avoids or decreases an obligation to pay or transmit money or property to the State;

(7) Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim; or

(8) Conspires to commit any of the conduct described in this subsection, shall be liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages that the State sustains due to the act of that person.

418. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

419. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Hawaii; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Hawaii, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Hawaii; (4) failed to disclose, within a reasonable time after discovery, a false claim to the State of Hawaii after discovering they were beneficiaries of an inadvertent submission of a false claim, and subsequently learning of the falsity of that claim; and (5) conspired to commit the conduct described in Haw. Rev. Stat § 661-21(a).

THIRD AMENDED COMPLAINT                                       2:16-cv-07937-JLS-ASx

420.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

421.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Hawaii State Government.

422.   The Hawaii State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

423.   By reason of Defendants' acts, the Hawaii State Government has been damaged in substantial amounts to be determined at trial.

424.   The State of Hawaii is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

425.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

426.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

## COUNT TWELVE
### Violations of the Illinois False Claims Act
### 740 ILL. COMP. STAT. § 175/1 *et seq.*

427.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

428.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

429.   740 Ill. Comp. Stat. §175/3(a) of the Illinois False Claims Act provides in relevant part:

(1)   In general, any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)  conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

\*   \*   \*   \*

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State, is liable to the State for a civil penalty of not less than the minimum amount and not more than the maximum amount allowed for a civil penalty for a violation of the federal False Claims Act (31 U.S.C. 3729 et seq.) as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C.

2461), plus 3 times the amount of damages which the State sustains because of the act of that person. Notwithstanding any other provision, a person is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person, when: (i) the civil action was brought by a private person pursuant to paragraph (1) of subsection (b) of Section 4; (ii) the State did not elect to intervene pursuant to paragraph (2) of subsection (b) of Section 4 . . . .

430.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval, directly or indirectly, and have knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

431.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval, directly or indirectly, to the State of Illinois; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of 740 Ill. Comp. Stat. §175/3(a)(1); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Illinois, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Illinois.

432.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use

submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

433.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Illinois State Government.

434.   The Illinois State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

435.   By reason of Defendants' acts, the Illinois State Government has been damaged in substantial amounts to be determined at trial.

436.   The State of Illinois is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

437.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

438.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

## COUNT THIRTEEN
**Violations of the Indiana False Claims and Whistleblower Protection Act
IND. CODE ANN. § 5-11-5.5 *et seq.***

439.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

440.   This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

441.    The Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5 *et seq*., provides in relevant part:

> (b)  A person who knowingly or intentionally:
>
> > (1)  presents a false claim to the state for payment or approval;
> >
> > (2)  makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
>
> > *     *     *     *
>
> > (6)  makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;
> >
> > (7)  conspires with another person to perform an act described in subdivisions (1) through (6); or
> >
> > (8)  causes or induces another person to perform an act described in subdivisions (1) through (6);
>
> is, except as provided in subsection (c), liable to the state for a civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state.  In addition, a person who violates this section is liable to the state for the costs of a civil action brought to recover a penalty or damages.

442.    By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

443.    Specifically, Defendants knowingly or intentionally: (1) presented a false claim for payment or approval, directly or indirectly, to the State of Indiana; (2) made or

used a false record to obtain payment or approval of a false claim from the State of Indiana; (3) made or used a false record or statement to avoid an obligation to pay or transmit property to the State of Indiana; (4) conspired to perform an act described in IND. CODE ANN. § 5-11-5.5-2(b)(1)- (6); and (5) caused or induced another person to perform an act described in IND. CODE ANN. § 5-11-5.5-2(b)(1)-(6).

444.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

445.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Indiana State Government.

446.   The Indiana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

447.   By reason of Defendants' acts, the Indiana State Government has been damaged in substantial amounts to be determined at trial.

448.   The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

449.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

THIRD AMENDED COMPLAINT                         2:16-cv-07937-JLS-ASx

450.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

### COUNT FOURTEEN
### Violations of the Iowa False Claims Law
### I.C.A. § 685.1 *et seq.*

451.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

452.   This is a claim for treble damages and penalties under the Iowa False Claims Law.

453.   I.C.A. § 685.2 of the Iowa False Claims Law provides in relevant part:

1.   A person who commits any of the following acts is liable to the state for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act . . . plus three times the amount of damages which the state sustains:

*a.* Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

b. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

c. Conspires to commit a violation of paragraph "*a*", "*b*", "*d*", "*e*", "*f*", or "*g*".

\*   \*   \*   \*

g. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

improperly avoids or decreases an obligation to pay or transmit money or property to the state.

454.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

455.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false claim for payment or approval, directly or indirectly, to the State of Iowa; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim the State of Iowa; (3) conspired to commit a violation of I.C.A. § 685.2; and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Iowa, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Iowa.

456.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

457.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Iowa State Government.

458.   The Iowa State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly,

that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

459.   By reason of Defendants' acts, the Iowa State Government has been damaged in substantial amounts to be determined at trial.

460.   The State of Iowa is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

461.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

462.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

## COUNT FIFTEEN
### Violations of the Louisiana Medical Assistance Programs Integrity Law
### LA. REV. STAT. § 46.437.1 *et seq.*

463.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

464.   This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

465.   The Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46-438.3 provides, in relevant part:

> A.   No person shall knowingly present or cause to be presented a false or fraudulent claim.

> B.   No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C.      No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D.      No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E.      (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

466.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

467.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim to the State of Louisiana; (2) engaged in misrepresentation or made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the State of Louisiana; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the medical assistance programs of the State of Louisiana, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the medical assistance programs of the State of Louisiana; (4) conspired to defraud, or attempted to defraud, the medical assistance

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

150

programs of the State of Louisiana through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim; and (5) submitted a claim for goods, services, or supplies which were medically unnecessary.

468.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

469.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Louisiana State Government.

470.   The Louisiana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

471.   By reason of Defendants' acts, the Louisiana State Government has been damaged in substantial amounts to be determined at trial.

472.   The State of Louisiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

473.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

474.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                                          2:16-cv-07937-JLS-ASx

### COUNT SIXTEEN
**Violations of the Massachusetts False Claims Law**
**MASS. GEN. LAWS CH. 12 § 5 *et seq*.**

475.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

476.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

477.   The Massachusetts False Claims Law, Mass. Gen. Laws Ann. chap. 12, §5(B) provides in relevant part:

(a) Any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) conspires to commit a violation of this subsection;

(4) knowingly presents, or causes to be presented, a claim that includes items or services resulting from a violation of section 1128B of the Social Security Act, 42 U.S.C. 1320a-7b, or section 41 of chapter 118E;

\* \* \* \*

(9) knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof; or

(10) is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or (ii) the date any corresponding cost report is due, if applicable,

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation . . . plus 3 times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation.

478.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

479.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false claim for payment or approval, directly or indirectly, to the Commonwealth of Massachusetts; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Mass. Gen. Laws Ann. chap. 12, §5(B); (4) presented, or caused to be presented, a claim that includes items or services resulting from a violation of section 1128B of the Social Security Act, 42

U.S.C. 1320a-7b, or section 41 of chapter 118E; (5) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or to transmit money to the Commonwealth of Massachusetts, or a political subdivision thereof, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Commonwealth of Massachusetts or a political subdivision thereof; and (6) failed to disclose, within the applicable time period, the receipt of overpayments from the Commonwealth of Massachusetts, or a political subdivision thereof, resulting from a false claim after discovering they were beneficiaries of an inadvertent submission of a false claim to the Commonwealth of Massachusetts or a political subdivision thereof, or were the beneficiaries of an overpayment from the Commonwealth of Massachusetts, or a political subdivision thereof.

480.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

481.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Massachusetts State Government.

482.   The Massachusetts State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

483.   By reason of Defendants' acts, the Massachusetts State Government has been damaged in substantial amounts to be determined at trial.

484.    The Commonwealth of Massachusetts is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

485.    Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

486.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

## COUNT SEVENTEEN
### Violations of the Michigan Medicaid False Claims Act
### MICH. COMP. LAWS § 400.601 *et seq*.

487.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

488.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

489.    M.C.L.A. 400.603 provides in relevant part:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit.

(3) A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a medicaid benefit or the initial or continued right of any other person on whose behalf he has

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

applied for or is receiving a benefit, shall not conceal or fail to disclose
that event with intent to obtain a benefit to which the person or any other
person is not entitled or in an amount greater than that to which the
person or any other person is entitled.

M.C.L.A. 400.606 provides in relevant part:

(1) A person shall not enter into an agreement, combination, or
conspiracy to defraud the state by obtaining or aiding another to obtain
the payment or allowance of a false claim under the social welfare act, .
. . being sections 400.1 to 400.121 of the Michigan Compiled Laws.

M.C.L.A. 400.612 provides in relevant part:

(1) A person who receives a benefit that the person is not entitled to
receive by reason of fraud or making a fraudulent statement or
knowingly concealing a material fact, or who engages in any conduct
prohibited by this statute, shall forfeit and pay to the state the full amount
received, and for each claim a civil penalty of not less than $5,000.00 or
more than $10,000.00 plus triple the amount of damages suffered by the
state as a result of the conduct by the person.

490.   By virtue of the acts described above, Defendants knowingly presented, or
caused to be presented, false or fraudulent claims to the Michigan State Government for
payment or approval, directly or indirectly, and have knowingly or intentionally made, used,
or caused to be made or used, false records and statements, and omitted material facts, to
induce the government to approve and pay such false and fraudulent claims.

491.   Specifically, Defendants knowingly: (1) made, or caused to be made, a false
statement or false representation of a material fact in an application for Medicaid benefits;
(2) made, or caused to be made, a false statement or false representation of a material fact
used in determining rights to a Medicaid benefit; (3) concealed or failed to disclose an event,

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

of which they had knowledge, that affected the initial or continued right of another person to receive a benefit to which the person was not entitled, with intent to obtain that benefit; and (4) entered into an agreement, combination, or conspiracy to defraud the State of Michigan by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act of sections 400.1 to 400.121 of the Michigan Compiled Laws.

492.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

493.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the Michigan State Government.

494.   The Michigan State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

495.   By reason of Defendants' acts, the Michigan State Government has been damaged in substantial amounts to be determined at trial.

496.   The State of Michigan is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

497.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

498.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

## COUNT EIGHTEEN
### Violations of the Minnesota False Claims Act
### M.S.A. § 15C.01 *et seq.*

499.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

500.   This is a claim for treble damages and penalties under the Minnesota False Claims Act.

501.   Section 15C.02 of the Minnesota False Claims Act provides in relevant part:

(a) A person who commits any act described in clauses (1) to (7) is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person . . .

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

\*      \*      \*      \*

(7) knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

502.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

503.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim payment or approval to the State of Minnesota; (2) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Section 15C.02(a) of the Minnesota False Claims Act; and (4) made or used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money, directly or indirectly, to the State of Minnesota or a political subdivision thereof, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money, directly or indirectly, to the State of Minnesota or a political subdivision thereof.

504.  Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

505.  Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Minnesota State Government.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

506.   The Minnesota State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

507.   By reason of Defendants' acts, the Minnesota State Government has been damaged in substantial amounts to be determined at trial.

508.   The State of Minnesota is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

509.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

510.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

## COUNT NINETEEN
### Violations of the Montana False Claims Act
### MONT. CODE ANN. § 17-8-401 *et seq.*

511.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

512.   This is a claim for treble damages and penalties under the Montana False Claims Act.

513.   Section 17-8-403 of the Montana False Claims Act provides in relevant part:

(1) Except as provided in subsection (2), a person is liable to a governmental entity for a civil penalty of not less than $5,500 and not more than $11,000 for each act specified in this section, plus three times

THIRD AMENDED COMPLAINT                        2:16-cv-07937-JLS-ASx

the amount of damages that a governmental entity sustains, along with expenses, costs, and attorney fees, if the person:

(a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of this subsection (1);

\*   \*   \*   \*

(g) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

514.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

515.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval to the State of Montana; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Section 17-8-403(1) of the Montana False Claims Act; (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to a governmental entity of Montana or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to a governmental entity of Montana; and (5) failed to disclose a false or fraudulent claim to the State of Montana after discovering they were the beneficiaries of an inadvertent submission of a false claim and subsequently learning of the falsity of that claim.

516.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

517.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Montana State Government.

518.   The Montana State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

519.   By reason of Defendants' acts, the Montana State Government has been damaged in substantial amounts to be determined at trial.

520.   The State of Montana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

521.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

522.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

<u>COUNT TWENTY</u>
**Violations of the Nevada False Claims Act**
**NEV. REV. STAT. ANN. § 357.010 *et seq.***

523.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

524.   This is a claim for treble damages and penalties under the Nevada False Claims Act.

525.   N.R.S. § 357.040(1) provides in relevant part:

1.   [A] person who, with or without specific intent to defraud, does any of the following listed acts is liable to the State or a political subdivision, whichever is affected, for the amounts set forth in subsection 2:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

\*   \*   \*   \*

THIRD AMENDED COMPLAINT                                      2:16-cv-07937-JLS-ASx

(f)  Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g)  Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h)  Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time.

(i)  Conspires to commit any of the acts set forth in this subsection,

526.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

527.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval to the State of Nevada; (2) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made or used, or caused to be made or used, a false record or statement that was material to an obligation to pay or transmit money to the State of Nevada or a political subdivision thereof; (4) concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Nevada or a political subdivision thereof; (5) failed to disclose, within a reasonable time, the falsity of a claim submitted to the State of Nevada, or a political subdivision thereof, after discovering they the beneficiaries of an

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

inadvertent submission of a false claim; and (6) conspired to commit one or more of the acts set forth in N.R.S. § 357.040(1).

528.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

529.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Nevada State Government.

530.   The Nevada State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

531.   By reason of Defendants' acts, the Nevada State Government has been damaged in substantial amounts to be determined at trial.

532.   The State of Nevada is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

533.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

534.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                                2:16-cv-07937-JLS-ASx

## COUNT TWENTY-ONE
### Violations of the New Jersey False Claims Act
### N.J. STAT. § 2A:32C-1 *et seq.*

535.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

536.   This is a claim for treble damages and penalties under the New Jersey False Claims Act.

537.   N.J. STAT. 2A § 32C-3 provides, in relevant part, liability for anyone who:

a.   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

\*   \*   \*   \*

g.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

538.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

539.   Specifically, Defendants knowingly: (1) presented, or caused to be presented to an employee, officer or agent of the State of New Jersey, or to any other recipient of State funds, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Jersey; (3) conspired to defraud the State of New Jersey by getting a false or fraudulent claim allowed or paid, directly or indirectly, by the State of New Jersey; and (4) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey.

540.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

541.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the New Jersey State Government.

542.   The New Jersey State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

543.   By reason of Defendants' acts, the New Jersey State Government has been damaged in substantial amounts to be determined at trial.

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

544.    The State of New Jersey is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

545.    Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

546.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

## COUNT TWENTY-TWO
### Violations of the New Mexico Medicaid False Claims Act
### N.M. STAT. ANN. § 27-14-1 *et seq*.

547.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

548.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

549.    N.M. Stat. Ann § 27-14-4 provides, in relevant part, liability for any person who:

A.    presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent;

B.    presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that the person receiving a medicaid benefit or payment is not authorized or is not eligible for a benefit under the medicaid program;

C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

D.      conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing that such claim is false or fraudulent;

E.     makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false;

F.     knowingly applies for and receives a benefit or payment on behalf of another person, except pursuant to a lawful assignment of benefits, under the medicaid program and converts that benefit or payment to his own personal use[.]

550.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

551.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to the State of New Mexico a claim for payment under the Medicaid program knowing that such claim was false or fraudulent; (2) presented, or caused to be presented, to the State of New Mexico a claim for payment under the Medicaid program knowing that the person receiving the Medicaid benefit or payment was not authorized or was not eligible for the benefit under the Medicaid program; (3) made, used or caused to be made or used a record

or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the State of New Mexico knowing such record or statement was false; (4) conspired to defraud the State of New Mexico by getting a claim allowed or paid under the Medicaid program knowing that such claim was false or fraudulent; 5) made, used, or caused to be made or used, a record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the State of New Mexico, relative to the Medicaid program, knowing that such record or statement was false; and (6) applied for and received a benefit or payment on behalf of another person under the Medicaid program and converted that benefit or payment to their own personal use.

552.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

553.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the New Mexico State Government.

554.   The New Mexico State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

555.   By reason of Defendants' acts, the New Mexico State Government has been damaged in substantial amounts to be determined at trial.

556.   The State of New Mexico is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

557.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

558.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

**COUNT TWENTY-THREE**
**Violations of the New York False Claims Act**
**NY STATE FIN. § 187 *et seq*.**

559.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

560.   This is a claim for treble damages and penalties under the New York False Claims Act.

561.   N.Y. State Finance Law § 189 (1) provides, in relevant part, liability for any person who:

> (a)  knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

> (b)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (c)  conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

*     *     *     *

> (g)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

(h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same;  shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

562.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

563.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim to the State of New York for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of N.Y. State Finance Law § 189 (1); (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of New York or a local government thereof; and (5) concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the State of New York or a local government thereof, or conspired to do the same.

564.  Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use

submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

565.  Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the New York State Government.

566.  The New York State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

567.  By reason of Defendants' acts, the New York State Government has been damaged in substantial amounts to be determined at trial.

568.  The State of New York is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

569.  Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

570.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

## COUNT TWENTY-FOUR
### Violations of the North Carolina False Claims Act
### N.C.G.S.A. § 1-605 *et seq*.

571.  Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

572.  This is a claim for treble damages and penalties under the North Carolina False Claims Act.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

573.    N.C.G.S.A. § 1-607 provides, in relevant part, for liability for any person who:

> (1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
>
> (3)    Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.
>
> *    *    *    *
>
> (7)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

574.    By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

575.    Specifically, Defendants knowingly: (1) presented, or caused to be presented a false or fraudulent claim to the State of North Carolina for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of N.C.G.S.A. § 1-607;  and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of North Carolina, or knowingly concealed, or knowingly

and improperly avoided or decreased, an obligation to pay or transmit money to the State of North Carolina.

576.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

577.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the North Carolina State Government.

578.   The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

579.   By reason of Defendants' acts, the North Carolina State Government has been damaged in substantial amounts to be determined at trial.

580.   The State of North Carolina is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

581.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

582.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

## COUNT TWENTY-FIVE
### Violations of the Oklahoma Medicaid False Claims Act
### 63 Okla. Stat. § 5053 *et seq.*

583.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

584.   This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

585.   The Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 (B), provides, in relevant part, liability for any person who:

1. Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

3. Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

\*   \*   \*   \*

7. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state[.]

586.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

587.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Oklahoma; (3) conspired to defraud the State of Oklahoma by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma.

588.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

589.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Oklahoma State Government.

590.   The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

591.   By reason of Defendants' acts, the Oklahoma State Government has been damaged in substantial amounts to be determined at trial.

592.   The State of Oklahoma is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

THIRD AMENDED COMPLAINT                     2:16-cv-07937-JLS-ASx

593.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

594.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

## COUNT TWENTY-SIX
### Violations of the Rhode Island False Claims Act
### R.I. Gen. Laws  § 9-1.1-1 *et seq.*

595.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

596.   This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

597.   The Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-3, provides in relevant part:

> (a) Any person who:
>
> > (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
> >
> > (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> >
> > (3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2), (3), (4), (5), (6) or (7);
> >
> > *   *   *   *
> >
> > (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly

conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state; is liable to the state for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), plus three (3) times the amount of damages which the state sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the state for the costs of a civil action brought to recover any such penalty or damages.

598. By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

599. Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval by the State of Rhode Island; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of R.I. Gen. Laws § 9-1.1-3(a); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Rhode Island, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Rhode Island.

600. Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement. Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use

submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

601.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Rhode Island State Government.

602.   The Rhode Island State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

603.   By reason of Defendants' acts, the Rhode Island State Government has been damaged in substantial amounts to be determined at trial.

604.   The State of Rhode Island is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

605.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

606.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

## COUNT TWENTY-SEVEN
### Violations of the Tennessee False Claims Act and Tennessee Medicaid False Claims Act
### TENN. CODE. ANN. §§ 4-18-101 *et seq.* and 71-5-181 *et seq.*

607.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

608.   This is a claim for treble damages and penalties under the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act.

609.   Tenn. Code Ann. § 4-18-103 (a) in relevant part, provides liability for any person who:

> (1)  Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

> (2)  Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

> (3)  Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

> *    *    *    *

> (7)  Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

> (8)  Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or

> (9)  Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

610.   Tenn. Code Ann. § 71-5-182(a)(1) in relevant, part provides liability for any person who:

(1)  (A) Presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent;

(B)  Makes, uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

(C)  Conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing such claim is false or fraudulent; or

(D)  Makes, uses, or causes to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing such record or statement is false; Is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

611.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

612.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an officer or employee of the State of Tennessee, or of any political subdivision thereof, a false claim for payment or approval; (2) made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or

approved by the State of Tennessee, or of any political subdivision thereof, knowing such record or statement was false; (3) conspired to defraud the State of Tennessee, or any political subdivision thereof, by getting a false claim allowed or paid by the State of Tennessee, or by any political subdivision thereof; (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Tennessee, or any political subdivision thereof; (5) failed to disclose, within a reasonable time after discovery, a false claim to the State of Tennessee after discovering they were the beneficiaries of an inadvertent submission of a false claim after subsequently learning of the falsity of that claim; and (6) made, used, or caused to be made or used, a false or fraudulent conduct, representation, or practice in order to procure anything of value, directly or indirectly, from the State of Tennessee or any political subdivision thereof.

613.   Defendants also: (1) presented, or caused to be presented, to the State of Tennessee, a claim for payment under the Medicaid program knowing such claim was false or fraudulent; (2) made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the State of Tennessee knowing such record or statement was false; (3) conspired to defraud the State of Tennessee by getting a claim allowed or paid under the Medicaid program knowing such claim was false or fraudulent; and (4) made, used, or caused to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Tennessee, relative to the Medicaid program, knowing such record or statement was false.

614.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use

submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

615.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Tennessee State Government.

616.   The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

617.   By reason of Defendants' acts, the Tennessee State Government has been damaged in substantial amounts to be determined at trial.

618.   The State of Tennessee is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

619.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

620.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

## COUNT TWENTY-EIGHT
### Violations of the Texas Medicaid Fraud Prevention Law
### TEX. HUM. RES. CODE § 36.001 *et seq.*

621.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

622.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

623.    Tex. Hum. Res. Code § 36.002 in relevant part, provides liability for any person who:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

*    *    *    *

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

*    *    *    *

(7) knowingly makes or causes to be made a claim under the Medicaid program for:

*    *    *    *

(B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

(C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

\*   \*   \*   \*   \*

(9)   conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(11)  knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12)  knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)  knowingly engages in conduct that constitutes a violation under Section 32.039(b).

624.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

625.   Specifically, Defendants knowingly: (1) made, or caused to be made, a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that was not authorized, or that was greater than the benefit or payment that was authorized; (2) concealed or failed to disclose information that permitted a person to receive a benefit or payment under the Medicaid program that was not authorized, or that was greater than the benefit or payment that was authorized; (3) applied

for and received a benefit or payment on behalf of another person under the Medicaid program and converted part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received; (4) made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program; (5) made, or caused to be made, a claim under the Medicaid program for a service or product that was substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; (6) made, or caused to be made, a claim under the Medicaid program for a product that has been adulterated, debased, mislabeled, or that was otherwise inappropriate; (7) conspired to commit a violation of Tex. Hum. Res. Code § 36.002; (8) made, used, or caused the making or use of, a false record or statement material to an obligation to pay or transmit money to the State of Texas under the Medicaid program, or knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the State of Texas under the Medicaid program; and (9) engaged in conduct that constituted a violation under Tex. Hum. Res. Code § 32.039(b).

626.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

627.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Texas State Government.

628.   The Texas State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly,

that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

629.   By reason of Defendants' acts, the Texas State Government has been damaged in substantial amounts to be determined at trial.

630.   The State of Texas is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

631.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

632.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT TWENTY-NINE
### Violations of the Vermont False Claims Act
### 32 V.S.A. § 630 *et seq*.

633.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

634.   This is a claim for treble damages and penalties under the Vermont False Claims Act.

635.   32 V.S.A. § 631(a) in relevant part, provides that no person shall:

(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

(3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of . . . section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

\*      \*      \*      \*

(9) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

(10) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

(11) as a beneficiary of an inadvertent submission of a false claim to the State, or as a beneficiary of an overpayment from the State, and who subsequently discovers the falsity of the claim or the receipt of overpayment, fail to disclose the false claim or receipt of overpayment to the State by the later of:

(A) a date which is 120 days after the date on which the false     claim or receipt of overpayment was identified; or

(B) the date any corresponding cost report is due, if applicable;  or

(12) conspire to commit a violation of this subsection.

636.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

637.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) presented, or caused to be presented, a claim that included items or services resulting from

a violation of section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b; (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Vermont; (5) concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money the State of Vermont; (6) failed to disclose, within the time specified in 32 V.S.A. § 631(a)(11), a false claim to the State of Vermont, or receipt of overpayment by the State of Vermont, after discovering they were the beneficiaries of an inadvertent submission of a false claim to the State of Vermont, or as the beneficiaries of an overpayment from State of Vermont, and subsequently discovering the falsity of the claim or the receipt of overpayment; and (7) conspired to commit a violation of 32 V.S.A. § 631(a).

638.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

639.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Vermont State Government.

640.   The Vermont State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

641.   By reason of Defendants' acts, the Vermont State Government has been damaged in substantial amounts to be determined at trial.

642.   The State of Vermont is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

643.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

644.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

**COUNT THIRTY**
**Violations of the Virginia Fraud Against Taxpayers Act**
**VA CODE ANN. § 8.01-216.1 *et seq*.**

645.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

646.   This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

647.   VA Code Ann. § 8.01-216.3(A) in relevant part, provides liability for any person who:

1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3. Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;

*   *   *   *

7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

THIRD AMENDED COMPLAINT                                        2:16-cv-07937-JLS-ASx

191

Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

shall be liable to the Commonwealth for a civil penalty of not less than $10,957 and not more than $21,916, except that these lower and upper limits on liability shall automatically be adjusted to equal the amounts allowed under the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended . . . plus three times the amount of damages sustained by the Commonwealth.

648.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

649.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of VA Code Ann. § 8.01-216.3(A); and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Commonwealth of Virginia or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money the Commonwealth of Virginia.

650.  Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

192

651.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Virginia State Government.

652.   The Virginia State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

653.   By reason of Defendants' acts, the Virginia State Government has been damaged in substantial amounts to be determined at trial.

654.   The Commonwealth of Virginia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

655.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

656.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

## COUNT THIRTY-ONE
### Violations of the Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code § 74.66.005 *et seq.*

657.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

658.   This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et. seq.*

THIRD AMENDED COMPLAINT                          2:16-cv-07937-JLS-ASx

659.   The Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.020, provides, in relevant part, that any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) Conspires to commit one or more of the violations in this subsection (1);

\*     \*     \*     \*

(g) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

660.   By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

661.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false statement or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspired to commit a violation of Wash. Rev. Code § 74.66.020; and (4) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the State of Washington, or a political subdivision thereof, or knowingly

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

194

concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money the State of Washington or a political subdivision thereof.

662.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the state-funded health insurance program represents a false or fraudulent claim for payment.

663.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Washington State Government.

664.   The Washington State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

665.   By reason of Defendants' acts, the Washington State Government has been damaged in substantial amounts to be determined at trial.

666.   The State of Washington is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

667.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

668.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT                              2:16-cv-07937-JLS-ASx

## COUNT THIRTY-TWO
### Violations of the City of Chicago False Claims Act
### Chicago Municipal Code 1-22-010 *et seq.*

669.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

670.    This is a claim for treble damages and penalties under the Chicago False Claims Act.

671.    The Chicago False Claims Act, Chicago Municipal Code 1-22-020 provides, in relevant part, liability for any person who:

> 1. knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;
>
> 2. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city;
>
> 3. conspires to defraud the city by getting a false or fraudulent claim allowed or paid;

*    *    *    *

7. knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city[.]

672.    By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Government of the City of Chicago for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and

THIRD AMENDED COMPLAINT                                 2:16-cv-07937-JLS-ASx

omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

673.   Specifically, Defendants knowingly: (1) presented, or caused to be presented, to an official or employee of the City of Chicago, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City of Chicago; (3) conspired to defraud the City of Chicago by getting a false or fraudulent claim allowed or paid; and (4) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the City of Chicago.

674.   Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement.  Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the government-funded health insurance program represents a false or fraudulent claim for payment.

675.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Government of the City of Chicago.

676.   The Government of the City of Chicago, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

677.   By reason of Defendants' acts, the Government of the City of Chicago has been damaged in substantial amounts to be determined at trial.

678.   The Government of the City of Chicago is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

679.   Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

680.   This Court is requested to accept supplemental jurisdiction of this related municipal claim pursuant to 28 U.S.C. § 1367(a), as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Government of the City of Chicago in the operation of its government health care programs.

### COUNT THIRTY-THREE
**Violations of the District of Columbia Procurement Reform Amendment Act**
**D.C. Code § 2-381-01 *et seq*.**

681.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

682.   This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

683.   The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-381.02, provides in relevant part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and shall be liable to the District for a civil penalty of not less than $5,500, and not more than $11,000, for each false or fraudulent claim for which the person:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

---

THIRD AMENDED COMPLAINT                           2:16-cv-07937-JLS-ASx

* * * *

(6) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(7) Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8) Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District; or

(9) Is the beneficiary of an inadvertent payment or overpayment by the District of monies not due and knowingly fails to repay the inadvertent payment or overpayment to the District.

684.  By virtue of the acts described above, Defendants knowingly or intentionally presented, or caused to be presented, false or fraudulent claims to the Government of the District of Columbia for payment or approval, directly or indirectly, and have knowingly or intentionally made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

685.  Specifically, Defendants knowingly: (1) presented, or caused to be presented, a false or fraudulent claim for payment or approval; (2) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; (3) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the District of Columbia, or knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money to the District of

Columbia; (4) conspired to commit a violation of D.C. Code § 2-381.02(a); (5) failed to disclose, after learning they were the beneficiaries of an inadvertent submission of a false or fraudulent claim, a false or fraudulent claim to the District of Columbia after subsequently discovering the falsity of the claim; and (6) failed to repay an inadvertent payment from District of Columbia, or overpayment to the District of Columbia, after learning they were the beneficiaries of the inadvertent payment or overpayment of monies not due.

686. Each claim presented or caused to be presented for reimbursement, directly or indirectly, for SUBSYS, represents a false or fraudulent record or statement. Each claim for reimbursement, directly or indirectly, for SUBSYS for a non-medically accepted use submitted to the government-funded health insurance program represents a false or fraudulent claim for payment.

687. Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Government of the District of Columbia.

688. The Government of the District of Columbia, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid claims, directly or indirectly, that would not be paid but for Defendants' false statements and representations concerning SUBSYS.

689. By reason of Defendants' acts, the Government of the District of Columbia has been damaged in substantial amounts to be determined at trial.

690. The Government of the District of Columbia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used or presented by Defendants.

691. Relator believes and avers that she is an "original source" of the facts and information on which this action is based.

692.   This Court is requested to accept supplemental jurisdiction of this related municipal claim pursuant to 28 U.S.C. § 1367(a), as it is predicated upon the exact same nexus of facts as the federal claim, and merely asserts separate damage to the Government of the District of Columbia in the operation of its government health care programs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment against the Defendants as follows:

693.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of 31 U.S.C. § 3729 *et seq.*;

694.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the California False Claims Act, § 12650 *et seq.*;

695.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*;

696.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Connecticut False Claims Act, C.G.S.A. § 2-274 *et seq.*;

697.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*;

698.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Florida False Claims Act, Fl. Stat. Ann. § 68.081 *et seq*.;

699.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et. seq*.;

700.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained as a result of Defendants' actions plus a maximum civil penalty for each violation of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.;

701.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq*.;

702.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Indiana False Claims and Whistleblower Protection Act, Ind. Code. Ann. § 5-11-5.5 *et seq*.;

703.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Iowa False Claims Act, I.C.A. § 685.1 *et seq*.;

704.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained as a result of Defendants'

actions, plus a maximum civil penalty for each violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq*.;

705.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Massachusetts False Claims Law, Mass. Gen. L. Ch. 12 § 5 *et seq*.;

706.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq*., as amended 2008 PA 421;

707.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Minnesota False Claims Act, M.S.A. § 15C.01, *et seq*.;

708.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq*.;

709.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*.;

710.    That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq*.;

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

711.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.;

712.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the New York False Claims Act, NY STATE FIN. § 187 *et seq*.;

713.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the North Carolina False Claims Act, N.C.G.S.A. § 1-605 *et seq*.;

714.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Oklahoma Medicaid False Claims Act, 63 Okla. Stat.  § 5053 *et. seq.*;

715.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of Rhode Island's State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et. seq.*;

716.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann § 71-5-181 *et seq*.;

717.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.;

718.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Vermont False Claims Act, 32 V.S.A. § 630 *et seq*.;

719.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.;

720.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq*.;

721.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the City of Chicago has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the Chicago False Claims Act, Chicago Municipal Code 1-22-010 *et seq*.;

722.   That this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained as a result of Defendants' actions, plus a maximum civil penalty for each violation of the District of Columbia False Claims Act, D.C. Code Ann. § 2-381-01 *et seq*.;

THIRD AMENDED COMPLAINT                                    2:16-cv-07937-JLS-ASx

723.   That the Plaintiffs be awarded the maximum amount allowable pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and the equivalent provisions of the State, City and District statutes and/or codes set forth above;

724.   That the Plaintiffs be awarded all costs of this action, including reasonable attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d) and the equivalent State, City and District statutes and/or codes set forth above; and

725.   That the United States, the States, Chicago, D.C. and the Plaintiffs be granted such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial.

Respectfully submitted,

**MILLER SHAH LLP**


/s/ *Kolin C. Tang*
KOLIN C. TANG (SBN 279834)
kctang@millershah.com
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Telephone: 323-510-4060
Facsimile: 866-300-7367

**KANG HAGGERTY & FETBROYT LLC**
Edward T. Kang
Kandis L. Kovalsky
Susan Moon O
Kyle Garabedian
ekang@kanghaggerty.com
kkovalsky@kanghaggerty.com
so@kanghaggerty.com
kgarabedian@kanghaggerty.com

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx

123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
Telephone: 215-525-5850
Facsimile: 215-525-5860

**McELDREW YOUNG, Attorneys-at-Law**
ERIC L. YOUNG, Esquire
eyoung@mceldrewyoung.com
BRANDON J. LAURIA, Esquire
blauria@mceldrewyoung.com
PAUL V. SHEHADI, Esquire
paul@mceldrewyoung.com
123 S. Broad Street, Suite 2250
Philadelphia, PA 19109
Telephone: 215-367-5151
Facsimile: 215-367-5143

**RICHARD J. HOLLAWELL & ASSOCIATES**
RICHARD J. HOLLAWELL, Esquire
rhollawell@consoleandhollawell.com
121 Saratoga Lane
Woolwich Twp., NJ 08085
Telephone: 215-498-8609
Facsimile: 856-467-5101
*Attorneys for Relator-Plaintiff Melina Ebu-Isaac*

THIRD AMENDED COMPLAINT                    2:16-cv-07937-JLS-ASx